# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CONSERVATION LAW FOUNDATION, et al.,

     Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

     Defendants.

Case No. 20-cv-10820-DPW

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      Statutory and Regulatory Background ..................................................................... 2

        A.      The Clean Water Act and "waters of the United States" ............................ 2

        B.      Section 7 of the Endangered Species Act ................................................... 6

II.     Factual Background .................................................................................................. 7

        A.      The 2015 Clean Water Rule ........................................................................ 7

        B.      The Navigable Waters Rule ........................................................................ 9

STANDARD OF REVIEW .............................................................................................. 11

ARGUMENT .................................................................................................................... 12

I.      The Navigable Waters Rule is arbitrary and capricious .................................... 12

        A.      The Agencies fail to provide a reasoned explanation for their decision ...... 12

                1.      The Agencies fail to provide a reasoned explanation for their
                        decision to eliminate Clean Water Act protections for
                        ephemeral streams ........................................................................... 13

                2.      The Agencies fail to provide a reasoned explanation for their
                        decision to eliminate Clean Water Act protections for wetlands
                        that lack "regular" surface-water connections to other protected
                        waters ............................................................................................. 19

        B.      The Agencies ignored the most important factor relevant to the
                rulemaking by failing to consider water quality impacts ......................... 23

II.     The Rule violates the Clean Water Act because it is inconsistent with the
        statute's text, structure, and purpose .................................................................... 25

        A.      The Rule, like the *Rapanos* plurality opinion on which it is
                modeled, is an unreasonable, unlawfully narrow interpretation
                of the Clean Water Act ............................................................................. 26

        B.      Section 101(b) fails to support the Agencies' unlawful interpretation ........ 29

III.    The Agencies violated the Endangered Species Act ............................................. 30

        A.      The Rule is a discretionary action subject to the requirements of
                section 7 ..................................................................................................... 31

B.     The Agencies were required to engage in consultation because the Rule at a minimum "may affect" ESA-listed species and critical habitat..............................................................................................33

IV.     Plaintiffs have standing to challenge the Rule .................................................................36

A.     Plaintiffs have suffered an injury-in-fact .............................................................36

B.     Plaintiffs satisfy the causation and redressability elements of standing ..................................................................................................................44

V.     The Court should vacate the Rule and order the Agencies to comply with the ESA ..............................................................................................................................45

CONCLUSION ..............................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alasaad v. Nielsen,*
No. 17-cv-11730, 2018 WL 2170323
(D. Mass. May 9, 2018) ....................................................................................36

*Allina Health Servs. v. Sebelius,*
746 F.3d 1102 (D.C. Cir. 2014) .......................................................................45

*Am. Fuel & Petrochem. Mfrs. v. EPA,*
937 F.3d 559 (D.C. Cir. 2019) .........................................................................35

*Am. Petroleum Inst. v. EPA,*
540 F.2d 1023 (10th Cir. 1976) .......................................................................28

*Asarco, Inc. v. EPA,*
616 F.2d 1153 (9th Cir. 1980) .........................................................................25

*Assoc'd Fisheries of Me., Inc. v. Daley,*
127 F.3d 104 (1st Cir. 1997) ......................................................................12, 13

*Boston Redevelopment Auth. v. Nat'l Park Serv.,*
838 F.3d 42 (1st Cir. 2016) ...............................................................................12

*Cal. ex rel. Lockyer v. Dep't of Agric.,*
575 F.3d 999 (9th Cir. 2009) ................................................................. 6, 35-36

*California v. Wheeler,*
20-cv-03005, 2020 WL 3403072
(N.D. Cal. June 19, 2020) ...................................................................................9

*City of Arcadia v. EPA,*
411 F.3d 1103 (9th Cir. 2005) .........................................................................30

*City of Kansas City v. Dep't of Hous. & Urban Dev.,*
923 F.2d 188 (D.C. Cir. 1991) .........................................................................14

*City of Milwaukee v. Illinois & Michigan,*
451 U.S. 304 (1981) .............................................................................................3

*CLF v. Jackson,*
964 F. Supp. 2d 152 (D. Mass. 2013) ..............................................................39

*Colorado v. EPA*,
    445 F. Supp. 3d 1295 (D. Colo. 2020)........................................................................9, 26

*Defs. of Wildlife v. EPA*,
    420 F.3d 946 (9th Cir. 2005),
    *rev'd on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)..........................................................................................................45

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020)......................................................................................................32

*D&F Afonso Realty Trust v. Garvey*,
    216 F.3d 1191 (D.C. Cir. 2000) .......................................................................................19

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987) .........................................................................................18

*Georgia v. Wheeler*,
    418 F. Supp. 3d 1336 (S.D. Ga. 2019)...............................................................................8

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) .......................................................................................25

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020) ...........................................................................................25

*Guertin v. United States*,
    743 F.3d 382 (2d Cir. 2014).......................................................................................14, 45

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)....................................................................................................17, 22

*Fla. Key Deer v. Paulison*,
    522 F.3d 1133 (11th Cir. 2008) .......................................................................................35

*Forest Guardians v. Johanns*,
    450 F.3d 455 (9th Cir. 2006) .............................................................................................6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................................................39

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
 92 F.3d 1248 (D.C. Cir. 1996) ....................................................................................18

*Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*,
 802 F.3d 99 (1st Cir. 2015) ........................................................................................12

*Int'l Paper Co. v. Ouellette*,
 479 U.S. 481 (1987) ....................................................................................................30

*Karuk Tribe of Cal. v. Forest Serv.*,
 681 F.3d 1006 (9th Cir. 2012) (en banc) ................................................................32, 33

*Me. People's All. v. Mallinckrodt, Inc.*,
 471 F.3d 277 (1st Cir. 2006) .......................................................................................36

*Michigan v. EPA*,
 576 U.S. 743 (2015) ....................................................................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
 463 U.S. 29 (1983) ...................................................................................12, 16, 19, 25

*Mozilla Corp. v. FCC*,
 940 F.3d 1 (D.C. Cir. 2019) .................................................................................. 25-26

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
 551 U.S. 644 (2007) ....................................................................................................31

*Nat'l Cotton Council of Am. v. EPA*,
 553 F.3d 927 (6th Cir. 2009) .......................................................................................28

*Nat'l Parks Conserv. Ass'n v. EPA*,
 788 F.3d 1134 (9th Cir. 2015) .................................................................................18, 22

*Nat'l Parks Conserv. Ass'n v. Jewell*,
 62 F. Supp. 3d 7 (D.D.C. 2014) .....................................................................................6

*Nat'l Wildlife Fed'n v. FEMA*,
 345 F. Supp. 2d 1151 (W.D. Wash. 2004) ...............................................................32, 35

*Nat'l Wildlife Fed'n v. NMFS*,
 524 F.3d 917 (9th Cir. 2008) .................................................................................. 31-32

*N. Cal. River Watch v. City of Healdsburg,*
  496 F.3d 993 (9th Cir. 2007) ............................................................5

*NRDC v. EPA,*
  824 F.2d 1258 (1st Cir. 1987) ...........................................................26

*Nulankeyutmonen Nkihtaqmikon v. Impson,*
  503 F.3d 18 (1st Cir. 2007) ........................................................ 44-45

*Organized Vill. of Kake v. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) (en banc) ...........................................17

*Pac. Rivers Council v. Robertson,*
  854 F. Supp. 713 (D. Or. 1993),
  *rev'd in part on other grounds sub. nom. Pac. Rivers Council v. Thomas,*
  30 F.3d 1050 (9th Cir. 1994) ...........................................................35

*Pac. Rivers Council v. Thomas,*
  30 F.3d 1050 (9th Cir. 1994) .............................................................6

*Penobscot Air Servs., Ltd. v. FAA,*
  164 F.3d 713 (1st Cir. 1999) .......................................................12, 26

*Puget Soundkeeper All. v. Wheeler,*
  No. 15-cv-1342, 2018 WL 6169196
  (W.D. Wash. Nov. 26, 2018) .............................................................9

*Rapanos v. United States,*
  547 U.S. 715 (2006) .....................................2, 4, 5, 13, 15, 16-17, 26-28

*R.F.M. v. Nielsen,*
  365 F. Supp. 3d 350 (S.D.N.Y. 2019) ...............................................19

*S.C. Coastal Conserv. League v. Pruitt,*
  318 F. Supp. 3d 959 (D.S.C. 2018) ....................................................9

*Sierra Club v. EPA,*
  972 F.3d 290 (3d Cir. 2020) .............................................................19

*Sierra Club v. Glickman*,
  156 F.3d 606 (5th Cir. 1998) ........................................................44

*Sierra Club v. Jewell*,
  764 F.3d 1 (D.C. Cir. 2014) ..........................................................44

*Sierra Club v. Salazar*,
  177 F. Supp. 3d 512 (D.D.C. 2016) ...............................................14

*Sistema Univ. Ana G. Mendez v. Riley*,
  234 F.3d 772 (1st Cir. 2000) .........................................................12

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001)........................................................................4

*Strahan v. Coxe*,
  939 F. Supp. 963 (D. Mass. 1996),
  *aff'd in part and vacated in part on other grounds*,
  127 F.3d 155 (1st Cir. 1997)..........................................................44

*Strahan v. Roughead*,
  No. 08-cv-10919, 2010 WL 4827880
  (D. Mass. Nov. 22, 2010)......................................................... 11-12

*Succar v. Ashcroft*,
  394 F.3d 8 (1st Cir. 2005)..............................................................29

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).......................................................................36

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978).........................................................................6

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .............................................8

*Torréns v. Lockheed Martin Servs. Grp., Inc.*,
  396 F.3d 468 (1st Cir. 2005)..........................................................38

*Transactive Corp. v. United States*,
  91 F.3d 232 (D.C. Cir. 1996) .........................................................18

*United States v. Bailey*,
    571 F.3d 791 (8th Cir. 2009) ............................................................5

*United States v. Donovan*,
    661 F.3d 174 (3d Cir. 2011)............................................................5

*United States v. Gerke Excavating, Inc.*,
    464 F.3d 723 (7th Cir. 2006) ...........................................................5

*United States v. Johnson*,
    467 F.3d 56 (1st Cir. 2006)........................................................5, 26

*United States v. Marathon Dev. Corp.*,
    867 F.2d 96 (1st Cir. 1989)..............................................................30

*United States v. Rivera Torres*,
    826 F.2d 151 (1st Cir. 1987)..............................................................1

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985)........................................3, 4, 23, 28-29, 32-33

*United States v. Robison*,
    505 F.3d 1208 (11th Cir. 2007) ........................................................5

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .....................................................17

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................29

*Wash. Toxics Coal. v. Dep't of Interior*,
    457 F. Supp. 2d 1158 (W.D. Wash. 2006).....................................31

*Wash. Toxics Coal. v. EPA*,
    413 F.3d 1024 (9th Cir. 2005)
    *abrogated on other grounds by Cottonwood Envtl. Law Ctr. v. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ...................................................31, 33

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) .................................................16

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ..........................................................34

## STATUTES

5 U.S.C. § 706(2) ........................................................................11, 26, 30, 45

16 U.S.C. § 1536(a) .......................................................................... 6, 30-31

16 U.S.C. § 1540(g) ...............................................................................45

33 U.S.C. § 1251(a) ............................................................. 1, 2-3, 23, 32

33 U.S.C. § 1251(b) ..........................................................................18, 30

33 U.S.C. § 1311(a) .................................................................................3

33 U.S.C. § 1318(a) .................................................................................3

33 U.S.C. § 1321 ....................................................................................40

33 U.S.C. § 1321(b) .................................................................................3

33 U.S.C. § 1342 .....................................................................................3

33 U.S.C. § 1342(b) ...............................................................................30

33 U.S.C. § 1344 .....................................................................................3

33 U.S.C. § 1344(g) ...............................................................................30

33 U.S.C. § 1345(a) .................................................................................3

33 U.S.C. § 1362(7) .................................................................................3

33 U.S.C. § 1370 ....................................................................................30

## REGULATIONS

33 C.F.R. § 328.3(a) (1987) .....................................................................4

33 C.F.R. § 328.3(a) ..............................................................................10

33 C.F.R. § 328.3(b) ..............................................................................10

33 C.F.R. § 328.3(c) (2015) .....................................................................8

33 C.F.R. § 328.3(c) ..............................................................................10

40 C.F.R. § 230.10(a) ...............................................................................3

40 C.F.R. § 230.10(d) ............................................................................................................3

40 C.F.R. § 232.2(q) (1988) ...................................................................................................4

50 C.F.R. § 402.01(b) .............................................................................................................6

50 C.F.R. § 402.02 .............................................................................................................6, 35

50 C.F.R. § 402.03 .............................................................................................................6, 30

50 C.F.R. § 402.14(a)..........................................................................................................6, 30

50 C.F.R. § 402.14(b) ....................................................................................................... 6-7

66 Fed. Reg. 11,202 (Feb. 22, 2001) .....................................................................................33

80 Fed. Reg. 37,054 (June 29, 2015) ....................................................... 7, 8, 16, 21-22

84 Fed. Reg. 56,626 (Oct. 22, 2019).......................................................................................9

85 Fed. Reg. 22,250 (Apr. 21, 2020) ...............................9, 10, 13, 14-15, 17-25, 27-29, 31, 32, 37

## OTHER AUTHORITIES

Exec. Order No. 13,778 §§ 2(a), 3 (Feb. 28, 2017) ...................................................... 8-9

Fed. R. Evid. 201(b)(2)...........................................................................................................38

H.R. Rep. No. 92-911 (1972)....................................................................................................3

S. Rep. No. 92-414 (1971) ............................................................................................. 3, 29-30

## INTRODUCTION

The Clean Water Act protects all "navigable waters," which the statute defines as the "waters of the United States." Although Congress did not define the phrase "waters of the United States," it made clear that the term should "be given 'the broadest constitutional interpretation.'" *United States v. Rivera Torres*, 826 F.2d 151, 154 (1st Cir. 1987) (quoting the Act's legislative history). Indeed, broad federal authority to control water pollution is necessary to achieve the statute's objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

In April 2020, the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (together, the Agencies) issued a regulation called the "Navigable Waters Protection Rule" (the Navigable Waters Rule). The Navigable Waters Rule unlawfully narrows the definition of "waters of the United States" under the Clean Water Act, eliminating federal protections for all rain-dependent (i.e., ephemeral) streams and all wetlands lacking specific types of surface-water connections to other waters. These excluded waters make up least 18 percent of the country's stream miles and about half of the country's wetlands. The Agencies' decision to eliminate protections for these waters was based on an executive order from President Trump—not their judgment that safeguarding these waters is unnecessary for maintaining and improving water quality. In fact, the scientific evidence clearly shows that waters that have lost Clean Water Act protections under the Rule are critically important to the health of the aquatic ecosystems the statute was enacted to protect.

The Administrative Procedure Act (APA) required the Agencies to provide a reasoned explanation for refusing to protect streams and wetlands that significantly affect the integrity of traditional navigable waters. The Agencies failed to provide that reasoned explanation, rendering

the Rule arbitrary and capricious. The Agencies ignore and misrepresent the scientific evidence; disregard, without explanation, their prior factual findings; and provide inconsistent and conclusory assertions instead of reasoned analysis. The Agencies also failed to consider the single most important issue at stake—impacts on the nation's water quality.

These defects in the Agencies' decisionmaking process are enough to render the Rule unlawful. But the Rule also violates the Clean Water Act because it adopts an interpretation of the statute that is inconsistent with its text, structure, and purpose. As ordered by President Trump, the Rule is modeled after a four-Justice plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006). However, the five concurring and dissenting Justices in *Rapanos* rejected the plurality's interpretation of the Act as "arbitrary," "revisionist," and "inconsistent" with the statute's purpose to protect water quality. For the same reasons, the Navigable Waters Rule is an unreasonable and unlawful interpretation of the Act.

The Agencies also violated section 7 of the Endangered Species Act (ESA). They failed to assess the Rule's effects on endangered and threatened species and failed to consult with the U.S. Fish & Wildlife Service and the National Marine Fisheries Service regarding those effects, thereby putting hundreds of ESA-listed species at risk.

Because the Agencies engaged in arbitrary and capricious decisionmaking under the APA, adopted an interpretation of "waters of the United States" that violates the Clean Water Act, and failed to comply with the ESA, the Rule must be vacated.

## **BACKGROUND**

### I.   **Statutory and Regulatory Background**

#### A.   **The Clean Water Act and "waters of the United States"**

Congress enacted the Clean Water Act in 1972 with a single objective: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

§ 1251(a). The statute's objective reflects a "broad, systemic view" of maintaining and improving water quality, with the key word "integrity" referring "'to a condition in which the natural structure and function of ecosystems [are] maintained.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R. Rep. No. 92-911, at 76 (1972)).

Before Congress passed the Act, states were primarily responsible for addressing water pollution problems, with the federal government playing a limited role. S. Rep. No. 92-414, at 3669 (1971). However, by the 1970s, Congress recognized that this state-led scheme had been "inadequate in every vital aspect," leaving many waters "severely polluted." *Id.* at 3674. To address this water quality crisis, Congress replaced the ineffective patchwork of state laws with the Clean Water Act—"an all-encompassing program of water pollution regulation." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 318 (1981).

The Clean Water Act regulates the pollution of "navigable waters," which the statute defines broadly as "waters of the United States." 33 U.S.C. § 1362(7). Under the Act, it is unlawful to discharge pollutants into "waters of the United States" without authorization, which in most cases means a state or federal permit. *See id.* § 1311(a). Permits under section 402 of the Act limit pollutants discharged into "waters of the United States," while also imposing monitoring and other requirements. *See id.* §§ 1342, 1318(a)(A). Permits under section 404 regulate the disposal of dredged or fill material into "waters of the United States." *See id.* § 1344. Section 404 permit applicants must show that they have taken steps to minimize potential impacts to federally protected waters, and a permit will not issue if a practicable alternative exists that would have less adverse impact. 40 C.F.R. § 230.10(a), (d). The Act also protects "waters of the United States" in other ways. *See, e.g.*, 33 U.S.C. §§ 1321(b)(1), 1345(a).

Although the Clean Water Act's protections apply to "waters of the United States," the statute does not include a definition of this phrase. Instead, EPA and the Army Corps have issued regulations defining the phrase. In the 1980s, the Agencies issued regulations—which remained substantially unchanged until 2015—that broadly defined "waters of the United States" as all waters within Congress's commerce power: navigable waters, tributaries of navigable waters, wetlands adjacent to both of those waters, and all other waters affecting interstate commerce. 33 C.F.R. § 328.3(a) (1987); 40 C.F.R. § 232.2(q) (1988) (the 1980s Regulations).

The U.S. Supreme Court, in its first case assessing "waters of the United States," also interpreted the phrase broadly. In *Riverside Bayview Homes*, the Court held that the Army Corps reasonably interpreted "waters of the United States" to include "adjacent" wetlands, which the agency had defined as wetlands next to or reasonably close to an otherwise protected water. 474 U.S. at 133-35. The Court explained that the Army Corps reasonably used its "ecological judgment" that these wetlands are "inseparably bound up with" traditional navigable waters, because of their key role in protecting and enhancing water quality. *Id.* at 133-34. In a subsequent case, *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, the Supreme Court clarified that adjacent wetlands were protected under the Act because of their "significant nexus" to traditional navigable waters. 531 U.S. 159, 167 (2001).

The Supreme Court's most recent decision interpreting "waters of the United States," *Rapanos v. United States*, resulted in a 4-1-4 decision with no majority opinion. However, consistent with the Court's decisions in *Riverside Bayview Homes* and *SWANCC*, five Justices agreed that the statute, at a minimum, extends to all waters that have a "significant nexus" to traditional navigable waters. *Rapanos*, 547 U.S. at 780, 787 (Kennedy, J., concurring in the judgment); *id.* at 810 (Stevens, J., dissenting). According to Justice Kennedy, who issued a

concurring opinion, a water has the requisite "significant nexus"—and is therefore a "water of the United States"—if it "either alone or in combination with" other similarly situated waters "significantly affect[s] the chemical, physical, and biological integrity" of a traditional navigable water. *Id.* at 779-80. The dissenting Justices agreed that the statute protects *at least* waters that are shown to have a "significant nexus" to traditional navigable waters. *Id.* at 808-10 & n.14.

The four-Justice plurality, in an opinion authored by Justice Scalia, adopted a much more cramped interpretation. The plurality asserted that the Clean Water Act extends only to "relatively permanent, standing or continuously flowing bodies of water" and "wetlands with a continuous surface connection" to those waters. *Id.* at 739, 742. Justice Kennedy and the four dissenting Justices rejected the plurality's reading of the Clean Water Act as untethered from its text, structure, and purpose, and unsupported by the Court's precedent. *See id.* at 767-87 (Kennedy, J., concurring in the judgment); *id.* at 800-07 (Stevens, J., dissenting).

Since *Rapanos*, circuit courts have uniformly held that the Act protects waters if they satisfy the "significant nexus" standard, as articulated by Justice Kennedy.[1] The First, Third, and Eighth Circuits have held that the statute also protects waters that satisfy the *Rapanos* plurality's test. Thus, the First Circuit has held that waters are federally protected if they have a significant nexus to navigable waters *or* if they are "relatively permanent" streams or wetlands with a "continuous" surface-water connection to protected waters. *See Johnson*, 467 F.3d at 66. No court has found that the statute's protections are limited only to waters that satisfy the plurality's test.

---

[1] *United States v. Donovan*, 661 F.3d 174, 182-83 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006) (per curiam); *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006).

B.        **Section 7 of the Endangered Species Act**

Congress enacted the ESA in 1973 "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). To that end, the ESA sets forth a comprehensive program to protect threatened and endangered species. The "heart" of this program is section 7 of the Act, *Cal. ex rel. Lockyer v. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009), which applies to "all actions in which there is discretionary Federal involvement or control," 50 C.F.R. § 402.03. Section 7 requires each federal agency to ensure, in consultation with the U.S. Fish & Wildlife Service and/or the National Marine Fisheries Service, that any discretionary action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).[2] In accordance with the protective purposes of section 7, the ESA regulations broadly define agency "action" as "all activities or programs of any kind," including the "promulgation of regulations" and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02; *see Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994).

Under section 7, a federal agency must determine "at the earliest possible time" whether its proposed action "may affect" ESA-listed species or critical habitat. 50 C.F.R. § 402.14(a). If there "may" be an effect, consultation is required. *Id.* An agency can avoid consultation only if its proposed action will have "no effect" on any listed species, *Nat'l Parks Conserv. Ass'n v. Jewell*, 62 F. Supp. 3d 7, 12 (D.D.C. 2014), or if it determines with the written concurrence of

---

[2] The U.S. Fish & Wildlife Service has jurisdiction over freshwater and terrestrial species and the National Marine Fisheries Service has jurisdiction over anadromous and marine species. *Forest Guardians v. Johanns*, 450 F.3d 455, 457 n.1 (9th Cir. 2006) (citing 50 C.F.R. § 402.01(b)).

the National Marine Fisheries Service or U.S. Fish & Wildlife Service that the proposed action

may affect, but is not likely to *adversely* affect, any listed species, 50 C.F.R. § 402.14(b)(1).

## II.     Factual Background

### A.     The 2015 Clean Water Rule

Although the Supreme Court's *Rapanos* decision did not invalidate the Agencies'

regulations defining "waters of the United States," the decision created uncertainty about the

scope of the Clean Water Act's protections. After *Rapanos*, the Agencies issued guidance

directing agency staff to assert jurisdiction over waters that satisfied *either* the plurality's test or

Justice Kennedy's "significant nexus" test. Wu Decl. Ex. 1, *Rapanos* Guidance.[3] However, the

guidance required staff to determine on a case-by-case basis whether waters had the requisite

"significant nexus," which was time consuming and created the potential for inconsistent

findings. *See* Clean Water Rule, 80 Fed. Reg. 37,054, 37,057 (June 29, 2015).

To solve these problems, the Agencies promulgated the Clean Water Rule in 2015. The

Clean Water Rule amended the definition of "waters of the United States," using the significant-

nexus test articulated by Justice Kennedy in *Rapanos*. *See id.* at 37,060. The Agencies thus

concluded that waters were "waters of the United States" if they "significantly affect the

chemical, physical, or biological integrity of traditional navigable waters." *Id.* To determine

which waters significantly affect the integrity of navigable waters, EPA prepared a voluminous

report (the Connectivity Report), which summarized 1,200 peer-reviewed scientific publications

addressing the connections between waterbodies. *Id.* at 37,057. The draft Connectivity Report

was peer reviewed by an expert panel created by EPA's Science Advisory Board—a group of

---

[3] The cited administrative record documents are attached to the accompanying Declaration of
Michelle Wu and are listed in the certified record index filed by Defendants, *see* ECF No. 26.

scientists tasked with providing EPA with scientific advice. *Id.* at 37,062; Wu Decl. Ex. 2, Connectivity Report at xii; *see also* Wu Decl. ¶ 3 (providing link to the full Report).

The Connectivity Report contained several major conclusions that informed the Clean Water Rule. 80 Fed. Reg. at 37,062. First, *all* streams—perennial, intermittent, *and* ephemeral—"exert a strong influence on the integrity of downstream waters." Wu Decl. Ex. 2, Connectivity Report at ES-2. Second, all floodplain wetlands are "highly connected" to streams and rivers, even if they "rarely flood." *Id.* at 4-39. Finally, non-floodplain wetlands connected to streams and rivers via shallow groundwater or surface water "clearly affect" those waters, *id.* at ES-3, and act as a "first line of defense" in protecting streams from polluted waters, *id.* at 4-42.

Based on this scientific evidence, the Agencies determined that all "tributaries" and "adjacent" waters—as defined by the Clean Water Rule—"significantly affect" the integrity of traditional navigable waters and thus were "waters of the United States." 80 Fed. Reg. at 37,057-60. The rule defined "tributaries" as waters—perennial, intermittent, and ephemeral—with a bed, banks, and an ordinary high-water mark that contribute flow to a traditional navigable water. 33 C.F.R. § 328.3(c)(3) (2015). The Clean Water Rule's definition of protected "adjacent" waters included wetlands within 100 feet of a protected water or within the 100-year floodplain of a protected water, out to a distance of 1,500 feet. *Id.* § 328.3(c)(1)-(2) (2015).[4]

Immediately after taking office, President Trump began efforts to undo the Clean Water Rule and drastically limit the scope of the Clean Water Act's protections. In February 2017, he ordered the Agencies to propose a rule "rescinding or revising" the Clean Water Rule, and to

---

[4] Various parties filed legal challenges to the Clean Water Rule. In two of those cases, district courts granted summary judgment to the plaintiffs but declined to vacate the rule. *See Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1382-83 (S.D. Ga. 2019).

consider interpreting "waters of the United States" "in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." Exec. Order No. 13,778 §§ 2(a), 3 (Feb. 28, 2017). Following President Trump's order, the Agencies issued a rule repealing the Clean Water Rule, which became effective in December 2019. *See* Repeal Rule, 84 Fed. Reg. 56,626, 56,626 (Oct. 22, 2019).[5] Many parties have filed legal challenges to the repeal rule, including Plaintiff NRDC. *See* Compl., *S.C. Coastal Conserv. League v. Wheeler*, 19-cv-3006 (D.S.C. Oct. 23, 2019).

### B.     The Navigable Waters Rule

Shortly after repealing the Clean Water Rule, the Agencies finalized an entirely new rule substantially narrowing the definition of "waters of the United States." The Navigable Waters Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020), replaces the 1980s Regulations, which were reinstated by the Clean Water Rule repeal. *See* 84 Fed. Reg. at 56,627. Various states, tribes, and environmental groups have filed challenges to the Navigable Waters Rule.[6] In June 2020, a Colorado district court preliminarily enjoined the Rule in that state, *see Colorado v. EPA*, 445 F. Supp. 3d 1295, 1313 (D. Colo. 2020) (order currently on appeal), while a California district court denied a motion to preliminarily enjoin the Rule nationwide, *see California v. Wheeler*, 20-cv-03005, 2020 WL 3403072, at *8 (N.D. Cal. June 19, 2020). The Rule is therefore currently in effect in every state except for Colorado.

---

[5] The Agencies also tried suspending the Clean Water Rule while the repeal proposal was still pending, but two courts struck down that suspension. *See S.C. Coastal Conserv. League v. Pruitt*, 318 F. Supp. 3d 959, 969-70 (D.S.C. 2018); *Puget Soundkeeper All. v. Wheeler*, No. 15-cv-1342, 2018 WL 6169196, at *7 (W.D. Wash. Nov. 26, 2018).

[6] *See Colorado v. EPA*, 20-cv-01461 (D. Colo.); *Envtl. Integrity Project v. Wheeler*, 20-cv-01734 (D.D.C.); *Pasqua Yaqui Tribe v. Wheeler*, 20-cv-00266 (D. Ariz.); *Chesapeake Bay Found. v. Wheeler*, 20-cv-01064 (D. Md.); *California v. Wheeler*, 20-cv-3005 (N.D. Cal.); *S.C. Coastal Conserv. League v. Wheeler*, 20-cv-01687 (D.S.C.); *Puget Soundkeeper All. v. EPA*, 20-cv-00950 (W.D. Wash.); *Navajo Nation v. Wheeler*, 20-cv-00602 (D.N.M.); *Murray v. Wheeler*, 19-cv-01498 (N.D.N.Y.).

The Rule purports to maintain federal protections for all "tributaries" and "adjacent" wetlands, but narrowly defines those two categories to exclude millions of miles of streams and millions of acres of wetlands that have long been protected by the Clean Water Act.

First, the Rule defines "tributaries" as only streams with "perennial" or "intermittent" flow. 33 C.F.R. § 328.3(a)(2), (c)(12). The Rule thus removes protections from all "ephemeral" streams, which flow only after rain or snowfall. *Id.* § 328.3(b)(3), (c)(3). Ephemeral streams make up at least 18 percent of the country's streams, according to national maps. *See* Wu Decl. Ex. 3, Army Corps analysis at 2. That 18 percent figure is likely a vast underestimate of the Rule's impacts, however, because ephemeral streams are not mapped in many parts of the country. *See* Wu Decl. Ex. 4, Res. & Programmatic Assessment for Proposed Rule at 40; *id.* Ex. 5, Trout Unlimited comment at 5 (estimating 57% of the nation's stream miles are ephemeral). The scientific evidence makes clear that these excluded streams are vitally important to maintaining the integrity of downstream navigable waters. *See* Wu Decl. Ex. 2, Connectivity Report at ES-5, ES-7, 3-5, 3-22, 3-23; *id.* Ex. 6, Ephemeral Streams Report at iii.

Second, the Rule defines "adjacent" wetlands as only those that either "abut" or have certain types of "regular hydrologic surface connections" to other protected waters. 85 Fed. Reg. at 22,279; *see* 33 C.F.R. § 328.3(a)(4), (c)(1). For instance, wetlands in the floodplain of a protected water are only considered "adjacent" if they are "inundated by flooding" from that water in a "typical year." 33 C.F.R. § 328.3(c)(1)(ii). According to the Agencies' preliminary estimates, the Rule's new restricted definition of "adjacent" could leave about half of the country's wetlands unprotected. *See* Wu Decl. Ex. 3, Army Corps analysis at 8-9 (51% of wetlands do not abut any mapped streams). The scientific evidence shows that wetlands excluded from the Rule perform functions essential to maintaining the integrity of navigable waters, such

as trapping pollutants, preventing flooding, and providing habitat for aquatic species. *See* Wu

Decl. Ex. 2, Connectivity Report at ES-2 to ES-4; *id.* Ex. 7, EPA wetlands fact sheet.

Despite evidence that streams and wetlands excluded from the Agencies' new definition

of "waters of the United States" are critically important to the integrity of navigable waters, the

Agencies decided to eliminate federal protections for them without considering impacts to water

quality. The Agencies also ignored concerns voiced by EPA's Science Advisory Board, which

warned EPA that eliminating protections for ephemeral streams and wetlands connected to

streams and rivers below the surface "departs from established science," "neither rests upon

science, nor provides long term clarity," and "potentially introduc[es] substantial new risks to

human and environmental health." Wu Decl. Ex. 8, draft SAB commentary at 3-4.[7]

The Agencies were aware that the Rule eliminates federal protections for streams and

wetlands that provide important habitat for hundreds of federally endangered and threatened

species. *See* Wu Decl. Ex. 11, Nat'l Wetland Assessment at 4; *id.* Ex. 7, EPA wetlands fact

sheet; *see also id.* Ex. 12, SAB review of Connectivity Report at 20. Yet they did not evaluate

the Rule's potential effects on ESA-listed species to determine whether consultation was

required under section 7 of the ESA.

## STANDARD OF REVIEW

Section 706 of the APA governs the Court's review of Plaintiffs' claims. The APA

requires courts to "hold unlawful and set aside" an agency rule found to be "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see*

*Strahan v. Roughead*, No. 08-cv-10919, 2010 WL 4827880, at *4 (D. Mass. Nov. 22, 2010)

---

[7] The Agencies finalized the Rule before the Board issued its final commentary, which provided similar criticism. *See* Wu Decl. Ex. 9 (final SAB commentary).

(noting that courts often look to the APA standards when reviewing ESA claims). "An agency

rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example,

if the agency . . . failed to consider pertinent aspects of the problem" or "offered a rationale

contradicting the evidence before it." *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109

(1st Cir. 1997) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43

(1983)). In other words, courts "focus on whether the agency examined the relevant data and

articulated a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99,

106-07 (1st Cir. 2015) (quoting *Sistema Univ. Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st

Cir. 2000)). In deciding whether an agency decision is arbitrary and capricious, the "court must

undertake 'a thorough, probing, in-depth review' and a 'searching and careful' inquiry into the

record." *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999) (citation omitted).

In the administrative law context, courts review agency action on summary judgment to

determine whether it is arbitrary, capricious, or otherwise not in accordance with law, rather than

"to determine whether a dispute of fact remains." *Boston Redevelopment Auth. v. Nat'l Park

Serv.*, 838 F.3d 42, 47 (1st Cir. 2016); *see Assoc'd Fisheries of Me.*, 127 F.3d at 109.

## ARGUMENT

## I.      The Navigable Waters Rule is arbitrary and capricious

### A.      The Agencies fail to provide a reasoned explanation for their decision

The Agencies eliminated Clean Water Act protections for all ephemeral streams and a

broad subset of the country's wetlands without providing a reasoned explanation for their

decision. Although the Agencies claim that their decision was based in part on science, the

Agencies ignore, cherry-pick from, and misrepresent the scientific record. The Agencies also

entirely ignore their prior science-based findings that these excluded waters significantly impact

the chemical, physical, and biological integrity of navigable waters, and thus must be protected

by the Act. Meanwhile, the Agencies' non-science-based reasons for excluding these waters—

such as their claim that these waters should be regulated by states—are internally inconsistent

and conclusory. In short, the Agencies fail to provide any "rational basis" for the Rule's drastic

exclusions, rendering the Rule arbitrary and capricious under the APA. *Assoc'd Fisheries of Me.*,

127 F.3d at 109.

1.  **The Agencies fail to provide a reasoned explanation for their decision to eliminate Clean Water Act protections for ephemeral streams**

*The Agencies' exclusion of all ephemeral streams has no scientific support*

The Agencies claim that their decision to eliminate Clean Water Act protections for all

ephemeral streams "rests upon a reasonable inference of [the] ecological interconnection"

between waters, and limits federal jurisdiction to streams with "significant enough" connections

to navigable waters. 85 Fed. Reg. at 22,310 (quoting *Rapanos*, 547 U.S. at 780-81 (Kennedy, J.,

concurring in the judgment)). To reach these conclusions, the Agencies claim they "relied on . . .

science" purportedly showing that ephemeral streams are less connected to downstream waters

than intermittent and perennial streams. *Id.* at 22,288; *see id.* at 22,290 (claiming revocation of

protections for ephemeral streams has a "scientific foundation"). But that claim is unsupported

and contradicted by the record evidence. The Agencies cite nothing in the record showing that

ephemeral streams as a category are any less important to downstream water quality; in fact, the

evidence shows that ephemeral streams, just like streams that flow perennially and intermittently,

have significant hydrological and ecological connections to downstream navigable waters.

Indeed, an EPA report recognized that ephemeral streams can "perform the *same* critical

hydrological functions as perennial streams." Wu Decl. Ex. 6, Ephemeral Streams Report at 13

(emphasis added), *id*. at 76 (concluding that ephemeral streams play a "significant role" in the

integrity of an ecosystem and "must be afforded the same importance as other wetter systems in the U.S. in land management decisions"). Similarly, EPA concluded in the Connectivity Report that ephemeral streams "can have substantial consequences on the integrity of downstream waters." Wu Decl. Ex. 2, Connectivity Report at ES-5, ES-7 (noting that the scientific evidence "for connectivity and downstream effects of ephemeral streams was strong and compelling"); *cf. id.* Ex. 13, Goodrich et al. paper at 1 ("A wide array of evidence clearly illustrates hydrologic, chemical, and ecological connectivity of ephemeral and intermittent streams throughout stream networks."). The science thus shows that ephemeral streams, just like intermittent and perennial streams, are ecologically and hydrologically connected to downstream waters and can significantly affect those waters. The Agencies' decision to eliminate protections for ephemeral streams on the basis that they are supposedly less connected is therefore "flatly contradicted by the . . . record" and "does not constitute reasoned administrative decisionmaking." *City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991).

The Agencies arbitrarily "ignore [the] relevant evidence" detailed above, and instead proffer a handful of record citations that are supposedly "favorable to [their] . . . position." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014). "Such cherry-picking embodies arbitrary and capricious conduct." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016). But more importantly, as experts from the Science Advisory Board panel that reviewed the Connectivity Report explained, the Agencies "misrepresent[]" even the selective parts of the scientific record they cite, drawing conclusions that directly contradict that evidence. Wu Decl. Ex. 14, SAB panel comment letter at 2-3.

Specifically, in deciding to eliminate protections for ephemeral streams, the Agencies claim that they relied on the "connectivity gradient"—a concept articulated by EPA's Science

Advisory Board. 85 Fed. Reg. at 22,271 & n.33, 22,288. The Board had recommended that EPA recognize that waters exist along a "gradient of connectivity." *Id.* at 22,271 n.33. The Agencies assert that the "connectivity gradient" shows that ephemeral streams are less connected to navigable waters as compared to perennial and intermittent streams, and thus the Agencies' decision to eliminate protections for ephemeral streams "rests upon a reasonable inference of ecological interconnection" between streams and downstream waters. *Id.* at 22,288 (quoting *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring)). The record belies that assertion.

Although the Science Advisory Board noted that ephemeral streams *individually* are less connected to downstream waters compared to perennial and intermittent streams, *see* Wu Decl. Ex. 12, SAB review of Connectivity Report at 54 fig.3, the Board explained that it is necessary to consider the streams' "cumulative" and "aggregate" effects, *id.* at 11, 14; *see* Wu Decl. Ex. 2, Connectivity Report at 1-10 (noting that one stream's "low-frequency connection" turns into a "high-frequency connection" when streams are considered cumulatively). And the cumulative impacts of ephemeral streams, which are often abundant and can constitute the majority of a river's water source, can make them integral to the health and composition of downstream waters. *See supra* p.14; Wu Decl. Ex. 2, Connectivity Report at ES-5 (cumulative effects of ephemeral streams "can have substantial consequences on the integrity of the downstream waters"); *id.* Ex. 12, SAB review of Connectivity Report at 22-23 ("[i]mportant cumulative effects are exemplified by ephemeral flows in arid landscapes," where ephemeral streams can be "critical to the maintenance of the chemical, physical, and biological integrity" of rivers).[8]

---

[8] For example, a study of the San Pedro River found that about 98% of nutrients came into the river during the monsoon season from ephemeral streams. Wu Decl. Ex. 6, Ephemeral Streams Report at 39. Similarly, during one storm event, flow from an ephemeral stream accounted for 76% of the flow in part of the Rio Grande. Wu Decl. Ex. 2, Connectivity Report at 3-7 to 3-8.

Indeed, in its commentary on the proposed Rule, the Science Advisory Board itself criticized the Agencies' misappropriation of the "connectivity gradient" concept to eliminate protections for ephemeral streams. According to the Board, the Agencies' decision "*abandon[s]* the . . . connectivity of waters accepted by current hydrological science." Wu Decl. Ex. 8, draft SAB commentary at 2 (emphasis added). The Board warned EPA that the proposed Rule was "in conflict with established science," "abandon[s] a scientific basis," and does not "rest[] upon science." *Id.* at 1, 3; *see id.* at 4 (the proposed Rule departs from "EPA recognized science" in failing to protect ephemeral streams).

Because the Agencies ignored an essential component of connectivity and misrepresented that concept while citing it as a basis for their decision to exclude ephemeral streams, the Rule is arbitrary and capricious. *See Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 69 (D.D.C. 2016) (remanding agency decision that "ignore[d] critical context" and "cherry-pick[ed] . . . evidence"); *State Farm*, 463 U.S. at 43 (action is arbitrary and capricious if agency "fail[s] to consider an important aspect of the problem").

### *The Agencies do not justify their new contradictory findings*

The Agencies also fail to explain why they are disregarding factual findings they made in support of their prior policy, the Clean Water Rule. The Clean Water Rule protected ephemeral streams with a bed, banks, and ordinary high-water mark because the Agencies found that these streams significantly affect the chemical, physical, and biological integrity of downstream navigable waters. 80 Fed. Reg. at 37,068-69, 37,079. In documents supporting the Clean Water Rule, the Agencies further explained that such streams "are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an

aquatic system." Wu Decl. Ex. 15, Technical Support Doc. at 70 (quoting *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring)).

The Agencies now make an about-face, claiming that all ephemeral streams purportedly lack sufficient connections to navigable waters, 85 Fed. Reg. at 22,288, and are not "significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system," *id.* at 22,310 (quoting *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring)). In making these new contradictory findings, the Agencies were required to provide a "reasoned explanation" for disregarding their prior findings. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). They did not. Instead, they fail even to acknowledge that they are now reaching opposite conclusions about the significance of ephemeral streams based on the same scientific record. This "unexplained departure" renders the Rule arbitrary and capricious. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019); *see Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 968-69 (9th Cir. 2015) (en banc) (rule resting on "a direct, and entirely unexplained, contradiction of" prior findings was arbitrary).

<u>*The Agencies' decision with respect to ephemeral streams is internally inconsistent*</u>

The Agencies' decision to eliminate protections for ephemeral streams is also arbitrary because it is based on internally inconsistent reasoning. While the Agencies claim that ephemeral streams do not have "significant enough" connections to downstream waters, *see* 85 Fed. Reg. at 22,310, they conclude that perennial and intermittent streams do have "sufficient" connections to downstream waters if they are connected via ephemeral streams, *id.* at 22,277-78. In other words, the Agencies recognize that ephemeral streams can provide "sufficient" connections between upstream and downstream waters. Yet at the same time, the Agencies conclude that ephemeral streams are not sufficiently connected to downstream waters to qualify for protection in their

17

own right. *See id.* at 22,252, 22,310, 22,288. This "internally inconsistent analysis" is illogical and arbitrary. *Nat'l Parks Conserv. Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015); *see Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987).

The Agencies' decision to remove protections from ephemeral streams, which flow after "rain" or "snowfall," is also inconsistent with their decision to retain protections for intermittent streams that flow as a result of melting "snowpack." *See* 85 Fed. Reg. at 22,276. The Agencies claim that streams flowing in response to melting snowpack are "waters of the United States" because they have "regular, predictable, seasonal" flow. *Id.*; *see id.* at 22,275 (claiming intermittent streams are protected because they have "continuous" "predictable" flow during certain times of the year). Yet the Agencies acknowledge that ephemeral streams can *also* have "seasonal," Wu Decl. Ex. 16, Resp. to Comments 5.2.4 at 21, and "regular and predictable" flow, 85 Fed. Reg. at 22,278. Since both ephemeral and intermittent streams can have regular, predictable, seasonal, and precipitation-fed flow, the only difference between some of these streams appears to be how long snow remains on the ground. The Agencies fail to explain how such a minor distinction is a "legitimate reason" for treating these similar types of streams differently. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *see Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (action is arbitrary when agency offers "insufficient reasons for treating similar situations differently").

> *The Agencies' other reasons for excluding ephemeral streams are conclusory*

The Agencies also provide some policy-based reasons for removing protections from ephemeral streams. As discussed *infra* pp.29-30, the Agencies misinterpret section 101(b) of the Clean Water Act, which recognizes states' responsibilities and rights to help control water pollution. 33 U.S.C. § 1251(b). But regardless, the Agencies' policy choices pursuant to section

101(b) are entirely unexplained, and thus violate the APA. The Agencies repeatedly claim that ephemeral streams are "more appropriately regulated by States and Tribes," and relatedly, that eliminating protections for ephemeral streams better "balances" the Clean Water Act's objective against the policy goal of section 101(b). *See, e.g.*, 85 Fed. Reg. at 22,287. But these are merely conclusions, not explanations. The Agencies never explain *why* ephemeral streams are supposedly "more appropriately regulated by States and Tribes" or *why* the Rule strikes the right "balance" between water quality and state control. As discussed *supra* pp.14-15, the evidence shows that ephemeral streams are significantly connected to navigable waters, rendering them functionally indistinguishable from streams that the Agencies have determined warrant federal protection. The Agencies' "*ipse dixit*" that ephemeral streams should be regulated by states therefore "falls short of [the Agencies'] obligation to provide a 'satisfactory explanation for [their] action[s].'" *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 379 (S.D.N.Y. 2019) (quoting *State Farm*, 463 U.S. at 43); *see Sierra Club v. EPA*, 972 F.3d 290, 305 (3d Cir. 2020) (an agency must "justify and explain" its decision, "not simply adopt it via *ipse dixit* authority"); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000) ("because the agency says so" is insufficient even under a "highly deferential standard of review").

>  **2. The Agencies fail to provide a reasoned explanation for their decision to eliminate Clean Water Act protections for wetlands that lack "regular" surface-water connections to other protected waters**

The Agencies' decision to limit covered "adjacent" wetlands to those that either "abut" or have "regular" surface-water connections to other protected waters is also arbitrary and capricious. According to the Agencies, they imposed these requirements to limit federal jurisdiction to wetlands that are "inseparably bound up with" navigable waters, 85 Fed. Reg. at 22,308, 22,310, and to ensure that the connection between the wetland and navigable water is

more than "possible" or "speculative," *id.* at 22,310. However, these purported justifications are contradicted by the scientific evidence that wetlands excluded by the Rule also have more than "possible" or "speculative" connections to nearby waters and are "inseparably bound up with" them. The Agencies' reasons for narrowing wetland protections are also internally inconsistent and conclusory, and thus fail to satisfy the Agencies' obligation to provide an adequate explanation for their decision.

The Agencies claim that they relied on science to "inform[]" their decision to protect only wetlands that "abut" or have "regular" surface-water connections to other protected waters. *Id.* at 22,314. However, the Agencies fail to cite any scientific evidence that supports imposing these requirements. The Agencies point to evidence that "areas that are closer to rivers and streams have a higher probability of being connected than areas farther away." *Id.* (quoting Connectivity Report). However, that evidence does not provide support for the Rule, which *excludes* many wetlands that are close to streams and rivers and *includes* wetlands far away so long as there is a "regular" surface-water connection. Besides the "abutting" requirement, the Agencies' definition of "adjacent" does not turn on whether a wetland is close to or far away from a river or stream.

In fact, as the Science Advisory Board informed EPA, the Agencies' line-drawing with respect to wetlands "departs from [the] established science" on which they purport to rely. Wu Decl. Ex. 8, draft SAB commentary at 3. For example, EPA concluded in the Connectivity Report that floodplain wetlands are "highly connected to streams and rivers" even if they "rarely flood." Wu Decl. Ex. 2, Connectivity Report at 4-39 (noting that infrequently-flooded wetlands can have "long-lasting effects" on rivers and can be connected to them "regularly through ground water"). The Agencies ignore this evidence, and claim they have limited "adjacent" wetlands to those that flood in a "typical year" to ensure the connection between the wetland and other water

"is not merely 'possible' or 'speculative.'" 85 Fed. Reg. at 22,310; *see id.* (claiming the "typical year" requirement ensures the connection is not "unduly speculative"). The Agencies do not reasonably explain their conclusion that wetlands that flood less frequently than a "typical year" only have "possible" or "speculative" connections, given the scientific evidence that such wetlands are "highly connected" to the relevant waterway.

The science also shows that wetlands with a "regular shallow subsurface-water connection" to downstream waters are highly connected to those waters and "clearly affect" them. Wu Decl. Ex. 2, Connectivity Report at ES-3; *id.* at 4-39 (concluding that floodplain wetlands are "highly connected to streams and rivers through . . . shallow ground water"). Again the Agencies ignore (and contradict) this evidence, asserting without record support or explanation that wetlands with subsurface connections are not protected because they have only "remote" connections to covered waters. 85 Fed. Reg. at 22,309; *see id.* at 22,313.

The Agencies' finding that wetlands have the necessary connection to navigable waters only when they are connected via "regular" surface-water flow, 85 Fed. Reg. at 22,279, also contradicts, without explanation, findings the Agencies made in support of the Clean Water Rule. For instance, in promulgating the Clean Water Rule, the Agencies found that wetlands can be significantly connected to navigable waters even if they are only connected via infrequent flooding or subsurface flow. *See, e.g.*, 80 Fed. Reg. at 37,085 (finding that all 100-year floodplain wetlands within 1,500 feet of a protected water "significantly affect" the integrity of navigable waters and are "critical to protect the downstream waters"); *id.* (finding that wetlands within 100 feet of a protected water perform "critical processes and functions" in part because they are "often connected via surface and shallow subsurface hydrology"). As discussed above, the Agencies now find that a wetland's connections are "speculative" if it lacks a "regular"

surface-water connection to a navigable water. 85 Fed. Reg. at 22,310. The Agencies do not

explain how these excluded wetlands can have "speculative" connections now when just five

years ago—based on the same scientific record—the Agencies found that many of them had

"significant," *i.e.*, "more than speculative or insubstantial," connections. 80 Fed. Reg. at 37,091.

The Agencies' failure to justify "factual findings that contradict those which underlay" their

prior policy is arbitrary and capricious. *Fox Television Stations*, 556 U.S. at 515.

The Agencies' reasons for excluding certain wetlands are also internally inconsistent. The

Agencies claim that wetlands flooded in a "typical year" are protected under the Act because the

"typical year" requirement "ensures that a sufficient surface-water connection occurs" between

the wetland and the other water. 85 Fed. Reg. at 22,310. At the same time, the Agencies

conclude that wetlands connected to jurisdictional waters via stormwater runoff or sheet flow in

a "typical year" are *not* protected under the Act because, they claim, such flow "lacks the indicia

of permanence and sufficiency necessary to establish jurisdiction." *Id.* at 22,303. However, that

rationale contradicts the Agencies' finding that a surface-water connection is "sufficient" as long

as it occurs in a "typical year." *Id.* at 22,310. In other words, the Agencies fail to reconcile their

conclusion that the typical-year requirement ensures a "sufficient" connection, with their finding

that certain types of surface-water connections that occur in a "typical year" *lack* a "sufficient"

connection. *Id.* at 22,302. This unexplained inconsistency renders the Rule arbitrary and

capricious. *See Nat'l Parks Conserv. Ass'n*, 788 F.3d at 1141.

Lastly, the Agencies repeatedly claim that they have limited federal protections to

wetlands that are "inseparably bound up with" downstream waters. *See* 85 Fed. Reg. at 22,263,

22,271, 22,273, 22,279, 22,308. But the Agencies fail to explain this conclusion. The phrase

"inseparably bound up" comes from *Riverside Bayview Homes*. In that case, as the Agencies

22

acknowledge, the Supreme Court found that adjacent wetlands could be regulated under the

Clean Water Act "on the basis that they are . . . 'inseparably bound up with' [navigable waters]

because of their 'significant effects on water quality and the aquatic ecosystem.'" *Id.* at 22,263

(quoting *Riverside Bayview Homes*, 474 U.S. at 131-35 & n.9). Thus, a wetland is "bound up

with" a downstream water if the wetland significantly affects water quality and the ecosystem.

Yet the Agencies *ignored* water quality and ecosystem impacts when deciding which wetlands

are "bound up with" navigable waters for purposes of the Rule—and instead arbitrarily

determined, without any explanation, that wetlands are only "bound up with" waters when they

are connected via certain types of surface-water flow. The Agencies fail to explain why these

specific types of surface-water connections are required, given the scientific evidence that many

wetlands without such connections have "significant effects on water quality and the aquatic

ecosystem." *Riverside Bayview Homes*, 474 U.S. at 135 n.9. In short, the Rule's definition of

adjacency is not adequately explained and has no rational basis.

> **B.      The Agencies ignored the most important factor relevant to the rulemaking
>          by failing to consider water quality impacts**

The sole objective of the Clean Water Act is to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Water quality is

therefore *the* most important factor the Agencies were required to consider in determining which

waters are protected by the statute. Yet the Agencies ignored questions of water quality when

deciding that ephemeral streams and wetlands that lack certain surface-water connections to

other protected waters are not "waters of the United States."

In response to public comments pointing out this failure, the Agencies cite their

"Economic Analysis" and "Resource and Programmatic Assessment"—two documents they

created to accompany the rulemaking—as purported evidence that they considered water quality

impacts when promulgating the Rule. *See* Wu Decl. Ex. 17, Resp. to Comments 1.5.5.2 at 112-13; *id.* Ex. 18, Resp. to Comments 11.0 at 1-3. As a threshold matter, these documents do not meaningfully analyze the Rule's impacts on water quality. Rather, they acknowledge the Rule could have significant adverse impacts across the country, then claim the Agencies were unable to fully assess or quantify those impacts. *See, e.g.*, Wu Decl. Ex. 10, Economic Analysis at 105 (identifying potential impacts like degraded aquatic habitat, increased flood risks, and greater water body impairments); *id.* at 171 (claiming that "data limitations constrain the agencies' ability to quantify and value the potential effects of the final rule" on the statute's section 402 and 311 programs); *id.* at 164-68, 171-72 (listing numerous "data limitations" that create "uncertainty" in the case studies and nationwide section 404 analysis).

But the flaws in these documents are beside the point. The Agencies cannot rely on these documents to justify the rulemaking because they repeatedly insist that the Rule "is *not based on* the information in the agencies' economic analysis or resource and programmatic assessment," and that these documents were "*not used* to establish the new regulatory text for the definition of 'waters of the United States.'" 85 Fed. Reg. at 22,332 (emphases added); *id.* at 22,335; *see also* Wu Decl. Ex. 18, Resp. to Comments 11.0 at 3. In declaring their non-reliance on these documents, the Agencies must be taken at their word. It is a "foundational principle of administrative law" that a court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758, 760 (2015); *see also id.* at 760 (refusing to consider impact analysis to establish that EPA considered costs where EPA conceded it did not "rely on" the analysis in reaching its decision). The Agencies thus cannot now rely on these documents as evidence that they considered water quality impacts in deciding how to define "waters of the United States."

All that remains are the Agencies' repeated assertions that the Rule carries out the Clean Water Act's objective to protect water quality, *see, e.g.*, 85 Fed. Reg. at 22,252, 22,272, and appropriately "balances" that objective against other policy goals, *see, e.g.*, *id.* at 22,287, 22,261, 22,308. But these assertions are conclusory. For example, although the Agencies claim that their decision to exclude ephemeral streams "balances" the Act's objective against state sovereignty interests, *id.* at 22,287, they never discuss how excluding ephemeral streams will impact water quality, much less why that impact is acceptable. There is thus no evidence, only the Agencies' own assertions, indicating that they considered water quality. Merely "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (courts do not simply "take the agency's word that it considered all relevant matters").

The Agencies were required to consider water quality impacts when deciding to remove federal protections for broad categories of critically important waters. Their failure to do so ignored the most "important aspect of the problem," and renders the Rule arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see Gresham v. Azar*, 950 F.3d 93, 102 (D.C. Cir. 2020) (loss of Medicaid coverage was an important factor the agency was required to consider because coverage was "principal objective of Medicaid").

## II.     The Rule violates the Clean Water Act because it is inconsistent with the statute's text, structure, and purpose

The Court does not need to consider whether the Agencies' definition of "waters of the United States" is a permissible interpretation of the Clean Water Act because even if it were, the Rule would still be unlawful. The Agencies' flawed decisionmaking process, discussed above, independently requires vacatur under the APA. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019) (agency's interpretation of statute was reasonable, but was "still arbitrary and

capricious" for "fail[ing] to address an important and statutorily mandated consideration");

*Penobscot Air Servs.*, 164 F.3d at 719 ("Even where [*Chevron*] deference is due, the agency's 'explication' of its reasoning must be 'not inadequate, irrational or arbitrary'" under the APA (citation omitted)); *NRDC v. EPA*, 824 F.2d 1258, 1280 n.11 (1st Cir. 1987) (finding that, even if it was "arguable that the[] regulations do not necessarily violate the law," the inadequate explanation was "at very least, arbitrary and capricious"). However, the Rule is also contrary to the text, structure, and purpose of the Clean Water Act, and for that reason, too, must be vacated under the APA as "not in accordance with law." 5 U.S.C. § 706(2)(A).

###    A.    The Rule, like the *Rapanos* plurality opinion on which it is modeled, is an unreasonable, unlawfully narrow interpretation of the Clean Water Act

The Agencies' interpretation of "waters of the United States" is modeled after the plurality opinion in *Rapanos*. Five Supreme Court Justices (the one-Justice concurrence and four-Justice dissent) rejected the plurality's statutory interpretation as "inconsistent with the Act's text, structure, and purpose," 547 U.S. at 776 (Kennedy, J., concurring in the judgment), as well as Supreme Court precedent, *id.* at 768; *id.* at 800 (Stevens, J., dissenting). In another case challenging the Rule, a district court found that because the Agencies' interpretation has been rejected by a majority of the Supreme Court, that alone renders the Rule unlawful. *See Colorado*, 445 F. Supp. 3d at 1312 ("*Rapanos* is unambiguously against the construction offered in the plurality opinion, on which the New Rule is modeled."). Indeed, all circuit courts to have decided the issue, *see supra* n.1—including the First Circuit—have held that "waters of the United States" extend beyond waters that satisfy the plurality's test. *See Johnson*, 467 F.3d at 64-66 (endorsing approach that combines dissent and concurrence "to find the ground of decision embraced by a majority of the Justices").

Even if the opinions of the concurring and dissenting Justices in *Rapanos* were not binding precedent, those Justices correctly concluded that the plurality had adopted an unlawfully limited interpretation of the Clean Water Act that was "arbitrary," "revisionist," and "not a correct reading of the text." *Rapanos*, 547 U.S. at 778, 793, 801, 802, 804. The Rule, which is modeled on the plurality opinion, suffers from the same fundamental flaws. Thus, even if the phrase "waters of the United States" is ambiguous, Supreme Court precedent, circuit court precedent, and tools of statutory construction make clear that the Rule is an unreasonable interpretation of that phrase, and therefore unlawful.

The first fundamental flaw in the Agencies' interpretation is their decision, based on the *Rapanos* plurality opinion, to define "waters of the United States" as including only waters with "relatively permanent" flow, thereby excluding all ephemeral streams. 85 Fed. Reg. at 22,278; *see id.* at 22,288-89. As Justice Kennedy and the dissenting Justices in *Rapanos* explained, there is no textual basis for concluding that the word "waters" in "waters of the United States" includes "relatively permanent" streams but not ephemeral ones. To the contrary, "a full reading of the dictionary definition" of "waters" "*precludes* . . . [an] emphasis on permanence," because the "term 'waters' may mean 'flood or inundation,'"—"events that are impermanent by definition." *Rapanos*, 547 U.S. at 770 (Kennedy, J., concurring) (quoting Webster's New Int'l Dictionary at 2882 (2d ed. 1954)) (emphasis added). "[C]ommon sense and common usage" also demonstrate that ephemeral streams are "waters" because they are "streams." *Id.* at 801 (Stevens, J., dissenting). Indeed, the Agencies admit that "waters of the United States" refers to "waters within the ordinary meaning of the term, such as . . . streams." 85 Fed. Reg. at 22,251.

The Agencies' "relatively permanent" flow requirement also ignores the structure and purpose of the statute because it means that streams with the "merest trickle, if continuous,"

27

count as "waters" subject to federal regulation, "while torrents thundering at irregular intervals through otherwise dry channels" do not. *Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring). As Justice Kennedy noted, this makes "little practical sense in a statute concerned with downstream water quality." *Id.* Indeed, the record shows that the "permanence" of flow is not commensurate with impacts on water quality—ephemeral, intermittent, and perennial streams all have significant impacts on the integrity of downstream navigable waters. *See supra* pp.14-15. The Agencies' decision to categorically exclude ephemeral streams—despite their significance to downstream water quality—thus impermissibly "ignores the directive given to [them] by Congress in the CWA, which is to protect water quality." *Nat'l Cotton Council of Am. v. EPA*, 553 F.3d 927, 939 (6th Cir. 2009); *see Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1028 (10th Cir. 1976) ("[T]he intent of Congress to improve and preserve the quality of the Nation's waters" must be the "guiding star" when interpreting the Clean Water Act.).

The second fundamental flaw in the Agencies' interpretation of the Act is their decision, based on the *Rapanos* plurality opinion, that "adjacent" wetlands only include wetlands that abut or have "certain regular hydrologic surface connections" to other protected waters. 85 Fed. Reg. at 22,279-80, 22,309. These requirements have no textual basis. *See Rapanos*, 547 U.S. at 805 (Stevens, J., dissenting); *id.* at 778 (Kennedy, J., concurring) (the plurality opinion is "not a correct reading of the text"). They are also plainly inconsistent with the Act's purpose of protecting water quality: "Given the role wetlands play in pollutant filtering, flood control, and runoff storage," it may be "the *absence* of hydrologic connection . . . that shows the wetlands' significance for the aquatic system," and thus makes their protection "*critical to the statutory scheme*." *Rapanos*, 547 U.S. at 775, 786 (Kennedy, J., concurring) (emphases added); *see Riverside Bayview Homes*, 474 U.S. at 133-34 (upholding Army Corps's authority over

"adjacent" wetlands given the "evident breadth of congressional concern for protection of water quality and aquatic ecosystems" (citation omitted)). As the record shows, non-abutting floodplain wetlands and those connected by subsurface flow can perform critical functions for maintaining downstream water quality. *See supra* pp.20-21. It was thus unreasonable to exclude them from the Act simply because they lack certain kinds of surface-water connections—a distinction that has no statutory significance.

Because the Agencies' decision to exclude all ephemeral streams and non-abutting wetlands that lack certain surface-water connections is inconsistent with the text, structure, and purpose of the Clean Water Act, their definition of "waters of the United States" is unreasonable and "does not merit deference." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014); *Succar v. Ashcroft*, 394 F.3d 8, 23, 36 (1st Cir. 2005) (reasonableness assessed in light of statutory scheme and congressional intent).

### B.   Section 101(b) fails to support the Agencies' unlawful interpretation

In promulgating the Rule, the Agencies advance a novel and unsupported claim that excluding ephemeral streams and wetlands that lack certain surface-water connections "strikes a better balance" between the Act's objective of protecting water quality and the policy of preserving states' "primary responsibilities and rights" to control water pollution, set forth in section 101(b) of the Act. 85 Fed. Reg. at 22,261-62; *see also id.* at 22,252. But the Agencies' attempt to use section 101(b) to revoke protections for streams and wetlands that significantly affect the integrity of navigable waters is inconsistent with the statute.

Contrary to the Agencies' claims, Congress did not intend for them to "balance" section 101(b) against the statute's objective of protecting water quality when defining the scope of "waters of the United States." Rather, section 101(b) refers to states' "primary responsibilities

and rights" to protect "waters of the United States" by playing a lead role in *administering* the Act. *See* S. Rep. No. 92-414, at 7-8 (1971) ("The States . . . have the primary responsibility and right to implement [the statute's] goal" of protecting water quality.); 33 U.S.C. § 1251(b) (it is the "policy of Congress" that states "implement the permit programs"); *see also id.* §§ 1342(b), 1344(g); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 489 (1987) (delegation of section 402 permitting program to states reflects their "significant role in protecting their natural resources" under section 101(b)). Section 101(b) also reflects state authority to set water quality standards for "waters of the United States" within that state's borders, and to impose additional or more stringent pollution limitations than the statute requires. *See* 33 U.S.C. § 1370; *City of Arcadia v. EPA*, 411 F.3d 1103, 1106 (9th Cir. 2005) (states' role in setting water quality standards reflects section 101(b)'s policy that "States remain at the front line in combating pollution"); *United States v. Marathon Dev. Corp.*, 867 F.2d 96, 99 (1st Cir. 1989) (similar). Even if the Agencies could "balance" section 101(b) against the Act's water quality objective, moreover, Congress did not give the Agencies unfettered discretion to do so in any way they choose, much less in a way that significantly diminishes the integrity of navigable waters—as the Agencies have done here.

Because the Agencies' interpretation is unreasonable and inconsistent with the Clean Water Act, it must be set aside as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## III.   The Agencies violated the Endangered Species Act

Before an agency carries out a "discretionary" action, 50 C.F.R. § 402.03, the ESA and its implementing regulations require the agency to analyze whether the proposed action "may affect" any ESA-listed species or critical habitat, *id.* § 402.14(a). If the agency determines there "may" be an effect, it must consult with the U.S. Fish & Wildlife Service and/or the National Marine Fisheries Service pursuant to section 7 of the ESA. *Id.* § 402.14(a); 16 U.S.C.

30

§ 1536(a)(2). The Agencies violated these requirements because they failed to make the required effects determination and engage in consultation about those effects, despite clear evidence that the rulemaking "may affect" ESA-listed species and critical habitat.

### A.    The Rule is a discretionary action subject to the requirements of section 7

The Rule is a "discretionary" action, and thus the Agencies were required to comply with section 7 before issuing it. *See* 50 C.F.R. § 402.14(a). In promulgating the Rule, the Agencies exercised discretion—although as described above, they abused that discretion—in at least two ways. First, the Agencies exercised discretion in deciding to issue a new regulation redefining "waters of the United States," instead of leaving the preexisting regulatory regime in place. In other words, this rulemaking was not an action that they were "*required* by statute to undertake." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007). Rather, it was the Agencies' choice, prompted by an executive order from President Trump, to promulgate a new definition of the phrase. And the Agencies maintain discretion to further revise the definition if and when they choose, so long as they follow the law in doing so. *See Wash. Toxics Coal. v. Dep't of Interior*, 457 F. Supp. 2d 1158, 1181 (W.D. Wash. 2006) (promulgation of regulations was a discretionary action because agencies were "free to alter or withdraw" them); *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1032-33 (9th Cir. 2005) (pesticide registrations were discretionary because EPA could "alter" or "cancel" them), *abrogated on other grounds by Cottonwood Envtl. Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015).

Second, the Agencies exercised (and abused) their discretion in deciding *how* to redefine "waters of the United States." *Cf.* 85 Fed. Reg. at 22,331 (stating that the Agencies had "discretion" in defining "waters of the United States"). As the Ninth Circuit has explained, when an action is not "specifically mandated by Congress" but is instead done "in furtherance of a

31

broad Congressional mandate," "that action is, by definition, discretionary and is thus subject to Section 7 consultation." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008); *see also Karuk Tribe of Cal. v. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc) (an action is non-discretionary only if Congress required the agency to "perform specific nondiscretionary acts, rather than achieve broad goals"). Here, Congress did not specifically mandate that the Agencies define "waters of the United States" as, for example, excluding wetlands that lack a surface-water connection to rivers and streams in a "typical year," or excluding ephemeral streams. Rather, these were choices the Agencies made by purportedly "balanc[ing] science, policy, and the law." 85 Fed. Reg. at 22,288. The discretionary nature of the rulemaking is highlighted by the Agencies' repeated statements that they defined "waters of the United States" in part based on "policy choices." *See, e.g.*, *id.* at 22,252, 22,277; *cf. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1911 (2020) (noting that secretary "plainly exercised . . . discretionary authority" in making "policy choices").

While the Agencies admit they exercised discretion in defining "waters of the United States," they falsely claim they lacked discretion to consider ESA-listed species in defining the phrase. *See* Wu Decl. Ex. 17, Resp. to Comments 1.5.2 at 88. The Clean Water Act contains numerous indications that Congress intended the Agencies to consider impacts to species, and at a minimum, empowered them to do so. *See Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1172 (W.D. Wash. 2004) (relevant question is whether agency "could" act for the benefit of protected species in taking action); 33 U.S.C. § 1251(a) (part of the objective of the Clean Water Act is to protect the "biological integrity of the Nation's waters"); *id.* § 1251(a)(2) (expressly declaring "the protection and propagation of fish, shellfish, and wildlife" as a "national goal"); *see Riverside Bayview Homes*, 474 U.S. at 134-35 (finding reasonable the Corps's decision that

wetlands are protected by the Act in part because they supply food and habitat for aquatic

species). Indeed, EPA itself previously declared that "the goals of the CWA and ESA [are]

compatible and complementary." 66 Fed. Reg. 11,202, 11,208 (Feb. 22, 2001). Because the

Clean Water Act and the ESA have "consistent, complementary objectives," the Agencies

"cannot escape [their] obligation to comply with the ESA" by claiming they lacked discretion to

consider impacts to protected species. *Wash. Toxics Coal.*, 413 F.3d at 1032 (EPA had to comply

with section 7 when registering pesticides because the applicable statute's mandate to consider

economic, social, and environmental costs/benefits was consistent with the ESA's mandate).

**B.      The Agencies were required to engage in consultation because the Rule at a
minimum "may affect" ESA-listed species and critical habitat**

Because the Rule was a discretionary action, the Agencies were required to analyze the

effects of the rulemaking to determine whether it "may affect" any ESA-protected species or

critical habitat, and then engage in consultation if the Agencies determined there "may" be an

effect. The Agencies violated section 7 by failing to initiate consultation, which was required

because the evidence shows that the Rule at a minimum "may affect" endangered and threatened

species. The Agencies also violated section 7's requirement to analyze the effects of the Rule in

the first place, to determine whether consultation was necessary.

The low "may affect" threshold for triggering consultation, which is satisfied if there is

"*[a]ny possible* effect, whether beneficial, benign, adverse or of an undetermined character,"

*Karuk Tribe,* 681 F.3d at 1027 (citation omitted), is easily met here. The Rule eliminates federal

protections for streams and wetlands that provide habitat for, or otherwise support, hundreds of

endangered and threatened species. EPA has acknowledged that "[a]bout 50% of threatened or

endangered animal species in the U.S. depend on wetlands for their survival." Wu Decl. Ex. 11,

Nat'l Wetland Assessment at 4; *see id.* Ex. 19, Economic Analysis for Proposed Rule at 49

("[M]ore than one-third of the United States' threatened and endangered species live only in wetlands, and nearly half use wetlands at some point in their lifecycle."). An EPA report likewise acknowledged that ephemeral streams provide habitat for various animals, including endangered species, cautioning that if even "a portion of [these] habitats . . . is damaged or destroyed, the breeding population of [these] species could be lost." Wu Decl. Ex. 6, Ephemeral Streams Report at 45, 48-50, 63. Many ESA-listed species that live in or near downstream waters also depend on wetlands and ephemeral streams, which significantly impact the quality of those downstream waters. *See supra* pp.14-15, 20-21; Wu Decl. Ex. 2, Connectivity Report at ES-2 to ES-6.

The Rule thus "may affect" endangered and threatened species that depend on the vast number of streams and wetlands now more vulnerable to pollution and destruction because they have lost federal protections under the Rule. *See* Wu Decl. Ex. 10, Economic Analysis at 120-21 (the Rule may result in decline in wetland acreage and stream miles, which "could result in a decline in . . . fauna and flora support"), *id.* at 105 (listing "potential environmental impacts" of the Rule as including "Dredging/Fill in streams," "Reduced wetland habitats," and "Greater pollutant loads"). The "sheer number of [waters] affected" by the Rule, and the "number of [ESA-listed] species who reside" in or otherwise depend on those waters, shows that the Rule, at a minimum, "'may affect' a listed species or its critical habitat." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).

The Agencies admit that any increased pollution and degradation resulting from the Rule "may have a range of potential impacts on . . . aquatic resources, including wildlife habitat." Wu Decl. Ex. 10, Economic Analysis at 105; *id.* at 106 ("[w]ater quality degradation" as a result of the Rule "may adversely affect species habitat"). But instead of consulting on these impacts pursuant to section 7, the Agencies claim that "harm to listed species or designated critical

habitat" is "too attenuated to establish legal causality" because it would be caused by third parties polluting or destroying waters no longer subject to federal regulation, rather than flowing directly from the Rule itself. Wu Decl. Ex. 17, Resp. to Comments 1.5.2 at 89-90. This justification is invalid.

First, to the extent the Agencies believe this constituted a "no effects" determination for purposes of section 7, they are wrong: The "inability to attribute environmental harms with reasonable certainty to" an agency action "is not the same as a finding that the [action] 'will not affect' . . . listed species or critical habitat" under the ESA. *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 597-98 (D.C. Cir. 2019) (alterations omitted); *see Pac. Rivers Council v. Robertson*, 854 F. Supp. 713, 719 n.11 (D. Or. 1993) (agency could not satisfy section 7 by claiming action was "not amenable to consultation analysis," rather than by reviewing the action and determining "that it would have no effect on the listed species"), *rev'd in part on other grounds sub. nom. Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994).

Second, even if the Agencies' statements could be construed as a "no effects" determination, such a finding would be arbitrary and capricious. An "action" under the ESA includes one "*indirectly* causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added). The ESA regulations thus preclude the Agencies from skirting their obligations by claiming that harm to species is an indirect consequence of the Rule, when it is the Rule that allows such consequences to occur. Courts have rejected similar attempts by agencies to evade the ESA. *See, e.g.*, *Nat'l Wildlife Fed'n*, 345 F. Supp. 2d at 1176 (finding FEMA's flood insurance program "may affect" listed salmon because it "may increase [private-party] development" of floodplains, resulting in impairment of floodplain functions of salmon-bearing waters); *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008) (similar); *Lockyer*, 575

F.3d at 1019 (repeal of more protective land-management rule satisfied "may affect" threshold). The record shows that the Rule "may affect" ESA-listed species by removing federal protections for vast numbers of waters on which many of these species rely. The Agencies were thus required to consult under section 7. Their failure to do so was unlawful.

## IV.     Plaintiffs have standing to challenge the Rule

Plaintiffs have standing to bring suit on behalf of their members. Protection of the nation's water resources is germane to Plaintiffs' core purposes, this lawsuit does not require the participation of Plaintiffs' members, and Plaintiffs' members would have standing in their own right because they have suffered an injury-in-fact traceable to the Rule and likely to be redressed by a favorable decision. *See Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006); Allison Decl. ¶¶ 2-3; Kelly Decl. ¶¶ 7-8; Knowles Decl. ¶¶ 2-4; Mahoney Decl. ¶¶ 6-8; O'Neill Decl. ¶¶ 5-7; Rippere Decl. ¶¶ 6-7; Thorne Decl. ¶¶ 5-10; Trujillo Decl. ¶¶ 5-7 (collectively confirming interests at stake are germane to Plaintiffs' core purposes).

### A.     Plaintiffs have suffered an injury-in-fact

The injury-in-fact requirement is satisfied when a plaintiff is threatened with injury and "there is a substantial probability that harm will occur." *Mallinckrodt*, 471 F.3d at 284; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if . . . there is a 'substantial risk' that the harm will occur" (citation omitted)). "There is no numerical threshold . . . at which likelihood of harm becomes a 'substantial risk' of harm." *Alasaad v. Nielsen*, No. 17-cv-11730, 2018 WL 2170323, at *9 (D. Mass. May 9, 2018) (citation omitted). Concerns about future pollution are sufficient to establish injury-in-fact if those concerns are "premised upon a realistic threat." *Mallinckrodt*, 471 F.3d at 284.

The Rule eliminates Clean Water Act protections for millions of wetland acres and stream miles, surrendering critically important waters to pollution and destruction without federal protections. *See supra* pp.10-11; 85 Fed. Reg. at 22,333 ("The final rule will reduce the scope of waters subject to CWA permitting . . ."). Even by the Agencies' estimates—which grossly underestimate the Rule's environmental impacts—wetland and stream loss under the Rule will likely cause millions of dollars in foregone benefits, Wu Decl. Ex. 10, Economic Analysis at 175, including "fauna and flora support, flood control, water filtration, and recreation," *id.* at 120-21. The Rule thus creates a substantial risk of harm to Plaintiffs' members' sources of drinking water and to their recreational, business, and property interests, which depend on waters that have lost federal protections.

*Harm to drinking water interests*

The Rule creates a substantial risk of harm to the rivers, lakes, aquifers, and reservoirs on which Plaintiffs' members rely as sources of drinking water. For example, Lisa Coté gets her drinking water from the Bellamy River in New Hampshire. Coté Decl. ¶ 14. The Rule substantially increases the risk that Ms. Coté's drinking-water source will be contaminated because many streams that flow into, and wetlands that filter pollutants from, the Bellamy River are now more vulnerable to increased pollution and destruction as a result of the Rule. *See* Woods Decl. ¶ 52, Ex. 22 at 2 (map showing non-abutting wetlands around Bellamy River); Fesenmyer Decl. ¶ 16 (estimating that several ephemeral streams flow into Bellamy River). As another example, the Los Alamos National Laboratory in New Mexico currently discharges pollutants into ephemeral streams that feed into Plaintiffs' members' drinking-water sources. *See* Taylor Decl. ¶¶ 3-5; McGavran Decl. ¶¶ 3-6; Woods Decl. ¶ 34, Ex. 5 (map showing area of members' drinking-water sources downstream of the Laboratory and ephemeral streams); Wu

Decl. Ex. 20 (Los Alamos CWA permit fact sheet).[9] Because these ephemeral streams have lost federal protection, there is a substantial risk that the Laboratory's current permit terms will be relaxed, increasing the contamination of these members' drinking-water sources.[10] *See also* Wu Decl. Ex. 33 (recent Army Corps determination that ephemeral stream in city of Rio Rancho is not protected under the Rule); Woods Decl. Ex. 5 (map showing that Rio Rancho is near where Ms. Taylor gets her drinking water).

Plaintiffs have many other members who also get their drinking water from downstream waters at substantial risk of increased contamination due to the Agencies' decision to remove federal protections from streams and wetlands that protect the integrity of those waters. *See, e.g.*, Hildreth Decl. ¶ 5 (gets drinking water from Sebago Lake in Maine); Woods Decl. ¶ 49 (estimating 52% of wetlands in watershed that includes Sebago Lake unprotected under Rule); *id.* Ex. 19 at 3 (map showing non-abutting wetlands around Sebago Lake); Fesenmyer Decl. ¶ 17 (estimating several ephemeral streams flow into Sebago Lake); Kerr Decl. ¶ 6 (gets drinking water from well near Little River); Woods Decl. ¶ 52, Ex. 22 at 3 (map showing non-abutting wetlands around Little River); Schillo Decl. ¶¶ 3-7 (members get drinking water from Lake Michigan in New Buffalo); Woods Decl. ¶ 56 (estimating 70% of wetlands in watershed that includes New Buffalo unprotected under Rule); *id.* Ex. 26 at 2 (map showing non-abutting wetlands around New Buffalo); Bohigian Decl. ¶¶ 11-12 (gets drinking water from Kings and San Joaquin Rivers in Fresno, California); Woods Decl. ¶¶ 37-38, Exs. 8, 9 (maps showing

---

[9] The Court can take judicial notice of this permit fact sheet and other government documents attached to the accompanying Declaration of Michelle Wu. *See* Fed. R. Evid. 201(b)(2); *Torréns v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005).

[10] In the 1940s-50s, the Los Alamos Laboratory discharged untreated plutonium into intermittent streams, contaminating the Rio Grande, Wu Decl. Ex. 2, Connectivity Report at 3-36, from which Tess Taylor gets drinking water, Taylor Decl. ¶ 3.

Kings and San Joaquin Rivers fed by ephemeral streams upstream of Fresno).

_Harm to recreational interests_

The Rule also creates a substantial risk that waters on which Plaintiffs' members rely for recreational activities will be destroyed, polluted, or degraded. _See CLF v. Jackson_, 964 F. Supp. 2d 152, 160 (D. Mass. 2013) ("plaintiffs can establish an injury in fact when they adequately 'aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity'" (quoting _Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc._, 528 U.S. 167, 183 (2000) (quotation marks omitted)). For example, Dan Graovac and John Macone frequently boat, swim, and fish in the Merrimack River in Massachusetts. _See_ Graovac Decl. ¶¶ 7, 14; Macone Decl. ¶¶ 11-14. There is a substantial risk the Rule will lead to increased contamination of the Merrimack River, harming these members' ability to use and enjoy the River, because many of the streams and wetlands that protect the River's health are now more vulnerable to development and degradation. _See_ Woods Decl. ¶ 47 (estimating 25% of wetlands in Merrimack River watershed unprotected under Rule); _id._ Ex. 17 (map showing non-abutting wetlands in Merrimack watershed); Fesenmyer Decl. ¶ 11 (estimating 30-51% of streams flowing into Merrimack River are ephemeral).

Cass Landrum, another member, regularly visits the Chaco Culture National Historical Park in New Mexico, which contains ephemeral streams that originate outside the Park in an area where there has been increased oil and gas development. _See_ Landrum Decl. ¶¶ 11-12, 15; Wu Decl. Exs. 21-24 (recent Army Corps determinations that ephemeral streams around the Park, which will be impacted by oil and gas projects, are not protected under the Rule); _id._ Ex. 25 (Bureau of Land Management analysis of oil and gas development in area surrounding the Park, noting potential impacts to water quality). Under the Rule, oil and gas developers are no longer

required to comply with the Clean Water Act, including section 311 of the statute, 33 U.S.C. § 1321 (oil and hazardous substance liability), for project impacts to ephemeral streams. The Rule thus substantially increases the risk that ephemeral streams flowing into the Park will be degraded, polluted, or destroyed, which would diminish Ms. Landrum's enjoyment of the Park. *See* Landrum Decl. ¶ 12.

Plaintiffs' members across the country are threatened with similar harms to their recreational interests in waterbodies at substantial risk of pollution, degradation, or destruction as a result of the Rule. *See, e.g.*, Crockett Decl. ¶¶ 4-5, 9 (goes camping and hiking along San Francisco and Gila Rivers, fed by ephemeral streams); Erickson Decl. ¶ 9 (camps along Gila River); Woods Decl. ¶¶ 41-42, Exs. 12, 13 (maps of San Francisco and Gila Rivers); Levy Decl. ¶¶ 6, 8 (observes wildlife in Caloosahatchee River and swims and kayaks in Estero Bay in Florida); Woods Decl. ¶¶ 53-54 (estimating 43% of wetlands in Caloosahatchee watershed and 81% of wetlands in Big Cypress watershed, which includes Estero Bay, unprotected under Rule), *id.* Exs. 23, 24 (maps showing non-abutting wetlands in Caloosahatchee and Big Cypress watersheds);[11] Coté Decl. ¶¶ 8-13 (recreates around Great Bay and rivers flowing into Bay); Woods Decl. ¶ 52 (estimating 41% of wetlands in watershed that includes Great Bay unprotected under Rule); *id.* Ex. 22 at 1; Gach Decl. ¶¶ 2, 21-22 (boats in Blackstone River in Massachusetts, and views wetland-dependent wildlife near home in Shrewsbury); Fesenmyer Decl. ¶ 7 (estimating 26-46% of streams that flow into Blackstone River are ephemeral); Woods Decl. ¶ 48 (estimating 16% of wetlands in Blackstone River watershed unprotected under Rule); *id.* Ex. 18 (map of Blackstone River watershed, which includes Shrewsbury); Hartman Decl. ¶¶ 11-

---

[11] The Army Corps recently determined that wetlands near Estero Bay and a tributary to it are not protected by the Clean Water Act under the Rule. *See* Wu Decl. Exs. 26-27.

15, 18 (kayaks in Namekagon River and birdwatches throughout Wisconsin); Woods Decl. ¶ 58 (estimating 26% of wetlands in Namekagon watershed unprotected under Rule); *id.* Ex. 28 (map showing non-abutting wetlands in Namekagon watershed); Fesenmyer Decl. ¶ 13 (estimating 64-77% of streams that flow into Namekagon River are ephemeral); Ricci Decl. ¶¶ 6-7 (recreates in Nashua River); Woods Decl. ¶ 50 (estimating 32% of wetlands in Nashua watershed unprotected under Rule); *id.* Ex. 20 at 1; Fesenmyer Decl. ¶ 14 (estimating 33-53% of streams flowing into Nashua River are ephemeral); Drewsen Decl. ¶¶ 12-14 (fishes for trout in Wisconsin, including Mt. Vernon Creek); Fesenmyer Decl. ¶ 18 (estimating that several ephemeral streams flow into Mt. Vernon Creek); Roth Decl. ¶¶ 8-16 (recreates in vernal pools in Cape Ann, Massachusetts); Woods Decl. ¶ 51, Ex. 21 at 2 (map showing non-abutting wetlands in Cape Ann); Pengelley Decl. ¶¶ 5-9 (recreates in McFadden Marsh and Middle Muddy Creek in Oregon); Woods Decl. ¶ 39, Ex. 10 (map of Middle Muddy Creek showing ephemeral stream leading to marsh); Szafoni Decl. ¶¶ 3-4 (views wildlife in likely unprotected wetland that is only partly on his property).

Increased pollution of waters where Plaintiffs' members recreate could also jeopardize their health. *See, e.g.*, Macone Decl. ¶¶ 19-21 (expressing concern about illness from increased sewage discharges in Merrimack River as a result of Rule); Graovac Decl. ¶ 18 (same); Levy Decl. ¶ 13 (expressing concern about red tide and blue-green algae blooms, which cause respiratory and other health problems); Hermans Decl. ¶¶ 5-8 (similar).

Plaintiffs' members are also harmed by the Agencies' failures to assess the Rule's impacts on threatened and endangered species and their critical habitat and to ensure the Rule will not jeopardize such species. For example, Plaintiffs' members enjoy viewing or looking for the following ESA-listed species that live in or along downstream waters at substantial risk of being further degraded as a result of the Rule: shortnose and Atlantic sturgeon in the Connecticut

River, *see* Fisk Decl. ¶ 7, Price Decl. ¶ 14, Fesenmyer Decl. ¶ 12 (estimating 25-46% of streams in Middle Connecticut River watershed are ephemeral), Woods Decl. ¶¶ 45-46 (estimating 19% of wetlands in Middle Connecticut watershed and 10% of wetlands in Upper Connecticut watershed unprotected under Rule); red knots at the mouth of the Merrimack River, *see* Parsons Decl. ¶¶ 16-21; piping plovers near the Merrimack River and Lake Michigan, *see* Graovac Decl. ¶ 10, Ricci Decl. ¶¶ 15-17, Hernandez Decl. ¶ 6, Campbell Decl. ¶¶ 12-21 (views piping plovers at Seagull Bar, Wisconsin), Woods Decl. ¶ 57 (estimating 22% of wetlands in watershed that includes Seagull Bar unprotected under Rule), *id.* Ex. 27 (map of watershed that includes Seagull Bar showing non-abutting wetlands); dwarf wedgemussels in western Massachusetts, *see* Lautzenheiser Decl. ¶¶ 19-20; Gila topminnow and Western yellow-billed cuckoo in Arizona and New Mexico, *see* Baucom Decl. ¶¶ 3-12 (Gila topminnow found in the Santa Cruz River), Wu Decl. Ex. 29 (more than 10,000 miles of streams in Santa Cruz watershed are ephemeral), Shimer Decl. ¶¶ 6-8, 14 (listens for yellow-billed cuckoo at home near Agua Fria River), Woods Decl. ¶ 40, Ex. 11 (map showing ephemeral streams in Agua Fria watershed), Erickson Decl. ¶ 7; and Florida manatees in the Caloosahatchee River and Estuary, *see* Levy Decl. ¶¶ 8-9. These species will be harmed by increased pollution or destruction of waters now unprotected by the Rule. *See, e.g.*, Parsons Decl. ¶¶ 21-23 (piping plovers are vulnerable to water pollution); Baucom Decl. ¶ 4 (Gila topminnow have become endangered due to habitat loss and poor water quality); Wu Decl. Ex. 28 (Fish & Wildlife Service website noting that habitat degradation and destruction from activities like increased pollution are "driving force" behind species decline).

Plaintiffs' members also enjoy observing and looking for the following threatened and endangered species that inhabit wetlands at substantial risk of being polluted or destroyed as a result of the Rule: wood storks and Everglade snail kite in Florida, *see* Braun Decl. ¶¶ 4-12,

Hermans Decl. ¶ 10, Williams Decl. ¶¶ 4-8; Southwestern willow flycatcher along streams in New Mexico, *see* Erickson Decl. ¶¶ 4-8; Hine's emerald dragonflies and eastern prairie fringed orchid in Wisconsin, *see* Kline Decl. ¶¶ 18-37; mountain sweet pitcher plants in Georgia, *see* Best Decl. ¶¶ 7-10; vernal pool fairy shrimp and California tiger salamander in California, *see* Bohigian Decl. ¶¶ 5-10, 13; and bog turtles in Massachusetts, *see* Lautzenheiser Decl. ¶¶ 22-28. These species will be harmed by increased pollution or destruction of their wetland habitat, *see, e.g.*, Braun Decl. ¶¶ 6, 11 (development of wetlands harms wood storks), Williams Decl. ¶ 6 (harm to water quality would harm Everglade snail kites),[12] Kline Decl. ¶ 22 (Hine's emerald dragonfly endangered due to destruction and degradation of wetland habitat and water pollution).

*Harm to livelihoods, property, and community infrastructure*

The Rule also creates a substantial risk of harm to Plaintiffs' members' livelihoods, properties, and communities. Plaintiffs' members' livelihoods depend on waters at substantial risk of being degraded because of the Agencies' decision to eliminate federal protections for ephemeral streams and wetlands, which significantly impact the integrity of those waters. *See* Hildreth Decl. ¶¶ 8-9 (works in seafood industry in Gulf of Maine); Woods Decl. Ex. 19 (map showing non-abutting wetlands in Presumpscot watershed, on Gulf of Maine); *id.* ¶ 49 (estimating 52% of wetlands in Presumpscot watershed unprotected under Rule); Fesenmyer Decl. ¶ 17 (estimating 30-52% of streams in Presumpscot watershed are ephemeral); Caron Decl. ¶¶ 4-10, 12 (owns hiking lodge in Upper Connecticut River watershed); Fesenmyer Decl. ¶ 19 (estimating 35-61% of streams in Upper Connecticut watershed are ephemeral); Clemens Decl. ¶¶ 3-14 (takes people fly-fishing in Rio Chama and Rio Grande); Woods Decl. ¶¶ 33, 36, Exs. 4,

---

[12] The Army Corps recently determined that a 6.71-acre wetland near Lake Okeechobee is not protected by the Clean Water Act under the Rule. *See* Wu Decl. Ex. 30. This wetland is within the range of the wood stork and the Everglade snail kite. *See* Wu Decl. Exs. 31-32.

7 (maps of Upper Rio Grande and Rio Chama, showing ephemeral streams); Crockett Decl. ¶¶ 3-8, 10-11 (owns backcountry outfitting service that depends on rivers fed by ephemeral streams); Vigil Decl. ¶¶ 3-7 (irrigates crops with water from Bull Creek and Pecos River, which are fed by ephemeral streams); Woods Decl. ¶ 43, Ex. 14 (map of Pecos River); Landrum Decl. ¶¶ 13, 15 (irrigates crops with water from Rio Hondo); Woods Decl. ¶ 35, Ex. 6 (map showing Rio Hondo fed by ephemeral streams); Erndt-Pitcher Decl. ¶¶ 4-5, 10-11 (uses water fed by ephemeral streams to irrigate crops and for livestock). Plaintiffs' members' communities and properties are also at substantial risk of increased flooding from the loss of federal wetland protections. *See* Coté Decl. ¶¶ 15-16; Gavin Decl. ¶¶ 11-15; Graovac Decl. ¶¶ 15-18.

### B.     Plaintiffs satisfy the causation and redressability elements of standing

The Rule causes Plaintiffs' injuries because it allows third parties to pollute and destroy ephemeral streams and wetlands without federal protections, substantially increasing the risk of harm to the wetlands, ephemeral streams, and downstream waters on which Plaintiffs' members rely. *See Sierra Club v. Glickman*, 156 F.3d 606, 614 (5th Cir. 1998) (even if injury is ultimately caused by third party, relevant inquiry for causation is whether the agency "has the ability through various programs to affect the . . . decisions of those third part[ies] . . . to such an extent that the plaintiff's injury could be relieved"); *Strahan v. Coxe*, 939 F. Supp. 963, 978-79 (D. Mass. 1996), *aff'd in part and vacated in part on other grounds*, 127 F.3d 155 (1st Cir. 1997). For the same reason, an order vacating the Rule would redress Plaintiffs' injuries because it would restore federal protections to the waters and habitats of endangered species in which Plaintiffs' members have a concrete interest. *See Sierra Club v. Jewell*, 764 F.3d 1, 8 (D.C. Cir. 2014) (noting that the causation and redressability inquiries overlap as "two sides of a causation coin"). Ordering the Agencies to comply with the ESA would redress Plaintiffs' ESA injuries

because compliance could prompt the Agencies to reconsider the Rule, alleviating the harm it causes.[13] *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007).

## V.     The Court should vacate the Rule and order the Agencies to comply with the ESA

The Court should vacate the Rule because it is arbitrary, capricious, and not in accordance with law under the APA, and because the Agencies failed to comply with the ESA. Vacatur is the "usual" remedy when an agency action is arbitrary and capricious or otherwise not in accordance with law. *Guertin*, 743 F.3d at 388; *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy" for an APA violation). Indeed, the APA itself states that a court "*shall . . . set aside* agency action" found to be unlawful. 5 U.S.C. § 706(2) (emphasis added). Vacatur or an injunction of the Rule pending compliance with the ESA is also warranted when an agency fails to engage in section 7 consultation. *See* 16 U.S.C. § 1540(g)(1)(A) (any person may sue to "enjoin" the government from taking action in violation of the ESA); *Defs. of Wildlife v. EPA*, 420 F.3d 946, 978 (9th Cir. 2005) ("Typically, when an agency violates the Administrative Procedure Act and Endangered Species Act, we vacate the agency's action and remand to the agency to act in compliance with its statutory obligations."), *rev'd on other grounds sub nom. Nat'l Ass'n of Home Builders*, 551 U.S. 644.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Navigable Waters Rule and order Defendants to comply with their obligations under section 7 of the ESA.

---

[13] Plaintiffs First (APA) and Third (ESA) claims are procedural. To demonstrate causation and redressability on these claims, Plaintiffs need show only that the procedures at issue "seek to minimize the risk of future harm" alleged and "some possibility" the requested relief will prompt the Agencies to "reconsider the decision." *Impson*, 503 F.3d at 27. Both prongs are satisfied here.

Dated: October 15, 2020

Respectfully submitted,

*/s/ Jolie McLaughlin*
Jolie McLaughlin, *pro hac vice*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 995-5902
Email: jdmclaughlin@nrdc.org

Nancy S. Marks, Bar No. 542204
Michelle Wu, *pro hac vice*
Catherine Marlantes Rahm, *pro hac vice*
Daniel Hessel, *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Phone: (212) 727-4414
Email: nmarks@nrdc.org

*Counsel for Plaintiffs Clean Wisconsin, Natural
Resources Defense Council, New Mexico
Wilderness Alliance, and Prairie Rivers Network*

*/s/ Heather A. Govern*
Heather A. Govern, Bar No. 688482
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Phone: (617) 850-1765
Email: hgovern@clf.org

Elena Mihaly, Bar No. 687387
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
Phone: (802) 622-3012
Email: emihaly@clf.org

*Counsel for Plaintiffs Conservation Law
Foundation, Connecticut River Conservancy,
Massachusetts Audubon Society, and Merrimack
River Watershed Council*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2020, I caused the foregoing **PLAINTIFFS'**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**,

and attached declarations, to be filed and served upon counsel of record via the Court's CM/ECF

filing system.


Dated:  October 15, 2020                          */s/ Jolie McLaughlin*_____