**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 20-cv-10820-DPW |
| v. | ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

GLOSSARY ...................................................................................................................... x

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

      A.      Statutory and Regulatory Background ................................................................. 3

            1.      CWA Permitting Programs ...................................................................... 4

            2.      Prior Regulatory Definitions of "Waters of the United States" and Litigation .............................................................. 5

                  a.      The 2015 Rule ................................................................... 6

                  b.      The Repeal Rule ............................................................... 7

            3.      The Endangered Species Act ................................................................. 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ..................................................................................................................... 10

I.      Plaintiffs' Challenge Is Not Ripe for Review. ................................................... 10

II.     The NWPR Is Permissible Under the CWA and Should Be Upheld. ................ 12

      A.      The NWPR Reasonably Construes "Waters of the United States," an Ambiguous Statutory Phrase. ..................................................... 13

      B.      Plaintiffs' Disagreement Does Not Unambiguously Preclude the Agencies' Reasonable Interpretation of "Waters of the United States." ................................................................................. 14

            1.      *Rapanos* Does Not Foreclose the Agencies' Interpretation of "Waters of the United States." ..................................... 14

            2.      The CWA's Objective Does Not Foreclose the Agencies' Interpretation of "Waters of the United States." ....................... 17

III.    The NWPR Is Neither Arbitrary Nor Capricious Under the APA. ................... 20

A.  The NWPR's Definition of "Tributary" Is Reasonable. ........................................21

  1.  The Agencies Explained Their Reasons for Excluding Ephemeral Features..................................................................21

  2.  Science Alone Cannot Determine the Agencies' Jurisdiction Over Tributaries. ....................................................23

  3.  Plaintiffs' Citations to the Record Do Not Show that the NWPR Is Arbitrary and Capricious. .........................................24

B.  The NWPR's Treatment of Adjacent Wetlands Is Reasonable. ...........................29

C.  The Agencies Adequately Considered the Effects of the NWPR on Water Quality...........................................................................33

IV.  The NWPR Does Not Violate the ESA. ........................................................35

A.  Defining the Limits of CWA Jurisdiction Does Not Trigger ESA Consultation. ...................................................................36

B.  The NWPR Has No Effect on Listed Species........................................41

V.  The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment. ...............................................44

CONCLUSION.................................................................................46

# TABLE OF AUTHORITIES

## Cases

*Adams v. EPA*,
   38 F.3d 43 (1st Cir. 1994) ................................................................................. 12

*Alaska Wilderness League v. Jewell*,
   788 F.3d 1212 (9th Cir. 2015)................................................................. 36, 39, 41

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) .......................................................................... 44

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ......................................................................................... 18

*Am. Forest & Paper Ass'n v. EPA*,
   137 F.3d 291 (5th Cir. 1998)............................................................................ 37

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019) ......................................................................... 42

*Am. Hospital Ass'n v. NLRB*,
   499 U.S. 606 (1991) ......................................................................................... 10

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) ........................................................................................... 9

*Baltimore Gas & Electric Co. v. NRDC, Inc.*,
   462 U.S. 87 (1983) ............................................................................................. 3

*Calderon-Serra v. Wilmington Trust Co.*,
   715 F.3d 14 (1st Cir. 2013) ................................................................................ 9

*California v. Wheeler*,
   467 F. Supp. 3d 864 (N.D. Cal. 2020) ....................................... 2, 3, 7, 16, 17, 19

*Center for Food Safety v. Vilsack*,
   718 F.3d 829 (9th Cir. 2013)....................................................................... 37, 41

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) ................................................................................ 1, 10, 12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................... 9

*City of Taunton, Mass. v. EPA*,
   895 F.3d 120 (1st Cir. 2018),
   *cert. denied*, 139 S. Ct. 1240 (2019) ................................................................. 9, 12

*Colorado v. EPA*,
   445 F. Supp. 3d 1295 (D. Colo. 2020),
   *appeals docketed*, Nos. 20-1238, 20-1262, 20-1263 (10th Cir.) .......................... 7, 14

*County of Maui, Hawaii v. Hawaii Wildlife Fund*,
   140 S. Ct. 1462 (2020) ............................................................... 3, 4, 26, 28

*CTIA-The Wireless Ass'n v. FCC*,
   530 F.3d 984 (D.C. Cir. 2008) ............................................................ 12

*Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.*,
   359 F. App'x 781 (9th Cir. 2009) ........................................................ 43

*Dep't of Transp. v. Public Citizen*,
   541 U.S. 752 (2004) ...................................................................... 42

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ...................................................................... 13

*F.C.C. v. Fox Tele. Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................. 20, 21

*Georgia v. Pruitt*,
   326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................... 7

*Georgia v. Wheeler*,
   418 F. Supp. 3d 1336 (S.D. Ga. 2019) ................................................ 7, 30

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................... 45

*In re EPA & DOD Final Rule*,
   803 F.3d 804 (6th Cir. 2015),
   *vacated by* 713 F. App'x 489 (6th Cir. 2018) ............................................ 7

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) .......................................................... 26

*Karuk Tribe v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) .......................................................... 36

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ................................................................. 43

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ......................................................................... 11

*Mayo Found. for Med. Educ. & Research v. United States*,
    562 U.S. 44 (2011) .......................................................................... 13

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................... 44, 45

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................ 17

*Murphy v. United States*,
    45 F.3d 520 (1st Cir. 1995) ................................................................. 9

*National Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) ................................................................ 38, 39, 41

*National Cable & Telecomm. Ass'n v. Brand X Internet Serv.*,
    545 U.S. 967 (2005) ........................................................ 2, 13, 15, 38, 42

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003) .................................................................... 10, 11

*Newton County Wildlife Ass'n v. Rogers*,
    141 F.3d 803 (8th Cir. 1998) .......................................................... 36, 41

*North Dakota v. EPA*,
    127 F. Supp. 3d 1047 (D.N.D. 2015) ........................................................ 7

*Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*,
    962 F.2d 27 (D.C. Cir. 1992) .......................................................... 36, 37

*Pronsolino v. Nastri*,
    291 F.3d 1123 (9th Cir. 2002) ............................................................. 5

*Rapanos v. United States*,
    547 U.S. 715 (2006) .................................................................. *passim*

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ......................................................................... 10

*Reno v. Flores*,
  507 U.S. 292 (1993) ............................................................................. 9, 10, 19, 22, 30

*River St. Donuts, LLC v. Napolitano*,
  558 F.3d 111 (1st Cir. 2009) ................................................................................... 9

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs (SWANCC)*,
  531 U.S. 159 (2001) ..................................................................................... *passim*

*Spokeo v. Robins*,
  136 S. Ct. 1540 (2016) ........................................................................................ 45

*Texas v. EPA*,
  No. 3:15-CV-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ........................................ 7

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ..................................................................... 7

*Texas v. United States*,
  523 U.S. 296 (1998) ........................................................................................... 12

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ........................................................................................ 45

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ........................................................................................... 16

*United States v. Johnson*,
  467 F.3d 56 (1st Cir. 2006) .................................................................................. 16

*United States v. Mendoza*,
  464 U.S. 154 (1984) ........................................................................................... 45

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985) ................................................................................. 5, 13, 29, 31

*Upper Blackstone Water Pollution Abatement Dist. v. EPA*,
  690 F.3d 9 (1st Cir. 2012) ................................................................................... 12

*Washington Toxics Coalition v. EPA*,
  413 F.3d 1024 (9th Cir. 2005) .............................................................................. 38

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................................... 45

*WildEarth Guardians v. U.S. Fish & Wildlife Service,*
   622 F. Supp. 2d 1155 (D. Utah 2009) ................................................................................ 43

**Statutes and Court Rules**

5 U.S.C. § 706(2) .................................................................................................... 9, 45

16 U.S.C. § 1533 .......................................................................................................... 8

16 U.S.C. § 1536(a)(2) ........................................................................................... 9, 35

16 U.S.C. § 1536(b)(3)(A) ........................................................................................... 36

16 U.S.C. § 1538(a)(1)(B) ............................................................................................ 43

33 U.S.C. § 1251(a) ................................................................................................... 3, 17

33 U.S.C. § 1251(b) .............................................................................. 3, 14, 17, 18, 19

33 U.S.C. § 1255(a)(1) .................................................................................................. 20

33 U.S.C. § 1311 ....................................................................................................... 3, 4

33 U.S.C. § 1313 ........................................................................................................... 4

33 U.S.C. § 1314 ........................................................................................................... 4

33 U.S.C. § 1316-17 ...................................................................................................... 4

33 U.S.C. § 1342 ........................................................................................................... 4

33 U.S.C. § 1344 ........................................................................................................... 4

33 U.S.C. § 1362 ........................................................................................................... 4

33 U.S.C. 1362(7) .................................................................................. 3, 7, 13, 18, 38, 39

**Other Authorities**

40 C.F.R. § 122.44(d)(1)(vii)(A) ................................................................... 4

40 C.F.R. § 130.2(j) ...................................................................................... 4

40 C.F.R. § 130.7(b)(1) ................................................................................. 4

40 C.F.R. § 131.10(b) .................................................................................. 35

40 C.F.R. § 232.2(q) ..................................................................................... 5

33 C.F.R. § 328.3(a) ...................................................................................... 5

50 C.F.R. § 402.02 ....................................................................................... 36

50 C.F.R. § 402.03 ................................................................................. 35, 36

50 C.F.R. § 402.14(a) ............................................................................ 36, 43

50 C.F.R. § 402.14(h) ................................................................................... 36

50 C.F.R. § 402.17(b) ............................................................................. 42-43

39 Fed. Reg. 12,115 (Apr. 3, 1974) ...................................................... 5, 13

42 Fed. Reg. 37,123 (July 19, 1977) ........................................................... 5

80 Fed. Reg. 37,054 (June 29, 2015) .................................................... 6, 23

84 Fed. Reg. 4154 (Feb. 14, 2019) ............................................................ 27

84 Fed. Reg. 44,976 (Aug. 27, 2019) ........................................................ 42

84 Fed. Reg. 56,626 (Oct. 22, 2019) ........................................................... 7

85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................................... *passim*

Executive Order 13778 ......................................................................... 7, 15

# GLOSSARY

| | |
|---|---|
| 2015 Rule | Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) |
| APA | Administrative Procedure Act |
| CWA | Clean Water Act, 33 U.S.C. §§ 1251 et seq. |
| EA | Economic Analysis |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| NPDES | National Pollutant Discharge Elimination System |
| NWPR | Navigable Waters Protection Rule: Definitions of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) |
| Repeal Rule | Definition of "Waters of the United States"- Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) |
| RPA | Resources and Programmatic Assessment |
| TMDL | Total Maximum Daily Load |
| WQLS | Water-quality-limited segments |
| WQS | Water Quality Standards |

# INTRODUCTION

The Navigable Waters Protection Rule ("NWPR") brings decades of debate regarding the jurisdictional limits of the Clean Water Act, 33 U.S.C. §§ 1251 et seq., ("CWA") to a close. Under prior regulations, CWA jurisdiction often turned on an administratively burdensome and case-specific analysis. This analysis looked at whether wetlands and other waters had a "significant nexus" to traditionally navigable waters—a judge-made doctrine that, from its inception, was only anticipated as a stopgap "[a]bsent more specific regulations" by the Agencies. *Rapanos v. United States*, 547 U.S. 715, 782 (2006) (Kennedy, J., concurring in judgment). The ongoing application of this standard muddied the waters of CWA jurisdiction. It spawned years of litigation. But the NWPR now far more clearly defines discrete categories of covered waters. People can more easily determine whether a CWA permit is required to discharge pollutants to a particular water or wetland. Yet the Agencies' best assessment is that these changes minimally impact the Agencies' CWA programs.

Plaintiffs' challenges to the NWPR are unfounded. Yet this Court should not even reach the merits. Plaintiffs fail to show any concrete application of the NWPR actually now injuring their interests. Even if the Court hears Plaintiffs' facial challenge, it should uphold the NWPR. The rule is consistent with the CWA and well-supported by the administrative record.

The NWPR promulgates a reasonable interpretation of the indisputably ambiguous phrase "waters of the United States." That Agency construction is entitled to deference by this Court. *See Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984). Plaintiffs argue otherwise using snippets of the disparate Supreme Court opinions in *Rapanos*. But *Rapanos* was a fundamentally different case. Even if that case's dissent were its holding, it would be legally and factually distinguishable. For *Rapanos* instead addresses the outer limits of the CWA: how far can the

Agencies reach; what waters may the Agencies regulate? The opinions do not dictate what waters the Agencies *must* regulate.

Further, while the Agencies carefully crafted the NWPR to synthesize major aspects of all the opinions in *Rapanos*, the Agencies' reasonable construction of the statute is entitled to deference—*regardless of these prior judicial interpretations. See National Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 982 (2005). A foundational principle of administrative law is that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). Yet no *Rapanos* opinion found the term "navigable waters," meaning "waters of the United States" unambiguous. Rather, as the Chief Justice stressed, the Agencies are "delegated rulemaking authority . . . [and] are afforded generous leeway by the courts" in interpreting the CWA. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring). And the NWPR articulates a clear and reasonable construction of the CWA.

The NWPR is also neither arbitrary nor capricious under the Administrative Procedure Act ("APA"). The Agencies' extensive analysis and discussion span more than 1,500 pages across the rule's preamble, the Resource and Programmatic Assessment ("RPA"), the Economic Analysis ("EA"), and Response to Comments ("RTC"). Plaintiffs suggest—contrary to their own evidentiary source—that scientific data alone should somehow determine the scope of CWA jurisdiction. It cannot. Jurisdiction is fundamentally a legal inquiry. And the Agencies did thoroughly consider the "scientific evidence," as well as other evidence and factors relevant to their reasoned decisionmaking. As the only district court in the country to consider such arguments correctly recognized, "Plaintiffs' arguments that the Agencies disregarded the

scientific evidence they previously had gathered is ultimately a policy disagreement as well." *California v. Wheeler*, 467 F. Supp. 3d 864, 877 (N.D. Cal. 2020) (denying prelim. injunction).

Plaintiffs incorrectly suggest that a shift from federal to state and tribal jurisdiction spells environmental catastrophe. The Agencies' conclusion that partnership with states consistent with the CWA's cooperative federalism can provide comparable environmental protection, at less societal cost, and net public benefit, is reasoned and well-supported. On these issues "within [the Agencies'] area of special expertise," "a reviewing court must generally be at its most deferential." *Baltimore Gas & Electric Co. v. NRDC, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiffs' Endangered Species Act ("ESA") claims also fail. The NWPR neither triggers ESA consultation obligations, nor affects any listed species. The Agencies are entitled to summary judgment. But should the Court decide any issues against the Agencies, facial vacatur is inappropriate. Separate remedy briefing, tailored to any decision, would be warranted.

## BACKGROUND

### A.     Statutory and Regulatory Background

Congress enacted the CWA with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.* § 1251(b). The Act prohibits "the discharge of any pollutant by any person," *id.* § 1311(a), to "navigable waters," which "means the waters of the United States," *id.* § 1362(7), unless otherwise authorized under the Act. The Act also prohibits certain discharges to non-jurisdictional waters that are conveyed downstream to jurisdictional waters and that are not authorized under the Act. *See* 85 Fed. Reg. 22,250, 22,289 (Apr. 21, 2020); *see also County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020)

(holding that the CWA applies to discharges to non-jurisdictional groundwater that reach navigable waters by a "functional equivalent" of a direct discharge).

### 1.    CWA Permitting Programs

Two programs are key to implementing the CWA's prohibition on the unauthorized discharge of pollutants to "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12).

EPA or authorized states issue CWA National Pollutant Discharge Elimination System ("NPDES") permits for the discharge of pollutants other than dredged or fill material into "waters of the United States." *Id*. § 1342. NPDES permits control water pollution using two strategies. The first, the "technology-based" approach, requires effluent limitations based on specific process-based controls. *Id*. §§ 1311, 1314, 1316–17, 1362(11). The second controls point source discharges by directing that NPDES permits include limits sufficiently stringent to implement applicable water quality standards. *Id*. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1)(vii)(A). For discharges of dredged or fill material into "waters of the United States," the U.S. Army Corps of Engineers ("Corps") or a state or tribe with a federally-approved program, may issue CWA Section 404 permits. 33 U.S.C. § 1344(a), (d), (g).

Backstopping these programs, states adopt water quality standards ("WQS") for particular waterbodies or waterbody segments within their boundaries. 33 U.S.C. § 1313(a), (b) & (c)(1). States then identify, and prioritize, water-quality-limited segments, i.e., segments that do not meet water quality standards even after implementation of technology-based effluent limitations. *Id.* § 1313(d)(1)(A) & (B); 40 C.F.R. §§ 130.2(j) & 130.7(b)(1). States develop a Total Maximum Daily Load ("TMDL") for each impaired waterbody and the particular pollutant causing the impairment. 33 U.S.C. § 1313(d). TMDLs function primarily as planning devices.

*See Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002). States implement TMDLs by adjusting pollutant discharge limits in individual permits and/or by nonpoint source controls.

### 2. Prior Regulatory Definitions of "Waters of the United States" and Litigation

The Corps first promulgated regulations defining "waters of the United States" in the 1970s. Those included only waters subject to the ebb and flow of the tide or were navigable in fact. 39 Fed. Reg. 12,115 (Apr. 3, 1974). Thereafter, the Corps substantially broadened its interpretation of the phrase. *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the 1980s, the Agencies adopted regulatory definitions substantially similar to the 1977 definition; those regulations remained in effect until 2015. *See* 33 C.F.R. § 328.3(a) (1987) (Corps); 40 C.F.R. § 232.2(q) (1988) (EPA) (collectively, the "1986 Regulations").

Over time, the Agencies refined their application of the 1986 Regulations, as informed by three Supreme Court decisions. In *Riverside Bayview*, the Court applied *Chevron* deference to hold the Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water was reasonable. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131–35 & n.9 (1985). But in *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court held "the text of the statute will not allow" the extension of CWA jurisdiction to "ponds that are not adjacent to open water." *Id.* at 168.

In *Rapanos*, the Supreme Court then assessed the Corps' assertion of jurisdiction over four specific wetlands adjacent to ditches that were at issue in an enforcement action and a permit proceeding. *Rapanos*, 547 U.S. at 719–20, 729–30. Pursuant to Justice Scalia's plurality opinion and a concurrence by Justice Kennedy, the Court found the Corps' jurisdictional analysis too expansive and remanded it for further consideration. *Id.* at 757 (Scalia, J., plurality); *id.* at 786–87 (Kennedy, J., concurring). The plurality stated that "the traditional term 'navigable

waters' . . . carries *some* of its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id.* at 734 (Scalia, J., plurality). But the plurality stated the term "waters of the United States" does "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id.* at 732 n.5. Further, the plurality would have excluded from jurisdiction "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States.'" *Id.* at 742.

In concurring in the judgment, Justice Kennedy opined that jurisdiction may extend to wetlands with a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring). But Justice Kennedy rejected the dissent's view that the CWA "would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

### a.    The 2015 Rule

In 2015, the Agencies revised the regulatory definition of "waters of the United States." 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Arguing Justice Kennedy's "significant nexus" discussion as its legal touchstone, *id.* at 37,060, the 2015 Rule had the "objective of enhancing regulatory clarity, predictability and consistency." *Id.* at 37,090. The 2015 Rule defined the jurisdictional scope of the CWA by placing waters into three categories: (A) waters that were categorically jurisdictional; (B) waters that were subject to case-specific analysis to determine jurisdiction; and (C) waters that were categorically excluded from jurisdiction. *Id.*

Multiple parties sought judicial review of the 2015 Rule in courts across the country. A court of appeals and several district courts stayed or enjoined the 2015 Rule, concluding

plaintiffs were likely to succeed.[1] Two courts ruled on summary judgment that the 2015 Rule was "unlawful" and remanded the rule to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504–06 (S.D. Tex. 2019). In so ruling, the Southern District of Georgia held that "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond [the Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360.

### b.  The Repeal Rule

In 2017, the President issued Executive Order ("EO") 13778, which directed the Agencies to "review" the 2015 Rule and "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. § 1362(7), in a manner consistent with the opinion of Justice Scalia in *Rapanos v. United States*." After the rulemaking process, the Agencies repealed the 2015 Rule, and reinstated the 1986 Regulations' definition of "waters of the United States." 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"). The Repeal Rule became effective on December 23, 2019, and a number of parties have filed suits challenging the rule.

On January 23, 2020, the Agencies then signed a separate final rule—the NWPR—that takes a new approach to defining "waters of the United States." The NWPR went into effect on June 22, 2020, 85 Fed. Reg. 22,250 (Apr. 21, 2020). A district court in San Francisco denied a nationwide preliminary injunction. *California*, 467 F. Supp. 3d at 877. But in Colorado, a state-specific preliminary injunction applies. *See Colorado v. EPA*, 445 F. Supp. 3d 1295 (D. Colo. 2020), *appeals docketed*, Nos. 20-1238, 20-1262, 20-1263 (10th Cir.).

---

[1] *See, e.g.*, *In re EPA & DOD Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (6th Cir. 2018); *Texas v. EPA*, No. 3:15-CV-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *North Dakota v. EPA*, No. 3:15-cv-59, ECF No. 250 (D.N.D. Sept. 18, 2018).

The NWPR establishes four categories of jurisdictional waters: (1) the territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than jurisdictional wetlands). 85 Fed. Reg. at 22,273. By creating these discrete categories of jurisdictional waters, the NWPR finally moves beyond the case-specific application of a "significant nexus" test. *Id.* The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id.* at 22,270; *see also id.* at 22,340–41.

The NWPR relies on "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." *Id.* at 22,252. It extends jurisdiction over "perennial" tributaries as well as "intermittent" tributaries that "flow[] continuously during certain times of the year and more than in direct response to precipitation." *Id.* at 22,338. As for wetlands, the NWPR extends jurisdiction over "adjacent wetlands," meaning those wetlands that abut jurisdictional waters and those wetlands that are non-abutting but are (1) "inundated by flooding" from a jurisdictional water during a typical year, (2) physically separated from a jurisdictional water only by certain natural features (e.g., a berm, bank, or dune), or (3) physically separated from a jurisdictional water by an artificial barrier that "allows for a direct hydrologic surface connection" during a typical year to a jurisdictional water. *Id.* at 22,251.

### 3.      The Endangered Species Act

The ESA provides for the listing of species as "threatened" or "endangered" and for the designation of critical habitat for listed species. 16 U.S.C. § 1533. Section 7(a)(2) directs each federal agency to ensure, in consultation with the U.S. Fish and Wildlife Service ("FWS") or the

National Marine Fisheries Service ("NMFS"), that "any action authorized, funded, or carried out" by that agency is not likely to "jeopardize the continued existence of any [listed] species" or "result in the destruction or adverse modification of [critical] habitat." *Id.* § 1536(a)(2).

## STANDARD OF REVIEW

"Federal courts, as courts of limited jurisdiction, may not presume the existence of subject matter jurisdiction, but, rather, must appraise their own authority to hear and determine particular cases." *Calderon-Serra v. Wilmington Trust Co.* 715 F.3d 14, 17 (1st Cir. 2013). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). When a federal court lacks subject matter jurisdiction, "the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

Under the APA, a reviewing court may overturn agency action that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also City of Taunton, Mass. v. EPA*, 895 F.3d 120, 126 (1st Cir. 2018), *cert. denied*, 139 S. Ct. 1240 (2019). This standard of review "is highly deferential, and the agency's actions are presumed to be valid." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). The court's role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* Where a court reviews a facial challenge to a regulation (here the NWPR), plaintiffs bear the burden of establishing that "no set of circumstances exists under which the [NWPR] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993). That is, even if Plaintiffs "can point

to a hypothetical case in which the rule might lead to an arbitrary result [,that] does not render the rule 'arbitrary or capricious.' [This is because their] case is a challenge to the validity of the entire rule in all its applications." *Am. Hospital Ass'n v. NLRB*, 499 U.S. 606, 619 (1991).

## ARGUMENT

The Court should grant the Agencies' cross-motion for summary judgment and deny Plaintiffs' motion. The Court lacks jurisdiction to review Plaintiffs' challenge to the NWPR because such claims are not ripe. Regardless, the NWPR constitutes a reasonable interpretation of the CWA's ambiguous phrase "waters of the United States," and should be upheld under *Chevron, U.S.A., Inc.*, 467 U.S. at 837. Additionally, the NWPR is neither arbitrary nor capricious under the APA; the rule was well-reasoned and adequately explained. Nor does the NWPR violate the ESA because the NWPR does not trigger any obligations to consult under the Act and does not affect listed species. Lastly, although the Agencies contend that Plaintiffs will not prevail, if the Court determines that jurisdiction exists and finds that the NWPR violates the law, the Agencies request separate briefing on an appropriately tailored remedy.

## I.    Plaintiffs' Challenge Is Not Ripe for Review.

"Ripeness is a justiciability doctrine" that is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). The doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807–08 (internal

citation omitted). Under *National Park*, "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Id.* at 808 (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Here, Plaintiffs put forth no "concrete action applying the regulation" in a manner that will affect them. *Id.* Indeed, Plaintiffs merely speculate that some waters they think will be no longer subject to regulation under the CWA as a result of the NWPR will potentially be subject to increased pollution. *See* Pls.' Br. 37–38. But Plaintiffs must wait for a "concrete action" that will impact these purportedly newly deregulated waters near their members for their claim to be ripe for review. For instance, an entity with a current permit under Section 402 of the CWA might request termination of that permit on the grounds that the water body in question is no longer jurisdictional. Or, in connection with an industrial activity, an entity could request a jurisdictional determination from the Corps declaring that a water body in question may be filled without a CWA Section 404 permit. Such concrete activity—involving the discharge of specific pollutants in specific water bodies—would "flesh[] out" Plaintiffs' claims to help this Court more thoroughly address the claims in this case. *Lujan*, 497 U.S. at 891.

Although there are exceptions to the general ripeness doctrine, none apply here. One exception involves instances where "a substantive rule . . . as a practical matter requires the plaintiff to adjust his conduct immediately," *id.*, but no such allegations are made here, Pls.' Br. 36–44. Plaintiffs are not regulated parties, so the NWPR does not require that they "adjust [their] conduct immediately." *Lujan*, 497 U.S. at 891. Moreover, as the D.C. Circuit has held, even a

claim involving purely legal issues is *still* not ripe for adjudication "if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.*" CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, of course, Plaintiffs' claims of injury are not purely legal. The potential for harm to drinking water interests or recreational interests that Plaintiffs identify, Pls.' Br. 37–43, may not come to pass at all, or may raise different legal issues depending on the nature of the specific activity that is the alleged source of their potential future harm.

## II.   The NWPR Is Permissible Under the CWA and Should Be Upheld.

As to the merits, the NWPR is a well-explained application of well-settled rules of statutory interpretation to a famously ambiguous statute. "[B]ecause interpreting and implementing the CWA falls squarely within the EPA's bailiwick," this Court should defer to the Agencies' "'reasonable interpretation' of that statute." *City of Taunton*, 895 F.3d at 126 (citing *Adams v. EPA*, 38 F.3d 43, 49 (1st Cir. 1994) and *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 21 (1st Cir. 2012) ("We also defer to the EPA's reasonable interpretation of the CWA.")). Where a challenged rule contains an agency interpretation of statutory language, the Court applies the *Chevron*'s familiar two-step framework. 467 U.S. at 837. At Step One, this Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Step Two to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Because "waters of the United States" is concededly ambiguous, the Court need only consider whether the Agencies' interpretation is reasonable. As explained further below, the NWPR construction of "waters of

the United States" reflects a reasonable and permissible interpretation of CWA § 1362(7) (defining "navigable waters" as "waters of the United States").

### A.     The NWPR Reasonably Construes "Waters of the United States," an Ambiguous Statutory Phrase.

*Chevron* "established a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982. Because "waters of the United States" is ambiguous, the Agencies were empowered to reconsider their prior statutory interpretation—*even in the face of contrary judicial precedent*.

The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011). This need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical, as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980.

The NWPR is based on the text of the statute, informed by Supreme Court decisions. Congress defined "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C § 1362(7). The Corps originally defined these terms to encompass only tidal waters and waters that were navigable in fact. 39 Fed. Reg. 12,115 (1974). After the Agencies broadened their statutory reading, the Supreme Court held that Congress permitted this language to extend to some "waters" that are not actually "'navigable' under the classical understanding of that term." 85 Fed. Reg. at 22,262 (citing *Riverside Bayview*, 474 U.S. at 133). But "the term

'navigable' indicates 'what Congress had in mind as its authority for enacting the CWA.'" *Id.* at 22,282 (citing *SWANCC*, 531 U.S. at 172). Congress also stated a goal "to preserve[ ] and protect" the power of states to regulate water resources and land within their borders. *See* 33 U.S.C. § 1251(b). The NWPR's "unifying legal theory"—consistent with the statutory text— asserts "federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,252. The NWPR thus avoids federal regulation of non-navigable, non-adjacent waters that lack a sufficient such connection. In accordance with CWA Section 101(b), states or tribes may regulate such waters as they see fit. 33 U.S.C. § 1251(b).

> **B.     Plaintiffs' Disagreement Does Not Unambiguously Preclude the Agencies' Reasonable Interpretation of "Waters of the United States."**

Contrary to Plaintiffs' arguments, neither the (distinguishable) *Rapanos* case nor the CWA undermines the Agencies' reasonable construction of "waters of the United States."

> **1.     *Rapanos* Does Not Foreclose the Agencies' Interpretation of "Waters of the United States."**

Plaintiffs do not meaningfully dispute that *Chevron* deference is due. They nevertheless argue that the NWPR is unlawful because it is modeled after the *Rapanos* plurality opinion, which Plaintiffs wrongly contend is "inconsistent with the Act's text, structure, and purpose," Pls.' Br. 26 (quoting *Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring in judgment)).[2] These arguments are meritless for multiple reasons.

---

[2] Plaintiffs' reliance on *Colorado*, 445 F. Supp. 3d at 1312, is misplaced. That court based its erroneous conclusion that *Rapanos* foreclosed the NWPR on an unnecessary application of the process for determining which Supreme Court opinion is controlling when there are multiple non-majority opinions. *See id.* The *Colorado* court also misunderstood the NWPR, particularly that it was not a rote application of the *Rapanos* plurality. *See id.* (incorrectly stating that the NWPR was intended to "take the plurality opinion . . . and make it the new law of the land").

*First*, *Rapanos* is entirely distinguishable. The case addresses the *outer* limits of the CWA: what waters the Agencies *may* regulate. Its opinions do not dictate what waters the Agencies *must* regulate. In other words, *Rapanos* was not a facial review of the text of the CWA. Rather, it was an as-applied challenge of the Corps' *implementation* of the 1986 Regulations that addressed whether the Corps extended jurisdiction to waters the CWA *cannot* regulate.

*Second*, even if *Rapanos* is read to suggest that there is a better interpretation of the CWA than offered by the NWPR—and it should not be so read—nothing in either the *Rapanos* dissent or *Kennedy* concurrence displaced the Agencies' discretion, under *Chevron*, to reasonably reinterpret the ambiguous term "waters of the United States." Under *Chevron* and *Brand X*, a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). Here, the Supreme Court has repeatedly recognized the term "waters of the United States" *is* ambiguous, including in *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring); *id.* at 752 (Scalia, J., plurality) (the CWA "is in *some* respects ambiguous"); *id.* at 796 (Stevens, J., dissenting) (noting "ambiguity inherent in the phrase"); *see also SWANCC*, 531 U.S. at 170–71. The dissent merely thought the Agencies' application of the 1986 regulation was "reasonable." 547 U.S. at 805 ("the proper question is not how [to] define, 'adjacent,' but whether the Corps' definition is reasonable.") So even if that opinion were binding—and it is not—the dissent did not foreclose the new interpretation of "waters of the United States" in the NWPR. So *Rapanos* does not bar the Agencies from taking another look.

*Third*, the NWPR is guided by the *Rapanos* plurality but does not simply apply that opinion. Executive Order 13778 did not require the Agencies to rely exclusively upon the

plurality opinion. 85 Fed. Reg. at 22,273. And they did not. The NWPR instead synthesized "common principles of the *Rapanos* plurality and concurring opinions" to "balance between the clear directive from Congress to ensure that States maintain primary authority over land and water resources" and preserving the appropriate level of federal authority. *Id.* There are concrete differences between the *Rapanos* plurality and the NWPR. Indeed, the NWPR asserts jurisdiction beyond "those wetlands with a continuous surface connection to bodies that are 'waters of the United States in their own right,'" as the plurality sought. *Rapanos*, 547 U.S. at 742.

*Fourth*, Plaintiffs mischaracterize Justice Kennedy's concurrence and the *Rapanos* dissent. As the Agencies explained, *eight* justices actually *rejected* the significant nexus methodology because it was not grounded in the text of the CWA or should not supplant agency rulemaking. RTC 1.3.3.4–.5, Ex. 1. Nor did Justice Kennedy and the dissenting justices read the text of the CWA to extend federal jurisdiction over all ephemeral streams, as Plaintiffs erroneously suggest. Pls.' Br. 27–29. The dissent merely said the Corps' prior definition was "reasonable." *Rapanos*, 547 U.S. at 805. Justice Kennedy did not conclude that jurisdiction must extend to non-abutting wetlands that lack surface-water connections. Pls.' Br. 29. More critically, neither *Rapanos* nor any other Supreme Court case has unambiguously considered and precluded the Agencies' interpretation set forth in the NWPR. *See United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009) (A "court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation."). Plaintiffs likewise overstate the holding in *United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006) (cited at Pls.' Br. 5, 26). That case did not decide the scope of "waters of the United States" but rather fashioned a practical way to determine CWA jurisdiction in light of *Rapanos*. *Id.* at 64–66. In sum, the NWPR is distinguishable from but entirely consistent with

*Rapanos*. As explained below, *infra* pp. 20–35, multiple factors, including relevant science, case law, policy considerations, and administrative practicalities all reasonably informed the NWPR.

> ### 2. The CWA's Objective Does Not Foreclose the Agencies' Interpretation of "Waters of the United States."

The NWPR appropriately balances Section 101(a) of the CWA, which states the Act's objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," with Section 101(b), which states Congress's policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(a)–(b). Plaintiffs assert that for the purposes of determining jurisdiction, "Congress did not intend for [the Agencies] to 'balance' section 101(b) against the statute's objective." Pls.' Br. 29. But Plaintiffs' preferred path for achieving the CWA's objective does not override the Agencies' delegated discretion to balance other statutory elements and policy considerations reflected in the statute itself. "It is [a court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270 (2010); *see also California*, 467 F. Supp. 3d at 874 (concluding that plaintiffs' "arguments that the narrowness of the [NWPR] serves poorly to carry out the objectives of the CWA . . . do not provide a sufficient basis for a court to substitute its judgment for the policy choices of the Agency"). To this end, the Agencies gave appropriate consideration to the objective of the CWA. *See* 33 U.S.C. § 1251(a). The Agencies also balanced and implemented Congress' other policy directives expressed in CWA § 1251(b). *See* 85 Fed. Reg. at 22,261–62, 22,273, 22,277, 22,287, 22,302, 22,308, 22,313. In that provision, Congress declared its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate

pollution." *Id.* § 1251(b). The Agencies must necessarily balance the statutory objective and policies. 85 Fed. Reg. at 22,253, 22,269–72, 22,287–88 (Apr. 21, 2020).

The CWA's objective to maintain water integrity must be achieved through a *valid exercise* of federal authority. Plaintiffs fundamentally misunderstand the relationship between jurisdictional limits and an agency's obligation to fulfil the statutory objective. The statutory objective does not give the Agencies the authority to extend their jurisdiction beyond the limits imposed by the CWA or the Constitution. Congress limited the CWA's jurisdiction to "navigable waters," 33 U.S.C. § 1362(7), and the Agencies cannot exceed this authority. The "textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Rapanos*, 547 U.S. at 752 (plurality). And "no legislation pursues its purposes at all costs." *Am. Express Co. v. Italian Colors Rest.,* 570 U.S. 228, 234 (2013).

In *SWANCC*, the Court specifically rejected that the legislative history "signifies that Congress intended to exert anything more than its commerce power *over navigation*." *SWANCC*, 531 U.S. at 168 n.3 (emphasis added). Where an agency's interpretation of a statute "invokes the outer limits of Congress' power," the Court expects "a clear indication that Congress intended that result." *Id.* at 172. The Court found no such clear statement of Congress' intent for the CWA to reach the waters at issue in *SWANCC*. *Id.* at 174.

Thus, *SWANCC* fully rejects Plaintiffs' argument here. Pls' Br. 1. While the CWA's objective is to restore and maintain water integrity, the Agencies may not interpret such jurisdiction to extend to the broadest constitutionally permissible reach under the Commerce Clause. *SWANCC*, 531 U.S. at 166 (reversing holding that "the CWA reaches as many waters as the Commerce Clause allows"); *id.* at 176–77 (Stevens, J., dissenting) (describing the majority's decision as "invalidat[ing] . . . the Corps' assertion of jurisdiction over all waters except for

actually navigable waters, their tributaries, and wetlands adjacent to each"). One court has already rejected such challenges to the NWPR, holding the CWA does not "compel[] the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable." *California*, 467 F. Supp. 3d at 875. Except where otherwise provided, agencies are "not compelled to ignore the costs and difficulty of alternative means of advancing its declared goal" and so "forswear use of reasonable presumptions and generic rules" to advance "administrative efficiency." *Reno*, 507 U.S. at 311–13.

Plaintiffs also discount statutory language establishing the important role of states for implementing water regulation to achieve the CWA's objective. Pls.' Br. 29–30. Congress recognized that states play a fundamental role in maintaining water quality and implementing the Act. *See, e.g.*, 33 U.S.C. § 1251(b) (establishing Congress' policy to "protect the primary responsibilities and rights of States"). *Rapanos*, 547 U.S. at 755–56 (Scalia, J., plurality) ("[C]lean water is not the *only* purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions."). Yet Plaintiffs dismiss the import of § 1251(b) as limited to the states' role in implementing the CWA. Pls.' Br. 29–30. Plaintiffs' interpretation makes no sense. Section 1251(b) expressly calls for "preserv[ing], and protect[ing] the . . . rights of States," including "to plan the development and use . . . of land." 33 U.S.C. § 1251(b). So the NWPR reasonably considers the CWA's statutorily-stated "policy" to preserve traditional state authority. The NWPR's "different balance between federal and state responsibilities does not mean [the Agencies] have disregarded the primary objective of the statute in an arbitrary or capricious manner." *See California*, 467 F. Supp. 3d at 877 (denying injunction).

In dismissing the role of the states and tribes in achieving the CWA's objective, Plaintiffs ignore the import of the technical and financial assistance to states, local governments, interstate agencies, and tribes to address pollution in waters even if they are *not* federally regulated. *See, e.g.*, 33 U.S.C. § 1255(a)(1) (authorizing grants for reducing pollutant discharge "into *any waters*") (emphasis added); *id.* § 1258(a) (authorizing agreements with states to "eliminate[e] or control . . . pollution, within all or *any part of the watersheds* of the Great Lakes") (emphasis added); *id.* § 1329(i)(1) (authorizing grants for groundwater protection). The NWPR does not disturb these critical statutory provisions that help to implement the CWA's objective.

## III.    The NWPR Is Neither Arbitrary Nor Capricious Under the APA.

Not only is the NWPR authorized by the statute, its interpretation of "waters of the United States" was reasoned, well-supported, and should be upheld. The NWPR's extensive preamble and response to comments thoroughly explained why "the agenc[ies] believe [the NWPR] to be better" than prior regulations. *F.C.C. v. Fox Tele. Stations, Inc*., 556 U.S. 502, 515 (2009). The summary of key elements spanned almost 60 pages. 85 Fed. Reg. at 22,273–329. The Agencies further analyzed district court opinions as to the infirmities of the 2015 Rule, including a district court's decision granting summary judgment against the 2015 Rule and remanding it to the Agencies. *E.g.*, *id.* at 22,272. The Agencies analyzed relevant Supreme Court cases. *E.g.*, *id.* at 22,268. And these analyses are further supplemented by almost 400 pages of responses to comments. *See generally* RTC (Topics 1–13).[3] The Agencies complied with their obligations under the APA. The NWPR's exclusion of (i) ephemeral streams; and (ii) non-

---

[3] *Available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11574 (last accessed December 2, 2020.

adjacent wetlands that lack a sufficient surface water connection to waters of the United States was well-explained and rational.

Much of Plaintiffs' challenge to the NWPR stems from their policy dissatisfaction with the new rule and their preference for the 2015 Rule. There is no question that the NWPR represents a departure from both the regulatory regime reinstated by the Repeal Rule and the 2015 Rule. But to change a policy, an agency must merely provide "a satisfactory explanation for its action." *Fox Tele. Stations*, 556 U.S. at 513. It does *not* require reasons any "more substantial than those required to adopt a policy in the first instance." *Id.* at 514. And an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *Id.* at 515. The Agencies have more than satisfied this test. The NWPR should be upheld.

### A.    The NWPR's Definition of "Tributary" Is Reasonable.

#### 1.    The Agencies Explained Their Reasons for Excluding Ephemeral Features.

The NWPR's definition of "tributary," which does not extend to ephemeral features that flow only when it rains, is not "conclusory," as argued by Plaintiffs. Pls.' Br. 18–19. The Agencies reasonably explained that ephemeral features, those which "flow only in direct response to precipitation," 85 Fed. Reg. at 22,251; *see also id.* at 22,275, are in no sense "navigable waters." In reaching this conclusion, the Agencies explained that "a mere hydrologic connection cannot provide the basis for CWA jurisdiction" because "the bodies of water must be . . . 'relatively permanent' (i.e., perennial or intermittent) and that contribute surface water flow to a traditional navigable water . . . in a typical year." *Id.* at 22,289. Because ephemeral features "only flow during or in immediate response to rainfall," *id.* at 22,274, they are not "relatively

permanent bodies of water," *id.* at 22,271, 22,289. The Agencies "determined that requiring surface water flow in a typical year from relatively permanent bodies of water to traditional navigable waters and wetlands adjacent to such waters as a core requirement of [jurisdiction] is the most faithful way of interpreting . . . CWA authority over a water." *Id.* at 22,271.

In excluding ephemeral features, the Agencies considered the "connectivity gradient," including the "decreased 'probability that changes . . . will be transmitted to downstream waters' at flow regimes less than perennial or intermittent." *Id.* at 22,288 (quoting EPA's Science Advisory Board ("SAB") Commentary). The Agencies reasonably concluded that ephemeral streams *are* scientifically different from intermittent or perennial streams. *E.g.*, *id.* at 22,275–76 (describing differences in water source and flow duration). And because ephemeral features are defined by their impermanence, they "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287. Such "[a] clear regulatory line between jurisdictional and excluded waters has the additional benefit of being less complicated than prior regulatory regimes that required a case-specific significant nexus analysis." *Id.* at 22,288; *see also Reno*, 507 U.S. at 311 (affirming consideration of "administrative efficiency as the reason for selecting one means of achieving a purpose over another"). This clear boundary "is consistent with the role of the Federal government under the Constitution and the CWA" because "States traditionally exercise 'primary power over land and water use.'" 85 Fed. Reg. at 22,287 (quoting *SWANCC*, 531 U.S. at 174). Thus, the Agencies' decision to exclude ephemeral features from the definition of "tributary" had "a 'reasonable foundation'" in the record. *Reno*, 507 U.S. at 309 (citation omitted). The Agencies explained their reasoning for drawing the boundaries they did. The Court owes this determination deference.

### 2. Science Alone Cannot Determine the Agencies' Jurisdiction Over Tributaries.

Plaintiffs' primary argument, that the Agencies' exclusion of ephemeral features lacks scientific support, fails. Pls.' Br. 13–16. Even though the Agencies thoroughly reviewed the relevant science, including their prior scientific findings, the Agencies recognized that the definition of "waters of the United States" must be grounded in a legal analysis of the limits on CWA jurisdiction, as reflected in the statutory text and Supreme Court precedent. 85 Fed. Reg. at 22,261 ("science cannot dictate where to draw the line between Federal and State Waters."). Therefore, even if Plaintiffs are correct that the Agencies made an "about-face"—and they did not—this alone cannot render the NWPR arbitrary and capricious. Pls.' Br. 17. The Agencies were entitled to weigh the relevant considerations differently in developing the NWPR. And, on one critical point for refuting Plaintiffs' argument, the Agencies reached the exact same conclusion that they reached when finalizing the 2015 Rule: science alone cannot define jurisdictional boundaries of "waters of the United States." *See, e.g.*, 80 Fed. Reg. at 37,055.

The 2015 Rule based its interpretation "not only on legal precedent and the best available peer-reviewed science, but also on the agencies' technical expertise and extensive experience in implementing the CWA over the past four decades." *Id.* EPA's SAB similarly stressed in 2015: "'significant nexus' is a legal term, not a scientific one." *Id.* at 37,065. So "science does not provide a precise point along the continuum at which waters provide only speculative or insubstantial functions to downstream waters." *Id.* at 37,090. Yet it is certain commentary of the SAB that Plaintiffs base their assertion upon that only science matters.

The Agencies reached different conclusions in the NWPR than they did in 2015. But in both rules they correctly explained that the contours of CWA jurisdiction require a balancing of various factors and evidence, including both legal and scientific considerations. *E.g.*, 85 Fed.

Reg. at 22,288. These include the statutory limits on the Agencies' legal authority (including the CWA text and structure), *e.g.*, *id.* at 22,283–89, what would sufficiently embody the statutory link to what is "navigable," and what would give due deference and respect for state authority. *See, e.g.*, *id.* at 22,270; RTC, Ex. 1 at 64–68, 114–15 (Topic 1). After considering these factors, the Agencies determined that ephemeral streams "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287. The Agencies are not obligated under the CWA to exercise jurisdiction over ephemeral features simply because, from a scientific viewpoint, these features may support certain ecological functions and possess some hydrological connection to downstream waters when considered in their totality, which is really all that Plaintiffs' argument boils down to.

The Agencies' balancing of relevant considerations is not arbitrary or capricious. Science does not and cannot offer a precise answer to the question of what constitutes a "water of the United States." *See id.* at 22,262–71 (discussing *SWANCC* and *Rapanos*). But in any event, as explained above, the Agencies fully considered the relevant science, as evidenced by the record.

### 3. Plaintiffs' Citations to the Record Do Not Show that the NWPR Is Arbitrary and Capricious.

Plaintiffs' scatter-shot citations to the record to argue the significance of ephemeral streams do not undermine the Agencies' decisionmaking process. None of the reports cited by Plaintiffs prove that the Agencies' exclusion of ephemeral streams is arbitrary and capricious.

*First*, Plaintiffs argue that the Connectivity Report supports the inclusion of ephemeral streams as jurisdictional. The Agencies, however, explained why the "Connectivity Report" and other science did not preclude—but actually supported—aspects of the NWPR. *E.g.*, *id.* at 22,288–95. The preamble summarized why the Agencies can recognize a "gradient of connectivity." 85 Fed. Reg. at 22,288 (quoting EPA's SAB Commentary). The Agencies relied

on principles of hydrologic connectivity to develop, among other things, the flow classifications (i.e., perennial, intermittent, ephemeral) used in the NWPR, the incorporation of inundation by flooding as a surface water connection establishing jurisdiction for certain waters and wetlands, and the use of the "typical year" concept that relies upon a large body of precipitation and other climatic data to inform what may be in a normal range for a particular geographic region. *Id.* Citing a conceptual model within the SAB Commentary, the Agencies recognized that, of perennial, intermittent, and ephemeral streams, ephemeral streams have the lowest probability of impacting downstream water quality. *See id.* The Agencies similarly based the definition of "tributary" "upon a reasonable inference of ecologic interconnection" between those tributaries and paragraph (a)(1) waters. *See id.* (citing *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring)). Thus, Plaintiffs' assertion that the Agencies "ignored an essential component of connectivity and misrepresented the concept" is inaccurate. Pls.' Br. 16. The Agencies accepted and analyzed the "connectivity gradient," and potential relationships among perennial, intermittent, and ephemeral streams and downstream waters within a tributary system. 85 Fed. Reg. at 22,288. And the Agencies' record also includes many sections specifically discussing, for example, the "Prior Findings in the Connectivity Report," "Consideration of Forgone Environmental Benefits," the intersection of "Scientific Rationale and Legal Authority," "The Connectivity Report," and "Other Comments on Science." RTC 1.5.5.3, 1.5.5.7, 1.7, 13.1.7.1, 13.1.7.2, Ex. 1.

 *Second,* Plaintiffs reference various studies on intermittent and ephemeral streams in the arid Southwest region to argue that ephemeral streams may "perform the same critical hydrological functions as perennial streams." Pls.' Br. 13 (citing Wu Decl. Ex. 6, ECF No. 34-6). *See also* Wu Decl. Ex. 13, ECF No. 34-13 (publication on connectivity of ephemeral features). Neither study adequately distinguishes between intermittent and ephemeral streams. And neither

offers guidance for determining *legal* jurisdiction prescribed by Congressional statute. All water, including precipitation, may exhibit connectivity-related traits. "Virtually all water, polluted or not, eventually makes its way to navigable water." *County of Maui*, 140 S. Ct. at 1470. Even the 2015 Rule, which Plaintiffs prefer, did not extend jurisdiction to all ephemeral features. In any event, for the purposes of *legal* jurisdiction, the Agencies properly considered the continuum of connectivity. Again, they reasonably determined ephemeral features are distinguishable for because of their lower risk of negatively impacting downstream water. 85 Fed. Reg. at 22,288.

*Third*, Plaintiffs attempt to conflate ephemeral features and intermittent tributaries to show that the Agencies should have extended federal jurisdiction to both. Pls.' Br. 18. But the Agencies adequately explained the difference between streamflow deriving from a *singular* snowfall event and streamflow from a *seasonal* snowpack, which is cumulative and seasonal, and thus relatively permanent. 85 Fed. Reg. at 22,275 (defining snowpack as "layers of snow that accumulate over extended periods of time in certain geographic regions or at high elevation"). The Agencies explained that "seasonal flow occurring more than in direct response to precipitation is an example of intermittent flow." RTC 5.4.4, Wu Decl. Ex. 16, ECF No. 34-16. Plaintiffs attempt to analogize the NWPR's choices for "waters of the United States" with another agency's unexplained disparate treatment of similar payments in *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996). Pls.' Br. 18. This misses the mark.[4] In contrast to *Independent Petroleum*, the Agencies here explained their rationale for including

---

[4] In *Independent Petroleum*, the court determined that an agency's different treatment of two similar types of payments was impermissible and that the agency had not given a sufficient reason for treating the two types of payments differently. 92 F.3d at 1258–59. Because the rationale of the court-adopted standard applied to both types of payments, "there [was] no meaningful distinction" between the two and they were "functionally indistinguishable," so the agency's treatment of them must be consistent. *Id.* at 1259–60.

certain waters within the NWPR's definition of "waters of the United States" and excluding others. What is more, contrary to the payments at issue in *Independent Petroleum*, "intermittent" and "ephemeral" flows are functionally distinct—as recognized by the very scientific literature Plaintiffs reference. *See, e.g.*, Connectivity Report at 2-14, Ex. 2.

*Fourth*, the Agencies' determination that ephemeral features will not sever jurisdiction of two otherwise jurisdictional waters is not logically inconsistent. Pls.' Br. 17. Initially, the Agencies proposed that an ephemeral stream that connected two jurisdictional waters *would* sever jurisdiction of upstream water. 84 Fed. Reg. 4154, 4173–74, 4182 (Feb. 19, 2019). In response to public comments that the Agencies carefully considered, the Agencies revised the final rule to account for practical considerations that could come from severing jurisdiction of upstream waters. 85 Fed. Reg. at 22,276–78. The Agencies recognized that while ephemeral features may not have sufficient flow to be jurisdictional in their own right, they may still convey flow from upstream jurisdictional waters to downstream jurisdictional waters at a frequency sufficient to maintain jurisdiction over the upstream waters. The Agencies' revision maintains some regulatory predictability, especially in arid regions where water transfers may be disrupted by ephemeral breaks. *Id.* at 22,278. This revision was well within the Agencies' discretion. The Agencies explained, the "Supreme Court has not spoken directly to the question of whether an ephemeral reach along or downstream of an otherwise jurisdictional tributary severs jurisdiction." *Id.* at 22,289. Nor did the Supreme Court "specify the type of connection necessary between relatively permanent waters and downstream traditional navigable waters." *Id.*

More importantly, the Agencies did ***not*** conclude "that ephemeral streams are not sufficiently connected to downstream waters to qualify for protection." Pls.' Br. 17. Plaintiffs misunderstand how the CWA works. Thus, they confuse the scope of CWA *jurisdiction* over

discharges with the scope of CWA *protection*. To this end, the Agencies considered that the CWA's longstanding NPDES permitting program will continue to address point source discharges of pollutants in non-jurisdictional waters that flow downstream into waters of the United States. *See* 85 Fed. Reg. at 22,319 ("[A] CWA section 402 permittee currently discharging to a jurisdictional water that becomes non-jurisdictional under this final rule would likely remain subject to the requirements of the Act."); RPA at 79, Ex. 3. The Agencies explained this "longstanding approach," which holds that discharges to a water that "is non-jurisdictional but conveys pollutants to downstream jurisdictional waters" may still be regulated because that water "may be a point source that subjects a discharger . . . to section 402 permitting requirements." 85 Fed. Reg. at 22,297; *see also County of Maui*, 140 S. Ct. at 1476 (the CWA "requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*.").

The CWA's non-regulatory measures will also continue to address pollution of the nation's waters generally. *Id.* at 22,253 (discussing non-regulatory program provisions). States, tribes, and local entities can also exercise programs that further enhance the quality of waters within their borders. *See* RPA Appendix A; Ex. 3, EA at 37, Ex. 4. And many states do so. *Id.* State programs may well require permits for certain discharges to state waters regardless of the NWPR. *See* 85 Fed. Reg. at 22,318 ("[C]ertain waters and features . . . not subject to regulation under the CWA . . . are or could be subject to State or tribal jurisdiction . . . ."); *see also* RPA at 47. These programs collectively pursue the objective of maintaining the integrity of the Nation's waters, the fundamental objective of the CWA. *See supra* III(C). Further, the Agencies' best assessment is that their major CWA programs will be minimally impacted by the definitional changes of the NWPR. For example, in case studies of three separate watersheds selected to be

representative, the Agencies found that only four of the 1,474 Section 402 permits would be impacted by the NWPR; approximately six percent of Section 404 permits would potentially be affected. EA at 113–15, 139, 141, 157, 159, Ex. 4.

Accordingly, the Agencies reasonably defined "tributary" to exclude ephemeral features, and the Court should defer to the Agencies' carefully considered NWPR.

**B.      The NWPR's Treatment of Adjacent Wetlands Is Reasonable.**

The Agencies explained their reasoning for assigning CWA jurisdiction to adjacent wetlands as they did in the NWPR. The Agencies defined "adjacent wetlands" as those that either abut, are separated by only natural berms and the like from jurisdictional waters, or have sufficient direct hydrologic surface connections in a typical year to an otherwise jurisdictional water. RTC 8.3, Ex. 1. These adjacent wetlands are included in the definition of "waters of the United States" because they are "inseparably bound up with the 'waters' of the United States." 85 Fed. Reg. at 22,308 (quoting *Riverside Bayview*, 474 U.S. at 134). This definition actually stretches to cover waters beyond the "continuous surface connection" of the *Rapanos* plurality. *See* 33 CFR § 328.3(c)(1)(iii) ("The term adjacent wetlands means wetlands that . . . (iii) are physically separated from a paragraph (a)(1) through (3) water only by a natural berm, bank, dune, or similar natural feature"). Contrary to Plaintiffs' assertions, Pls.' Br. 23, the Agencies explained their interpretation of the phrase "inseparably bound up with" waters of the United States. And they rooted their interpretation in the "text, structure, and legislative history of the CWA and on the core principles and concepts" set forth in *Riverside Bayview*, *SWANCC*, and *Rapanos*. 85 Fed. Reg. at 22,308. The Agencies also explained their reasons for excluding non-adjacent wetlands. Classifying all wetlands as jurisdictional would be inconsistent with the CWA and Supreme Court case law. *Id.* So would inclusion of isolated wetlands that lack a hydrological

surface connection to other jurisdictional waters, or that connect hydrologically only infrequently. *Id.* The redefined category of "adjacent wetlands," by contrast, provides regulatory agencies and the regulated community with a "clear and implementable approach" to determining CWA jurisdiction. RTC 8.1, Ex. 1; *see also Reno*, 507 U.S. at 311–13. The NWPR therefore provides objective, categorical tests for adjacency, with improved clarity and ease of administration. 85 Fed. Reg. at 22,307–08.

Notably, the 2015 Rule also sought to "increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States.'" 80 Fed. Reg. at 37,054. But in doing so, the rule relied in part on one-size-fits-all distance limitations that a court ruled were arbitrary, "improper under Justice Kennedy's test in *Rapanos*," and not supported by science. *Georgia*, 418 F. Supp. 3d at 1367. The NWPR rectified this deficiency and eliminates the "multi-factored and ambiguous significant nexus test" that was applied to certain categories of waters. RTC 8.1, Ex. 1.

Plaintiffs wrongly argue that the NWPR's provisions as to wetlands are arbitrary and capricious because they contradict scientific evidence and are internally inconsistent. Pls.' Br. 19–23. *First*, just as with the definition of "tributary," the definition of "adjacent wetlands" rests upon a legal determination, informed by science. The Agencies recognized "that science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." 85 Fed. Reg. at 22,308. Therefore, the Agencies' definition of "adjacent wetlands" need not be rooted in science to be reasonable. Moreover, Plaintiffs' mere disagreement with the Agencies' use of the relevant scientific literature, such as the Connectivity Report, and dissatisfaction with the outcome of the NWPR, do not render the rule arbitrary and capricious.

*Second*, deference is particularly important in situations like this, where no one clear answer exists and where many reasonable definitions could be adopted. The "scope of CWA jurisdiction over wetlands has confounded courts, members of the regulated community, regulators, and the public for decades." 85 Fed. Reg. at 22,308. The Supreme Court has acknowledged the difficult task facing the Agencies, which "must necessarily choose some point at which water ends and land begins . . . this is often no easy task." *Riverside Bayview*, 474 U.S. at 132. "Where on this continuum to find the limit of 'waters' is far from obvious" for any entity. *Id.* In *SWANCC*, the Supreme Court held that the Agencies do not have authority to regulate isolated, intrastate waters that lack a sufficient connection to a traditional navigable water, as regulation of those waters raise questions regarding the scope of CWA authority. 531 U.S. at 172. In *Rapanos*, the Court could not agree on whether the wetlands at issue were jurisdictional and therefore remanded for further consideration. *Rapanos*, 547 U.S. at 757. In light of these historically different views on the scope of jurisdictional wetlands, the Agencies reasonably decided to "strike a better balance" between federal, state, and tribal jurisdiction, consistent with the Agencies' best interpretation of the text, structure, and purpose of the CWA and of relevant Supreme Court guidance. The Court owes deference to the Agencies' determination.

*Third*, the Agencies adequately explained why they included as "adjacent wetlands" those wetlands that are inundated by flooding from a jurisdictional water in a typical year. 85 Fed Reg. at 22,313. They also explained why they excluded wetlands that otherwise do not meet the definition of "adjacent wetlands" because they are inundated less frequently, are only connected by subsurface flow, or do not otherwise have a sufficient hydrologic connection to other jurisdictional waters. *Id.* Applying their technical experience, the Agencies explained that groundwater or subsurface connections could be "confusing and difficult to implement." *Id.*

Nonetheless, the Agencies reasonably established a definition of "adjacent wetlands" that inherently includes certain wetlands connected to jurisdictional waters through subsurface flow, provided those wetlands meet one of the four "adjacency" criteria in the NWPR. *Id.* The Agencies further noted that implementation of subsurface connections as a standalone basis for CWA jurisdiction "would be overinclusive and would encroach upon State and tribal authority over land and water resources." *Id.*

*Fourth*, the Agencies reasonably distinguished between inundation of a wetland by flooding *from* a jurisdictional water in a typical year, which is sufficient to create a direct hydrologic surface connection that meets the definition of "adjacent wetland," and flooding of a wetland *to* a jurisdictional water, akin to runoff or sheet flow, which is not sufficient to support jurisdiction over the wetland. 85 Fed. Reg. 22,303–10.[5] Plaintiffs attempt to conflate two distinct hydrological connections to argue an "internal inconsisten[cy]." Pls.' Br. 22. There is no such thing. As the Agencies explained, inundation by flooding *from* a jurisdictional water must occur in a typical year to ensure "that the hydrologic connection occurs regularly and is not 'unduly speculative.'" 85 Fed. Reg. 22,310 (citing *Rapanos*, 547 U.S. at 770 (Kennedy, J., concurring in judgment)).

*Fifth*, as with the NWPR's treatment of tributaries, setting jurisdictional boundaries as to wetlands does not conclusively determine "which of the nation's waters warrant environmental

---

[5] The Agencies received comments that jurisdiction should extend to inundation of a wetland from any direction, rather than only from a jurisdictional water to the wetland as proposed. The Agencies disagreed and concluded in the NWPR that the inundation of water *from* the jurisdictional water to a wetland, and not vice versa, indicates the wetland is inseparably bound up with the jurisdictional water. The Agencies noted that "flooding from a nearby wetland to a [jurisdictional] water is more like diffuse stormwater run-off and directional sheet flow over upland, which the agencies have concluded are not sufficient to create or maintain federal jurisdiction." *Id*. at 22,310.

protection and which do not." RTC 8.3.3, Ex. 1. The Agencies cannot exceed their authority

under the CWA even to achieve "specific scientific, policy, or other outcomes." *Id. See also*

*Rapanos*, 547 U.S. at 741–42 (Scalia, J., plurality) (ecological connections do not provide an

independent basis for including physically isolated wetlands in the definition of "waters of the

United States."). Accordingly, the Agencies reasonably defined "adjacent wetlands," and the

Court should defer to Agencies' carefully-considered NWPR.

### C. The Agencies Adequately Considered the Effects of the NWPR on Water Quality.

Plaintiffs wrongly characterize both the "sole objective" of the CWA as maintaining

water quality and the Agencies' consideration of the NWPR on water quality. Pls.' Br. 23–25.

The RTC contains 117 pages of discussions on water quality. *See generally* RTC.[6] That

document includes numerous discussions directly or cross-referencing such issues, including (but

not limited) to § 11.3.3.2 ("Reduction in Jurisdictional Waters"), § 11.3.2.3 ("Concerns with

States' Abilities to 'Fill the Gap'"), § 11.3.2.5 ("Interstate Impacts from the Proposed Rule"),

§ 11.4 ("CWA Programmatic Analysis"), § 11.6 ("Aquatic Resource Benefits and Ecosystem

Services"). *Id.*

Plaintiffs' real objection is that the Agencies did not reach a specific conclusion about the

NWPR's effects on water quality due to data limitations, as the Agencies did consider the effects

on water quality within those limitations. But the data limitations that prevented such precise

conclusions have long been known and consistently explained by the Agencies. In 2015, former

EPA Administrator McCarthy testified to Congress that national datasets, including the National

Wetlands Inventory and the National Hydrography Dataset, are "not used to determine

---

[6] *Available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11574 (last accessed December 2, 2020.

jurisdiction and not intended to be used for jurisdiction," "are not relevant to the jurisdiction of the 'waters of the U.S.," and "are not consistent with how we look at the jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330 n.61. And in 2014, when developing the 2015 Rule, an EPA blog post entitled "Mapping the Truth" stated, "[w]hile these [USGS and FWS] maps are useful tools for water resource managers, they cannot be used to determine CWA jurisdiction—now or ever." *Id*. at 22,329–30 n.61. As a result, the Agencies could not make the kind of predictions about the potential effects of the NWPR on water quality that Plaintiffs argue were necessary. The Agencies have avoided such predictions in the past because of these very same data limitations.

Plaintiffs also misconstrue the relevance to this Court's review of the Agencies' statement that they did not rely upon the EA nor the RPA as part of their rulemaking. Pls.' Br. 24 (citing 85 Fed. Reg. at 22,332; 22,335). The Agencies stated that "the final rule is not based on the *information* in the agencies' economic analysis or resource and programmatic assessment." 85 Fed. Reg. at 22,322 (emphasis added). Thus, to the extent the EA quantifies economic benefit of the NWPR in dollars, that information is not a basis for the Agencies' decision. But, both the EA and RPA provide helpful explanations about how the CWA works, including the specifics of the permit programs under Sections 402 (NPDES) and 404 (Dredged and Fill) of the CWA. The Agencies are not precluded from citing to these documents to help explain how the CWA works, either in the rulemaking process or in their briefing here. These documents were part of the record before the Agencies during this rulemaking and nothing required the Agencies—or this Court now—to pretend these documents do not exist, as Plaintiffs so ask.

As previously noted, Plaintiffs also confuse the scope of CWA jurisdiction with the breadth of the Act's regulatory protection. For example, Plaintiffs repeatedly downplay the

continued role that states play in protecting water quality, which the NWPR does not disturb. As addressed *supra* p. 4, states must establish WQS for "waters of the United States" within their borders, and these standards must consider the downstream effects on other jurisdictions. *See* 40 C.F.R. § 131.10(b). The NWPR does not alter the substantive requirements of WQS that states must have in place for "waters of the United States." These account for *all* pollution reaching waters of the United States, including from non-jurisdictional ephemerals, non-adjacent wetlands, and even nonpoint sources. So, even if under the NWPR certain discharges will no longer be within Agency permitting jurisdiction (though potentially covered by state laws), to the extent this pollution reaches downstream waters, increased pollution that causes an exceedance of WQS may continue to be addressed. Should that occur, states will need to adjust their TMDLs to ensure that the underlying WQS are met. The Agencies' technical assessment (ignored by Plaintiffs) explained this. RPA at 63, Ex. 3.

Because pollution conveyed downstream to a jurisdictional waterbody remains covered by the CWA—even if initially discharged into a non-jurisdictional water or feature—the record thus disproves the suggestion that all aspects of the CWA's existing permit scheme, WQS, and other protections will necessarily be materially altered by the NWPR. 85 Fed. Reg. 22,333 ("complete State "gap-filling" could result in a zero-net impact in the long-run.").

**IV.     The NWPR Does Not Violate the ESA.**

Section 7 of the ESA directs each federal agency to ensure, in consultation with FWS or NMFS, that its actions are not likely to jeopardize the existence of any listed species. 16 U.S.C. § 1536(a)(2). Section 7(a)(2) applies to "actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. The "discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species." *Karuk Tribe v.*

*U.S. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012). When formal consultation is required, the Service issues a biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). If the Service concludes that the action is likely to cause jeopardy, it must identify reasonable and prudent alternatives "that can be implemented *consistent with the scope of the Federal agency's legal authority and jurisdiction*." 50 C.F.R. §§ 402.02, 402.14(h)(2) (emphasis added). Consequently, if the agency lacks authority or jurisdiction under its enabling act to implement changes for the benefit of listed species, "consultation would be merely a meaningless exercise" and is not required. *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1219 (9th Cir. 2015). Even if the action agency possesses the requisite discretion, consultation is required only if the agency determines that its action "may affect" listed species. 50 C.F.R. § 402.14(a). A "finding of no effect obviates the need for consultation." *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810 (8th Cir. 1998).

Plaintiffs' claim that the Agencies issued the NWPR in violation of the duty to consult fails for two reasons: (1) Section 7 does not apply where (as here) an agency is simply defining the extent of its regulatory jurisdiction under its enabling act; and (2) the Agencies reasonably determined that the NWPR does not affect listed species, obviating the need for consultation.

## A.   Defining the Limits of CWA Jurisdiction Does Not Trigger ESA Consultation.

Section 7 of the ESA does not apply where (as here) an agency is simply defining the limits of its regulatory jurisdiction under its enabling act. That is because Section 7's "no jeopardy" requirement serves as a check on action that an agency is otherwise authorized to take, but it "does not expand the powers conferred on an agency by its enabling act." *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 34 (D.C. Cir. 1992); *see also Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 298 (5th Cir. 1998). The enabling act

36

itself sets the limits of the agency's jurisdiction, and those limits cannot be expanded based on the results of consultation with FWS or NMFS—neither of whom is empowered to interpret another agency's enabling act. Consultation thus would serve no purpose and is not required. *See Center for Food Safety v. Vilsack*, 718 F.3d 829, 841–42 (9th Cir. 2013).

*Center for Food Safety* involved an act that authorized the agency to regulate "plant pests." The agency deregulated genetically modified alfalfa after determining that it was not a "plant pest." Plaintiffs argued that the decision triggered ESA consultation because the agency had discretion to regulate genetically modified plants, *id.* at 839, and because deregulation harmed listed species, *id.* at 841–42. The Ninth Circuit held that the dispute turned solely on the meaning of the statutory term "plant pest," *see id.* at 834, 839, a threshold issue that did not itself implicate the ESA. Because the agency correctly determined that the alfalfa was not a "plant pest," *id.* at 839–41, the agency "no longer had jurisdiction to continue regulating the plant," *id.* at 832. And that "lack of jurisdiction over [the plant] obviated the need for the agency to consult with the [Service] under the ESA." *Id.* at 833. No matter what the outcome of consultation, the agency could not regulate a plant that it lacked jurisdiction to regulate. *See id.*

This case is essentially the same. The CWA authorizes the Agencies to regulate discharges of pollutants into "waters of the United States." 33 U.S.C. § 1362(7). The purpose of the NWPR is to define that phrase. Plaintiffs argue that the NWPR triggered ESA consultation because the Agencies relinquished CWA jurisdiction over ephemeral streams and isolated wetlands, which will harm listed species. Pls.' Br. 33–36. But that argument begs the question that the rule was designed (in part) to answer: whether ephemeral streams and isolated wetlands *qualify* as "waters of the United States." The Agencies—not the Plaintiffs, FWS, nor NMFS, nor even the courts—are the "authoritative interpreter[s] (within the limits of reason)" of the CWA.

*Brand X*, 545 U.S. at 983–84. Because the Agencies reasonably determined that ephemeral streams and isolated wetlands are not "waters of the United States" under the CWA, *see supra* pp. 20–35, the Agencies lack jurisdiction to regulate those areas. That lack of jurisdiction obviates the need to consult with NMFS and FWS about the effects of *not* regulating those areas.

None of the cases cited by Plaintiffs support a different conclusion because none involved a situation where (as here) the agency was merely defining the extent of its regulatory jurisdiction, rather than *exercising* that jurisdiction in a way that could affect listed species. *See, e.g.*, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005) (EPA's exercise of statutory jurisdiction to register pesticides triggered consultation).

Plaintiffs nevertheless argue that consultation is required because the ESA and the CWA serve similar objectives, the CWA does not explicitly *prohibit* the Agencies from classifying ephemeral streams and isolated wetlands as "waters of the United States," and the Agencies exercised discretion in determining that those areas do not so qualify. *See* Pls.' Br. 32–33. That argument fails because the Agencies lack authority to consider the protection of listed species as an end in itself in defining the limits of their CWA jurisdiction. The Agencies cannot, in other words, classify areas as "waters of the United States" simply because listed species might use those areas or might benefit from CWA regulation. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 671 (2007); *see also SWANCC*, 531 U.S. at 167–72.

*Home Builders* involved a challenge to EPA's decision to transfer certain permitting powers under the CWA to Arizona. The statute mandates that EPA approve such a transfer if a state's application satisfies nine criteria. The Supreme Court held that the transfer decision did not trigger Section 7 consultation because that provision "covers only discretionary agency actions," and does not apply to actions like the transfer decision "that an agency is *required* by

38

statute to undertake once certain specified triggering events have occurred." 551 U.S. at 669. The plaintiffs nevertheless argued the transfer decision was discretionary because EPA exercised judgment in determining whether Arizona's application satisfied the nine criteria. *Id.* at 671. The Supreme Court disagreed. The Court explained that even though EPA's application of the criteria was not entirely mechanical, consultation was not required because the CWA did not authorize EPA "to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.*; *see also Alaska Wilderness*, 788 F.3d at 1225 (agency approval of oil spill response plan did not trigger consultation, even though agency exercised discretion in applying statutory approval criteria, because "determining whether the statutory criteria have been achieved does not trigger the ESA's consultation requirement").

The Supreme Court's reasoning applies equally here. To be sure, the Agencies must exercise discretion in identifying the "waters" that bear a sufficiently close connection to traditional "navigable" waters to qualify as "waters of the United States." 33 U.S.C. § 1362(7). But the Agencies lack authority to consider the protection of listed species as an end in itself in making those determinations: "even if ESA consultation revealed waters of importance to listed species, the agencies nonetheless lack authority to extend CWA jurisdiction to such waters on that basis alone." RTC 1.5.2, Ex. 1 (citing *SWANCC*, 531 U.S. at 171–74). The Agencies' interpretation of the CWA is reasonable, consistent with *SWANCC*, and entitled to deference. *See Alaska Wilderness*, 788 F.3d at 1221–23 (affording *Chevron* deference to agency's conclusion that it lacked authority under ambiguous statute to modify proposed action for the benefit of listed species, obviating any need for ESA consultation).

*SWANCC* held that the Corps could not assert CWA jurisdiction over isolated, non-navigable, intrastate ponds merely because they were used by migratory birds. The Court

explained that the statute's reach is limited to traditional navigable waters and to those waters or wetlands that possess a sufficiently close connection to traditional navigable waters. An assertion of jurisdiction based solely on the presence of migratory birds was "not fairly supported by the CWA," *id.* at 167, would effectively "read[] the term 'navigable waters' out of the statute," *id.* at 171–72, and "exceeds the authority granted to" the Agencies under the statute, *id.* at 174.

The outcome in *SWANCC* would not have been different had the migratory birds been threatened or endangered: the intrastate ponds still would have been isolated, non-navigable, and beyond the reach of the CWA. Indeed, the "Migratory Bird Rule" declared to be unlawful in *SWANCC* purported to extend CWA jurisdiction to any body of water that provided habitat for *either* migratory birds *or* "endangered species." *Id.* at 164. The point is that neither condition, standing alone, provides a valid basis for the assertion of CWA jurisdiction. *See id.* at 167–74.

The Agencies likewise could not assert jurisdiction over ephemeral streams and isolated wetlands based solely on a biological opinion from FWS or NMFS concluding that listed species use those areas and might benefit from CWA regulation. "*SWANCC* rejected the notion that ecological considerations . . . provided an *independent* basis for including entities like 'wetlands' (or 'ephemeral streams') within the phrase 'the waters of the United States.'" *Rapanos*, 547 U.S. at 741–42 (plurality opinion); *see also id.* at 778 (Kennedy, J., concurring in the judgment) (recognizing that "environmental concerns provide no reason to disregard limits in the statutory text"). Because the Agencies lack authority to consider the protection of listed species as an end in itself in defining the limits of their jurisdiction, ESA consultation would serve no purpose and is not required. *See Home Builders*, 551 U.S. at 671; *see also Alaska Wilderness*, 788 F.3d at 1221–23; *Ctr. for Food Safety*, 718 F.3d at 841–42.

Plaintiffs also contend the Agencies exercised discretion triggering consultation when they decided to issue a new definition of "waters of the United States" in the first place. Pls.' Br. 31. That argument also fails. The Agencies cannot lawfully implement the CWA without lawfully defining the limits of their jurisdiction. The Agencies had to replace the definition in the 2015 Rule because it was unlawful, and they reasonably reinstated the prior regulatory regime on an interim basis while they developed a new definition that is fully consistent with the text, structure, and history of the CWA and Supreme Court precedent. *See* 85 Fed. Reg. at 22,259–60. That process did not trigger ESA consultation with FWS and NMFS because those wildlife agencies do not interpret the CWA. EPA and the Corps bear that responsibility, and whether they adequately fulfilled it depends *solely* on whether their interpretation is reasonably explained and permissible under *Chevron*. The ESA is not implicated.

### B.       The NWPR Has No Effect on Listed Species.

Consultation is not required for an independent reason: the Agencies reasonably determined that the NWPR has no effect on listed species, which "obviates the need for consultation." *Newton County*, 141 F.3d at 810.

Contrary to Plaintiffs' assertions, Pls.' Br. 35, the Agencies did not state that it was "impossible to know" whether the rule will affect listed species. *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019). The Agencies found that the rule does not "exceed the ESA's 'may affect' threshold" because it "does not authorize any activity that could affect a listed species or designated critical habitat," RTC 1.5.2, Ex. 1, and because any effects of future third-party projects in non-jurisdictional waters are speculative and not effects of the rule, *id.* at 89–90. Although Plaintiffs dispute the Agencies' finding, Plaintiffs' arguments lack merit.

Plaintiffs assert that the NWPR affects listed species because it "eliminates federal protections for streams and wetlands that provide habitat for" listed species. Pls.' Br. 33–34. Once again, this question-begging argument incorrectly assumes that CWA jurisdiction extends to areas not covered by the rule. Because the NWPR reasonably interprets ambiguous provisions of the CWA and represents the Agencies' best reading of the statute, the NWPR is the "authoritative" statement of the limits *that Congress* intended to set on the Agencies' jurisdiction. *Brand X*, 545 U.S. at 983–84. Whatever effects result from Congress' decision to place non-jurisdictional waters beyond those limits are ultimately *effects of the statute* that the Agencies have no authority to prevent. Where "an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004); *see also id.* at 766 (accepting agency's "entirely reasonable reading" of statutory provision in the course of concluding that the agency lacked discretion under the statute to prevent the relevant effects). Plaintiffs' ESA claim fails for this reason alone.

Moreover, under ESA regulations, an effect is a consequence of the proposed agency action only if it (1) "would not occur but for the proposed action and [(2)] is reasonably certain to occur." 50 C.F.R. § 402.17(b). "A conclusion of reasonably certain to occur must be based on clear and substantial information," *id.* § 402.17(b), not "speculation or conjecture," 84 Fed. Reg. 44,976, 44,977 (Aug. 27, 2019). Any relationship between the NWPR and the harmful effects of future projects in non-jurisdictional waters fails both prongs of the test.

The NWPR is not a "but for" cause of any adverse effects from future projects in non-jurisdictional waters. The rule does not authorize such projects. Nor are such projects exempt from the ESA merely because they do not require a CWA permit. Any project requiring federal

funding or approvals under another statute would trigger ESA consultation if listed species or critical habitat may be affected. *See* 50 C.F.R. § 402.14(a). Even in the absence of a federal nexus, such projects are subject to Section 9's "take" prohibition. 16 U.S.C. § 1538(a)(1)(B); *see also id*. § 1532(19) (defining "take"). The project proponent is prohibited from taking listed species without a permit, the issuance of which is a federal action triggering consultation. *See WildEarth Guardians v. U.S. Fish & Wildlife Service*, 622 F. Supp. 2d 1155, 1162–63 (D. Utah 2009). The project's adverse effects thus would be properly evaluated (and potentially mitigated or avoided) at that time, when the now-hypothetical project is clearly defined and can be meaningfully analyzed. Regardless, the project proponent—*not* the Agencies—would be solely responsible for any adverse effects. *See Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev*., 359 F. App'x 781, 783 (9th Cir. 2009) (agencies' loan guarantees had "such a remote and indirect relationship to the watershed problems allegedly stemming from the urban development that they cannot be held to be a legal cause of any effect on protected species"); *cf. Katz v. Pershing, LLC*, 672 F.3d 64, 71–72 (1st Cir. 2012) (explaining in the standing context that "causation is absent if the injury stems from the independent action of a third party").

The effects of future projects in non-jurisdictional waters also are not "reasonably certain to occur" because they are "remote in time" and separated from the NWPR by a "lengthy causal chain." RTC 1.5.2, Ex. 1 (quoting 50 C.F.R. § 402.17(b)(1), (3)). The effects depend on a host of factors unrelated to the NWPR, including the nature, timing, and location of such projects and the applicability of other federal, state, tribal, and local laws. *Id.* at 89–90. And, as noted above, such effects are contingent on compliance with the ESA itself, regardless of whether the waters or wetlands are jurisdictional under the CWA. Plaintiffs thus have not shown that the effects of

hypothetical future projects in features not covered by the NWPR are legally attributable to the rule.

## V.     The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment.

If the Court perceives an APA violation, rather than set aside the entire NWPR, the court must impose a "less drastic remedy," for example "partial" vacatur of individual provisions, if "sufficient to redress respondents' injury." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Because remedy issues are complex—and the implications for setting aside a nationwide rule with public benefits like the NWPR are significant—the Agencies request further detailed briefing to the Court on any issues of remedy that may arise. A blanket, nationwide vacatur or injunction against the NWPR would be improper.

Without detailed briefing of the implications of the request, Plaintiffs generically ask the court to "vacate the Rule." Pls.' Br. 45. But courts should not simply vacate agency regulations as a matter of course. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (deciding whether to vacate based on seriousness of agency action's deficiencies and vacatur's disruptiveness). A remedy must impact no more than the specific deficiencies identified and consider whether the agency may fix them. *See id.*; *Monsanto*, 561 U.S. at 165–66 (requiring "partial" vacatur if "sufficient"). Thus, the APA does not require blanket disruption of the NWPR for the entire country. Plaintiffs raise a variety of challenges to the NWPR. Pls.' Br. 12–33. Depending on the Court's findings, an appropriate remedy may need to be tailored based on the claimed violation, the identified injury to Plaintiffs, and the broader equities of impacting the NWPR and the millions of other persons it affects nationwide.

Congress may not expand the Article III powers of the courts through statutory provisions. *See, e.g.*, *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016). So Article III's

jurisdictional limits apply to the APA's general instruction that unlawful agency action "shall" be "set aside." 5 U.S.C. § 706(2). As a result, § 706(2) does not mandate a "depart[ure] from established principles" of equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). A "Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it"; so "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933–34 (2018). APA § 706 does not supplant the Article III requirement that, "[f]or all relief sought, there must be a litigant with standing." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, "[i]f a less drastic remedy (such as partial or complete vacatur of [an agency's challenged] decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at 165–66.

As a court acting in equity deciding only the case or controversy before it, *see Romero-Barcelo*, 456 U.S. at 313, an appropriate remedy must take into account the jurisdiction of and parties before other district courts, debating similar issues about the NWPR, throughout the country. "Government litigation frequently involves legal questions of substantial public importance," so "[a]llowing only one final adjudication would deprive this [Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). Any judicial remedy here cannot be nationwide, but must be narrowly tailored to the Article III injuries proven. That tailoring of remedy should occur pursuant to separate briefing, specific to any issues identified, and based on the facts and circumstances at that time.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and

Defendants' cross-motion for summary judgment should be granted.

Dated: December 3, 2020.

Of Counsel:                                            Respectfully submitted,

DAVID FOTOUHI                                   */s/ Sarah Izfar*
Acting General Counsel                          JONATHAN D. BRIGHTBILL
Environmental Protection Agency          *Principal Deputy Assistant Attorney General*
                                                            PHILIP DUPRE
CRAIG R. SCHMAUDER                        SARAH IZFAR
Deputy General Counsel                         KEVIN MCARDLE
Department of Army                               *Attorneys*
                                                            Environment and Natural Resources Division
DAVID COOPER                                   U.S. Department of Justice
Chief Counsel
U.S. Army Corps of Engineers
*Attorneys*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.


*/s/ Sarah Izfar*
SARAH IZFAR