## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY et al., <br><br> *Defendants.* | Civil Action No. 20-cv-10820-DPW |

## AMICUS BRIEF OF MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Thomas V. Urmy, Jr. (BBO # 506620)
Adam M. Stewart (BBO# 661090)
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, MA 02210
Telephone: (617) 439-3939
Facsimile: (617) 439-0134
turmy@shulaw.com
astewart@shulaw.com

William Buzbee (New York Bar No. 2144004)
Edward and Carole Walter Professor
Professor of Law
Georgetown University Law Center
600 New Jersey Avenue NW
Washington DC 20001-2075
202 661 6536
wwb11@law.georgetown.edu

David R. Owen (California Bar No. 222314)
UC Hastings College of the Law
200 McAllister Street
San Francisco, CA 94102
(415) 703-8285
owendave@uchastings.edu

Sam Kalen (D.C. Bar No. 40483)
Centennial Distinguished Professor of Law
University of Wyoming College of Law
Laramie, Wyoming 82071
skalen@uwyo.edu
307-766-6706

Kim Diana Connolly
University of Buffalo School of Law
519 O'Brian Hall
Buffalo, NY 14260
(716) 645-2092
kimconno@buffalo.edu

*Counsel for Members of Congress.*

(Professors' affiliations provided for identification purposes only. Each professor has written in his or her personal capacity.)

## **<u>TABLE OF CONTENTS</u>**

IDENTITY AND INTERESTS OF AMICI CURIAE ..................................................................... 1

INTRODUCTION and SUMMARY OF ARGUMENT ................................................. 3

I. THE CLEAN WATER ACT EMPHASIZES WATER QUALITY AND SCIENCE ............... 4

II. THE NWPR DISREGARDS WATER QUALITY EFFECTS AND SCIENCE ..................... 6

III. THE NWPR MISUNDERSTANDS CLEAN WATER ACT FEDERALISM ....................... 9

    A.    Section 101 ......................................................................................................... 9

    B.    The Act's Other Provisions and Overall Structure ........................................... 10

    C.    Legislative History ............................................................................................ 12

    D.    Clean Water Act Federalism in Practice ........................................................... 15

CONCLUSION ........................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*County of Maui v. Hawai'i Wildlife Fund*, 140 S.Ct. 1462 (2020) .............................................. 3

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...................................................... 8

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................................ 8

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) 8

*PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012) ......................................................... 16

*PUD No. 1 of Jefferson County v. Wash. Dept. of Ecology*, 511 U.S. 700 (1994) ....................................... 12

*Rapanos v. United States,* 547 U.S. 715 (2006) ................................................................. 6, 7

*United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985) ............................................... 14

**Statutes**

5 U.S.C. § 706 ................................................................................................... 8

33 U.S.C. § 1252 .................................................................................................. 4

33 U.S.C. § 1254 .................................................................................................. 4

33 U.S.C. § 1254a ................................................................................................. 4

33 U.S.C. § 1311 ............................................................................................... 4, 12

33 U.S.C. § 1312 .................................................................................................. 4

33 U.S.C. § 1313 ................................................................................................. 11

33 U.S.C. § 1314 .................................................................................................. 4

33 U.S.C. § 1341 ................................................................................................. 11

33 U.S.C. § 1342 ................................................................................................. 10

33 U.S.C. § 1344 ............................................................................................. passim

33 U.S.C. §§ 1266-1274 ............................................................................................ 4

33 U.S.C. § 1365 ................................................................................................ 12

33 U.S.C. § 1370 ................................................................................................ 12

5 U.S.C. § 706 .................................................................................................... 8

**Other Authorities**

118 Cong. Rec. 33,572 (daily ed. Oct. 4, 1972) ............................................... 13

A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL
AMENDMENTS OF 1972 (1972) ............................................... 5, 12, 13

BARTON H. THOMPSON ET AL., LEGAL CONTROL OF WATER RESOURCES (6ᵗʰ ed. 2018) ................ 16

Dave Owen, *Little Streams and Legal Transformations*, 2017 UTAH L. REV. 1 ..................... 16

Dave Owen, *Regional Federal Administration*, 63 U.CL.A. L. REV. 58 (2016) ...................... 16

Edmund S. Muskie, *An Environmental Program for America*, 1 ENVTL. L. 1 (1970) ................ 5

EPA, Impaired Waters and TMDLs .................................................................... 15

EPA, NPDES State Program Information ...................................................... 11, 15

EPA, State-Specific Water Quality Standards Effective under the Clean Water Act (CWA) ........... 15

Hearing before the Subcommittee on Water Resources and the Environment of the Committee on
Transportation and Infrastructure, September 18, 2019 ............................ 8

RYAN W. TAYLOR, FEDERALISM OF WETLANDS (2013) ............................................. 16

Water Pollution Control Legislation—1971: Hearings on H.R. 11896, H.R. 11895 Before the
Committee on Public Works, 92d Cong., 1st Sess. 273 ............................ 13

William L. Andreen, *The Evolution of Water Pollution Control in the United States—State, Local, and Federal
Efforts*, 1789-1972: Part 1, 22 STAN. ENVTL. L. J. 145 (2003) ...................... 13

**Regulations**

The Navigable Waters Protection Rule: Definition of "Waters of the United States", 85 Fed. Reg.
22250 (2019) ............................................................................................ passim

Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210 (2020) ................... 11

## IDENTITY AND INTERESTS OF AMICI CURIAE

*Amici* are current or former members of the Congress of the United States. *Amici's* interest is in presenting this Court with an understanding of the text, structure, and goals of the law our predecessors enacted in 1972—along with its subsequent amendment in 1977, which further confirmed Congress' intent—and with an understanding of the ways in which the so-called "Navigable Waters Protection Rule" (NWPR) dishonors that intent. *Amici* include the following: Representative Peter A. DeFazio of Oregon, 4th Congressional District; Representative Grace Napolitano of California, 32nd Congressional District; Representative Donald S. Beyer Jr. of Virginia, 8th Congressional District; Representative Gwen Moore of Wisconsin, 4th Congressional District; Representative Gerald E. Connolly of Virginia, 11th Congressional District; Representative Paul D. Tonko of New York, 20th Congressional District; Representative Alan Lowenthal of California, 47th Congressional District; Representative Eleanor Holmes Norton of the District of Columbia; Representative Raúl M. Grijalva of Arizona, 3rd Congressional District; Representative Susan A. Davis of California, 53rd Congressional District; Representative André Carson of Indiana, 7th Congressional District; Representative Debbie Mucarsel-Powell of Florida, 26th Congressional District; Representative Danny K. Davis of Illinois, 7th Congressional District; Representative Jared Huffman of California, 2nd Congressional District; Representative Chris Pappas of New Hampshire, 1st Congressional District; Representative Jackie Speier of California, 14th Congressional District; Representative Marcy Kaptur of Ohio, 9th Congressional District; Representative Juan Vargas of California, 51st Congressional District; Representative Bonnie Watson Coleman of New Jersey, 12th Congressional District; Representative Lisa Blunt Rochester of Delaware, Delegate At Large; Representative Steve Cohen of Tennessee, 9th Congressional District; Representative Jan Schakowsky of Illinois, 9th Congressional District; Representative Nanette Diaz Barragán of California, 44th Congressional District; Representative Ro Khanna of California, 17th Congressional District;

1

Representative Alcee L. Hastings of Florida, 20th Congressional District; Representative Chellie Pingree of Maine, 1st Congressional District; Representative Kathy Castor of Florida, 14th Congressional District; Representative Jesús "Chuy" García of Illinois, 4th Congressional District; Representative Julia Brownley of California, 26th Congressional District; Representative Maxine Waters of California, 43rd Congressional District; Representative Henry C. "Hank" Johnson, Jr. of Georgia, 4th Congressional District; Representative A. Donald McEachin of Virginia, 4th Congressional District; Representative Suzanne Bonamici of Oregon, 1st Congressional District; Representative Zoe Lofgren of California, 19th Congressional District; Representative Grace Meng of New York, 6th Congressional District; Representative Ed Case of Hawaii, 1st Congressional District; Representative Bobby L. Rush of Illinois, 1st Congressional District; Representative Adriano Espaillat of New York, 13th Congressional District; Representative Debbie Wasserman Schultz of Florida, 23rd Congressional District; Representative Tom Malinowski of New Jersey, 7th Congressional District; Representative Bill Foster of Illinois, 11th Congressional District; Representative Sean Casten of Illinois, 6th Congressional District; Representative Donald M. Payne, Jr. of New Jersey, 10th Congressional District; Representative Mike Quigley of Illinois, 5th Congressional District; Representative Salud Carbajal of California, 24th Congressional District; Representative Brenda Lawrence of Michigan, 14th Congressional District; Representative Doris Matsui of California, 6th Congressional District; Representative Deb Haaland of New Mexico, 1st Congressional District; Representative Debbie Dingell of Michigan, 12th Congressional District; Representative Pramila Jayapal of Washington, 7th Congressional District; Representative Tim Ryan of Ohio, 13th Congressional District; Representative Darren Soto of Florida, 9th Congressional District; Representative Robert C. "Bobby" Scott of Virginia, 3rd Congressional District; Representative John P. Sarbanes of Maryland, 3rd Congressional District; Representative Peter Welch of Vermont, Delegate At Large; Representative Albio Sires of New Jersey, 8th Congressional District;

2

Representative Brendan F. Boyle of Pennsylvania, 2nd Congressional District; Representative Daniel T. Kildee of Michigan, 5th Congressional District; Representative Mark DeSaulnier of California, 11th Congressional District; Representative David N. Cicilline of Rhode Island, 1st Congressional District; Representative Nydia Velázquez of New York, 7th Congressional District; Representative Bill Keating of Massachusetts, 9th Congressional District; Representative Betty McCollum of Minnesota, 4th Congressional District; Representative Alma S. Adams, Ph.D. of North Carolina, 12th Congressional District; Representative Barbara Lee of California, 13th Congressional District' Representative James P. McGovern of Massachusetts, 2nd Congressional District; Representative José E. Serrano of New York, 15th Congressional District; Senator Thomas R. Carper of Delaware; Senator Benjamin L. Cardin of Maryland; Senator Tammy Duckworth of Illinois; Senator Edward J. Markey of Massachusetts; Senator Jeffrey A. Merkley of Oregon; Senator Sheldon Whitehouse of Rhode Island; Senator Bob Menendez of New Jersey; former Representative Tim Bishop of New York, 1st Congressional District; former Representative James P. Moran of Virginia, 8th Congressional District and former Senator Barbara Boxer of California.

## INTRODUCTION and SUMMARY OF ARGUMENT

In 1972, Congress enacted the Clean Water Act, a landmark statute with the core objective of cleaning up the nation's waters.  *See* 33 U.S.C. § 1251(a); *County of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020).  The NWPR turns this statutory scheme on its head.  85 Fed. Reg. 22250 (2020).  Where Congress called for science-based decision-making, the NWPR largely ignores the science of clean water.  And where Congress called for a collaborative, comprehensive, and mandatory federal and state cleanup of the nation's waters, the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps)—the agencies primarily responsible for implementing the Clean Water Act—have tried to decrease protections from water pollution, all based on fallacious

notions about Clean Water Act federalism.  Because of these errors, the NWPR is arbitrary, capricious, and grounded in misunderstandings of governing statutory law.

To address these errors, our brief makes three primary points.  First, we emphasize what should be obvious: the Clean Water Act envisions agency decisions grounded in water-quality science and oriented toward cleaning the nation's waters.  Second, we explain how the NWPR undermines these statutory mandates.  Because the plaintiffs have discussed this issue in depth, our discussion is brief, and it focuses on the agencies' failure to provide Congress with basic information about the environmental consequences of their proposed action.  Finally, we explain how the agencies have misunderstood Clean Water Act federalism.

## I. THE CLEAN WATER ACT EMPHASIZES WATER QUALITY AND SCIENCE

That the Clean Water Act requires regulatory actions to protect America's waters and be grounded in science is indisputable.  The very first words of the statute emphasize both science and water quality; the statute opens by declaring, "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's Waters." 33 U.S.C. § 1251(a).  The statute's opening section also states that water quality regulation must provide for "the protection and propagation of fish, shellfish, and wildlife" and "provide[] for recreation," all of which requires understanding, through science, the conditions upon which fish, shellfish, wildlife, and recreation depend, and the relationships between those conditions and water pollution.  33 U.S.C. § 1251(a)(2).

Similarly directed provisions exist throughout the Clean Water Act.  *See, e.g.*, 33 U.S.C. § 1252(a) (calling for programs to protect the "sanitary conditions" of waters and again referencing protection of "fish and aquatic life and wildlife" and "recreational purposes"); 33 U.S.C. § 1254 (calling for research programs on water pollution effects); 33 U.S.C. § 1254a (same); 33 U.S.C. §§ 1266-1274 (creating programs to address pollution challenges in assorted named waters and fund research projects); 33 U.S.C. §§ 1311-1313 (setting forth water quality goals and mandates tied to water quality

4

status); 33 U.S.C. § 1314 (providing for EPA creation of information and guidelines regarding water quality and factors necessary to achieve integrity goals).  Section 404, which sets forth the "dredge or fill" permit requirements and has often been the locus of disputes over Clean Water Act jurisdiction, similarly calls for science-based judgments, requiring regulatory "guidelines" to be based on "criteria comparable" to those mandated for analysis of degradation of ocean waters. 33 U.S.C. § 1344(b), (c). That section also authorizes regulators to forbid disposal at sites where filling would cause environmental damage or harm drinking water.  *Id.*  All of these provisions reflect a larger theme: the entire statute is built on the premise that regulators will use science to improve water quality.

Legislative history supports this emphasis on science-grounded and ambitious water quality protection.  In 1970, Senator Edmund Muskie, who would go on to be one of the 1972 statute's main sponsors, wrote that "[o]ur study of ecology has taught us that the relationship between man and nature and man among men is a delicate balance."  Edmund S. Muskie, *An Environmental Program for America*, 1 ENVTL. L. 1, 2-3 (1970).  In accordance with those principles, and with their understanding of hydrology, legislators crafted a statute with deliberately broad jurisdictional scope.  As the Senate Committee on Public Works noted, "[w]ater moves in hydrologic cycles and it is essential that discharges of pollutants be controlled at the source. Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries."  S. Rep No. 92-414, 92nd Cong. 77 (1971).

That broad scope also reflected the profound sense of urgency shared by members of Congress.  Alabama Congressman Robert Jones summarized the prevailing sentiment: "The price of action is high.  But the price of inaction is a national disaster beyond all reckoning."  A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL AMENDMENTS OF 1972 96 (1972) (hereinafter A 1972 LEGISLATIVE HISTORY).  Senator Muskie likewise warned, "[o]ur planet is beset with a cancer which threatens our very existence and which will not respond to the kind of treatment that has been

prescribed in the past."  118 Cong. Rec. 33,572, 33692 (daily ed. Oct. 4, 1972).  Committee reports described the Clean Water Act as "the most far-reaching environmental bill in history," and as "authoriz[ing] the greatest cleanup program in history." Committee Print, Vol. 1, A 1972 LEGISLATIVE HISTORY, Serial No. 93-1, 93d Cong., 1st Sess. 109 (Jan. 1973).

In summary, the Congress designed the Clean Water Act to achieve dramatic improvements in water quality, and it envisioned achieving that crucial objective through decisions grounded in science.

## II. THE NWPR DISREGARDS WATER QUALITY EFFECTS AND SCIENCE

In the NWPR, EPA and the Corps have sidestepped science and subordinated the Clean Water Act's core objective of water quality protection.  Indeed, the agencies did not even try to document key water-quality consequences that will result from their rollback. In their brief, the environmental group plaintiffs have explained at length how the agencies' rationales ignore much of the relevant scientific evidence, mischaracterize other evidence, disregard the critiques of EPA's own Science Advisory Board, contain a mess of internal contradictions, and stand in stark contrast to the thorough and scientifically-grounded work the agencies have done in the past.  We will just add two specific points to that discussion.

First, this disregard for science, and for the environmental consequences of the agencies' actions, was planned and deliberate.  In the NWPR's preamble, the agencies stated: "While science informs the agencies' interpretation" of the phrase "waters of the United States," "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions." 85 Fed. Reg. 22271; *see also id.* At 22314 (further explaining why the agencies did not view "scientific principles" as governing).  The agencies' theory seems to be that science could play only a limited role because the Clean Water Act's federalism language and Justice Scalia's plurality

opinion in *Rapanos v. United States,* 547 U.S. 715 (2006)—an opinion that five justices *rejected*—left the agencies no choice.[1]  That rationale is deeply flawed because, as explained above, the Clean Water Act does call for science- and water-quality-driven decisionmaking.  And as shown below, that rationale also is flawed because the Clean Water Act's approach to federalism in no way compels the agencies to ignore or distort the science of clean water.

Second, this disregard for science, and for the environmental impacts of the agencies' proposed change, occurred despite the efforts of Congress to identify basic information about the consequences of the NWPR.  The agencies did not make any serious attempt to quantify the NWPR's effects on the stream and wetland areas that would lose protection, or the economic costs of those losses (though they did purport to quantify the economic benefits of shrinking water quality protections).  *See* 85 Fed. Reg. at 22269, 22334-35.  Instead, in the preamble, they claim "significant limitations" in the "currently available data" justify this lack of quantification of effects.  Id. at 22329-30; *see* U.S. EPA AND DEPT. OF THE ARMY, ECONOMIC ANALYSIS FOR THE NAVIGABLE WATERS PROTECTION RULE: DEFINITION OF "WATERS OF THE UNITED STATES" xiv, xxii,  11, 14-17, 19, 22-23, 48-94, 99, 105-07, 127, 164-65, 171 (2020); U.S. EPA and DEPT. OF THE ARMY, RESOURCE PROGRAMMATIC ASSESSMENT FOR THE NAVIGABLE WATERS PROTECTION RULE: DEFINITION OF "WATERS OF THE UNITED STATES" 10, 20-24, 26-28 (2020).   And this failure to provide key information persisted despite Congressional and public concern.

At a September 18, 2019 U.S. House Committee on Transportation and Infrastructure hearing, Chairman DeFazio attempted to extract from David Ross, the Assistant Administrator of EPA's

---

[1] Treating this minority opinion as binding law is a legal error that recurs throughout much of the NWPR's preamble. *See, e.g.,* 85 Fed. Reg. at 22289, 22291 22304, 22308, 22309, 22314 (reading Justice Scalia's *Rapanos* plurality as precluding jurisdiction based on ecological connections, even though Justice Kennedy's "significant nexus" standard, which four other justices supported, would allow jurisdiction based on such connections).

Office of Water, at least some of the missing information. The resulting dialogue makes clear the

agencies' lack of interest in the science behind, and environmental consequences of, their rule:

> Mr. DEFAZIO: . . . Now, your initial proposal says that ephemeral streams are out.
> What percent is that of what is covered today? Do you know?
> Mr. ROSS. Actually, we don't.
> … Mr. DEFAZIO: . . .Let's try one more. So let's go to wetlands. A lot of people care
> about wetlands, including hunters, fishers, recreationists, everybody. So what percent
> of our wetlands would be eliminated from Clean Water Act protections under your
> proposal?
> Mr. ROSS. Actually, we also do not know that as well . . .
> Mr. DEFAZIO. So—OK. Wait a minute, wait a minute, wait a minute. So you are
> proposing to undo protections on intermittent streams, ephemeral streams, and
> wetlands, and you don't know what the impact of what you are proposing would be. .
> . . So how about the economic impacts? If I could have the chart back up. That is your
> own chart there. [Slide.] We talk about—oh, downstream inundation damages, flood
> risk. What about that? Greater drinking water treatment and dredging costs. These are
> desirable outcomes? This is like—seriously? Who is going to pay for that stuff?
> Mr. ROSS. So in our economic analysis, we did qualitatively discuss if there would be
> reduced Federal jurisdiction——
> Mr. DEFAZIO. Qualitative, not quantitative?
> Mr. ROSS. Because we do not have the data——

Hearing before the Subcommittee on Water Resources and the Environment of the Committee on

Transportation and Infrastructure, September 18, 2019, pp 16-17 (Sept. 18, 2019), *available at*

https://www.govinfo.gov/content/pkg/CHRG-116hhrg40826/pdf/CHRG-116hhrg40826.pdf.

*     *     *     *     *

In any rulemaking under the Clean Water Act, environmental consequences and

environmental science should hold central importance. Here, the agencies instead treated both as

largely irrelevant. These choices render the rule arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A);

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 49

(1983) (finding that an agency's rule was arbitrary and capricious when it failed to consider options

consistent with the intent of the underlying statutory scheme); *see also Encino Motorcars, LLC v. Navarro,*

136 S. Ct. 2117, 2124-25 (2016) (discussing the need to analyze the effects of, and provide good

reasons for, policy changes); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (same).

8

### III. THE NWPR MISUNDERSTANDS CLEAN WATER ACT FEDERALISM

In promulgating the NWPR, EPA and the Corps tried to explain away their indifference to water quality and science by contending that principles of federalism, which they extracted from Clean Water Act section 101(b), mandated a narrower jurisdictional scope. But that excuse is flawed, both because of the Clean Water Act's central emphasis on clean water and because of the manner in which the Act approaches federalism.

Federalism was important to the senators and representatives who enacted the Clean Water Act, and the ongoing importance of states in protecting America's waters is a recurring theme of the statute. But the Congresses that crafted the Clean Water Act *rejected* the agencies' current view, which identifies federalism solely with limits on federal authority. Instead, Congress chose to enlist the states in a mandatory and nationwide project of improving water quality, and to give states discretion to add extra layers of water quality protection if they chose to do so. They chose cooperative federalism over deregulatory federalism. Nothing about their vision supports using environmentally irrelevant jurisdictional boundaries to carve out huge geographic areas where the addition of pollutants to waters would be unregulated.

### A. Section 101

The agencies' misunderstanding of Clean Water Act federalism begins with the very text that they cite. They rely heavily—in fact, nearly exclusively—on Clean Water Act section 101(b), which states, in relevant part,

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (parentheses in original). This language clearly emphasizes the importance of states. But it says nothing about jurisdictional boundaries. Instead, it speaks of "water resources"

generally, drawing no distinctions within that broad category. This language therefore expresses Congress's desire for the states to be heavily involved in protecting waters that *are* subject to Clean Water Act jurisdiction. It says nothing about excluding a class of aquatic features from that protection.

This language, along with the other language of section 101, also indicates that the purpose of state involvement was to restrain water pollution, not to authorize it. Section 101(b) itself begins by noting the "responsibilities and rights of States to prevent, reduce, and eliminate water pollution." 33 U.S.C. 1251(b). That is definitely not the language of state-centered deregulation. And in section 101(a)—indeed, in the very first words of the statute—Congress emphasized that "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a). It then listed seven specific national policies, all focused on improving water quality. The text therefore makes the goal of section 101(b) crystal clear. Congress was enlisting the states in pursuit of the crucial national goal of protecting water quality. It was not trying to limit the scope of the Clean Water Act's coverage.

### B. The Act's Other Provisions and Overall Structure

Section 101 is not the only Clean Water Act section that demonstrates Congress's intent that states be key participants in the project of achieving national water quality goals. Multiple provisions of the statute reflect that basic structure, and none suggest, as EPA and the Corps currently assert, that a key goal of the statute was to carve out geographic zones in which states could authorize water pollution.

This emphasis on state participation is particularly salient in the act's key permitting programs. Clean Water Act section 402, which authorizes the National Pollutant Discharge Elimination System (NPDES) permitting program, authorizes delegation of permitting authority to state agencies. 33 U.S.C. § 1342. Nearly every state in the country has taken up this invitation, and NPDES permitting now is largely handled at the state level. *See* EPA, NPDES State Program Information,

https://www.epa.gov/npdes/npdes-state-program-information. Yet nothing in section 402 gives states the option of authorizing unpermitted discharges. Similarly, Clean Water Act section 404, which creates the permitting program for discharges of dredged or fill material, authorizes delegation of permitting authority (except for a subset of waters reserved for federal permitting authority) to state agencies, but it does not give states the option to exempt waters from regulatory protection. 33 U.S.C. § 1344(e). Section 303, which governs water quality standards and water quality planning, likewise delegates to states the primary responsibility for deciding on water quality standards and developing plans for their attainment, but it makes having water quality standards and planning processes mandatory. 33 U.S.C. § 1313. The theme of all these sections, and many others, is that Congress valued state involvement, but it expected that state involvement to be directed toward the national project of restoring the nation's waters.

These and other provisions of the Clean Water Act also reflect a second theme of section 101(b), which is preserving the authority of the states to go *further* than the federal government in protecting water quality. One of the clearest authorizations for these efforts comes from section 401, which authorizes states to issue water quality certifications for projects involving federally-licensed discharges—and which EPA is currently attacking.[2] 33 U.S.C. § 1341. Section 401 gives states authority to require additional steps, beyond those already imposed by federal agencies, to protect state water quality. *Id.* And section 401 reflects a broader theme. As Justice Stevens once pointedly noted, "[n]ot a single sentence, phrase, or word in the Clean Water Act purports to place any constraint

---

[2] In 2020, EPA issued a final rule drastically curtailing the scope of states' section 401 certification authority, while baldly asserting that its restrictions "neither diminish[] nor undermine[] cooperative federalism." Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210, 42226 (2020). The position embodied in these two rulemakings—that federalism carries outcome-determinative importance when states want to authorize water pollution and is irrelevant when the states seek to protect their waterways—turns the core objective of the Clean Water Act on its head. *See* 33 U.S.C. 1251(a) ("The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.").

on a State's power to regulate the quality of its own waters more stringently than federal law might require. In fact, the Act explicitly recognizes States' ability to impose stricter standards." *PUD No. 1 of Jefferson County v. Wash. Dept. of Ecology*, 511 U.S. 700, 723 (1994) (Stephens, J. concurring) (citing 33 U.S.C. § 1311(b)(1)(C)).   Likewise, section 1365(e) preserves state common law protections, and section 1370 allows additional state regulation as long as it is not "less stringent" than federal requirements.  See 33 U.S.C. §§ 1365(e), 1370.  And section 404, which tends to be at the center of jurisdictional controversies, similarly preserves state authority to regulate above and beyond federal requirements, even when that state regulation constrains federal activities.  33 U.S.C. § 1344(t).

The role of section 101(b) within this statutory scheme is clear.  Through the scheme as a whole, Congress was creating a mandatory partnership for the pursuit of water quality, and section 101(b) recognizes the states' crucial roles *within* that partnership.  It was not placing boundaries on the Clean Water Act's ability to control water pollution.  To interpret section 101(b) as mandating limits on federal jurisdiction—indeed, limits so powerful that they obviate the need to weigh the science and consider the water quality consequences of a jurisdiction rule—is to turn the statute inside out and upside down.

**C.  Legislative History**

The Clean Water Act's ample legislative history confirms what the Act's provisions and overall structure make clear: this emphasis on using cooperative federalism to reduce pollution was not happenstance.  Instead, it was central to Congress's design, and it responded to Congress's frustrating experiences with the kinds of state voluntarism that the NWPR prioritizes expanding.

When Congress began working on the Federal Water Pollution Control Act, it did so in response to failed efforts to afford states primacy.  *See* A 1972 LEGISLATIVE HISTORY, *supra*, at 1419 (reprinting the report from the Senate Committee on Public Works); *see generally* William L. Andreen, *The Evolution of Water Pollution Control in the United States—State, Local, and Federal Efforts*, 1789-1972:

12

Part 1, 22 STAN. ENVTL. L. J. 145 (2003).  In 1971 and 1972, members debated whether the failures

of the present system were attributable primarily to a lack of state initiative or to a dearth of federal

financial support.  But universal agreement surfaced on one key point: the present system was

dangerously broken, and a federal floor to protect water quality was necessary.[3]  And Congressmen

had a ready explanation for this lack of state progress.  As Minnesota Governor Wendell Anderson

explained, in testimony quoted by multiple representatives:

> Every governor in the country knows what is the greatest political barrier to effective
> pollution control.  It is the threat of our worst polluters to move their factories out of
> any State that seriously tries to protect its environment.  It is the practice of playing
> off one State against the other.

1 LEGISLATIVE HISTORY at 452 (Statement of Rep. Reuss).

Congress took this threat of state inaction seriously.  As Minnesota Representative John

Blatnik, a key sponsor of the House bill, explained, it was "totally restructuring the water pollution

control program and making a far-reaching national commitment to clean water."  A 1972

LEGISLATIVE HISTORY, *supra*, at 350.  Kentucky Senator John S. Cooper echoed that theme, explaining

how the Clean Water Act was "one of the most significant, most comprehensive, most thoroughly

debated pieces of environmental legislation ever to be considered by Congress," and how the Act

squarely addressed "the need for strong, uniform, and enforceable standards to improve the quality

of our Nation's waters."  118 Cong. Rec. 33,572, 33704 (daily ed. Oct. 4, 1972).  These were hardly

isolated remarks: Members repeatedly stressed the important roles states would play in implementing

---

[3] *See, e.g.,* Water Pollution Control Legislation—1971: Hearings on H.R. 11896, H.R. 11895 Before the Committee on Public Works, 92d Cong., 1st Sess. 273 (Rep. Jones) ("We left it to the States, year after year, and we didn't get a single thing but a bunch of nursery rhymes as to the Constitution, and we didn't get any clean water until the Federal Government insisted upon it and made some dollars available to the states for that use."); A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL AMENDMENTS OF 1972 349 (1972) (Statement of Rep. Gross) ("Through the years the states and the local subdivisions of government, including the municipalities, failed to enforce laws and ordinances in the matter of pollution and especially the polluting of streams.  This is where the breakdown really came about.").

the regulatory regime, but the basic concept was to "engage[] all levels of government… in a concerted national effort to cleanse our water."  A 1972 LEGISLATIVE HISTORY, *supra*, at 218 (Sen. Eagleton).

Similar debates surfaced before the 1977 amendments, when Congress chose the same cooperative federalism arrangement.  The most direct evidence of Congress's intent involved Clean Water Act jurisdiction and section 404, which emerged as a central focus of Congressional debate.  *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 135-39 (1985) (summarizing the debate and its outcome).  The House of Representatives' bill would have created a system under which regulatory protection of tributary waterways would have occurred at the discretion of each state.  *See* H.R. 3199, 95th Cong., 1st Sess. 17 § 16(f) (1977), *reprinted in* 4 LEGISLATIVE HISTORY, *supra*, at 1158.  The Senate bill, meanwhile, maintained the full jurisdiction established by EPA, the Corps, and the courts, while also including provisions streamlining allowing states to assume responsibility for permitting fills in some waterways.  *See* S. Rep. No. 370, 95th Cong., 1st Sess. 75 (1977), *reprinted in* 4 LEGISLATIVE HISTORY, *supra*, at 708.  The conference members chose, and Congress enacted, the Senate's approach. *See* 33 U.S.C. § 1344.  In debates over the conference bill, member after member emphasized the importance of preserving a broad jurisdictional scope while giving states the option (which members assumed the states would exercise) of taking the lead on implementation.[4]  By design, the system of broad federal jurisdiction—coupled with robust state involvement—remained intact.

---

[4] *See, e.g.,* 4 LEGISLATIVE HISTORY at 426, 470 (Senator Muskie) (praising the bill for "extend[ing] our pollution control capability to the limits of the resource jurisdiction of the United States," and "maintaining the full scope of Federal regulatory authority," while also providing for "the substitution of adequate state programs"); *id.* at 523 (Senator Baker) (emphasizing the importance of retaining "comprehensive jurisdiction over the Nation's waters" while also allowing "State permit programs to assume the primary permitting responsibility for protecting those lakes, rivers, streams, swamps, marshes, and other portions of the navigable waters that lie outside the Corps program in the so-called phase I waters").

The basic federalism question presented by this litigation therefore is not new.  Congress confronted it in 1972 and again in 1977, and both times it rejected the very model that EPA and the Corps, in a break from decades of contrary views, now argue that the Clean Water Act mandates.

### D. Clean Water Act Federalism in Practice

All of this evidence of Congress's statutory design might be slightly less compelling if, over time, implementation of the Clean Water Act had in fact strayed from these federalism principles and led federal regulators to obliterate the roles of states.  In their rhetoric, the NWPR's proponents have suggested that scenario has come to pass.  But it has not.  In fact, Clean Water Act implementation has honored Congress's blueprint for substantial state roles in advancing water quality, while also preserving states' ability to be partners in water quality protection and to manage land and water resources.  Indeed, because many of these partnerships depend on federal Clean Water Act jurisdiction, the NWPR would actually undermine state authority.

In practice, states do take the lead in implementing nearly every key part of the statute.  They adopt water quality standards.  *See* EPA, State-Specific Water Quality Standards Effective under the Clean Water Act (CWA), https://www.epa.gov/wqs-tech/state-specific-water-quality-standards-effective-under-clean-water-act-cwa (last visited October 6, 2020).  They draft water pollution budgets and engage in continuing planning processes.  *See* EPA, Impaired Waters and TMDLs, https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls (last visited October 6, 2020).  Nearly every state holds delegated authority to issue NPDES permits.  EPA, NPDES State Program Information, https://www.epa.gov/npdes/npdes-state-program-information.  And while only two states (New Jersey and Michigan) have elected to hold delegated authority to issue section 404 permits, states influence those permits in a variety of ways.  Using their authority under section 401, states routinely work with the Corps' district offices to craft the terms of section 404 permits, and they also work with the Corps to implement compensatory mitigation programs.  *See* Dave Owen,

15

*Regional Federal Administration*, 63 U.CL.A. L. REV. 58, 98-99, 115 (2016). State involvement, in short, pervades every key part of Clean Water Act implementation, and state implementation of that authority is often intertwined with and supported by federal efforts and contingent upon waters falling within Clean Water Act jurisdiction. Consequently, unless states enact new legislation and appropriate additional funds, many of these state programs would actually shrink if Clean Water Act jurisdiction is narrowed.

There are many other ways in which the Clean Water Act leaves state authority intact. Even if a waterway is subject to federal jurisdiction, states still retain primary responsibility for allocating water rights in that waterway. *See generally* BARTON H. THOMPSON ET AL., LEGAL CONTROL OF WATER RESOURCES (6th ed. 2018) (describing, over hundreds of pages, the doctrines states use to allocate waters from waterways subject to Clean Water Act jurisdiction). If the waterway is navigable-in-fact—and thus unquestionably subject to Clean Water Act jurisdiction—the state in which it is located still owns its streambed. *PPL Montana, LLC v. Montana*, 565 U.S. 576, 589 (2012) (describing "[t]he rule that the States, in their capacity as sovereigns, hold title to the beds under navigable waters"). Similarly, so long as streams or wetlands are not on federally-owned land, states and local governments retain their land use authority over those streams and wetlands and surrounding uplands. Nor is there de facto preemption of that authority. If states or local governments want to authorize development in areas with jurisdictional aquatic features, they generally can, and they routinely do so; the Corps issues tens of thousands of fill permits every year, and permit denials are exceedingly rare. *See* RYAN W. TAYLOR, FEDERALISM OF WETLANDS 88 (2013) ("During the time of this study, the USACE approved an average of 86,427 permits per year."); Dave Owen, *Little Streams and Legal Transformations*, 2017 UTAH L. REV. 1, 41 (quoting an experienced state water-quality regulator, who observed that "there is no stopping things, with very, very, very limited exceptions"). All of this illustrates the fallacy in the NWPR's suggestion, in its preamble, that limits on federal jurisdiction are necessary to preserve state

authority.  85 Fed. Reg. at 22269 (suggesting that federal and state waters are distinct categories); *id.* at 22271 (stating, erroneously, that the rulemaking is about deciding "where to draw the line between Federal and State or tribal waters").[5]  Federal and state authority routinely coexist and support each other, just as the Clean Water Act's drafters hoped and intended they would.

## **CONCLUSION**

When Congress enacted the Clean Water Act, it made the attainment of clean water the statute's central objective, and it clearly envisioned reliance on science-based decision-making to achieve those ends.  Congress also enacted a cooperative federalism system, in which states participate in, rather than create exemptions from, programs designed to achieve the national goal of water quality protection.  These were complementary visions.  For decades, and through the dedicated work of EPA and the Corps, Congress's vision has been turned into reality, with successful state-federal integration throughout many Clean Water Act programs, and with major improvements in water quality—along with much work still to do.  The Clean Water Act's critics, some of whom, at the time of this brief's filing, call the shots at EPA and the Corps, may not particularly like this system or value these successes. They prefer a vision of Clean Water Act federalism in which all that matters is limiting the scope of federal governance, and they see artificial limits on federal jurisdiction as a key means to that end.  But the agencies' role, and now the courts', is to interpret the Clean Water Act as Congress

---

[5] This notion that federal and state waters are exclusive categories is also at odds with section 404(t), which expressly preserves *state* regulatory authority over dredging and filling of waters subject to Clean Water Act jurisdiction.  Section 404(t) states:

> Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements.

33 U.S.C. 1344(t).

wrote it, not as the agencies' current political leadership would prefer to see it revised.  And Congress

wrote a statute mandating a federal-state partnership for achieving clean water.

Date: December 15, 2020                                      Respectfully submitted,

                                                            */s/ Adam M. Stewart*
                                                            Thomas V. Urmy, Jr. (BBO #506620)
                                                            Adam M. Stewart (BBO# 661090)
                                                            SHAPIRO HABER & URMY LLP
                                                            Seaport East
                                                            Two Seaport Lane
                                                            Boston, MA 02210
                                                            Telephone: (617) 439-3939
                                                            Facsimile: (617) 439-0134
                                                            turmy@shulaw.com
                                                            astewart@shulaw.com

                                                            *Counsel for Members of Congress*

                        **Certificate of Service**

        I hereby certify that this document filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) on December 15,
2020.

                                                            */s/ Adam M. Stewart*
                                                            Adam M. Stewart

18