**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CONSERVATION LAW FOUNDATION, et
al.,

     *Plaintiffs*,

  v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     *Defendants.*

No. 20-cv-10820-DPW

**BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK
UNIVERSITY SCHOOL OF LAW AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Eric Lesser
41 Dover Road
Longmeadow, MA 01106
(413) 364-4341
ericplesser@gmail.com

Bethany A. Davis Noll (*pro hac vice* pending)
139 MacDougal Street, Third Floor
New York, New York 10012
(212) 992-8932
bethany.davisnoll@nyu.edu

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

December 17, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF AMICUS CURIAE .....................................................................................1

SUMMARY OF ARGUMENT .............................................................................................2

ARGUMENT ........................................................................................................................3

I.    The Agencies Cannot Evade Responsibility for Assessing the Rule's Harms .....................4

II.   The Agencies Irrationally Disregard Most of the Rule's Harms ............................................6

III.  The Agencies Grossly Undervalue the Harms That They Do Quantify, Failing to
      Recognize the Critical Importance of Wetlands ....................................................................8

      A.   The Nationwide Analysis Irrationally Undervalues the Harms of Wetlands
           Degradation Through at Least Three Major Errors .......................................................8

           1.   The Agencies Ignore the Substantial Interstate Benefits Wetlands Provide............9

           2.   The Agencies Grossly Underestimate Wetlands' In-State Benefits .....................11

           3.   The Agencies' Assumption that States Will Preserve Waters Losing Federal
                Protection Is Speculative and Overlooks Key Considerations .............................13

      B.   The Agencies' Case Study Estimates Are Fundamentally Flawed............................14

IV.   In Stark Contrast to Their Treatment of Forgone Benefits, the Agencies Overestimate
      the Rule's Compliance Cost Savings .....................................................................................16

CONCLUSION ......................................................................................................................17

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Advocates for Highway & Auto Safety v. FMCSA*, 429 F.3d 1136, 1146–47 (D.C. Cir. 2005) ......4

*Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)..............................................5

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir. 2001) ..................13

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)............................................12

*California v. Bernhardt,* 2020 WL 4001480 (N.D. Cal. July 15, 2020)........................................16

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172 (9th Cir. 2008) ..................................................................................................................11, 17

*EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014)................................................13

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)..........................................16

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................................4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................3, 5

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012)........................................5

*Rapanos v. United States*, 547 U.S. 715 (2006)........................................................2, 13

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ................................10

**Statutes and Regulations**

33 U.S.C. § 1251(a) ................................................................2, 3, 5

Clean Water Rule: Definition of "Waters of the United States,"
80 Fed. Reg. 37,054 (June 29, 2015) ................................................................4

**TABLE OF AUTHORITIES (cont.)**

**Statutes and Regulations (cont.)**                                                                 **Page(s)**

Navigable Waters Protection Rule: Definition of "Waters of the United States,"
   85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................................................................ *passim*

**Other Authorities**

Attorneys General of New York et al., Comment Letter to Revised Definition of "Waters of the
   United States" (Apr. 15, 2019), *available at* https://www.regulations.gov/document?D=EPA-
   HQ-OW-2018-0149-5467 .......................................................................................................14

Brief for Appellants, *Colorado v. EPA*, No. 20-1238 (10th Cir. July 9, 2020) ..............................6

Catherine L. Kling, Ph.D., *Expert Review of the Economic Analysis for the Proposed Revised
   Definition of "Waters of the United States"* (2019), *available at*
   https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5467 (Attachment B).
   ....................................................................................................................................10, 11

EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of
   the Scientific Evidence* (2015), *available at*
   https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414 .........................................10, 11

EPA, *Guidelines for Preparing Economic Analyses* (2010), *available at*
   https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses .....13

EPA & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule (2015),
   *available at* https://www.epa.gov/sites/production/files/2015-06/documents/508-
   final_clean_water_rule_economic_analysis_5-20-15.pdf ................................................4, 6, 16

EPA & Dep't of the Army, Economic Analysis of the Navigable Waters Protection Rule:
   Definition of "Waters of the United States" (2020), *available at*
   https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf
   ....................................................................................................................................... *passim*

EPA & Dep't of the Army, The Navigable Waters Protection Rule – Public Comment Summary
   Document, Topic 11: Economic Analysis and Resource and
   Programmatic Assessment (2020), *available at*
   https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11574
   .................................................................................................................................. 11-12, 16

**TABLE OF AUTHORITIES (cont.)**

**Other Authorities (cont.)**                                                    **Page(s)**

EPA Sci. Advisory Bd., Commentary on the Proposed Rule Defining the Scope of Waters
  Federally Regulated Under the Clean Water Act (2020), *available at* https://perma.cc/ETX9-
  QSPQ ...................................................................................................................................3

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) .......................................................4

Glenn C. Blomquist & John C. Whitehead, *Resource Quality Information and Validity of
  Willingness to Pay in Contingent Valuation*, 20 Res. & Energy Econ. 179 (1998) .................15

Jeffrey Mullen, Ph.D., *Final Review of the 2018 EPA Economic Analysis for the Proposed
  Revised Definition of Waters of the United States* (2019), *available at*
  https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-9717 (Ex. D) ..........9, 12

John C. Whitehead, Ph.D., *Comments on "Economic Analysis for the Proposed Revised
  Definition of 'Waters of the United States'"* (2019), *available at*
  https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-9717 (Ex. C)
  ....................................................................................................................................10, 15

Klaus Moeltner, et al., *Waters of the United States: Upgrading Wetland Valuation Via Benefit
  Transfer*, 164 Ecological Econ. 1 (2019)...........................................................................11, 12

Mass. Dep't Envtl. Protection, *Inland and Coastal Wetlands of Massachusetts* 18 (2019),
  mass.gov/doc/inland-and-coastal-wetlands-of-massachusetts-status-and-trends/download .....12

Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis (2003)..................................6, 7, 9

Peter Howard & Jeffrey Shrader, An Evaluation of the Revised Definition of "Waters of the United
  States" (Apr. 11, 2019), *available at*https://www.regulations.gov/document?D=EPA-HQ-OW-
  2018-0149-5272 ................................................................................................................ 10-11

States' Memorandum in Support of Motion for Preliminary Injunction, *North Dakota v. EPA*, 127
  F. Supp. 3d 1047 (D.N.D. 2015)..............................................................................................14

The Institute for Policy Integrity at New York University School of Law ("Policy Integrity") submits this brief as amicus curiae in support of Plaintiffs' challenge to the Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("Navigable Waters Rule"), promulgated by the Environmental Protection Agency and Department of the Army, Corps of Engineers (collectively, "the agencies").[1]

## INTEREST OF AMICUS CURIAE

Policy Integrity is a nonpartisan think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and environmental policy. Policy Integrity's staff of economists and lawyers has produced extensive scholarship on the use of economic analysis in regulatory decisionmaking. Its director, Professor Richard L. Revesz, has published over 80 articles and books on environmental and administrative law, including numerous works on environmental federalism.[2]

Harnessing its academic and regulatory expertise, Policy Integrity has participated in multiple agency and court proceedings regarding the Navigable Waters Rule. For instance, Policy Integrity submitted comments on the proposal underlying the rule. Policy Integrity's economics director, Peter Howard, Ph.D., co-authored a report with Jeffrey Shrader, Ph.D., a professor at Columbia University's School of International and Public Affairs, analyzing flaws in the economic analysis accompanying that proposal, which Policy Integrity submitted to the record. And Policy Integrity has submitted amicus briefs in support of plaintiffs challenging the Navigable Waters

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law. Policy Integrity states that no party's counsel authored this brief in whole or in part, and no person contributed money intended to fund the preparation or submission of the brief.

[2] A full list of publications can be found in Prof. Revesz's online faculty profile, https://its.law.nyu.edu/facultyprofiles/index.cfm?fuseaction=profile.overview&personid=20228.

Rule in five other courts. *See* Mot. of the Institute of Policy Integrity at New York University School of Law to File as Amicus Curiae at 4.

Here, the agencies have cited their economic analysis to justify the rule. See *infra* at 5; Plaintiffs Br. at 23–24 (collecting cites). And Plaintiffs argue that the agencies "ignored the most important factor relevant to the rulemaking by failing to consider water quality impacts," and explain that the economic analysis prepared by the agencies "do[es] not meaningfully analyze the Rule's impacts on water quality." *Id*. at 24. Policy Integrity's expertise in economic analysis and experience with this rule give it a unique and useful perspective on these arguments.

Accordingly, this brief focuses on the fundamental flaws, including economic errors and unfounded assumptions, in the agencies' economic analyses accompanying the Navigable Waters Rule. EPA & Dep't of the Army, Economic Analysis of the Navigable Waters Protection Rule: Definition of "Waters of the United States" (2020) ("EA").

## SUMMARY OF ARGUMENT

Despite their obligation to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—and their authority to exercise jurisdiction over waters with "a significant nexus to waters . . . navigable in fact," *Rapanos v. United States*, 547 U.S. 715, 759 (2006) (Kennedy, J., concurring) (internal quotation marks omitted)—the agencies do not meaningfully assess the impacts of the Navigable Waters Rule on downstream water quality, repeatedly failing to recognize the extensive harm the rule will cause.

Though the agencies have cited their economic analysis as one way that they have assessed the rule's water-quality impacts, *see infra* at 5, time after time in that analysis they rely on irrational and ill-informed assumptions, violate regulatory guidance and precedent, and make claims about water connectivity that are inconsistent with science—all with the effect of making the rule's

extensive harms seem minor in relation to its alleged cost savings. For example, the agencies tout the rule as net beneficial for society despite failing to assess the extent of whole categories of water-quality harms that it will impose. And while the agencies value some impacts of wetlands degradation under Section 404's dredge/fill program, their analysis is riddled with errors that understate critical regulatory harms. All told, the agencies neglect the vast majority of the wetlands-related costs from the rule—more than $1 billion annually, according to expert analysis. This is particularly egregious because, as detailed below, the agencies' cost-savings estimates for the Navigable Waters Rule are substantially inflated from prior analyses.

By disregarding many impacts on the "chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the agencies "fail[] to consider an important aspect" of the Clean Water Act's jurisdictional analysis, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), rendering the Navigable Waters Rule arbitrary and capricious.

## ARGUMENT

In limiting clean-water protection to its narrowest scope in decades, the agencies repeatedly obscure the Navigable Waters Rule's substantial harms from both a scientific and an economic perspective. As EPA's Science Advisory Board concluded, the agencies "do[] not provide a scientific basis" for the rule or "incorporate best available science" to analyze its impacts. EPA Sci. Advisory Bd., Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act 1–2 (2020). And while the agencies' economic analysis claims to assess the rule's impacts, it too is sorely lacking. The errors in that analysis demonstrate that the agencies fail to provide a reasoned explanation for the Navigable Waters Rule.

## I.      The Agencies Cannot Evade Responsibility for Assessing the Rule's Harms

As a preliminary matter, the agencies apparently hope to avoid responsibility for their error-filled economic analysis by claiming that they did not rely on it. 85 Fed. Reg. at 22,335; *see also* Defendants Br. 34. But those attempts fall flat.

The agencies prepared an economic analysis for the Navigable Waters Rule pursuant to a longstanding executive order that requires agencies to assess regulatory costs and benefits and adopt a regulation only when the "benefits . . . justify its costs." Exec. Order No. 12,866, § 1(b)(6), 58 Fed. Reg. 51,735 (Oct. 4, 1993). Costs in a regulatory analysis encompass "any disadvantage" from a rule, including harms "to human health or the environment." *Michigan v. EPA*, 576 U.S. 743, 748 (2015). Thus, in an analysis for a rollback such as the rule at issue here, costs often take the form of environmental harms or forgone environmental benefits.

Pursuant to this Executive Order, agencies for decades have assessed, quantified, and monetized regulatory impacts. When promulgating the Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("Clean Water Rule"), for instance, the agencies monetized many of the rule's environmental benefits and determined that those benefits exceeded total compliance costs by tens or hundreds of millions of dollars per year. EPA & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule xi (2015) ("2015 EA"). Yet in the Navigable Waters Rule, the agencies now conclude that compliance cost savings exceed monetized benefits of the forgone environmental protections—this time unreasonably understating forgone benefits while inflating compliance cost savings. *See infra* Sections II–IV.

When substantial flaws undermine an agency's economic analysis, like here, courts find the rule arbitrary and capricious. *See, e.g.*, *Advocates for Highway & Auto Safety v. FMCSA*, 429 F.3d 1136, 1146–47 (D.C. Cir. 2005). Yet the agencies here claim that the Navigable Waters Rule

"is not based on the . . . economic analysis," and cite caselaw to suggest that only if "an agency decides to rely on a cost-benefit analysis" would this doctrine apply. 85 Fed. Reg. at 22,335 (citing *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012)). But this claim cannot relieve the agencies of responsibility for their erroneous economic analysis, for two reasons.

First, when changing course, an agency is required to "articulate a satisfactory explanation for its action," and courts set aside the action if an agency failed to consider "an important aspect of the problem." *State Farm*, 463 U.S. at 43. An important aspect that agencies may not ignore is the harm of a deregulatory rule, *see, e.g.*, *Air All. Houston v. EPA*, 906 F.3d 1049, 1067–68 (D.C. Cir. 2018), including, like here, when the agency makes policy judgments it considers "reasonable" in interpreting a purportedly "ambiguous" statute. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–25 (2016). Here, the agencies attempt to exercise their discretion under the Clean Water Act yet hardly assess the Navigable Waters Rule's impact on "the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a). By failing to adequately assess the rule's water-quality harms—as evidenced, in part, by their faulty economic analysis—the agencies do not provide the required justification for this rule.

Second, the agencies' own statements demonstrate that the Navigable Waters Rule is in fact based in part on the economic analysis. For example, in justifying the rule, the agencies tout their belief that the rule will "ease administrative burdens," 85 Fed. Reg. at 22,269, and result in "net cost savings for all entities affected," *id*. at 22,335, and that "net benefits would increase," *id.* at 22,334. And while the agencies claim that they only cite the economic analysis to explain "how the [Clean Water Act] works," *see* Defendants Br. 34, the agencies also cite that analysis to defend the rule, *see id*. at 2, 28, and have claimed in other litigation that the Navigable Waters Rule is "supported" by the economic analysis and that the analysis helps "thoroughly explain[]" the

agencies' decisions by showing that the rule's benefits "far outweigh costs or foregone benefits." Brief for Appellants 15, *Colorado v. EPA*, No. 20-1238 (10th Cir. July 9, 2020).

For these reasons, the agencies cannot escape the flaws in their economic analysis. And as detailed below, those flaws make clear that the Navigable Waters Rule is arbitrary and capricious.

## II.    The Agencies Irrationally Disregard Most of the Rule's Harms

The agencies pay little attention to the unquantified costs (in the form of forgone environmental benefits) of the Navigable Waters Rule under the Section 311 oil spill prevention program and the Section 402 pollutant-discharge program.

As longstanding White House guidance explains, agencies should assess "quantitative information" about a rule's impacts whenever possible—such as the number of "stream miles of [affected] water quality." Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis 27 (2003) ("Circular A-4"). If an agency cannot "express in monetary units all of the important benefits and costs," then it should carefully assess how "important the non-quantified benefits or costs may be in the context of the overall analysis," performing a detailed qualitative analysis when "the non-quantified benefits and costs are likely to be important." *Id.* at 2. Here, however, the agencies not only fail to provide adequate quantitative estimates, but also draw conclusions about the rule that may be undermined by a fair assessment of those unquantified impacts.

The agencies' contrasting approach in the Clean Water Rule helps illustrate this point. In 2015, to assess that rule's impacts, the agencies used mathematical sampling to project that the Clean Water Rule would increase federal regulatory protection of all waters by 2.84–4.65%. 2015 EA at 12. By knowing how many waters would be affected, the agencies were able to quantify and monetize many costs and benefits. The agencies projected *all* compliance costs from the rule, and monetized regulatory benefits under the Section 402 and 404 programs. *Id.* at xi. Through this

6

assessment, the agencies concluded that the rule's monetized benefits—that is, environmental benefits under Sections 402 and 404—exceeded total compliance costs. *Id.* at x–xi. Thus, the agencies were able to conclude that this rule was net beneficial on the whole. Though there were benefits of the Clean Water Rule that were unmonetized at the time, monetizing those benefits would have only served to further support the agencies' conclusion that the rule was net beneficial.

In contrast to that sensible approach in 2015, the agencies now continually complain that "data limitations" prevent quantification of the waters losing protection under the Navigable Waters Rule, and as a result, the agencies provide a nationwide analysis only of the rule's impacts under Section 404, providing no quantification of the rule's nationwide impact outside that single program. EA at xxii. This leads to a very restricted set of analyses. For example, the agencies analyze three limited "case study" watersheds, but fail to monetize Section 402 water-quality impacts like they did in the Clean Water Rule. *Id.* at xviii–xix tbl. ES-4. And in a qualitative assessment, the agencies briefly recognize adverse impacts such as the rule's possible "negative impact on water quality," *id.* at 59, and probability of an increased risk of oil spills, *id.* at 83, but do not assess the severity or downstream harms of these impacts and repeatedly suggest that states may limit these impacts by filling the regulatory gap. *See, e.g.*, *id.* at 62; *see also infra* Section III.A.3 (criticizing assumption of state gap-filling as unsupported).

Circumscribing their analysis in these ways leaves the agencies unable to make meaningful estimates of the Navigable Waters Rule's impacts, despite their obligation to reasonably assess available information about a rule's effects. By failing to meaningfully assess the scope of so many of the rule's impacts, the agencies do not meaningfully evaluate "how important" these rollbacks are or provide even ballpark estimates of the resulting water-quality harms. *See* Circular A-4 at 2. Nor do they "evaluate the[] significance" of all effects—quantified and unquantified—and assess

7

"which non-quantified effects are most important," using reasonable assumptions to analyze whether the rule is net beneficial once those impacts are taken into account. *Id.*

In sum, the agencies cannot seriously purport to protect the nation's waters when they do not meaningfully assess how severely the Navigable Waters Rule will harm water quality. Their failure to quantify or meaningfully assess so many regulatory impacts renders hollow their claims that the rule is net beneficial and undermines their justification for the rule.

### III.     The Agencies Grossly Undervalue the Harms That They Do Quantify, Failing to Recognize the Critical Importance of Wetlands

The limited and circumscribed monetization that the agencies provide is also fatally flawed as it unreasonably undervalues the Navigable Waters Rule's harms in multiple ways. As explained above, the agencies monetize harms only under the Section 404 program. They assess these impacts at two different scales: nationwide, and in three case studies. But under both approaches, the agencies arbitrarily minimize the harms of wetlands degradation.

#### A. The Nationwide Analysis Irrationally Undervalues the Harms of Wetlands Degradation Through at Least Three Major Errors

The nationwide analysis irrationally disregards most of the harms to wetlands under the Section 404 program and incorrectly concludes that this aspect of the rule is cost-benefit justified.

The nationwide analysis projects cost savings and forgone benefits from wetlands degradation under four "scenarios," which apply different assumptions about the degree to which states will regulate the waters losing federal protection. EA at xxii–xxiii. Under each scenario, the agencies conclude that purported cost savings under Section 404 exceed the harms. Yet the agencies' own analysis shows that the rule may cause more harm through wetlands degradation than economic benefit. *See id.* at xxiii (reporting overlapping ranges of costs and benefits). When a regulatory measure may be net costly, as these analyses show, longstanding White House

guidance instructs the agency to "conduct further analysis" to determine whether "alternative plausible assumptions [are] more appropriate." Circular A-4 at 42. Yet the agencies disregard this advice and continually short-change their forgone benefit estimates.

Specifically, the agencies commit at least three crucial errors. First, they ignore wetlands' well-recognized interstate benefits. Second, they erroneously devalue the benefits that individuals enjoy from in-state wetlands. And third, they make baseless assumptions that states will seamlessly fill the regulatory gap left by the rule, despite extensive indications otherwise. And these errors are significant: Correcting them reveals that the rule could deprive society of over $1.6 billion in annual benefits under the Section 404 program, according to an expert economist's regulatory comments, far beyond what the agencies project. Jeffrey Mullen, Ph.D., *Final Review of the 2018 EPA Economic Analysis for the Proposed Revised Definition of Waters of the United States* 32 tbl. 2.2 (2019) ("Mullen Report").[3] When properly analyzed, the rule's social harms from wetlands degradation thus likely exceed associated cost savings by a wide margin.

### 1.    The Agencies Ignore the Substantial Interstate Benefits Wetlands Provide

One of the most substantial errors is the agencies' decision to cut off the harms of wetlands degradation at the state border. This not only leads to a drastic undercounting of the rule's harms, but also evinces a fundamental misunderstanding of wetlands services.

To monetize the costs of wetlands degradation, the agencies estimate the wetlands acreage lost in each state from the rule and then, using studies that assess people's willingness to pay for wetlands protection, calculate the monetary value of that lost acreage. But the agencies erroneously

---

[3] Mullen's estimates are in 2017$, whereas the EA presents estimates in 2018$.

assume that only individuals residing within the state of the affected wetland are harmed, and that the harm from loss of out-of-state wetlands "is zero." EA at 207.

This assumption violates sound science, as wetlands benefit a wide range of other water bodies without respect to state boundaries. EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* 4-1 to 4-45 (2015) ("Connectivity Report"). To provide an illustration, under the agencies' assumptions, Massachusetts households that enjoy the Connecticut River obtain no benefit from upstream wetlands near the river in New Hampshire and Vermont. But there is no basis for that conclusion.

Echoing the science, economic studies submitted to the agencies during the comment period conclude that individuals place considerable value on wetlands outside their home state. *See, e.g.*, Catherine L. Kling, Ph.D., *Expert Review of the Economic Analysis for the Proposed Revised Definition of "Waters of the United States"* 6 (2019) ("Kling Report"). One study, for example, finds that more than 80% of the benefits of wetlands protection are interstate. John C. Whitehead, Ph.D., *Comments on "Economic Analysis for the Proposed Revised Definition of 'Waters of the United States'"* 10 (2019) ("Whitehead Report"). The agencies' assumption that the benefits of wetlands protection stop at the state border thus represents "a complete failure to reasonably reflect upon the information contained in the record." *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (internal quotation marks omitted).

The agencies' justification for this approach—that much of the relevant economic literature on wetlands valuation was "conducted at the state level," EA at 207—misses the point. The fact that some studies looked at valuation of in-state wetlands hardly means that wetlands provide zero interstate benefits. In fact, numerous relevant studies assess multi-state regions, and those studies "make clear that people are willing to pay for wetlands across regional distances." Peter Howard

10

& Jeffrey Shrader, An Evaluation of the Revised Definition of "Waters of the United States" (Apr. 11, 2019). One study, for instance, "found that residents of Oregon, Washington, and Nevada all reported positive willingness to pay values to protect wetlands in . . . California." Kling Report at 6. Research also shows that households as distant as 640 miles from a water body can benefit from its preservation. *Id*. Indeed, the agencies briefly admit that "wetland benefits cross[] state boundaries," EA at 226, yet their analysis assumes the opposite.

Ultimately, while there may be "a range of values" for wetlands' interstate benefits, the value is "certainly not zero" as the agencies assume. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172, 1200 (9th Cir. 2008).

## 2.   The Agencies Grossly Underestimate Wetlands' In-State Benefits

Because the agencies irrationally disregard wetlands' interstate benefits, they consider only the harms to in-state residents. But here, too, they severely undervalue the rule's harms.

To monetize in-state harms, the agencies commissioned a study that calculated a per-acre value for wetlands loss per household. *See* Klaus Moeltner, et al., *Waters of the United States: Upgrading Wetland Valuation Via Benefit Transfer*, 164 Ecological Econ. 1 (2019) ("Moeltner Study"), *cited in* EA at 207–10. The agencies then apply that value to monetize the harm of degraded wetlands in each state to that state's residents. In calculating those state-level values, the agencies commit several errors.

First, the agencies ignore the unique benefits that wetlands provide to local residents, such as attenuating flooding, Connectivity Report at 4-1 to 4-2 (describing benefits), by irrationally assuming that *no* in-state residents live near any degraded wetland. EPA & Army Corps of Engineers, The Navigable Waters Protection Rule – Public Comment Summary Document, Topic 11: Economic Analysis and Resource and Programmatic Assessment 80 (2020) ("Response to

11

Comments"). The agencies' explanation for this exclusion—that "the majority [of] the affected households are likely to be non-local," *id.*—is insufficient. Even if many individuals do not live near a degraded wetland, the agencies' own analysis shows that whether someone lives locally to a wetland is a major variable in their valuation, EA at 209, and the additional valuation from those who do live near a wetland could thus still be substantial.

The agencies also reduce the benefits of wetlands for in-state residents through a mathematical trick. The commissioned study found that individuals place a greater value on each acre of wetlands as the total acreage of wetlands increases. *See* Moeltner Study at 9 (reporting "convexity of the [willingness-to-pay] function"). Accordingly, individuals suffer more when wetlands are degraded in areas with greater wetlands acreage versus less acreage. Thus, the "baseline" acreage used in the analysis—that is, the assumed acreage starting point, prior to any degradation—significantly affects the assessment of forgone benefits.

Yet in calculating the harms from wetlands losses, the agencies assume an unreasonably low baseline acreage of just 10,000 per state, EA at 210, even though most states have well beyond 10,000 acres of wetlands. Massachusetts alone, for instance, has nearly 600,000 wetlands acres.[4] According to one expert, setting the low baseline acreage obscures more than $1.2 billion in annual harms caused by the Navigable Waters Rule. *See* Mullen Report at 32.

By arbitrarily reducing the harms that in-state residents suffer from wetlands loss, the agencies "opportunistically frame[] the costs . . . of the rule." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011).

---

[4] Mass. Dep't Envtl. Protection, *Inland and Coastal Wetlands of Massachusetts* 18 (2019), mass.gov/doc/inland-and-coastal-wetlands-of-massachusetts-status-and-trends/download.

3.      **The Agencies' Assumption that States Will Preserve Waters Losing Federal Protection Is Speculative and Overlooks Key Considerations**

The agencies also inappropriately minimize the harms of the rule under Section 404 through unsupported assumptions about state gap-filling. To support their claim that the benefits of the rule outweigh its costs, the agencies rely on the speculative assumption that states may preserve many of the waters losing federal protection. *See, e.g.,* EA at xxiii (showing that cost savings outweigh forgone benefits by greater ratio as states are assumed to fill the gap).

But agencies are not permitted to rely on "speculation . . . not supported by the record," *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1244 (9th Cir. 2001)—an important principle enshrined in EPA's own guidelines. Specifically, EPA guidelines provide that a cost-benefit analysis may account for rules that are "currently under consideration," but should not speculate about future rulemakings that are neither "imminent" nor can be "anticipated with a high degree of certainty." EPA, *Guidelines for Preparing Economic Analyses* 5-2, 5-13 (2010).

And here, the agencies ignore concrete evidence showing that states will likely not fill the regulatory gap. That evidence falls into three categories. First, states have little incentive to prohibit pollution across state lines. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014) (explaining that since "pollution emitted in one State . . . caus[es] harm in other States," states will typically underregulate pollution when "[l]eft unregulated"). Indeed, a key purpose of the Clean Water Act is to "protect[] downstream States from out-of-state pollution that they cannot themselves regulate," *Rapanos*, 547 U.S. at 777 (Kennedy, J., concurring), and that upstream states are incentivized to under-regulate. The agencies assume away this reality.

Second, state-by-state regulation can be very costly, and many states may lack the resources to effectively protect their own waters. For instance, Michigan—one of only two states to administer its own Section 404 program—generates permit fees covering less than 20% of the

program's cost. Attorneys General of New York et al., Comment Letter to Revised Definition of "Waters of the United States" A-12 (Apr. 15, 2019). As fifteen states advised the agencies, regulating would require states to "commit a substantial amount of state money" or "impose extremely high permit application fees," either of which "would impose a substantial burden." *Id.*

Third, numerous states have staunchly opposed additional clean-water protections in the recent past. Indeed, thirty-two states sued to enjoin the Clean Water Rule in 2015, 85 Fed. Reg. at 22,258 n.15, arguing that the rule's modest expansion of federal jurisdiction would "burden the States with substantial unrecoverable costs." *See* States' Memorandum in Support of Motion for Preliminary Injunction 10, *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015). Yet despite this demonstrated antipathy to sensible clean-water controls, the agencies now implausibly assume that fifteen of those same states may fill the regulatory gap left by the Navigable Waters Rule. *Compare* 85 Fed. Reg. at 22,258 n.15 *with* EA at 39–41.

In short, the agencies' claim that states may preserve the waters losing protection omits key considerations and thus inappropriately minimizes regulatory harms.

### B. The Agencies' Case Study Estimates Are Fundamentally Flawed

The agencies also evaluate the costs and benefits of wetlands degradation through "case studies" of three watersheds, but these case studies suffer from similar errors as the nationwide analysis,[5] and again arbitrarily minimize the costs of wetlands degradation.

The case studies also have their own unique errors. To monetize wetlands degradation in the case studies, the agencies rely on a single economic paper, written in 1998 by Dr. John C. Whitehead and Dr. Glenn C. Blomquist. EA at 121. Yet as one of that study's authors—Dr.

---

[5] Just like with the nationwide analysis, the case studies rely on inappropriate assumptions about state gap-filling, *see, e.g.*, EA at xx–xxi, and falsely assume that only residents in-state and in certain neighboring counties are harmed by wetlands degradation, *id.* at 121.

Whitehead—advised the agencies in his comments, the agencies misapply the study to devalue wetlands services. For instance, Dr. Whitehead explained, the agencies "biase[d] . . . benefits downward" by using the *median* valuation reported in the study, even though the *mean* valuation supplies the "appropriate measure." Whitehead Report at 14. Because the mean wetlands benefit identified by the Blomquist & Whitehead study is "at least[] 3.25 times larger than" the study's median estimates, the agencies' disregard for this valuation—against Dr. Whitehead's sound advice —results in a drastic underestimate of wetlands benefits. Whitehead Report at 13–14.

The agencies also apply an inappropriately narrow timeframe, falsely assuming that individuals suffer the harms of wetlands degradation only in the year in which the degradation occurs. EA at 121 (reporting that agencies derive "annual forgone benefits" by using lumpsum values from the Blomquist & Whitehead Study, without accounting for timing difference). This is mistaken. As Blomquist & Whitehead reported, individuals suffer from wetlands degradation not just in the year when the wetlands are lost, but also "each year" thereafter. Glenn C. Blomquist & John C. Whitehead, *Resource Quality Information and Validity of Willingness to Pay in Contingent Valuation*, 20 Res. & Energy Econ. 179, 186 n.4 (1998). This makes sense, since the downstream benefits that wetlands provide do not stop when the calendar turns. By irrationally assuming that harm from wetlands loss is limited to a single year, the agencies grossly devalue the reported cost of their case studies even further.

Ultimately, the case studies—like the national analysis—betray basic misunderstandings about the benefits of wetlands services and fail to reasonably capture the rule's harms.

15

**IV.    In Stark Contrast to Their Treatment of Forgone Benefits, the Agencies Overestimate the Rule's Compliance Cost Savings**

While drastically undercounting the forgone benefits of the Navigable Waters Rule, the agencies take the opposite approach to cost savings, inflating these savings by quintupling their per-acre mitigation-cost estimates from the Clean Water Rule without explanation.

In 2015, when assessing the Clean Water Rule's impacts, the agencies used available data to catalogue mitigation costs, projecting per-acre mitigation costs to comply with the rule at $24–$66 thousand. *See* 2015 EA at xi (reporting total compliance cost), 40–41 (reporting total acreage affected). But here, the agencies greatly increase this valuation without explanation. Specifically, the agencies now report per-acre mitigation-cost estimates for the national analysis of $146–$327 thousand. *See* EA at 174–75. In other words, the Navigable Waters Rule's high-end per-acre cost-savings estimate is nearly five times the Clean Water Rule's estimate. With this increase in compliance costs, the agencies falsely report the rule overall as net beneficial—even without correcting for their other methodological errors.

Yet the agencies offer little explanation or justification for this change, stating simply that they "updated mitigation costs per acre and linear foot for each state." Response to Comments at 94. This bare-bones account falls well short of the "reasoned explanation" necessary to "disregard[] facts and circumstances that underlay" the Clean Water Rule. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Because the agencies "failed to identify or explain any changed circumstances, technology, or economic conditions that would justify this dramatic recalculation" of compliance costs, their "new and inflated calculations" lack a reasonable basis. *California v. Bernhardt,* 2020 WL 4001480, at *30 (N.D. Cal. July 15, 2020).

16

Since agencies "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards," *Ctr. for Biological Diversity*, 538 F.3d at 1198, this lopsided analysis cannot stand.

## CONCLUSION

For the forgoing reasons, this Court should grant Plaintiffs' motion.

Dated: December 17, 2020         Respectfully submitted,


                                 /s/ Eric Lesser
                                 Eric Lesser
                                 41 Dover Road
                                 Longmeadow, MA 01106
                                 (413) 364-4341
                                 ericplesser@gmail.com
                                 *Counsel for Amicus Curiae*
                                 *Institute for Policy Integrity*