**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, *et al.*, | ) ) ) ) |
| *Plaintiffs*, | )   Case No. 20-cv-010820-DPW |
| v. | ) ) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) |
| *Defendants*. | ) ) ) ) |
| _____ | ) |

**[PROPOSED]** *AMICUS CURIAE* **BRIEF OF 15 CONSTRUCTION, MINING, MANUFACTURING, AGRICULTURE, LIVESTOCK, AND ENERGY TRADE ASSOCIATIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR <u>SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF THE *AMICI CURIAE* ..................................................................... 1

BACKGROUND ...................................................................................................... 5

SUMMARY OF THE ARGUMENT ........................................................................ 6

ARGUMENT ............................................................................................................ 7

    I.     THE AGENCIES PROVIDED A REASONED EXPLANATION FOR THE 2020 RULE ............................................................................... 7

          A.     The 2020 Rule is supported by a reasoned explanation............................ 8

          B.     Plaintiffs' Arguments That The 2020 Rule Is Arbitrary And Capricious Have No Merit ....................................................................... 10

                1.     The agencies explained their treatment of ephemeral features........................................................................................ 10

                2.     The agencies explained their treatment of wetlands .................... 11

          C.     The agencies did not ignore water quality ............................................. 12

    II.    THE 2020 RULE IS CONSISTENT WITH THE CLEAN WATER ACT......... 12

          A.     The 2020 Rule is consistent with controlling Supreme Court precedent ................................................................................................ 12

          B.     Plaintiffs misunderstand the Rule's foundations and ignore governing precedent................................................................................ 15

          C.     The 2020 Rule is a proper interpretation of the States' role in water resource regulation................................................................................. 19

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brzonkala v. Virginia Polytechnic Inst. & State Univ.*,
  169 F.3d 820 (4th Cir. 1999) ...................................................17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)...................................................12

*Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric*,
  984 F.2d 514 (1st Cir. 1993)...................................................11

*County of Maui v. Hawaii Wildlife Fund*,
  140 S. Ct. 1462 (2020)...................................................18

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)...................................................7, 8, 12

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...................................................7, 8

*Georgia v. Pruitt*,
  326 F. Supp. 3d 1356 (S.D. Ga. 2018)...................................................5

*Georgia v. Wheeler*
  418 F. Supp. 3d 1336 (S.D. Ga. 2019)...................................................11

*Gonzales-Veliz v. Barr*,
  938 F.3d 219 (5th Cir. 2019) ...................................................10

*In re Jones*,
  534 B.R. 149 (Bankr. E.D. Ky. 2015) ...................................................17

*King v. Palmer*,
  950 F.2d 771 (D.C. Cir. 1991) (en banc) ...................................................13, 15, 16

*Large v. Fremont Cty., Wyo.*,
  670 F.3d 1133 (10th Cir 2012) ...................................................13

*Marks v. United States*,
  430 U.S. 188 (1977)................................................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)...................................................7

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Nat'l Ass'n of Mfrs.* v. *Dep't of Defense,*
  138 S. Ct. 617 (2018) ........................................................................................................4

*Nat'l Ass'n of Regulatory Util. Comm'rs v. SEC,*
  63 F.3d 1123 (D.C. Cir. 1995) .........................................................................................9

*Nat'l Shooting Sports Found., Inc. v. Jones*
  716 F.3d 200 (D.C. Cir. 2013) .......................................................................................11

*National Cable & Telecommunications Association v. Brand X Internet Services,*
  545 U.S. 967 (2005) ....................................................................................................7, 15

*New York v. U.S. Dep't of Health & Human Servs.,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..............................................................................8

*North Dakota v. EPA,*
  127 F. Supp. 3d 1047 (D.N.D. 2015) ...............................................................................5

*O'Dell v. Netherland,*
  521 U.S. 151 (1997) ........................................................................................................16

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) .........................................................................................17

*Purcell v. BankAtlantic Fin. Corp.,*
  85 F.3d 1508 (11th Cir. 1996) .......................................................................................17

*Rapanos v. United States,*
  547 U.S. 715 (2006) .................................................................................................. *passim*

*Tyler v. Bethlehem Steel Corp.,*
  958 F.2d 1176 (2d Cir. 1992) ........................................................................................15

*United States v. Alcan Aluminum Corp.,*
  315 F.3d 179 (2d Cir. 2003) ..........................................................................................13

*United States v. Brooks,*
  2009 WL 3644122 (E.D.N.Y. 2009) ...............................................................................17

*United States v. Cundiff,*
  555 F.3d 200 (6th Cir. 2009) .........................................................................................13

*United States v. Davis,*
  825 F.3d 1014 (9th Cir. 2016) .......................................................................................13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*United States v. Epps*,
    707 F.3d 337 (D.C. Cir. 2013) ..................................................................14

*United States v. Freedman Farms, Inc.*,
    786 F. Supp. 2d 1016 (E.D.N.C. 2011) ....................................................18

*United States v. Johnson*,
    467 F.3d 56 (1st Cir. 2000) ..............................................................15, 18

*United States v. Riverside Bayview Homes*,
    474 U.S. 121 (1985) ..................................................................................13

*United States v. Robison*,
    505 F.3d 1208 (11th Cir. 2007) ................................................................17

*Whole Woman's Health v. Paxton*,
    972 F.3d 649 (5th Cir. 2020) ....................................................................17

**Statutes, Rules, and Regulations**

5 U.S.C. § 706(2) ...........................................................................................7

33 U.S.C. § 1251(a) .......................................................................................8

33 U.S.C. § 1251(b) .......................................................................................8

33 U.S.C. § 1344(g)-(l) ................................................................................19

91 Stat. 1567, 1575, Public Law 95-217 (1977) .........................................19

Clean Water Rule: Definition of "Waters of the United States",
    80 Fed. Reg. 37,054 (June 29, 2015) ....................................................4, 12

Restoring the Rule of Law, Federalism, and Economic Growth by reviewing the
    "Waters of the United States" Rule, 82 Fed. Reg. 12,497 (Feb. 28, 2017) ..............................9

Definition of "Waters of the United States"—Recodification of Pre-Existing
    Rules, 82 Fed. Reg. 34,899 (July 27, 2017)..............................................5

Definition of "Waters of the United States"—Recodification of Pre-Existing
    Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019)..............................................5

The Navigable Waters Protection Rule: Definition of "Waters of the United
    States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) .................................. *passim*

iv

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**Other Authorities**

*American Farm Bureau Fed'n v. EPA*,
    3:15-cv-165 (S.D. Tex. Sept. 12, 2018), Dkt. 87 .................................................5

A.M. Honore, *Ratio Decidendi*: *Judge and Court*, 71 Law Q. Rev. 196 (1955) ..........................17

Am. Forest & Paper Ass'n, *State Industry Economic Impact–United States* (Aug.
    2018), https://www.afandpa.org/docs/default-source/factsheet/2018-
    update/united-states-august-2018.pdf?sfvrsn=2 ........................................................2

American Petroleum Inst., *Oil & Natural Gas: Supporting the Economy, Creating
    Jobs, Driving America Forward* (2018),
    https://www.api.org/~/media/Files/Policy/Taxes/DM2018-086_API_
    Fair_Share_OnePager_FIN3.pdf ...............................................................................3

Forest2Market, *New Report Details the Economic Impact of US Forest Products
    Industry* (May 9, 2019),  https://blog.forest2market.com/new-report-details-
    the-economic-impact-of-us-forest-products-industry ...............................................2

Jonathan H. Adler, *Reckoning With Rapanos: Revisiting "Waters of the United
    States" and the Limits of Federal Wetland Regulation*, 14 Mo. Envt'l L. &
    Pol'y Rev. 1, 14 (2006) ...........................................................................................16

Nat'l Alliance of Forest Owners, *The Economic Impact of Privately-Owned
    Forests in the 32 Major Forested States* (Apr. 4, 2019),
    https://nafoalliance.org/wp-
    content/uploads/2018/11/Forest2Market_Economic_Impact_of_Privately-
    Owned_Forests_April 2019 ......................................................................................2

Nat'l Mining Association, *The Economic Contributions of U.S. Mining* (Sept.
    2018), https://nma.org/wp-
    content/uploads/2016/09/Economic_Contributions_of_Mining_2017_
    Update.pdf ..................................................................................................................3

U.S. Census Bureau, *Annual Value of Construction Put in Place 2008-2019*,
    https://www.census.gov/construction/c30/ historical_data.html ...............................1

U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Sectors and the
    Economy* (May 4, 2020), https://www.ers.usda.gov/data-products/ag-and-
    food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy .......2

U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Statistics: Charting
    the Essentials, February 2020* (Feb. 2020),
    https://www.ers.usda.gov/webdocs/publications/96957/ap-083.pdf .........................2

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

U.S. Energy Information Ass'n, *Annual Energy Outlook 2019*,
  https://www.eia.gov/outlooks/aeo/ data/browser/#/?id=1-
  AEO2019&cases=ref2019&sourcekey=0.pdf ........................................................................3

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae*, which are further described in the Appendix, are the American Farm Bureau Federation, American Petroleum Institute, American Road & Transportation Builders Association, Chamber of Commerce of the United States, Edison Electric Institute, Leading Builders of America, National Alliance of Forest Owners, National Association of Home Builders, National Cattlemen's Beef Association, National Corn Growers Association, National Mining Association, National Pork Producers Council, National Stone, Sand & Gravel Association, Public Lands Council, and U.S. Poultry & Egg Association. These national trade associations represent a broad cross-section of the Nation's infrastructure, commercial and residential construction industries, and mining, manufacturing, forestry, agriculture, livestock, and energy industries, all of which are vital to a thriving national economy, including providing much needed jobs.

Many of *amici*'s members construct residential developments, multi-family housing units, commercial buildings, shopping centers, factories, warehouses, waterworks, roads and other infrastructure. During 2019, total public and private investment in the construction of residential structures alone totaled over $550 billion. U.S. Census Bureau, *Annual Value of Construction Put in Place 2008-2019*, https://www.census.gov/construction/c30/ historical_data.html. Every $1 billion of residential construction generates around 16,000 jobs. Spending on commercial and institutional facilities such as shopping centers, schools, office buildings, factories, libraries, and fire stations has an even larger job creation effect, at around 18,000 jobs per $1 billion of spending.

In addition, many of *amici*'s members construct and maintain critical infrastructure: highways, bridges, railroads, tunnels, airports, electric generation, transmission, and distribution

facilities, and pipeline facilities. Infrastructure investments increase economic growth, productivity, and land values. Not only are investments in infrastructure critical to quality of life throughout the nation, but they create many jobs. Every $1 billion in transportation and water infrastructure construction creates approximately 18,000 jobs.

*Amici*'s agricultural members grow virtually every agricultural commodity produced commercially in the United States, including significant portions of the U.S. wheat, soybean, cotton, milk, corn, poultry, egg, pork, and beef supply. Agriculture and livestock-related industries contributed over $1 trillion to the U.S. gross domestic product in 2017 and employed 22 million people in 2018. U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Sectors and the Economy* (May 4, 2020), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy; *see also* U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Statistics: Charting the Essentials, February 2020* (Feb. 2020), https://www.ers.usda.gov/webdocs/publications/96957/ap-083.pdf. Forestry-related businesses support 2.9 million total jobs and are associated with $128.1 billion in total payroll. And forest products—paper, wood, and furniture manufacturing—contribute nearly 6% of GDP. Forest2Market, *New Report Details the Economic Impact of US Forest Products Industry* (May 9, 2019), https://blog.forest2market.com/new-report-details-the-economic-impact-of-us-forest-products-industry; Nat'l Alliance of Forest Owners, *The Economic Impact of Privately-Owned Forests in the 32 Major Forested States* (Apr. 4, 2019), https://nafoalliance.org/wp-content/uploads/2018/11/Forest2Market_Economic_Impact_of_Privately-Owned_Forests_April 2019. pdf; *see also* Am. Forest & Paper Ass'n, *State Industry Economic Impact–United States* (Aug. 2018), https://www.afandpa.org/docs/default-source/factsheet/2018-update/united-states-august-2018.pdf?sfvrsn=2.

Additionally, *amici* represent producers of most of America's coal, metals, and industrial minerals. In 2017, U.S. mining activities directly and indirectly generated over 1.5 million U.S. jobs and $95 billion in U.S. labor income, and contributed $217.5 billion to the U.S. GDP. *See* Nat'l Mining Association, *The Economic Contributions of U.S. Mining*, at E-1 (Sept. 2018), https://nma.org/wp-content/uploads/2016/09/Economic_Contributions_of_Mining_2017_ Update.pdf. They also represent the energy industry that generates, transmits, transports, and distributes the nation's energy to residential, commercial, industrial, and institutional customers. Together, oil and natural gas supply more than 60 percent of our nation's energy. U.S. Energy Information Ass'n, *Annual Energy Outlook 2019*, https://www.eia.gov/outlooks/aeo/ data/browser/#/?id=1-AEO2019&cases=ref2019&sourcekey=0.pdf. Overall, as of 2017, the oil and natural gas industry supported 10.3 million U.S. jobs and contributed 8% of U.S. GDP. American Petroleum Inst., *Oil & Natural Gas: Supporting the Economy, Creating Jobs, Driving America Forward* (2018), https://www.api.org/~/media/Files/Policy/Taxes/DM2018-086_API_ Fair_Share_OnePager_FIN3.pdf.

Individually and collectively, *amici*'s members are thus of critical importance to the Nation's economy. Their experience, planning, and operations make them experts in the Clean Water Act (CWA) and the practical consequences of the regulatory definition of "waters of the United States" (WOTUS) challenged here, the *Navigable Waters Protection Rule*, 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("2020 Rule"). *Amici* have a strong interest in ensuring that federal CWA jurisdiction is exercised lawfully and in promoting national uniformity in the definition of what features are "waters of the United States." Their members must comply with the CWA's prohibition against unauthorized "discharges" into areas that are ultimately deemed jurisdictional. The 2020 Rule provides their members much-needed certainty in describing features that

are or are not "waters of the United States." The prior regulatory regime required unpredictable case-by-case determinations by the agencies, and under that system businesses did not know which features on their lands were jurisdictional and which were not. That uncertainty was compounded by court rulings that meant different regulatory regimes applied in different states. Uncertainty as to which features were jurisdictional deprived *amici*'s members of notice of what the law requires and made it impossible for them to make informed decisions concerning the operation, logistics, and finances of their businesses. And it put them at risk of severe criminal and civil penalties and citizen suits for failing to predict how the Act would be applied.

The 2020 Rule culminates more than five years of multiple administrative rulemakings and litigation, in which many members of the *amicus* coalition participated at every step. They have submitted comments on every proposed rule and litigated for a lawful, reasonable standard since the U.S. EPA and Army Corps of Engineers (the "agencies") proposed what became the 2015 rule defining WOTUS. *See* 80 Fed. Reg. 37,054 (June 29 2015) ("2015 Rule"). They were among the most active litigants challenging the 2015 Rule's unlawful expansion of federal jurisdiction. Many of the *amici* challenged the 2015 Rule in district courts in Texas and Georgia—where the courts held the 2015 invalid—and as *amici* in the District of North Dakota and elsewhere. Among other things, they persuaded the U.S. Supreme Court that these challenges belong in district court, resolving a long-time split among the circuits as to where jurisdiction lay. *Nat'l Ass'n of Mfrs.* v. *Dep't of Defense*, 138 S. Ct. 617 (2018).

For all these reasons, *amici* believe that their experience with the development of and litigation over the regulatory definition of WOTUS—including their members' experience operating under prior regulatory regimes—should inform this Court's decision.

# BACKGROUND

The agencies' brief describes the landscape; *amici* need not repeat it here, except to emphasize the regulatory confusion predating the agencies' adoption of the 2020 Rule, which harmed *amici*'s members. What features qualify as WOTUS for purposes of the CWA has been a source of confusion to regulated parties and regulators alike for some time. Seeking to bring clarity to the definition, but in reality engendering much more confusion, the Obama administration published an expansive definition of WOTUS in 2015, sweeping in features that had never been subject to federal jurisdiction. For the regulated community, including *amici*'s members, the 2015 Rule was a disaster, imposing huge risks for ordinary land use activities, while bearing no discernible relation to statutory text or Supreme Court precedent. *See* Declaration of Don Parrish ("Parrish Decl.") ¶¶ 27-29, 40-45 (detailed costs and confusion under the 2015 Rule) (attached as Exhibit 1). The 2015 Rule was subject to multiple legal challenges and was preliminarily enjoined in twenty-seven States. *See American Farm Bureau Fed'n v. EPA*, 3:15-cv-165 (S.D. Tex. Sept. 12, 2018), Dkt. 87; *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1364-65 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1051 n.1, 1055 (D.N.D. 2015). But it went into effect in other states, leading to a patchwork regulatory regime with inconsistent legal obligations for regulated entities with nationwide operations. Parrish Decl. ¶ 25.

In part due to the legal uncertainty generated by the 2015 Rule, the agencies resolved to repeal and replace it in a "comprehensive, two-step process." 82 Fed. Reg. 34,899, 34,899 (July 27, 2017). As the first step, the agencies repealed the defunct 2015 Rule. 84 Fed. Reg. 56,626 (Oct. 22, 2019). The agencies then promulgated the 2020 Rule, the second step, to implement the "objective of the Clean Water Act to restore and maintain the integrity of the nation's waters." 85 Fed. Reg. 22,250. That involved relying on science to "inform[] the agencies' interpretation

of [WOTUS]," while recognizing that "science cannot dictate where to draw the line between Federal and State or Tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id.* at 22,271. To correct the illegalities inherent in the 2015 Rule, the agencies thus struck "a reasonable and appropriate balance between Federal and State waters" that is "intended to ensure that the agencies operate with the scope of the Federal government's authority over navigable waters." *Id.* And, to address the significant confusion generated under prior regimes, the agencies crafted the 2020 Rule with "categorical bright lines" to improve clarity and predictability. *Id.* at 22,273.

## SUMMARY OF THE ARGUMENT

The 2020 Rule was a valid exercise of the agencies' authority and should be upheld. The 2015 Rule manifested an unreasonably expansive scope of federal jurisdiction and required costly case-by-case jurisdictional determinations that failed to provide certainty to the regulated community. The agencies promulgated the 2020 Rule to better accommodate the twin congressional purposes underlying the Clean Water Act ("CWA")—protection of the integrity of navigable waters and preservation of state authority over land and water use—in a manner that observed constitutional boundaries and provided greater regulatory predictability.

Plaintiffs charge that the 2020 Rule violates the APA because it is arbitrary and capricious. But the agencies complied with their obligation to provide a reasoned explanation for their policy change. The agencies were not required to affirmatively disprove the scientific basis for the 2015 Rule because the 2020 Rule is predicated on a legal policy determination regarding the permissible scope of federal jurisdiction, not a rejection of past science or alteration of federal jurisdiction as a scientific matter. Plaintiffs' repeated attempts to fault the 2020 Rule as scientifically unsound thus fall flat.

Another central focus of Plaintiffs' challenge is on the agencies' decision to incorporate into the 2020 Rule aspects of Justice Scalia's plurality decision in *Rapanos v. United States*, 547 U.S. 715 (2006). But Justice Scalia's opinion is only one of the sources relied on by the agencies in promulgating the Rule. And the agencies retain authority to reasonably interpret ambiguous statutory provisions within the bounds of the CWA and binding precedent. See *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). The 2020 Rule is a reasonable and measured interpretation of the scope of federal jurisdiction under the CWA in the light of statutory language, structure, and purpose and Supreme Court precedent.

Contrary to Plaintiffs' argument, there is no binding holding from *Rapanos* rejecting the plurality's view. To prevail on that point, Plaintiffs must combine the four-Justice dissent in *Rapanos* with Justice Kennedy's concurrence. But a dissenting opinion cannot be used to form the basis of a legal holding: because the dissenters did not join in the judgment, their views can have no precedential weight.

## ARGUMENT

## I.   THE AGENCIES PROVIDED A REASONED EXPLANATION FOR THE 2020 RULE

Agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under that standard of review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Agencies need not rigidly adhere to their past policies. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). But they must provide a "reasoned explanation" for any change in position (*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016)) and "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. The agencies here satisfied those standards.

A.       **The 2020 Rule is supported by a reasoned explanation**

Although Plaintiffs claim the agencies failed to provide reasoned explanations for changes in the 2020 Rule impacting jurisdiction over certain ephemeral waters and wetlands, Dkt. 31 at 12-19, the agencies in fact provide explanations that span 75 pages of the Federal Register and meticulously set forth the agencies' interpretation of the CWA's text, structure, and purpose (85 Fed. Reg. 22,252-54), the regulatory history (*id*. at 22,254-55), legal precedent bearing on the phrase "waters of the United States" (*id*. at 22,256-59), and the rulemaking process. *Id*. at 22,259-337. This is not a rule backed by "terse explanation" or beset by "unexplained inconsistency." *Encino Motorcars*, 136 S. Ct. at 2126; *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 549 (S.D.N.Y. 2019).

The agencies acknowledge the change in policy in the 2020 rule, explaining the 2020 Rule was intended to "eliminat[e] the case-specific application of the agencies' previous interpretation of Justice Kennedy's significant nexus test" in favor of "clear categories of jurisdictional waters that adhere to the basic principles articulated" in Supreme Court precedent and comport with the structure of the CWA. 85 Fed. Reg. 22,273. And they showed "good reasons" for the new rule. *Fox*, 556 U.S. at 515. The 2020 Rule balances the CWA's goals of preventing pollution and preserving states' control over their water and land resources—a key defect of the prior rule. 85 Fed Reg. 22,252; *see* 33 U.S.C. §§ 1251(a), (b). The agencies found that the 2015 Rule had rested on too narrow a "view of Congress' policy in section 101(b)" regarding states' roles under the CWA as inconsistent with statutory text and history. 85 Fed Reg. at 22,269-70. Under the reasoned-explanation test, "an agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies." *Encino Motorcars*, 136 S. Ct. at 2127. That is what the agencies did.

In carrying out their mandate to balance national interests in keeping navigable waters free from pollution while "promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles on the Congress and the States under the Constitution," 82 Fed. Reg. 12,497, 12,497 (Feb. 28, 2017), the agencies concluded that the 2015 Rule "failed to adequately consider and accord due weight to the policy of Congress" preserving states' rights. 85 Fed. Reg. 22,260. The policy change thus rebalances jurisdiction to match Congress' purposes in the CWA. That is a "good reason" for the change. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. SEC*, 63 F.3d 1123, 1127 (D.C. Cir. 1995).

The agencies also implemented the Rule to be consistent with constitutional limits on their jurisdiction. In *SWANCC*, 531 U.S. at 172-73, the Court explained that Congress did not manifest a clear intent in the CWA for federal regulation to extend to the limits of the agencies' constitutional authority under the Commerce Clause. An interpretation of WOTUS to be as broad as the federal government's Commerce Clause authority would "alter[] the federal-state framework by permitting federal encroachment upon a traditional state power"—the power over local land use. *Id.* at 173. The agencies properly crafted the 2020 Rule to bring the definition of WOTUS within that constitutional limit and to comply with SWANCC. See 85 Fed. Reg. 22,264-65.

Another "good reason" for the change in policy from the 2015 Rule to the 2020 Rule is that the new Rule provides greater regulatory certainty that was lacking in the prior regulations, which were impermissibly vague. 85 Fed. Reg. 22,325 (2020 Rule's "categorical bright lines" provide "clarity and predictability for regulators and the regulated community"); *see* Parrish Decl. ¶¶ 49-55 (outlining benefits under the 2002 Rule). Without doubt, "[r]emoving the source

of confusion" is "'good reason[] for the new policy.'" *Gonzales-Veliz v. Barr*, 938 F.3d 219, 235 (5th Cir. 2019).

**B.     Plaintiffs' Arguments That The 2020 Rule Is Arbitrary And Capricious Have No Merit**

Plaintiffs' claims that the 2020 Rule is nevertheless arbitrary and capricious boil down to their dissatisfaction that the agencies did not adopt findings that informed the 2015 rulemaking and their allegations that the agencies did not address scientific matters. Dkt. 31 at 13-15. But the 2020 Rule establishes the opposite: the agencies were cognizant of the hydrological science, addressed that science, and considered it along with other factors. There is no requirement that the agencies consider *only* science; indeed, it would be unlawful for the agencies to do so at the expense of statutory language, structure, and precedent.

**1.     The agencies explained their treatment of ephemeral features**

Plaintiffs' claim that the agencies ignored the scientific record regarding the importance of ephemeral streams to downstream water quality (Dkt. 31 at 13, 16), but the agencies did not need to rebut the scientific record of a connection between ephemeral streams to downstream water quality because science alone cannot answer the jurisdictional question and the agencies made a determination that the policies underlying the CWA supported their line-drawing. Further, the agencies *did* address this question, acknowledging that the Connectivity Report supports the conclusion that ephemeral streams influence downstream waters. 85 Fed. Reg. 22,288. They observed that the SAB recommended using a "connectivity gradient" to recognize the probability that impacts occurring along the gradient will be transmitted downstream, but the SAB also recognized that the Connectivity Report is not a "policy document." *Id*. The agencies explained that they used the Connectivity Report "to inform" the new WOTUS definition, including by "recognizing the 'connectivity gradient' and potential consequences between

10

perennial, intermittent, and ephemeral streams and downstream waters within a tributary system." *Id*.

Plaintiffs assail the agencies' use of the connectivity gradient to exclude ephemeral streams, Dkt. 31 at 15-16, but that is simply a complaint about the agencies' drawing lines that accommodate the governing legal principles. *See Nat'l Shooting Sports Found., Inc. v. Jones* 716 F.3d 200, 214-15 (D.C. Cir. 2013); *Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric*, 984 F.2d 514, 522 (1st Cir. 1993). The agencies explained that they considered the connectivity gradient in light of their decision to draw lines to preserve state sovereignty and provide regulatory certainty (85 Fed. Reg. 22,288, 22,325), and that they "looked to science to inform" their definition of the term "'ephemeral'" while following the legal principles established in the statute and precedent. *Id*. at 22,271.  That was sufficient.

### 2.    The agencies explained their treatment of wetlands

Because the definition of WOTUS is a legal, not scientific, exercise, Plaintiffs' criticisms that the agencies ignored record evidence and findings in the Connectivity Report regarding coverage of wetlands fail. Dkt. 31 at 31-32. The agencies explained that a scientific analysis of the interconnectedness of remote waters and wetlands cannot alone answer the legal question of the scope of federal jurisdiction under the statute: "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." 85 Fed. Reg. 22,271 (emphasis added). Instead, the definition of WOTUS "must be grounded in a legal analysis of the limits on CWA jurisdiction reflected in the statute and Supreme Court case law." *Id*. (emphasis added). They further stated that the 2015 Rule, which rested in large part on the Connectivity Report, failed to "implement the legal limits on the scope of the agencies' authority under the CWA" which were recognized by the district court in *Georgia v. Wheeler* when it held the 2015 Rule to be unlawful. 418 F. Supp. 3d 1336 (S.D. Ga. 2019); 85 Fed. Reg. 22,272.

And simply because the Connectivity Report found that wetlands are connected to downstream water integrity does not mean that those wetlands must come within the definition of WOTUS, as even the 2015 Rule recognized. *See* 80 Fed. Reg. 37,057. Therefore, the exclusion of some wetlands in the 2020 Rule is not an "unexplained inconsistency in agency policy" and does satisfy the reasoned-explanation test. *Encino Motorcars*, 136 S. Ct. at 2126.

### C.     The agencies did not ignore water quality

Plaintiffs say the agencies failed to consider the effects of the Rule on the CWA's objective "to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Dkt. 31 at 23. But, as Plaintiffs concede, the agencies repeatedly considered water quality in the Rule. *Id.* (quoting 85 Fed. Reg. at 22,252, 22,272, 22,287). And they specifically discussed that States may begin to regulate more waters and that "a State can more efficiently allocate resources towards environmental protection due to local knowledge of amenities and constituent preferences." 85 Fed. Reg. 22,334. Thus, the agencies did not ignore an aspect of the problem—they considered the likelihood that states would exercise their powers to efficiently fill any regulatory gaps, which would be a net benefit from the Rule.

## II.     THE 2020 RULE IS CONSISTENT WITH THE CLEAN WATER ACT

Plaintiffs claim that the 2020 Rule violates the CWA because it incorporates aspects of the *Rapanos* plurality (Dkt. 31 at 26) and it improperly addresses the role of the states under the Act (*id*. at 29-30). Neither of those arguments has any merit.

### A.     The 2020 Rule is consistent with controlling Supreme Court precedent

The Rule complies with the Supreme Court's binding holdings on the interpretation of WOTUS. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 865-66 (1984), "[a] court's prior judicial construction of a statute trumps an agency construction" when "the prior court decision holds that its construction follows from the

unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The agencies properly determined that precedent constrained the reach of CWA jurisdiction in ways previous rulemaking had failed to implement.

Although "WOTUS" is, to some extent, an ambiguous term, courts have found that the term unambiguously has (or does not have) certain core attributes. *See SWANCC*, 531 U.S. 159 (2001); *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985). That is where a second legal doctrine comes into play. *Rapanos* was a fractured decision without a majority opinion. The Supreme Court's guidance in that situation is that "'the holding of the Court may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (emphasis added). "[T]he *Marks* rule produces a determinative holding 'only when one opinion is a logical subset of other, broader opinions.'" *Large v. Fremont Cty., Wyo.*, 670 F.3d 1133, 1141 (10th Cir 2012); *see United States v. Davis*, 825 F.3d 1014, 1021-22 (9th Cir. 2016) ("A fractured Supreme Court decision should only bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably described as a logical subset of the other"); *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) ("Where no standard put forth in a concurring opinion is a logical subset of another concurring opinion (or opinions) that, together, would equal five votes, *Marks* breaks down"); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (applying logical subset rule under *Marks*); *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc) ("one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justice who support the judgment").

In a situation where "the plurality and concurring opinions do not share common reasoning whereby one analysis is a 'logical subset' of the other," there is no controlling opinion. *United States v. Epps*, 707 F.3d 337, 350 (D.C. Cir. 2013). That is the case here because neither the *Rapanos* plurality opinion nor Justice Kennedy's concurrence is the logical subset of the other—they are distinct approaches to defining the scope of WOTUS. The plurality applied a two-part test to determine whether a wetland was within the jurisdictional reach of the CWA. First, there must be "waters" that contain a "relatively permanent flow," and second, there must be a "continuous surface connection" between the water and the wetland. *Rapanos*, 547 U.S. at 757 (plurality). By contrast, Justice Kennedy's significant nexus test provided that wetlands "possess the requisite nexus . . . if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780 (Kennedy, J., concurring).

The plurality did not accept Justice Kennedy's significant nexus test, explaining that the test "leaves the [CWA]'s 'text' and 'structure' virtually unaddressed." *Id*. at 753. The plurality continued that the "case-by-case determination of ecological effect" of a wetland on a navigable water under the significant nexus test "*was not the test*" and had been "*specifically rejected*" by the Court's prior cases. *Id*. at 754. Likewise, Justice Kennedy did not accept the plurality's test, finding it to be "inconsistent with the Act's text, structure, and purpose." *Id*. at 776 (Kennedy, J.) The plurality's test, but not the significant nexus test, would exclude wetlands that abut navigable-in-fact waters but lack a continuous surface connection, and it would include remote wetlands with a surface-water connection with a small but continuously flowing stream that may be excluded by the significant nexus test. *Id*. at 776-77. Because the *Rapanos* plurality and concurrence took entirely different approaches, under *Marks* neither opinion is the binding

14

holding of *Rapanos*. *See United States v. Johnson,* 467 F.3d 56, 63-64 (1st Cir. 2000) (neither the *Rapanos* plurality or concurrence is a logical subset of the other under *Marks*).

In the absence of a controlling opinion under *Marks*, the Court should still determine whether there is common ground between the *Rapanos* plurality and concurrence. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1182 (2d Cir. 1992) (court may look for common ground in plurality and concurring opinions); *King*, 950 F.2d at 781 (the focus of the *Marks* analysis and the logical subset test is on finding "a common denominator of the Court's reasoning"). Both the plurality and Justice Kennedy agreed that (1) the word "navigable" in the CWA must be given some effect, *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring); *see id*. at 731 (plurality); (2) WOTUS includes some waters and wetlands not navigable-in-fact but which bear a substantial connection to navigable waters, *id*. at 739, 742 (plurality); *id*. at 784-85 (Kennedy, J.); (3) environmental concerns cannot override the statutory text, *id.* at 745-46 (plurality); *id*. at 778 (Kennedy, J.); and (4) WOTUS cannot include drains, ditches, streams remote from navigable-in-fact water and carrying only a small volume water toward navigable-in-fact water, or waters or wetlands that are alongside a drain or ditch, *id*. at 733-34, 742 (plurality); *id*. at 778, 778-91 (Kennedy, J.). Under *Brand X*, those are conclusions about the core meaning of WOTUS that the agencies cannot ignore in their subsequent rulemaking, and the 2020 Rule is consistent with those requirements. *E.g.*, 85 Fed. Reg. 22,251-52.

## B.   Plaintiffs misunderstand the Rule's foundations and ignore governing precedent

Plaintiffs argue that the 2020 Rule "is modeled after the plurality opinion in *Rapanos*" but that five Supreme Court Justices "rejected the plurality's statutory interpretation[.]" Dkt. 31 at 26. Those points are both incorrect and irrelevant.

As an initial point, Plaintiffs' premise is false because the 2020 Rule does not wholly adopt the *Rapanos* plurality opinion nor wholly reject Justice Kennedy's concurrence. Instead,

the agencies explained that "there are sufficient commonalities between these opinions to help instruct the agencies on where to draw the line between Federal and State waters." 85 Fed. Reg. 22,268. For instance, the 2020 Rule "incorporates important aspects of Justice Kennedy's opinion, together with those of the plurality, to craft a clear and implementable definition [of "tributary"] that stays within their statutory and constitutional authorities." *Id*. at 22,291. The agencies further acknowledged that each opinion "excludes some waters and wetlands that the other standard does not," but were guided by the fact that both opinions "agreed in principle that the determination must be made using a basic two-step approach that considers (1) the connection of the wetland to the tributary; and (2) the status of the tributary with respect to downstream traditional navigable waters." *Id*. at 22,267. Additionally, both opinions "also agreed that the connection between the wetland and the tributary must be close." *Id*. The agencies sought to implement guidance from "the [opinions'] common analytical framework." *Id*. The 2020 Rule thus uses both the *Rapanos* plurality and concurrence as guideposts.

Further, Plaintiffs' suggestion that a "majority" of the *Rapanos* Court rejected the plurality decision is misguided. Dkt. 37 at 26. As explained, to determine the legal holding of a fragmented decision, *Marks* instructs courts to consider the opinions of the Justices "who concurred in the judgments." 430 U.S. at 193; *see O'Dell v. Netherland*, 521 U.S. 151, 160 (1997) (in determining precedential effect of its fragmented decisions, the Court looks to the opinions of "the Justices whose votes were necessary to the judgment"). That analysis excludes consideration of dissenting opinions. *King*, 950 F.2d at 783 ("*Marks* has never been so applied by the Supreme Court, and we do not think we are free to combine a dissent with a concurrence to form a *Marks* majority"); Jonathan H. Adler, *Reckoning With Rapanos: Revisiting "Waters of the United States" and the Limits of Federal Wetland Regulation*, 14 Mo. Envt'l L. & Pol'y Rev. 1, 14 (2006) ("it would be wrong to view any part of Justice Stevens' dissent as a 'holding' of

the Court. Nothing in the dissent constitutes a portion of the judgment of the Court, so nothing in the dissent is part of the actual holding of the case").

This approach stands to reason. "Although dissents may be scholarly and persuasive to some, they are not binding law to any." *Okpalobi v. Foster*, 244 F.3d 405, 415 n.15 (5th Cir. 2001); *see Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996) ("a dissenting Supreme Court opinion is not binding precedent"). Because the Justices' "views in dissent, of course, are not binding authority," *Brzonkala v. Virginia Polytechnic Inst. & State Univ.*, 169 F.3d 820, 878 (4th Cir. 1999), it does not make sense to combine dissenting views with a concurrence to create binding authority. *See United States v. Brooks*, 2009 WL 3644122, at *12 (E.D.N.Y. 2009) ("a dissent, even from the Supreme Court … 'has absolutely no precedential value'").

Dissenting opinions "cannot form part of the *ratio decidendi* of a case [because] they are not reasons for the order made by the court." A.M. Honore, *Ratio Decidendi*: *Judge and Court*, 71 Law Q. Rev. 196, 198 (1955). "The Supreme Court, like all appellate courts, makes binding precedent solely by giving reasons for its judgments. Dissents do not contain reasons for the Court's judgments; they provide reasons their authors oppose the Court's judgment." *In re Jones*, 534 B.R. 149, 158 (Bankr. E.D. Ky. 2015). Therefore, "any intimation that the views of dissenting Justices can be cobbled together with those of a concurring Justice to create a binding holding must be rejected. That is not the law in this or virtually any court following common-law principles of judgments." *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020).

As specifically applied to *Rapanos*, the Eleventh Circuit held that "[w]e simply cannot avoid the command of *Marks*," which "does *not* direct lower courts interpreting fractured Supreme Court decisions to consider the positions of those who dissented," so "it would be inconsistent with *Marks* to allow the dissenting *Rapanos* Justices to carry the day." *United States*

*v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) (emphasis in original); *see also id.* ("pursuant to *Marks*, we are left to determine which of the positions taken by the *Rapanos* Justices *concurring in the judgment* is the 'narrowest,' i.e, the least 'far-reaching'") (emphasis in original); *United States v. Freedman Farms, Inc.*, 786 F. Supp. 2d 1016, 1021 (E.D.N.C. 2011) (agreeing with Eleventh Circuit that "it would be 'inconsistent with *Marks* to allow the dissenting *Rapanos* Justices to carry the day'").

Strong policy considerations support this rule that courts should not assign weight to dissenting opinions to contrive a precedential holding from a Supreme Court decision otherwise lacking one under the *Marks* analysis. When a decision of the Court does not yield a binding legal holding, "the process of continued percolation through independent lower court reasoning yields important value." *Duvall*, 740 F.3d at 622 (Williams, J., concurring in denial of *en banc* consideration).

Therefore, there is no binding holding from *Rapanos* that agencies cannot consider the plurality decision.[1] In fact, the Supreme Court's own understanding of *Rapanos* confirms this because the Court looks to the plurality when it seeks guidance from that case. For instance, in *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), the Court issued a fragmented decision addressing the meaning of language in the CWA regarding discharge of pollutants "from any point source." Four Justices wrote opinions and all of them cited the *Rapanos* plurality's discussion of point sources under the CWA. *Id.* at 1468-78; *id.* at 1478-79 (Kavanaugh, J., concurring); *id.* at 1479-82 (Thomas, J., dissenting); *id.* at 1482-92 (Alito, J., dissenting). While each opinion applied the plurality's reasoning differently, there can be no

---

[1]   Plaintiffs cite *Johnson*, 467 F.3d 56, for the proposition that Justice Stevens's dissent is the binding opinion in *Rapanos*. Dkt. 31 at 26. *Johnson* stands for no such thing. In that case, the First Circuit found the *Marks* framework unworkable as applied to *Rapanos* and sought guidance from Justice Stevens's dissent as a "simple and pragmatic" alternative to finding a binding opinion where there is none. 467 U.S. at 64. And *Johnson* was not considering the issue here, which is the propriety of the 2020 Rule under the APA, and did not have the benefit of the agencies' lengthy explanation of their approach.

question that the Court believes the plurality—even though not a holding under *Marks*—is the source from which to draw guidance about the meaning of the statute.

### C. The 2020 Rule is a proper interpretation of the States' role in water resource regulation

Plaintiffs argue that the 2020 Rule places too much emphasis on the States' role in regulating water and land resources set forth in Section 101(b). Dkt. 31 at 29-30. They suggest that Section 101(b) assigns to states a role in administering federal programs but does not have any broader relevance. Dkt. 31 at 29-30. That reading is based on a misunderstanding of the statute's history. As the *Rapanos* plurality explained, the "statement of policy" that Congress intended in the CWA "to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution," and "to plan the development and use . . . of land and water resources" was included in the CWA as amended in 1972. 547 U.S. at 737. The 1977 amendments to the CWA then added language defining certain roles for states in permitting programs under the Act. 91 Stat. 1567, 1575, Public Law 95-217 (1977). Given this history, the *Rapanos* plurality explained that the statement of policy from the 1972 Act "plainly referred to something beyond the subsequently added state administration program of 33 U.S.C. § 1344(g)-(l)." 547 U.S. at 737; *see* 85 Fed. Reg. 22,270. The evolution of the statutory text confirms that the agencies were entitled to rely on the preservation of state authority over land and water resources as one key policy of the CWA.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion should be granted.

Dated: December 17, 2020                       Respectfully submitted,

Timothy S. Bishop                               /s/ *James M. Campbell*
MAYER BROWN LLP                                 James M. Campbell (BBO #541882)
1999 K Street NW                                Jacob J. Lantry (BBO #690452)
Washington, DC 20006                            CAMPBELL CONROY & O'NEIL, P.C.
(202) 263-3000                                  1 Constitution Wharf, Suite 310
(202) 263-3300                                  Boston, MA 02129
tbishop@mayerbrown.com                          (617) 241-3060
                                                (617) 241-5115
*Counsel for* Amici Curiae                      jmcampbell@campbell-trial-lawyers.com
                                                jlantry@campbell-trial-lawyers.com

                                                *Counsel for* Amici Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 17, 2020, the foregoing document was electronically submitted to the Clerk of Court for the U.S. District Court for the District of Massachusetts using the Court's electronic case filing system. Accordingly, notice of this filing will be sent to all counsel of record.

/s/ *James M. Campbell*
James M. Campbell

# APPENDIX

*Amici* are as follows:

The American Farm Bureau Federation (AFBF) is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. Through its state and county Farm Bureau organizations, AFBF represents about six million member families in all 50 States and Puerto Rico.

The American Petroleum Institute (API) is the only national trade association representing all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy. API's more than 600 members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, marine businesses, and service and supply firms. These companies provide most of the nation's energy. API was formed in 1919 as a standards-setting organization. In its first 100 years, API has developed more than 700 standards to enhance operational and environmental safety, efficiency and sustainability.

The American Road and Transportation Builders Association (ARTBA) is a non-partisan federation established in 1902 whose primary goal is to aggressively grow and protect transportation infrastructure investment to meet the public and business demand for safe and efficient travel. ARTBA's members designed, built and continue to manage the Nation's Interstates and intermodal surface transportation network. Its core mission is market development and protection on behalf of the U.S. transportation design and construction industry.

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation, representing the interests of approximately 300,000 direct members and indirectly representing the interests of more than three million businesses and organizations of every size, in every industry sector, and from every geographical region of the country. A central function of the Chamber is to represent the interests of its members in important matters before Congress, the Executive Branch, and the courts.

The Edison Electric Institute (EEI) is the trade association representing all U.S. investor-owned electric companies. Its members provide electricity for about 220 million Americans and operate in all 50 states and the District of Columbia. EEI's mission is to promote the long-term success of the electric power industry.

The Leading Builders of America (LBA) is a national trade association representing 20 of the largest homebuilding companies in North America. Collectively, LBA members build approximately 35% of all new homes in America. Its purpose is to preserve home affordability for American families. LBA member companies build across the residential spectrum from first-time and move-up to luxury and active-adult housing. In each of these segments, its members are leaders in construction quality, energy efficiency, design, and the efficient use of land. Many of its members are also active in urban multi-family markets and also develop traditional and neo-traditional suburban communities.

The National Alliance of Forest Owners (NAFO) is a national advocacy organization committed to advancing federal policies that support the long-term economic, social, and environmental benefits of sustainably managed, privately owned forests. NAFO member companies own and manage more than 46 million acres of private working forests—forests that are managed to provide a steady supply of timber. NAFO's membership also includes state and

national associations representing tens of millions of additional acres. NAFO works aggressively to sustain the ecological, economic, and social values of forests and to assure an abundance of healthy and productive forest resources for present and future generations.

The National Association of Home Builders (NAHB) is a national trade association incorporated in Nevada. NAHB's membership includes more than 140,000 builder and associate members organized into approximately 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. Its members include individuals and firms that construct single-family homes, apartment buildings, condominiums, and commercial and industrial projects, as well as land developers and remodelers.

The National Cattlemen's Beef Association (NCBA) is the largest and oldest national trade association representing American"show that there are good reasons for the new policy." cattle producers. Through state affiliates, NCBA represents more than 175,000 of America's farmers and ranchers, who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests.

The National Corn Growers Association (NCGA) was founded in 1957. NCGA represents nearly 40,000 dues-paying corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their States. NCGA and its 50 affiliated state organizations work together to create and increase opportunities for corn growers to help them sustainably feed a growing world.

The National Mining Association (NMA) is the national trade association of the mining industry. NMA's members include the producers of most of the Nation's coal, metals, and

industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry.

The National Pork Producers Council (NPPC) is an association of 43 state pork producer organizations and the global voice in Washington, DC for the Nation's approximately 60,000 pork producers. NPPC conducts public policy outreach at both the state and federal level with a goal of meeting growing worldwide consumer demand for pork while simultaneously protecting the water, air, and other environmental resources that are in the care of or potentially affected by pork producers and their farms. NPPC and its members have engaged directly with EPA over the last two decades regarding the development of water quality standards and have made significant capital investments in the design and operation of farms to comply with these environmental regulations.

The National Stone, Sand, and Gravel Association (NSSGA) member companies are responsible for the essential raw materials found in every home, building, road, bridge and public works project in the U.S. and produce more than 90% of the crushed stone and 70% of the sand and gravel consumed annually in the United States. The industry employs about 100,000 men and women nationally. NSSGA and its predecessor organizations have represented the industry for over 100 years.

The Public Lands Council (PLC) has actively represented cattle and sheep producers who hold public lands grazing permits since 1968. Public land grazing is the economic backbone of countless rural communities within 11 western states. The PLC advocates for these western ranchers, who preserve the Nation's natural resources while providing vital food and fiber to the Nation and the world. Approximately 22,000 ranchers own nearly 120 million acres of private land and hold grazing permits on more than 250 million acres managed by the U.S. Forest

Service and Bureau of Land Management. Nearly 40% of western cattle herd and 50% of the nation's sheep herd spend time on public lands.

The U.S. Poultry & Egg Association (U.S. Poultry) is the world's largest and most active poultry organization. The Association represents the entire industry as an "All Feather" association. Membership includes producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Formed in 1947, the association has affiliations in 27 states and member companies worldwide.

# **<u>Exhibit 1</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, *et al.*, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 20-cv-10820-DPW |
| v. | ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) | |
| *Defendants*. | ) ) ) | |

**DECLARATION OF DON PARRISH**

I, Don Parrish, declare based upon personal knowledge that:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I offer this Declaration based on my 30 years working primarily on Clean Water Act ("CWA") issues on behalf of farmers, ranchers, and industry groups in a wide variety of business areas.

3.      I am the Senior Director of Regulatory Affairs at the American Farm Bureau Federation ("AFBF"). AFBF is a voluntary general farm organization formed in 1919, representing about 6 million member families through Farm Bureau organizations in all 50 states plus Puerto Rico. Each state Farm Bureau is an independent entity, affiliated with AFBF through a membership agreement. Individual and family Farm Bureau members are associate members of AFBF.

4.      AFBF's primary function is to advance and promote the interests of farmers and ranchers and their rural communities. This involves advancing, promoting, and protecting the economic, business, social, and education interests of farmers and ranchers across the United States. AFBF seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of agricultural land.

5.      AFBF has a dedicated staff and expends a great amount of resources to advocate on many issues before Congress, the Executive Branch and federal courts to serve the interests of farmers and ranchers. AFBF routinely lobbies the federal government to improve the regulatory climate for farmers and ranchers and to protect their ability to make productive use of their land.

6. The scope of federal jurisdiction under the Clean Water Act is of key importance to AFBF and its members. AFBF has expended great resources related to promoting a lawful and reasonable interpretation of the CWA.

7. In addition to my role at AFBF, I am the Chairman of the Waters Advocacy Coalition ("WAC" or "the Coalition"), a position in which I have served since its inception in 2010. My duties as Chairman of the Waters Advocacy Coalition include holding weekly meetings, responding to requests for information from the government and the general public, providing information on government regulations to the Coalition's members, assisting the members with participation in legislation and rulemaking processes, and ensuring the Coalition's members are able to express their interests to government entities.

8. WAC and its members, including AFBF, advocated against the 2015 expansion of the definition of jurisdictional Waters of the United States ("WOTUS"), for the repeal of the 2015 Rule, and for a more certain and narrower definition of WOTUS like that adopted in the 2020 Navigable Waters Protection Rule. Their advocacy throughout has reflected the great harm to their member landowners and operators that results from broad and uncertain federal jurisdiction beyond what Congress intended in the CWA. Vacating that Rule would cause great harm to *amici* and WAC's members. I submit this declaration to describe some of the harms that arose from prior, broader definitions of WOTUS that have been addressed by the 2020 Navigable Waters Protection Rule ("NWPR"), which *amici*'s and WAC's members support.

9. Vacating that Rule would expose *amici*'s and WAC's members to the same enormously burdensome and illegal regime imposed by the Environmental Protection Agency

("EPA") and the U.S. Army Corps of Engineers ("the Corps") (collectively "the agencies") prior to promulgation of the NWPR, in the 2015 Rule and before.[1]

### WAC Members' Involvement in WOTUS Regulation

10.     The Waters Advocacy Coalition represents a large cross-section of the Nation's construction, transportation, real estate, mining, manufacturing, forestry, agriculture, energy, wildlife conservation, and public health and safety sectors—all of which are vital to a thriving national economy and provide much-needed jobs. The Coalition's members—which include most of the *amici*'s members—are committed to a successful American economy, the success of the respective industries that they represent, and the protection and preservation of America's wetlands and waters, and believe that clear CWA regulation will help further these goals.

11.     Among other organizations, Coalition members include: American Farm Bureau Federation ("AFBF"), American Petroleum Institute ("API"), American Road & Transportation Builders Association ("ARTBA"), Chamber of Commerce of the United States ("the Chamber"), Edison Electric Institute ("EEI"), Leading Builders of America ("LBA"), National Association of Home Builders ("NAHB"), National Cattlemen's Beef Association ("NCBA"), National Corn Growers Association ("NCGA"), National Mining Association ("NMA"), National Pork Producers Council ("NPPC"), and the National Stone, Sand and Gravel Association ("NSSGA"). From my experience working with these organizations on CWA issues at WAC, I am aware that

---

[1] A few months prior to finalization of the NWPR, the agencies repealed the 2015 Rule, reinstating the pre-2015 regulatory regime, including 2008 guidance that based jurisdiction on a vague "significant nexus" test. The Repeal Rule has been challenged in lawsuits pending in multiple courts. If both the NWPR and Repeal Rule were found unlawful, the 2015 Rule would apply in some states, but the 2008 guidance would apply in most states as the result of injunctions issued by various district courts against the 2015 Rule. This mess is impossible for businesses to analyze to determine if their property contains jurisdictional WOTUS, the more so because both the 2015 Rule and the prior regulatory regime used (different) vague standards. Any uncertain test for WOTUS harms landowners and users, but my declaration focuses principally on harms flowing from the 2015 Rule for ease of comparison.

each of these organizations has for years devoted substantial resources toward lobbying and other efforts to advocate for a reasonable scope of federal jurisdiction under the CWA, because the member organizations that they represent are the directly regulated parties that stand to be significantly harmed by an overly-broad definition of "WOTUS."

12.     In my capacity at WAC and AFBF, I have also collaborated for years through extensive litigation and lobby efforts with the National Alliance of Forest Owners ("NAFO"), Public Lands Council ("PLC"), and the U.S. Poultry & Egg Association on CWA issues. From that collaboration, I am aware that those organizations also represent the directly regulated parties harmed by a bloated or unclear definition of WOTUS, and thus treat the scope of CWA jurisdiction as a key issue to advance the interests of their members.

13.     Since its inception, the Coalition and its members have been involved in every permutation of CWA regulation. The definition of WOTUS under the CWA is of paramount interest to WAC members, because the ability of their members to plan projects and organize their affairs is highly sensitive to the scope of the agencies' regulatory jurisdiction. Members' operations are irreparably disrupted by an overly broad or ambiguous assertion of CWA jurisdiction.

14.     The Coalition was formed in 2010, when I and other individuals familiar with the needs of the industries that would eventually make up the Coalition learned that some members of Congress introduced an amendment to the CWA that would result in the removal of the word "navigable" from the Act. This was deeply concerning to the members of the Coalition because removal of the word "navigable" from the CWA could result in a significant expansion of federal jurisdiction under the CWA to virtually all water, along with the lands that water touches.

15.     The Coalition and its members were at the center of efforts to convince Congress not to undertake such a dramatic expansion in CWA jurisdiction, because it would result in a massive infringement on landowners' use of their land, and increase costs and regulatory burden on nearly every aspect of ordinary business operations across the American economy. The Coalition demonstrated to Congress that this expansion of federal jurisdiction under the CWA would unreasonably expand federal permitting requirements, increase exposure of the Coalition's members to civil penalties, potential criminal liability, and private lawsuits over alleged violations of the CWA, result in job losses and business closures, and cause delays and add costs for services, such as construction of roads, schools, and homes, and growing our nation's food, that ordinary people depend upon every day. Congress decided not to proceed with the removal of the word "navigable" from the CWA.

16.     The Obama Administration apparently did not agree with Congress's decision not to remove the word "navigable" and sought to accomplish through regulatory action what it could not accomplish through legislation. The agencies promulgated a sweeping regulatory definition of WOTUS in the mis-labelled "Clean Water Rule" (the 2015 Rule), which effectively wrote the word "navigable" out of the Act.

17.     The Coalition and its members vigorously opposed the 2015 Rule, for much the same reasons they objected to amending the CWA.[2] In negotiations regarding the proposal, officials in the Obama Administration argued that their proposed regulatory changes would add clarity and transparency to regulation of "Waters of the United States" under the CWA by creating

---

[2] The Coalition members and the proposed *amici* filed extensive comments regarding the proposed 2015 Rule and how it would harm their membership. *See* WAC, Comment Letter on 2015 Rule (Nov. 13, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-14568.

a presumption that businesses should *assume* their activities would impact a WOTUS and, therefore, should seek federal permits for ordinary business activities that would not previously have required a permit. These permits come at great cost: As the Supreme Court has noted, "[t]he average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes." *Rapanos v. United States*, 547 U.S. 715, 725 (2006) (plurality) (quoting Sunding & Zilberman, The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 74–76 (2002)).

18.    While it is true that the scope of federal jurisdiction under the CWA had not been clear under the prior regime, the 2015 Rule required jurisdictional determinations and permits over a sweeping array of activities that had never previously been covered. This sweeping coverage over desiccated features remote from waterways only served to add more confusion.

19.    The agencies promulgated the final 2015 Rule in June 2015. From its inception, the 2015 Rule was vigorously contested in various district courts by States, industry interests, and NGO groups. The Coalitions' members remained at the center of these efforts. Several members filed an original suit challenging the 2015 Rule in the Southern District of Texas, and also participated in litigation contesting the jurisdiction of the Sixth Circuit Court of Appeals to hear challenges to the 2015 Rule. Another member filed an original suit challenging the 2015 Rule in the Northern District of Oklahoma. Many members also participated as intervenors in suits challenging various aspects of the 2015 Rule before the Southern District of Georgia and the

6

Western District of Washington, and as *amicus curiae* before the District of North Dakota and the Tenth Circuit Court of Appeals.

20.     Simultaneously with this ongoing litigation, the agencies recognized that the 2015 Rule was likely unlawful, and promulgated a so-called Applicability Date Rule to delay the effective date of the 2015 Rule while they engaged in a two-step rulemaking process to first repeal, and second replace, the 2015 Rule. WAC's and *amici*'s members participated extensively in discussions with the agencies during this ongoing rulemaking and submitted detailed comments.[3] Coalition members also participated in litigation challenging these later regulatory efforts.

21.     As part of WAC's and AFBF's participation in the ongoing WOTUS Rule litigation described above, I personally submitted a declaration on September 20, 2016 in litigation before the U.S. Court of Appeals for the Sixth Circuit, explaining the serious harms that the 2015 Rule would impose on AFBF members. (Ex. A). I also submitted a declaration on February 6, 2018 in support of AFBF's challenge to the 2015 Rule in the Southern District of Texas (Ex. B), and another declaration in support of AFBF's challenge as an intervenor-plaintiff to the 2015 Rule in the Southern District of Georgia on September 10, 2018 (Ex. C). These declarations explained the irreparable harms caused to industry members by the vague, overly broad 2015 Rule, and by an uncertain regulatory climate. Any statement made in those declarations remains true except insofar as it has been superseded by anything I have said here.

---

[3] For WAC comments on each rulemaking stage, *see* supra, p. 6, n. 2; WAC, Comment Letter on Applicability Date Rule (Dec. 13, 2017), https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0644-0375; WAC, Comment Letter on Repeal Rule (Sept. 27, 2017), https://www.regulations.gov/document?D=EPA-HQ-OW-2017-0203-11027; WAC, Comment Letter on NWPR (Apr. 29, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-684.

22.     From my participation in WOTUS litigation with them, I am aware that WAC members and *amici*'s members submitted numerous declarations explaining how the regulatory definition of WOTUS is important to their organizational missions, and further that many members submitted declarations describing the significant harms caused to them by an expansion of jurisdiction under the CWA and by an overly-broad, uncertain WOTUS Rule. *See* Excerpts of Addendum to the Opening Br. of Municipal Pet'rs, *In Re EPA*, No. 15-3751 (6th Cir. Nov. 1, 2016) (Dkt. 129-2) (Ex. D) (compiling declarations filed before the Sixth Circuit Court of Appeals); Exhibit D to Business Intervenor-Plaintiffs' Motion to Amend the Court's Preliminary Injunction, *Georgia v. Wheeler*, No. 2:15-cv-79 (S.D. Ga. Sept. 26, 2018) (Dkt. 208) (Ex. E) (compiling 7 member declarations).

23.     Several courts agreed that the 2015 Rule was likely unlawful, and issued regional preliminary injunctions guarding against its enforcement. And in cases initiated by members of *amici*'s members, the federal district courts in Texas and Georgia held the 2015 Rule to be unlawful and remanded it to the agencies, while keeping their regional preliminary injunctions in place.

24.     Also during the ongoing WOTUS rule litigation, the District of South Carolina issued a nationwide injunction vacating the Applicability Date Rule, which had prevented the 2015 Rule from going into effect in the states not covered by a preliminary injunction. As a result, the 2015 Rule entered into effect in those unprotected states in 2018.

### The Serious Harms Caused by Unclear, Uncertain WOTUS Regulation

25.     The entry into force of the 2015 Rule on a patchwork basis created a deeply troubling state of affairs for WAC and *amici*'s members. Members who operated nationwide found

8

themselves straddling two conflicting legal regimes and unable to plan for their multistate operations.

26.     In the jurisdictions where it entered into effect, the 2015 Rule dramatically expanded the scope of CWA jurisdiction as it applies to land in use for farming, ranching, mining, and construction—you name it. *See* Exs. B, C. But it did not, as promised, provide regulatory clarity and consistency. Rather, it continued to prove very difficult for individual farmers and business owners to determine whether a feature on their property would be considered a "water of the United States."

27.     This is because, while the pre-2015 regime was often unclear, the 2015 Rule was even more unclear in that it swept in countless only sometimes-wet landscape features that are ubiquitous in and around farmland, on building sites, and in and around mining operations. *See* Ex. B, ¶ 6. These common features included drains carrying rainfall away from farm fields, ordinary farm ditches, drainage ditches along roadsides, retention ponds, and low areas in fields where water channels or temporarily pools after heavy rains.

28.     As an example, Figure 1 below depicts the type of sometimes-wet low areas, otherwise known as "puddles," that the 2015 Rule may have covered as a depressional wetland and for which coverage under the pre-2015 regime was unclear.  *See* AFBF, Comment on the 2015 Rule, App. A at 38, https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-18005 (Nov. 14, 2014).



29.    The 2015 Rule also brought under its umbrella man-made features, like purpose-built ponds to water livestock. For example, under the 2015 Rule, the feature in Figure 2 below depicts a former logging road. Under the 2015 Rule, this type of feature was likely deemed to be a "tributary" to a "navigable water." API, Comment Letter on 2015 Rule at 129 (Nov. 14, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15115. Under the pre-2015 regime, there is not a bright line rule that would have excluded this feature.



30.     Although the 2015 Rule purported to exclude puddles, rills, swales, and some ditches from jurisdiction, those exclusions were meaningless because they were undefined, unclear, and many such features were swallowed up by the all-inclusive definitions of covered features such as wetlands and tributaries. Under a broad rule that does not clearly exempt such features, members had to either seek exorbitantly expensive permits or else internalize significant costs to avoid accidentally building or operating in features that had not previously been classified as a WOTUS, but were now potentially jurisdictional. Every time members plowed a field, sank a shovel in the ground, built a road through uplands, placed a pipe in the ground, or moved waste or soil—activities that occur on *land*, not on water—they were required to expend resources to obtain a permit or avoid features that could potentially be classified as "WOTUS."

31.     The need to procure additional permits or avoid jurisdictional features increased the cost of conducting ordinary business operations sharply. For example, it is my understanding from

my experience with individuals in the homebuilding industry that the cost of building a home significantly spiked. As another example, the National Association of Manufacturers explained that energy exploration and production companies expected the number of permits required for projects to *double* under the 2015 Rule. Ex. D, at A-6.

32.     Seeking additional permits is not an option for all businesses. Jurisdictional determinations come at great cost and delay. Indeed, a jurisdictional determination from the agencies can take around six months to a year to receive. During the intervening months, a business owner or farmer is trapped waiting in limbo. Further, a CWA permit comes with the cost of consultants, engineers, permit applications, mitigation costs, and compliance costs that make it an untenable option for many businesses. *See* Tr. of Oral Argument in *SWANCC v. U.S. Army Corps of Engineers*, No. 99-1178, at 40 (U.S. Sup. Ct. Oct. 31, 2000) (observing that the successive permit applications and regulatory decisions required for the isolated ponds at issue in *SWANCC* totaled 47,000 pages). And, in some cases, a permit will be denied or unavailable.

33.     Thus, some members operating under the 2015 Rule significantly decreased their productivity to avoid potentially jurisdictional features. I am aware of farmers who had to avoid plowing certain parts of their fields or, in some cases, take areas entirely out of production for fear of accidentally plowing through a remote ditch that qualified as a WOTUS. Another farmer-AFBF member submitted a declaration in the WOTUS litigation explaining that, under the 2015 Rule, he would need to create a fifteen-foot buffer around drainage ditches on his farm to avoid the risk of any fertilizers or pesticides accidentally reaching those ditches. Ex. E, at A-16. And some farmers were even harder hit. I estimate that in certain regions of the country, the 2015 Rule stood to take

around 20% of farmland out of production on account of the need to create a buffer to avoid potentially jurisdictional features.

34.     As a result of these costs, some projects were delayed, reduced, or even entirely prevented. These delays and reduced productivity could come at the loss of jobs and sometimes threaten the closure of businesses. For example, the National Association of Manufacturers explained that application of the 2015 Rule and its expanded permitting requirements "could impede the construction and operation of new facilities or expansions and could cost American jobs." Ex. E, at A-6. NAHB explained that many homebuilders would delay or abandon projects to avoid the costs imposed under the 2015 Rule. *Id.* at A-23.

35.     Members of NSSGA would experience similar harms. *See* Ex. E, at A-2-3. The coverage of dry stream beds and isolated wetlands in the definition of WOTUS renders the permitting process much more difficult, costly, and time consuming for its member companies, which are responsible for producing essential raw materials for construction projects. *Id.* An overly expansive definition of WOTUS makes it difficult and expensive for these companies to supply customers with aggregate needed for essential public works projects, including new road construction, flood control, water and wastewater treatment, and repair of existing highways and bridges. *Id.* NSSGA anticipates that, if required to operate under the 2015 Rule, some property owners would have to abandon reserves because of these increased compliance costs. *Id.*

36.     These harms extend to businesses large and small. One landowner located in Delaware explained that the 2015 Rule would require him to abandon planned improvements to his land, which would no longer be economically feasible. Because some portions of his land contained physical signs of occasional water flow, there was a significant risk that these land

features were covered under the 2015 WOTUS Rule. The enormous burden and cost of obtaining a CWA permit rendered it too expensive for him to clear his land for cattle grazing and to harvest valuable timber. The location of a probable jurisdictional feature on his land, and the resulting inability to improve his land, significantly lowered the land's value. Ex. D, at 74a-78a.

37.     Areas in the Southwest were particularly hard hit by the 2015 Rule's assertion of jurisdiction over certain forms of "ephemeral waters," such as those depicted below in Figure 3, that are dry most of the year and only contain water during periods of heavy rain, which may or may not occur in a given year. These features often reflect one-time extreme water events and are not reliable indicators of regular flow. In the desert, rainfall occurs infrequently; and sandy, lightly vegetated soils are highly erodible. Thus washes, arroyos, and other erosional features often reflect physical indicators that trigger the assertion of jurisdiction under the 2015 Rule, even if they were formed by a long-past and short-lived flood event, and the topography has persisted for years or even decades without again experiencing flow. *See* Ariz. Mining Ass'n, Comment on 2015 Rule at 7-11 (Nov. 18, 2014), https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-13951. The NWPR, in contrast, clearly excludes these types of features.



38.     While it is often difficult to determine what remote features are covered by the 2015 Rule, the price of any mistake under the CWA is steep. Violations expose farmers and business owners, including owners of small and medium-sized operations, to potentially millions of dollars in civil penalties as well as the risk of criminal liability.

39.     The case of John Duarte is illustrative of the burdens the 2015 Rule imposed on small and medium-sized farms and businesses. John Duarte purchased 400 acres of agricultural land in California. At the time John purchased the land, its previous owner had placed the land into a local conservation program for two ten-year terms. Under the terms of this conservation program, the United States Department of Agriculture considered the land farmed, although it had not been used for the production of crops for twenty years. Prior to this twenty-year period, all 400 acres of the land had a history of wheat production – a history documented by the USDA. When the term of the conservation program ended, John decided not to re-enter his land into it. Instead, John began to use the land to grow wheat. When he plowed his land, the Army Corps of Engineers stepped in and determined, first, that the isolated vernal pools on John's land were now "waters of the United States" under the 2015 Rule and, second, that plowing the land was not "ordinary activity" because the previous owner had voluntarily entered the land into a temporary conservation program and, therefore, had not plowed the land in twenty years.  As a result of these findings, John faced millions of dollars in civil penalties for violating the CWA and was forced to reach a settlement with the U.S. Government to save his family farm and preserve his livelihood. *See also*, *e.g.*, *Borden Ranch v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002) (affirming by equally divided Court a $1 million civil penalty against farmer who plowed an isolated vernal pool to switch crops).

### *Example of Problematically Overbroad Jurisdiction*

40.     The photograph below, Figure 4, is illustrative of the type of feature that was not considered a WOTUS prior to the 2015 Rule, but which was regulated by the federal government under the 2015 Rule. *See* AFBF, Comments on the 2015 Rule at App. A, 31, https://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-18005 (Dec. 4, 2014). Figure 4 will be referenced repeatedly hereafter to demonstrate the harms caused by an overly-broad definition of WOTUS.



41.     Figure 4 depicts a portion of a field on a Tennessee farm. The depression in the middle of that field is caused by occasional bursts of heavy rain. This type of feature is common on farms in the Southeastern United States in states such as Tennessee, Alabama, and Mississippi. This type of feature will certainly not be considered a "water" triggering federal jurisdiction under the NWPR, and likely was not jurisdictional under the pre-2015 rules.

42.     Treating this feature as jurisdictional would have a significant detrimental impact on this farmers' ability to utilize this land and on the commercial value of the land itself. Based on my knowledge and experience, I would estimate that the land shown in Figure 4 would be valued at approximately $3,000 per acre. The costs of avoiding this feature or the cost of obtaining and complying with an EPA permit could amount to an approximately $600 per acre decrease in the commercial value of the land shown in Figure 4. These costs are significant for farms consisting of hundreds or thousands of acres, which may have many such features.

43.     The devaluation of commercial value of land on a farm—or for any other business—has collateral effects beyond simply the cost of applying for permits. It amounts to a reduction in the business's capital, which has significant effects on the terms and availability of loans and other forms of financing that businesses depend upon to operate. Land containing jurisdictional features under the 2015 Rule such as ephemeral drains, ditches, and other low areas had less value while the 2015 Rule was in effect because of the land-use restrictions imposed on jurisdictional waters and surrounding land, even when there was no water in the feature and it otherwise appeared to be dry land. The added cost of seeking a permit for agricultural or non-agricultural use made the land more difficult to sell and lowered its value.

44.     The land depicted in Figure 4 was eventually sold and a manufacturing facility was constructed on the site. Based on my experience, if a feature like the one in Figure 4 is determined to be jurisdictional under the CWA, the costs associated with mitigating it to proceed with development could reach $3000 *per linear foot*.

45.     Figure 4 also demonstrates how an overly broad definition of WOTUS is counterproductive to achieving the goals of the Clean Water Act. Figure 4 depicts an erosion

17

feature that occurs during periods of heavy rain. When these rains occur, soil and other chemical inputs such as fertilizer and pesticides common to agriculture are washed away through the feature where they may contribute to pollution of downstream waters. Ordinarily, a farmer would attempt to mitigate the feature to prevent harm to the environment and prevent the loss of valuable topsoil. Under the 2015 Rule, however, a farmer could not take even environmentally friendly action without incurring the costs of applying for a federal permit. If a farmer could not obtain a permit, the farmer would be forced to retain a feature that harms the farmer's business *and* the environment— all as a result of the expansion of CWA jurisdiction under the 2015 Rule.

### Inconsistent and Unjust Application of the "Significant Nexus" Standard

46.     The circumstances under which the feature in Figure 4 was designated a "water of the United States" also demonstrate the harm to farmers and business operators caused by the "significant nexus" standard derived from Justice Kennedy's opinion in *Rapanos,* first applied by the agencies through a guidance document adopted in the pre-2015 regime, and later defined through a broad, vague multi-step test under the 2015 Rule. The owner of the land depicted in Figure 4 sought and received a determination from the Army of Corps of Engineers that the CWA applied to the feature. Applying the case-specific "significant nexus" standard, the Corps determined that it was a "water of the United States." The landowner had no way to tell that this remote, desiccated feature was under the jurisdiction of the CWA until the Corps determined that it was.

47.     These types of features can, and often do, stretch onto neighbors' properties. Thus, the neighboring landowners with property onto which such a feature stretched would similarly experience the negative repercussions of a jurisdictional determination, including restrictions on

the use of their land and lowered property value, based on a determination in which they did not participate and of which they likely had no notice. Any post-determination use of the land, whether it is continued farming or sale for mineral production or other development, must account for the feature's new status as a "water of the United States." As stated previously, this requires all of the landowners impacted by the feature to either avoid impacting the feature or incur the costs of applying for an EPA permit.

48.     Moreover, the outcome of the case-specific, highly subjective significant nexus determination for a feature like the one in Figure 4 can depend on the Corps district in which the land is located. It is my understanding that different Corps districts would apply the standard differently, potentially reaching different results for identical features based on the happenstance of where they are located. That means that whether a landowner is forced to bear the costs and burdens as well as the potential liabilities of having a jurisdictional feature depends not on the nature of the feature but the arbitrary boundaries of the Corps district in which his or her land is located. This random, unjust, and inconsistent application of the "significant nexus" standard added to the already significant harms suffered by farmers and business owners prior to the most recent regulatory action.

### *The Benefits of the NWPR*

49.     Following significant efforts on the part of *amici* and other WAC members to advocate for a clear, reasonable definition of WOTUS, and following the culmination of the agencies' efforts to repeal and replace the 2015 Rule, the agencies published the 2020 Navigable Waters Protection Rule ("the NWPR") in April 2020.

50.     The NWPR became effective on June 22, 2020, except in the State of Colorado, where District Court for the District of Colorado issued a preliminary injunction against it taking effect within that State. Order, *Colorado v. EPA*, Case No. 1:20-cv-01461 (D. Colo. June 19, 2020) (Dkt. 61).

51.     Based on my understanding of the application of the NWPR, I believe the NWPR achieves what the 2015 Rule and 2008 guidance failed to do by addressing the lack of clarity under those regulatory regimes. The NWPR provides increased regulatory clarity and consistency for the business community and eliminates the unnecessary costs and burdens imposed upon businesses by prior unlawful expansion of the CWA and the uncertainty of jurisdictional criteria.

52.     Among its most critical features, the NWPR clearly excludes ephemeral features that flow only in direct response to precipitation. The NWPR also provides clear definitions of what waters qualify as jurisdictional "adjacent" waters and as "tributaries." These features of the NWPR are essential to the ability of WAC members to determine what is and is not jurisdictional, to avoid exorbitant permitting costs, and to avoid the loss of productivity that results from a broad and unclear definition of WOTUS.

53.     These brighter line definitions offered in the NWPR allow construction, building, mining, farming, and other business to go forward without the delays, costs, and uncertainties discussed above. For example, under the NWPR, it is clear that the types of features depicted in Figures 1, 2, 3 and 4 are not considered "waters of the United States." This means that, should the NWPR stay in place, *amici*'s members and WAC Coalition's members would no longer need to incur the costs of avoiding these features or applying for federal permits in order to conduct ordinary, but essential, business operations.

20

54.     The NWPR also alleviates unreasonable burdens that an overly-broad definition of WOTUS places on states. For example, the State of Tennessee, prior to the 2015 Rule, did not have any state water quality standards for the type of remote, desiccated feature depicted in Figure 4. Were this feature to be covered under the CWA, the State would be forced to develop and enforce water quality standards for that feature under Section 301 of the CWA. The resources to develop and enforce these new standards would have to come at the expense of other services the state provides to the Coalition's members and to the citizens of Tennessee.

55.     The NWPR further provides a more appropriate federal-state balance in regulating our Nations waters. Based on my experience, state and local officials are the more appropriate, and more efficient, parties to determine if and how to regulate ephemeral, remote features in any given State. It is local conservation districts that provide the true backbone of natural resource and water preservation. Both States and federal agencies depend on them in implementing conservation programs, and farmers, ranchers, and other local businesses are more used to dealing with these local officials who are more involved in their ordinary operations.

### Harms Caused by Vacating the NWPR

56.     Vacating the NWPR would cause significant harm to *amici*'s and WAC's members. Most obviously, businesses across the United States would lose the bright line jurisdictional standards that the NWPR offers. They would also again be subject to the harmful and difficult to predict significant nexus standard.

57.     Absent a clear standard, farmers with drainage ditches and ephemeral drains located in and around farm fields would need to again exercise caution and avoid placing seed, fertilizer and pesticides into those potentially regulated features to avoid CWA liability for an unauthorized

discharge of pollutants into a "water of the United States." This would require many to put parts of their land out of use, or instead expend often cost-prohibitive amounts on a consultant. Similarly, tree farmers often rely on aerial application of pesticides for the health and safety of the trees. If the ditches running alongside a row of trees may be classified as "waters of the United States," tree farmers may forgo this step or scale back operations rather than seek a permit. In either case, this would result in significant harm to their businesses, which would have ripple effects on the local economy, as tree farmers in this situation would be less likely to hire the workers they rely on to prune and harvest the trees.

58.     Ranchers, builders, mining operations, and other Coalition members would need to exercise caution—or even delay or avoid—constructing and maintaining important infrastructure, such as roads, fences, ditches, ponds and culverts, when those improvements are constructed in a landscape feature that may or may not be a regulated "water of the United States."

59.     Return to a broader definition of WOTUS would also be detrimental to constructing homes, roads, schools, and infrastructure. Take homebuilding as an example. NAHB estimates that 25% of the value of a new home is caused by compliance with government regulations, a large portion of which is associated with CWA compliance. Any expansion of federal regulation would add to that cost.

60.     A broader, less clear definition of WOTUS would impact all landowners and operators, coming at a loss of productivity and jobs, but would hit small and mid-sized operations the hardest. That is because these are the businesses least able to weather a reduction in productivity or afford a costly jurisdictional determination.

61.     Without the NWPR in place, businesses must either scale back important and otherwise lawful activities, roll the dice and assume the risk of potentially crippling liability, or incur tens of thousands of dollars plus months or years of delay in performing services essential to the economy while they seek precautionary permits.

62.     Even worse, vacating the NWPR would require members to confront the serious risk that even the wholly unlawful 2015 Rule could be reinstated, as parallel actions challenging the Repeal Rule are pending throughout district courts nationwide. (For example, as discussed above, the NWPR has already been preliminarily enjoined within the State of Colorado). If there is a possibility that the 2015 Rule will be reinstated, the Coalitions' and the proposed *amici*'s members must plan and prepare their activities to guard against inadvertent "discharges" of "pollutants" to "waters" that could once-again be categorized as "waters of the United States."

63.     Putting the risk of the 2015 Rule coming back into place aside, should the scope of CWA jurisdiction continue to flip-flop or remain uncertain, many members of the proposed *amici* and WAC will be irreparably harmed by their inability to plan their farming and business activities, such as planning the purchase of seed, fertilizer, and crop protection tools.

64.     It is my firm belief that the NWPR will not result in any harm to the environment. The permitting programs under the CWA are only one part of a robust regulatory framework at the state and federal level, including under other provisions of the CWA, designed to protect and preserve our Nation's waters. Indeed, other CWA programs provide federal grants to states to assist with maintaining water quality. Additional federal laws, including the Solid Waste Disposal Act, the Resource Conservation and Recovery Act, and the Safe Drinking Water Act, protect natural resources and waters. And states can, and often do, enact greater regulation.

65.     Protecting our Nation's water quality and ensuring access to clean water is as important to the Coalition's members as it is to the groups challenging the NWPR. This belief stems from my personal background in agriculture. I was raised in a farming family and can attest that the health and integrity of this Nation's land and water is, and always has been, of great importance to me and my family, and to the farm families I meet. But we believe that there is an important distinction between using a statute as Congress intended to coordinate a permitting program in "navigable" waters, versus extending federal power beyond the CWA's limits to regulate land-based activities far removed from such features.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: __December 17, 2020__

# EXHIBIT A

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

## **DECLARATION OF DON PARRISH**

I, Don Parrish declare upon personal knowledges as follows:

1. I am over eighteen years old and suffer from no disability that would preclude me from giving this declaration.

2. I am Senior Director of Regulatory Affairs at the American Farm Bureau Federation ("AFBF"). I offer this Declaration based on my 28 years working on behalf of AFBF's members, focusing primarily on Clean Water Act issues.

3. AFBF is a voluntary general farm organization formed in 1919, representing about 6 million member families through Farm Bureau organizations in all 50 states plus Puerto Rico, including members who are directly and adversely impacted by the rule challenged in this case. Each state Farm Bureau is an independent entity, affiliated with AFBF through a membership agreement. Individual and family Farm Bureau members are associate members of AFBF.

4. AFBF's primary function is to advance and promote the interests of farmers and ranchers and their rural communities. This involves advancing, promoting, and protecting the economic, business, social, and education interests of farmers and ranchers across the United States.

5. AFBF has a dedicated staff and expends a great amount of resources to advocate on many issues before Congress, the Executive Branch and federal courts to serve the interests of farmers and ranchers. AFBF seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of agricultural land.

6. AFBF has expended great resources related to promoting a lawful and reasonable interpretation of the Clean Water Act's jurisdiction over agricultural lands. AFBF filed numerous amicus briefs supporting reasonable and lawful reading of the Clean Water Act before courts of appeals and the U.S. Supreme Court, including *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"), and *Rapanos v. United States*, 547 U.S. 715 (2006) ("*Rapanos*").

7. AFBF filed detailed comments in connection with regulatory proposals published by the Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") (collectively, "Agencies."). AFBF filed extensive comments on the Agencies' advanced notice of proposed rulemaking following the *SWANCC* decision. American Farm Bureau Federation Comments in Response to the U.S. Army Corps of Engineers' and U.S. Environmental Protection Agency's Advance Notice of Proposed Rulemaking on the Clean Water Act Regulatory Definition of 'Waters of the United States'", Dkt. No. OW-2002-0050 (Apr. 16, 2003) (corrected Apr. 30, 2003).

2

**111a**

8. AFBF later filed extensive comments in response to the Agencies' proposed guidance following the *Rapanos* decision. American Farm Bureau Federation, et al., "Comments in Response to the U.S. Environmental Protection Agency's and U.S. Army Corps of Engineers' Guidance Pertaining to Clean Water Act Jurisdiction After the U.S. Supreme Court's Decision in *Rapanos v. United States* and *Carabell v. United States*," Dkt. No. EPA-HQ-OW-2007-0282-0204 (Jan. 22, 2008).

9. AFBF filed detailed comments on guidance proposed by the Agencies in 2011. Comments in Response to the Environmental Protection Agency's and U.S. Army Corps of Engineers' Draft Guidance on Identifying Waters Protected by the Clean Water Act, Dkt. No. EPA-HQ-OW-2011-0409.

10. AFBF prepared extensive legal, policy and economic comments on the proposed rule. Comments of the American Farm Bureau Federation on the U.S. EPA and U.S. Army Corps of Engineers Proposed Rule to Define "Waters of the U.S." Under the Clean Water Act, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 5, 2014). AFBF also joined the Waters Advocacy Coalition (WAC), which submitted comments on behalf of a coalition of industry groups. Comments of the Waters Advocacy Coalition on the Envt'l Protection Agency's and U.S. Army Corps of Engineers' Proposed Rule to Define "Waters of the United States" Under the Clean Water Act, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 13, 2014) (corrected Nov. 14, 2014).

11. AFBF staff testified numerous times on the proposed and final rule before congressional committees. I testified before the U.S. Senate Committee on Environment and Public Works on May 24, 2015, on "Erosion of Exemptions and Expansion of Federal Control – Implementation of the Definition of Waters of Waters of the United States,

3

http://www.epw.senate.gov/public/index.cfm/hearings?ID=3F9479F7-CA54-44B6-A202-631D86380A66. On March 17, 2015, AFBF's general counsel Ellen Steen testified on the impact of the rule on farmers, ranchers and rural America before the U.S. House of Representatives Committee on Agriculture, Conservation and Forestry Subcommittee. http://agriculture.house.gov/calendar/eventsingle.aspx?EventID=2428. On June 10, 2015, she testified before the Senate Committee on the Judiciary on the procedural concerns related to the rule in the context of "Examining the Federal Regulatory System to Improve Accountability, Transparency and Integrity." http://www.judiciary.senate.gov/meetings/examining-the-federal-regulatory-system-to-improve-accountability-transparency-and-integrity.

12. AFBF expended resources to provide an extensive education of its members on the complexities and uncertainties of the rule.

13. Many AFBF members will be directly affected by the rule. Many of the water and dry landscape features typically found in and around private farmland, such as depressional areas, ditches and ephemeral drains, will be categorically regulated as "waters of the United States" under the rule challenged in this case. Regulation of those landscape features will require AFBF members to avoid any "discharges" of "pollutants" to those waters categorized as "waters of the United States." under the rule. AFBF members will need to take farm lands out of production to avoid an unlawful discharge or expend resources to obtain (and comply with) a Clean Water Act permit for discharges of pollutants to those "waters of the United States." In some cases, a Clean Water Act permit will be denied or unavailable to AFBF members.

4

14. Some AFBF members will be unsure of how the vague language in the rule applies to landscape features in and around their farm lands. To avoid the risk of an unlawful discharge to these landscape features, these members will need to expend resources to determine whether land and water features in and around their property are "waters of the United States" and alter their agricultural operations to ensure compliance with the Clean Water Act.

15.     Vacatur of the Final Rule and a declaration that the final rule is unlawful would remedy these ongoing costs and uncertainties.

Executed this 20 day of September, 2016.

Don Parrish

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

STATE OF TEXAS, *et al.*,
     *Plaintiffs*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,
     *Defendants*.

No. 3:15-cv-162

## DECLARATION OF DON PARRISH

I, Don Parrish, declare upon personal knowledge as follows:

1. I am over eighteen years old and suffer from no disability that would preclude me from giving this declaration.

2. I am the Senior Director of Regulatory Affairs at the American Farm Bureau Federation ("AFBF"). I offer this Declaration based on my 30 years working on behalf of farmers and ranchers across the nation, focusing primarily on Clean Water Act issues.

3. I submitted a declaration on September 20, 2016, in support of AFBF's challenge to the so-called 2015 "Clean Water Rule" (WOTUS Rule). Every statement made in that declaration remains true.

4. It is my understanding that the Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") are engaging in a multi-step regulatory process that may conclude with the repeal and replacement of the WOTUS Rule, which had expanded the scope of landscape features subject to Clean Water Act jurisdiction. The Agencies just finalized a revision to the WOTUS Rule adding an applicability date

(Applicability Date Rule). The Agencies have also proposed a rule to rescind the WOTUS Rule (Repeal Rule). The Agencies have indicated their intent to redefine and presumably narrow the definition of "waters of the United States" in a future replacement rule (Replacement Rule). Meanwhile, the rules and agency guidance that were in place prior to the WOTUS Rule continue to be implemented and enforced nationwide.

5. Based on countless press reports, there is no doubt that every step of this regulatory process will be vigorously challenged in court by several States and environmental groups, each seeking immediate injunctive relief from various carefully chosen district courts. I am concerned that one or more district courts will issue injunctions that bring the WOTUS Rule back into effect, at least in those States not subject to the District of North Dakota's regional preliminary injunction of the WOTUS Rule.

6. Any court injunction that allows the WOTUS Rule to go into effect will dramatically expand the scope of Clean Water Act jurisdiction as it applies to farm and ranch lands. The WOTUS Rule expanded jurisdiction to categorically regulate countless sometimes-wet landscape features that are ubiquitous in and around farmland. These common features include drains carrying rainfall away farm fields, ordinary farm ditches, and low areas in farm fields where water channels or temporarily pools after heavy rains.

7. The risk that the WOTUS Rule will go into and out of effect due to litigation means that AFBF members in every state must plan and prepare their activities to guard against inadvertent unlawful "discharges" of "pollutants" to waters categorized as "waters of the United States." Farmers who can identify landscape features on their land that *may* be jurisdictional "waters" as defined under the WOTUS Rule need to decide *now* whether to avoid those fields and features to avoid unlawful "discharges" from plowing, fertilizer

application, or disease and insect control if the legal landscape suddenly changes and the scope of WOTUS suddenly expands. The only way such farmers can fully guard against this risk would be to expend resources now to obtain (and comply with) a Clean Water Act permit, but the exorbitant cost of consultants, engineers, permit applications, mitigation costs and compliance costs makes that an untenable option for most farmers.

8. If the scope of Clean Water Act jurisdiction flip-flops multiple times over the next several years due to litigation, many AFBF members will be irreparably harmed by their inability to plan their farming activities and ensure maximum productivity of their land. For example, under the WOTUS Rule, farmers with drainage ditches and ephemeral drains located in and around farm fields will need to exercise caution and avoid placing seed, fertilizer and pesticides into those potentially regulated features to avoid Clean Water Act liability for an unauthorized discharge of pollutants to a "water of the United States." If the jurisdictional status of those common features flip-flops from year to year, farmers will have little ability to plan the purchase of seed, fertilizer and crop protection tools and are less likely to continue farming some, if not all, of that field. Similarly, tree farmers relying on aerial pesticide applications for the health of the trees are unlikely to hire sufficient workers to prune and harvest the trees if the ditches running alongside the rows are classified as "waters of the United States" in some years, but not others.

9. In many areas, farmers will be limited in their ability to conduct basic soil manipulation necessary for any farming – using a plow. If a field contains low areas deemed to be "adjacent waters" under the WOTUS Rule, farmers will be unable to plow through those low areas when the WOTUS Rule is in effect. Other common soil manipulation activities such as grading, laser leveling, and terracing are often necessary for agricultural production.

3

However, if a landscape feature is considered perfectly farmable land one month and "navigable water" the next, few farmers will be willing to conduct soil manipulation activities that risk Clean Water Act liability if the WOTUS Rule suddenly springs into effect. Farmers may choose to expend the resources necessary to seek Clean Water Act "dredge and fill" permits for these soil manipulation activities, even if the permit is not necessary. However, the Clean Water Act does not guarantee that a permit will be available or granted.

10. If the definition of "waters of the United States" is constantly changing with developments in litigation and the rulemaking process, it also will make it difficult for farmers to avoid the risk of Clean Water Act liability in constructing and maintaining important farm infrastructure, such as farm roads, fences, ditches, ponds and culverts, when those improvements are constructed in a landscape feature that may or may not be a regulated "water of the United States" depending on the status of litigation in a local district court. Farmers who dig post holes to construct a fence in or alongside an ephemeral drain while the Applicability Date Rule is in effect will not be in violation of the Clean Water Act (rules in place prior to the WOTUS Rule did not categorically regulate ephemeral drains). If a district court enjoins the Applicability Date Rule, and the WOTUS Rule comes into effect, farmers within that district court will be at risk of violating the Clean Water Act because installing a fence post in an ephemeral drain is an unlawful discharge to a jurisdictional water under the WOTUS Rule. This same cycle would repeat itself as future regulations are finalized by the Agencies and then subjected to new waves of legal challenges and district court injunctions.

11. The harm to AFBF members caused by a constantly changing regulatory climate is further compounded by the vague language and lack of clarity in the WOTUS Rule. That lack of clarity complicates efforts by AFBF members to determine how they can farm their land

4

because in many instances, they will be unable to identify jurisdictional "waters" on their land without expending resources on a technical consultant. The WOTUS Rule allows the Agencies to rely on desktop tools and remote sensing technology unavailable to farmers. As a result, many farmers will be unable to identify jurisdictional waters on their land with a naked eye, increasing the risk of an unintentional Clean Water Act violation, particularly in times when the WOTUS Rule is in place. To avoid the risk of an unlawful discharge to these landscape features, farmers are more likely to expend resources to determine whether land and water features in and around their property are "waters of the United States" and alter their agricultural operations to ensure compliance with the Clean Water Act.

12. The value of farmland will also be affected by the flip-flopping of regulatory definitions due to litigation and the regulatory process. Land containing jurisdictional features such as ephemeral drains, ditches and low areas has less value because of the land-use restrictions imposed on jurisdictional waters and surrounding land, even when there is no water in the feature and it otherwise appears to be dry land. The added cost of seeking a permit for agricultural or non-agricultural use makes the land more difficult to sell and lowers its value.

13. AFBF members may be unaware of which rule is in effect in their local area at any given time. The lack of regulatory continuity over which waters are regulated under the Clean Water Act will place farmers at risk for hefty civil fines and even jail time, causing many farmers to avoid common farming activities and lose productive capacity of their land.

14. Entering a nationwide stay of the WOTUS Rule at this time will ensure that the definition of a "water of the United States" is consistent for every AFBF member across the nation until the rulemaking process is complete and litigation over the process is resolved. Without a nationwide injunction, farmers must either scale back important and otherwise lawful

agricultural activities, roll the dice and assume the risk of potentially crippling future liability, or incur tens of thousands of dollars plus months or years of delay in farming to seek precautionary permits. This level of uncertainty leaves farmers with no appealing option.

Executed this 6th day of February, 2018.

Don Parrish

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

STATE OF GEORGIA, *et al.*,

       *Plaintiffs*,

      v.

ANDREW WHEELER, *et al.*,

       *Defendants*.

Case No. 2:15-cv-79

## ~~DECLARATION OF DON PARRISH~~

I, Don Parrish, declare based upon personal knowledge that:

    1.     I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

    2.     I am the Senior Director of Regulatory Affairs at the American Farm Bureau Federation ("AFBF"). I offer this Declaration based on my 30 years working on behalf of farmers and ranchers across the nation, focusing primarily on Clean Water Act issues.

    3.     I submitted a declaration on September 20, 2016, in support of AFBF's challenge to the so-called 2015 "Clean Water Rule" (WOTUS Rule) in the U.S. Court of Appeals for the Sixth Circuit. I also signed a declaration on February 6, 2018 in support of AFBF's challenge to WOTUS Rule in the Southern District of Texas. Any statement made in those declarations remains true except insofar as it has been superseded by anything I have declared here.

    4.     In the jurisdictions where the 2015 WOTUS Rule has entered into effect, it has significantly expanded the scope of Clean Water Act jurisdiction as it applies to farm and ranch lands. The WOTUS Rule expands jurisdiction to regulate countless sometimes-wet landscape features that are ubiquitous in and around farmland. These common features include drains carrying

A-9

rainfall away farm fields, ordinary farm ditches, and low areas in farm fields where water channels or temporarily pools after heavy rains.

5.      AFBF members in the 26 states where the WOTUS Rule is currently in effect now must alter their activities to prevent inadvertent unlawful "discharges" of "pollutants" into waters categorized as "waters of the United States," which may require them to take lands out of production. Alternatively, they can obtain costly Clean Water Act permits, but the exorbitant cost of consultants, engineers, permit applications, mitigation costs and compliance costs makes that an untenable option for most farmers. This is despite the fact that the Agencies are currently working to repeal and replace the WOTUS Rule, such that it may soon be out of effect.

6.      The enormous costs of taking land out of production or seeking and obtaining permits will be not be recoverable by these farmers and ranchers. Nor will the injuries be remedial to the employees they may have to let go as a consequence.

7.      In many areas, farmers are now limited in their ability to conduct basic soil manip-ulation necessary for any farming – using a plow. If a field contains low areas deemed to be "adjacent waters" under the WOTUS Rule, farmers will be unable to plow through those low areas when the WOTUS Rule is in effect. Other common soil manipulation activities such as grading, laser leveling, and terracing are often necessary for agricultural production. But if a landscape feature is considered perfectly farmable land one month and "navigable water" the next, few farmers will be willing to conduct soil manipulation activities that risk CWA liability now that the WOTUS Rule is in effect. Farmers may choose to expend the resources necessary to seek Clean Water Act "dredge and fill" permits for these soil manipulation activities, even if the permit is not necessary. The costs associated with the permit process will not be recoverable.

8.      The WOTUS Rule also makes it difficult for farmers to avoid the risk of Clean Water Act liability in constructing and maintaining important farm infrastructure, such as farm roads, fences, ditches, ponds and culverts, when those improvements are constructed in a landscape feature

**A-10**

that may or may not be a regulated "water of the United States" depending on the status of litigation in a local district court. In states now subject to the WOTUS Rule, farmers within that district court will be at risk of violating the Clean Water Act because installing a fence post in an ephemeral drain is an unlawful discharge to a jurisdictional water under the WOTUS Rule.

9.     The harm to AFBF members caused by a constantly changing regulatory climate is further compounded by the vague language and lack of clarity in the WOTUS Rule. That lack of clarity complicates efforts by AFBF members to determine how they can farm their land because in many instances, they are unable to identify jurisdictional "waters" on their land without expending resources on a technical consultant. The WOTUS Rule allows the Agencies to rely on desktop tools and remote sensing technology unavailable to farmers. As a result, many farmers are unable to identify jurisdictional waters on their land with a naked eye, increasing the risk of an unintentional Clean Water Act violation. To avoid the risk of an unlawful discharge to these landscape features, farmers will either expend resources to determine whether land and water features in and around their property are "waters of the United States" or alter their agricultural operations to avoid discharges into ambiguous features. Again, these costs will not be recoverable.

10.     Without a nationwide injunction, farmers must either scale back important and otherwise lawful agricultural activities, roll the dice and assume the risk of potentially crippling liability, or incur tens of thousands of dollars plus months or years of delay in farming to seek precautionary permits.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9-10-18

Don Parrish

# EXHIBIT D

No. 15-3751 (lead)

*In the*

# United States Court of Appeals

*for the*

# Sixth Circuit

———————————

IN RE: ENVIRONMENTAL PROTECTION AGENCY
AND DEPARTMENT OF DEFENSE,
FINAL RULE: CLEAN WATER RULE:
DEFINITION OF "WATERS OF THE UNITED STATES,"
80 Fed. Reg. 37,054, Published on June 29, 2015 (MCP No. 135)

———————————

On Petitions for Review of a Final Rule
of the U.S. Environmental Protection Agency and the
United States Army Corps of Engineers

———————————

**ADDENDUM TO OPENING BRIEF FOR THE
BUSINESS AND MUNICIPAL PETITIONERS**

———————————

BROOKS M. SMITH
DOUGLAS A. HENDERSON
JUSTIN T. WONG
  *Troutman Sanders LLP*
  *1001 Haxall Point*
  *Richmond, VA 23219*
  *(804) 697-1200*

*Counsel for Petitioner in*
*No. 15-3751*

TIMOTHY S. BISHOP
MICHAEL B. KIMBERLY
  *Mayer Brown LLP*
  *1999 K Street NW*
  *Washington, DC 20006*
  *tbishop@mayerbrown.com*
  *(202) 263-3000*

*Counsel for Petitioners in*
*No. 15-3850*

*Additional counsel listed on the inside cover and following page*

WILLIAM S. CONSOVOY
J. MICHAEL CONNOLLY
   *Consovoy McCarthy Park PLLC*
   *3033 Wilson Boulevard, Suite 700*
   *Arlington, VA 22201*
   *(703) 243-9423*

MICHAEL H. PARK
   *Consovoy McCarthy Park PLLC*
   *3 Columbus Circle, 15th Floor*
   *New York, NY 10019*
   *(212) 247-8006*

*Counsel for Petitioners in*
*No. 15-3823*

KRISTY A. N. BULLEIT
ANDREW J. TURNER
KARMA B. BROWN
KERRY L. MCGRATH
   *Hunton & Williams LLP*
   *2200 Pennsylvania Ave. NW*
   *Washington, DC 20037*
   *(202) 955-1500*

*Counsel for Petitioner in*
*No. 15-3858*

RICHARD A. HORDER
JENNIFER A. SIMON
   *Kazmarek Mowrey Cloud Laseter LLP*
   *1230 Peachtree Street NE, Ste 3600*
   *Atlanta, GA 30309*
   *(404) 812-0126*

KIMBERLY S. HERMANN
   *Southeastern Legal Foundation, Inc.*
   *2255 Sewell Mill Rd, Ste 320*
   *Marietta, GA 30062*
   *(770) 977-2131*

*Counsel for Petitioners &*
*Petitioner-Intervenors in No. 15-3885*

MOHAMMAD O. JAZIL
DAVID W. CHILDS
ADAM F. BLALOCK
   *Hopping Green & Sams, P.A.*
   *119 South Monroe St., Ste 300*
   *Tallahassee, FL 32314*
   *(850) 224-8551*

*Counsel for Petitioners in*
*No. 15-4159*

JOHN J. BURSCH
SCOTT D. HUBBARD
   *Bursch Law PLLC*
   *9339 Cherry Valley Ave. SE*
   *Suite 78*
   *Caledonia, Michigan 49316*
   *(616) 450-4235*

*Counsel for Petitioner in*
*No. 15-4162*

M. REED HOPPER
ANTHONY L. FRANÇOIS
   *Pacific Legal Foundation*
   *930 G Street*
   *Sacramento, California 95814*
   *(916) 419-7111*

*Counsel for Petitioners in*
*No. 15-4188*

JOEL M. GROSS
S. ZACHARY FAYNE
   *Arnold & Porter LLP*
   *601 Massachusetts Ave. NW*
   *Washington D.C.*
   *(202) 942-5705*

*Counsel for Petitioners in*
*No. 15-4211*

Warren W. Harris
  *Bracewell LLP*
  *711 Louisiana St., Ste 2300*
  *Houston, Texas 77002*
  *(713) 221-1490*

Lowell M. Rothschild
  *Bracewell LLP*
  *111 Congress Avenue*
  *Suite 2300*
  *Austin, TX 78701*
  *(512) 494-3616*

*Counsel for Petitioner in*
*No. 15-4234*


Steven J. Lechner
  *Mountain States Legal Foundation*
  *2596 South Lewis Way*
  *Lakewood, Colorado 80227*
  *(303) 292-2021*

*Counsel for Petitioner in*
*No. 15-4305*

Kevin A. Gaynor
Benjamin S. Lippard
Jeremy C. Marwell
  *Vinson & Elkins LLP*
  *2200 Pennsylvania Ave. NW*
  *Suite 500 West*
  *Washington, DC 20037*
  *(202) 639-6500*

*Counsel for Petitioners in*
*No. 15-4404*

No. 15-3850

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

AMERICAN FARM BUREAU FEDERATION, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

_____

## DECLARATION OF TIM CANTERBURY

I, Tim Canterbury, declare based upon personal knowledge that:

1.      I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.      I am the owner of Canterbury Ranch ("Canterbury Ranch"), and a member of a Public Lands Council affiliate. In this role, I oversee all aspects of operation of Canterbury Ranch, including compliance with the Clean Water Act and other regulatory requirements.

3.      Canterbury Ranch has numerous ditches and other land and water features on its lands that we previously understood not to be subject to regulation under the Clean Water Act. Some of these features do or may constitute a "water of the United States" under EPA's recently promulgated WOTUS Rule, 80 Fed. Reg. 37,054 (June 29, 2015), although it is unclear which specific ones because the Rule is vague. These features include ditches and other features that can convey water.

4.      The possibility that the features will be treated as waters of the United States creates uncertainty about whether and how Canterbury Ranch can use its lands and what regulatory

requirements of particular uses apply. The Rule would have direct effects on the use of land at the Canterbury Ranch, as discharges from point sources like farming equipment into features like ditches may require permits or changes in ranching practices.

5.      I have reviewed the Rule in an effort to understand the requirements and determine the impact to the operation. Canterbury Ranch has dedicated time to identifying features that may be covered under the Rule, and has made plans to take further action in response to the Rule if there were no stay of the Rule in place.

6.      Canterbury Ranch has expended time, money, and other resources in attempting to ascertain the implications of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:   September 16, 2016                                 _Tim Canterbury_

**10a**

No. 15-3850

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

AMERICAN FARM BUREAU FEDERATION, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

_____

**DECLARATION OF JIM CHILTON**

I, Jim Chilton, declare based upon personal knowledge that:

1.      I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.      I am the owner of Chilton Ranch LLC ("Chilton Ranch"), and a member of a Public Lands Council. In this role, I oversee all aspects of operation of Chilton Ranch, including compliance with the Clean Water Act and other regulatory requirements.

3.      Chilton Ranch has dry washes and other features on the land that we previously understood not to be subject to regulation under the Clean Water Act. Some of these features do or may constitute "waters of the United States" under EPA's recently promulgated WOTUS Rule, 80 Fed. Reg. 37,054 (June 29, 2015), although it is unclear which specific ones because the Rule is vague. These features include dry washes and other features that can convey water.

4.      The Chilton Ranch has a dry wash feature that is roughly twenty-four inches wide that may meet the definition of "tributary" under the Rule. This dry wash leads to a larger dry wash called the Aravaca Wash, which leads to the Santa Cruz River, a river that is dry and only has

**11a**

water flow from precipitation events. The Santa Cruz River leads to the Gila River which leads to the Colorado River. The Colorado River is 265 miles away from the dry wash at Chilton Ranch.

5.     The Army Corps of Engineers requested the Chilton Ranch obtain a 404 dredge and fill permit prior to constructing a bridge across the dry wash. The Chilton Ranch hired a consultant, an engineer, and a surveyor to get the 404 permit. The costs of obtaining the permit were burdensome and the process was time-consuming so Chilton Ranch decided to abandon the bridge project.

6.     The possibility that features like the dry wash and other dry washes on the Chilton Ranch will be treated as waters of the United States creates uncertainty about whether and how Chilton Ranch can use its lands and what regulatory requirements of particular uses apply. The Rule would have direct effects on the use of land at the Chilton Ranch, as discharges from point sources like farming equipment into features like ditches may require permits or changes in ranching practices.

7.     I have reviewed the Rule in an effort to understand the requirements and determine the impact to the operation. Chilton Ranch has dedicated time to identifying features that may be covered under the Rule, and has made plans to take further action in response to the Rule if there were no stay of the Rule in place.

8.     Chilton Ranch has expended time, money, and other resources in attempting to ascertain the implications of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2016.

James K. Chilton, Jr.

2

**12a**

No.15-4188

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

WASHINGTON CATTLEMEN'S ASSOCIATION, et al.,

*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.

*Respondents*

## **DECLARATION OF CAREN COWAN**

BASED ON PERSONAL KNOWLEDGE, I, CAREN COWAN, DECLARE:

1. I am the Executive Director of the New Mexico Cattle Growers'
   Association, which is headquartered at 2231 Rio Grande Blvd., NW,
   Albuquerque, NM, 87104.

2. Describe organization's legal status, membership, and local affiliate
   structure: NM Cattle Growers' is an association organized to advance and
   protect the cattle industry in New Mexico. It has approximately 1,400
   members in 32 of the state's 33 counties as well as 19 other states. Its
   objective includes providing an official and united voice on issues of
   importance to cattle producers and feeders.

3. Should the Final Rule on the Definition of "Waters of the United States" Under the Clean Water Act ("WOTUS Rule") be allowed to take effect, a significant number of NM Cattle Growers' members will be required to seek Clean Water Act Section 404 permits for projects on or adjacent to waters and land features not previously subject to Environmental Protection Agency or U.S. Army Corps of Engineers jurisdiction.

4. As a matter of organizational policy, NM Cattle Growers' advocates on behalf of its members on numerous issues related to federal laws that regulate the livestock industry, including the Clean Water Act and regulations adopted under it. NM Cattle Growers' lobbies on Clean Water Act issues, publishes information on Clean Water Act issues for its members, researches issues arising under the Clean Water Act, and submits comments to government agencies addressing concerns that Clean Water Act regulations pose for the organization and its members.

5. Since the original publication of the proposed WOTUS Rule, NM Cattle Growers' staff, members and consultants have expended significant time reading, researching, and analyzing the Rule and its potential impacts on NM Cattle Growers' members and their property and livestock operations.

6. NM Cattle Growers has communicated with and lobbied federal regulators and members and staff of Congress on the WOTUS Rule, as well as

communicated its concerns to state and local government agencies which are also subject to different and increased regulatory burdens as a result of the WOTUS Rule.

7. NM Cattle Growers has also communicated extensively with its members about the WOTUS Rule and related Clean Water Act issues, through regular organizational publications, its website, and by way of speakers and organizational discussions at its annual and mid-year meetings.

8. On November 13, 2014, NM Cattle Growers' joined several other New Mexico organizations and formally filed a fifteen page substantive comment letter, opposing adoption of the then-proposed WOTUS Rule.

9. NM Cattle Growers' has also directly encouraged its members to communicate directly with EPA and the Corps of Engineers, and with members and staff of Congress, to express their opposition to the WOTUS Rule and to communicate the adverse impacts that the Rule will likely have on their property and livestock operations.

10. The final WOTUS Rule was published on June 29, 2015. 80 Fed. Reg. 37054. However, the final Rule was so different from the draft rule that it was almost unrecognizable as the same rule. The final Rule changed the definition of covered waters and added numerous categories that would automatically be deemed "waters of the United States," such as all

"tributaries," including ephemeral streams and ditches, as well as various "adjacent" waters that are often found on member properties and which, for the first time, would be regulated by the federal government. The final Rule deprived NM Cattle Growers' and its members of the opportunity to comment on these changes to the detriment of the NM Cattle Growers' mission to inform and protect its members from arbitrary and onerous federal regulation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of September, 2016.

Caren Cowan

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU
FEDERATION, et al.,

                    *Petitioners,*         No. 15-3850

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

                    *Respondents.*

## DECLARATION OF TERRANCE W. CUNDY

I, Terrance W. Cundy, declare that:

1.      I am over the age of eighteen years, and the facts contained in this declaration are based upon my personal knowledge. I suffer from no disability that would preclude me from giving this declaration.

2.      My current position is Manager of Silviculture, Wildlife and Environment for Potlatch Land and Lumber Corporation ("Potlatch").  Potlatch is a National Association of Forest Owners member company. I am responsible for supporting Potlatch's forestry operations in understanding and complying with environmental regulatory requirements.

3.      Potlatch owns timberlands in a number of states throughout the United States. These timberlands contain features on its lands (the "Features") that do or may constitute a water of the United States under the definition of Waters of The United States," 80 Fed. Reg. 37,054 (JUNE 29, 2015) (the "Rule").

4.      The possibility that the Features will be treated as waters of the United States creates uncertainty about whether and how Potlatch can use its lands and about what regulatory requirements of particular uses may apply.  These requirements include, but are not limited to

**31a**

whether to obtain or amend national pollutant discharge elimination system (NPDES) permits under Section 402 of the Clean Water Act for discharges to Features and whether to obtain or amend dredge and fill permits under Section 404 of the Clean Water Act for certain discharges to Features. Obtaining these permits or modifying these permits often takes significant time and expenses and once issued are often costly to ensure compliance. Alternatively, changing forestry practices to avoid discharges to Features can be very costly and severely limit how Potlatch uses its lands.

5.     Potlatch has undertaken a detailed internal review of the Rule in an effort to interpret the requirements and determine the impact to timberland operations encompassing a multi-state land base. Staff and contractors have dedicated significant time and expended money to identifying Features covered under the Rule. Potlatch has made and will need to take further actions if the Rule is upheld.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 7, 2016.

TERRANCE W. CUNDY

**32a**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU
FEDERATION, et al.,

                *Petitioners,*

v.

           No. 15-3850

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

                *Respondents.*

## DECLARATION OF BLAYDE FRY

I, Blayde Fry, declare that:

1.    I am over the age of eighteen years, and the facts contained in this declaration are based upon my personal knowledge. I suffer from no disability that would preclude me from giving this declaration.

2.    My current position is Vice President, General Manager for the Northwest Timberlands Division of Green Diamond Resource Company ("Green Diamond"), a National Association of Forest Owners member company. In this role, I am responsible for managing Green Diamond's forestry operations in Washington State, including compliance with regulations for the protection of resources and the environment.

3.    Green Diamond owns and manages over 1.3 million acres of timberland in California, Oregon, and Washington. Green Diamond has features on its timberlands (the "Features") that do or may constitute a water of the United States under the definition of "Waters of The United States," 80 FED. REG. 37,054 (JUNE 29, 2015) (the "Rule").

**56a**

4.      Determining which of the Features qualify as waters of the United States and which do not is difficult and costly.  This is especially the case for ephemeral tributaries and wetlands that are within rule-defined distances from tributaries that are not easily identified.  The possibility that Green Diamond personnel might err in identifying and delineating the Features that will be treated as waters of the United States creates uncertainty about what regulatory requirements should be applied to particular uses of Green Diamond timberlands to ensure compliance with the Clean Water Act.

5.      Prior to the imposition of a stay on the Rule, Green Diamond initiated an internal review of the Rule as it applies to the Features in an effort to assess the expanded scope of regulatory requirements that may apply to Green Diamond's timberland management activities and to determine the impact on timberland operations under the Rule.  Green Diamond staff have dedicated considerable time and resources to identifying and delineating Features that appear to be covered under the Rule, but the task is inherently ambiguous and may never be completed with substantial certainty.  Based on our understanding of the Rule and our initial analysis of the Features, Green Diamond anticipates that if the Rule comes into effect, the new definition of "waters of the United States" will likely require that Green Diamond's timberland management practices be modified to ensure compliance.

6.      Green Diamond has expended time, money and other resources in attempting to ascertain the implications of the Rule and expects that additional effort and resources will be required if the Rule is implemented.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 20, 2016.

Blayde Fry
Blayde Fry

**57a**

No. 15-3850

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

AMERICAN FARM BUREAU FEDERATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

---

## DECLARATION OF NICK GOLDSTEIN

I, Nick Goldstein, declare based on personal knowledge as follows.

1.      I am the Vice President of Regulatory and Scientific Affairs and Assistant
General Counsel at the American Road & Transportation Builders Association (ARTBA)  in
Washington, D.C.  Since September of 2004, I have worked on behalf of ARTBA's members,
focusing on key regulatory issues impacting the transportation construction industry.  At
ARTBA, I oversee efforts addressing multiple regulatory topics, including air, climate, water,
safety and contracting issues.  I coordinate ARTBA's advocacy efforts with respect to these
issues, including but not limited to, the drafting of regulatory comments as well as necessary
legislative and litigation efforts.

2.      ARTBA, founded in 1902, is America's oldest and most respected national
transportation construction related association.  It represents the interests of the transportation
construction industry by advocating in a non-partisan way for policies that support and protect
the U.S. transportation construction market.  ARTBA's membership includes more than 6,500
private and public sector members that are involved in the planning, designing, construction and

Page 1 Declaration of Nick Goldstein

**61a**

maintenance of the nation's roadways, waterways, bridges, ports, airports, rail and transit systems. Our industry generates more than $380 billion annually in U.S. economic activity and sustains more than 3.3 million American jobs.

3.      ARTBA is the industry's primary environmental, legal and regulatory advocate. Its members undertake a variety of activities that are subject to the environmental review and approval process in the normal course of their business operations. ARTBA's public sector members adopt, approve, or fund transportation plans, programs, or projects. ARTBA's private sector members plan, design, construct and provide supplies for these federal transportation improvement projects.  The interests at stake in this litigation are therefore germane to ARTBA's mission and purpose.

4.      While ARTBA's members would have standing to bring suit in this case individually, their participation is not indispensible here, and they are relying instead on ARTBA to represent their interests before this Court.

5.      In light of the significant potential impacts of the proposed Rule on ARTBA and our members, ARTBA submitted comments on the proposed rule.  ARTBA's comments are available at http://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-15521 and identify significant policy, legal, and procedural flaws in the agencies' Rule.  If ARTBA had been given an opportunity to comment on the final Rule, which varies substantially from the proposed Rule, it would have submitted additional comments. The agencies' failure to provide an adequate opportunity for public comment on the final Rule thus hindered ARTBA's pursuit of its mission on behalf of its members.

6.      The economic effects of federal jurisdiction over waters and landscape features are of great concern to ARTBA because such jurisdiction impacts ARTBA's members' ability to

Page 2 Declaration of Nick Goldstein

**62a**

plan, design, construct and provide supplies for federal transportation improvement projects.

      7.     ARTBA's members are subject to close regulation under the Clean Water Act. They often must obtain Clean Water Act permits to construct roads, bridges and other transportation projects across the United States.

      8.     ARTBA is particularly concerned with the treatment of roadside ditches under the rule. Current federal regulations say nothing about ditches, but the proposed rule expands EPA and Corps jurisdiction to the point where virtually any ditch with standing water could be covered. Federal environmental regulation should be applied when a clear need is demonstrated and regulating all roadside ditches under the theory of interconnectedness fails to meet this threshold. A ditch's primary purpose is safety and they only have water present during and after rainfall. In contrast, traditional wetlands are not typically man-made nor do they fulfill a specific safety function. As such, roadside ditches are not, and should not be regulated as, traditional jurisdictional wetlands because the only time they contain water is when they are fulfilling their intended purpose.

      9.     The length of the environmental review and approval process for federal-aid highway projects has been routinely documented and acknowledged by both political parties and the current administration. Adding more layers of review—for unproven benefits—will only lengthen this process. Delays in the environmental review and approval process often cause project owners to delay and/or scale back transportation improvement projects. This, in turn, creates uncertainty for ARTBA member companies and can result in less work for their employees.

      10.     Further, requiring wetland permits for ditch construction and maintenance would force project sponsors and the private sector to incur new administrative and legal costs. The

Page 3 Declaration of Nick Goldstein

**63a**

potential delays and increased costs that would result from EPA's proposal would divert resources from timely ditch maintenance activities and potentially threaten the role ditches play in promoting roadway safety.

11.     ARTBA members work on transportation construction projects in areas of the United States that contain land features that may be deemed dry "tributaries" to navigable waters under the Rule.  Under some conditions, project owners may be able to obtain general permits, which impose financial costs and time delays.  If general permits are unavailable, however, our members are required to obtain individual permits, which typically them hundreds of thousands of dollars and years of time.  Increased cost and delays can lead to projects being scaled down or cancelled, creating economic harm for ARTBA members and their employees who work on those projects.

12.     The Rule's test to determine the "significant nexus" of a dry land feature or waterbody to a jurisdictional water is vague.  The Rule's vagueness and ambiguity will require both project owners and ARTBA members to expend considerable time and money to determine whether the waters or dry landscape features involved on any job site bear a "substantial nexus" to jurisdictional waters and are subject to the Rule's requirements. These are costs that members would not bear were it not for the Rule.

13.

I, Nick Goldstein, declare under penalty of perjury that the foregoing is true and correct. Executed this _12th_ day of _Sept._, 2016.

Nick Goldstein

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

### DECLARATION OF Chris Hawkins

I, Chris Hawkins, declare based on personal knowledge as follows.

1.      My name is Chris Hawkins and I am the Chief Operating Officer of Hawkins Construction Company. In the position of Chief Operating Officer I am responsible for all construction projects performed by Hawkins; hiring, promoting and terminating employees; and all general company operations.

2.      Hawkins Construction Company is a 4th generation family-owned and operated construction firm. Hawkins Construction Company provides construction services in nearly all sectors of the construction industry. The types of projects which Hawkins Construction Company works on include, but are not limited to commercial buildings, industrial facilities, airports, railways, highways and bridges.

3.      Hawkins Construction Company is a member of the Contractors Division of the American Road and Transportation Builders Association (ARTBA). As part of Hawkins Construction Company's membership in ARTBA, I have attended ARTBA regional and national meetings.

Page 1 Declaration of Chris Hawkins

4. In light of the significant potential impacts of the proposed rule on our company, our company supports ARTBA's advocacy efforts on behalf of its membership against the proposed rule. This includes supporting the current litigation efforts as well as both regulatory comments and regulatory testimony offered to the United States Environmental Protection Agency (EPA) and United States Army Corps of Engineers (Corps).

5. The economic effects of federal jurisdiction over waters and landscape features are of great concern to our company because such jurisdiction impacts our ability and costs to design and construct transportation improvements. Our company has expended time and money to ascertain the implications of the final Rule on our company.

6. A significant number of jobs Hawkins Construction Company works on are transportation improvement projects. As part of constructing any federal transportation project, Hawkins Construction Company undertake a variety of activities that are subject to the environmental review and approval process in the normal course of our business operations. Specifically, activities involved in transportation construction often impact wetland areas. When any activity associated with construction impacts a wetland area or a "water of the United States" as defined by the Clean Water Act, a permit is required under Section 404 of the Act.

7. Hawkins Construction Company believes the final rule will expand federal jurisdiction udder the Clean Water Act and require permits for areas which had not previously been defined as "waters of the United States." At a minimum, Hawkins Construction Company believes the final rule will cause confusion over what is and what is not considered a "water of the United States."

8. Increased permitting requirements and confusion over federal jurisdiction will lead to delays in the project review and approval process. Delays will result in increased material costs and uncertainty of work schedules for our employees. Additionally, increased

Page 2 Declaration of Chris Hawkins

permitting requirements will also drive up the total cost associated with transportation improvement projects and possibly force project owners to scale back transportation projects, resulting in less work for Hawkins Construction Company and its employees.

9. Hawkins Construction Company is particularly concerned with the treatment of roadside ditches under the rule. A ditch's primary purpose is safety, and a ditch typically carries water present only during and after rainfall.

10. The NPDES and Section 404 permit review and approval process will lengthen the already burdensome review process for federal-aid highway projects, inflicting new administrative and legal costs on our company. The potential delays and increased costs that would result from EPA's proposal would divert resources from timely ditch maintenance activities and potentially threaten the role ditches play in promoting roadway safety.

11. In addition, the rule creates a completely new concept of allowing for "aggregation" of the contributions of all similar waters "*within an entire watershed.*" This concept results in a blanket jurisdictional determination—meaning the EPA and Corps could regulate the complete watershed. Such a broadening of jurisdiction would literally leave no transportation project untouched regardless of its location, as there is no area in the United States not linked to at least one watershed.

12. Our company works on transportation construction projects in areas of the United States that contain land features that may be deemed dry "tributaries" to navigable waters under the Rule. Such dry tributaries are per se jurisdictional under the final Rule. Determining which land features qualify as jurisdictional "tributaries" under the Rule will require the expenditure of substantial resources, including the hiring of engineers. The treatment of those dry channels as jurisdictional will require project owners to obtain permits under Sections 402 and 404 of the Clean Water Act for disturbances to those features or for discharges into those features. Under

Page 3 Declaration of Chris Hawkins

**67a**

some conditions, project owners may be able to obtain general permits, which impose financial costs and time delays. If general permits are unavailable, however, project owners are required to obtain individual permits, which typically cost hundreds of thousands of dollars and years of time. The increased cost and delay project owners feel results in projects being scaled back and job uncertainty for Hawkins construction employees.

13.    Hawkins has built at least 20 transportation projects every year for the past 5 years and anticipates continuing at the rate. Almost every one of those projects has been constructed near areas which could be defined as wetlands under the new rule.

14.    Determining that a particular water or dry landscape feature is *not* jurisdictional under the new Rule will require our company to assume substantial risk. Given the vagueness and malleability of the Rule's "significant nexus" definition, the U.S. Army Corps of Engineers or EPA may later challenge a finding of no significant nexus and bring an enforcement action against the company for failure to comply with the Clean Water Act. This may lead to civil fines and criminal penalties.

15.    More generally, the possibility that various previously-non-jurisdictional features will be treated as waters of the United States creates uncertainty about whether and how our company can construct transportation improvements. This issue is exacerbated where Hawkins works with non-public entities who lack the resources to regularly assist and share the risk in wetlands analysis. Hawkins constructs multiple land improvement and private transportation projects (such as for short-line railroads) every year which fall into this latter category.

16.    Overall, if the stay of the Rule were lifted and the Rule were allowed to go into effect, the Rule's expansion of regulatory jurisdiction and its malleability and vagueness would

Page 4 Declaration of Chris Hawkins

and  have enormous practical impacts on the company's willingness to undertake new
transportation construction projects and on the cost of those projects that it elects to undertake.

17.    Vacatur of the Rule would save the company these substantial costs.

I, Chris Hawkins, declare under penalty of perjury that the foregoing is true and correct.

Executed this 13ᵗʰ day of September, 2016.

Chris Hawkins

Page 5 Declaration of Chris Hawkins

**69a**

Cases Nos. 15-3751, 15-3799, 15-3817, 15-3820, 15-3822,
15-3823, 15-3831, 15-3837, 15-3839, 15-3850, 15-3853

─────────────────────────────────────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

─────────────────────────────────────────────

IN RE: ENVIRONMENTAL PROTECTION AGENCY AND DEPARTMENT
OF DEFENSE, FINAL RULE: CLEAN WATER RULE: DEFINITION OF
"WATERS OF THE UNITED STATES," 80 FED. REG. 37,054, PUBLISHED
ON JUNE 29, 2015 (MCP NO. 135)

─────────────────────────────────────────────

On Petitions for Review of a Final Rule
of the U.S. Environmental Protection Agency and the
United States Army Corps of Engineers

─────────────────────────────────────────────

**DECLARATION OF MICHAEL JACOBS**

─────────────────────────────────────────────

1.      My name is Michael Jacobs and I am a long-time resident of Delaware

County, Oklahoma.

2.      I am the President of Jacobs Manufacturing Corporation in Delaware

County, Oklahoma. My company makes fiberglass products for water and

wastewater treatment.

3.      I am an active member of the National Federation of Independent

Business.

4.      My family and I live on a 20-acre plot of land in Delaware County,

Oklahoma. This land contains my home as well as about eight acres of hay, which

**74a**

we harvest throughout the year.

5.     Adjacent to this plot is a 50-acre plot of land, which I also own. Because this land is undeveloped, it has great potential to be used for economic activity and personal enjoyment.

6.     Before the Environmental Protection Agency enacted its rule regarding "navigable waters" under the Clean Water Act ("WOTUS Rule"), I had planned to develop this 50-acre property for agricultural and other purposes.

7.     Specifically, I planned to clear the area for cattle grazing and other farming purposes. This process would yield valuable timber, which I would sell for profit. I also planned to improve the land so that cattle could graze on the property, including putting fences up for the cattle, planting grass, removing excess trees, and impounding waters that flow from small underground springs.

8.     I had anticipated beginning this work in September or October of 2015. After my property was cleared, I had intended to raise about 30 cattle on the property. I had planned to take these cattle to market in the summer or fall of 2016 and, hopefully, to realize a sizable return on my investment.

9.     These improvements, I believe, would greatly increase the value of the property. After the improvements are finished, I hope to either sell the property or give it to one of my children so that they can build a home on the property.

10.     Because of the WOTUS Rule, however, I no longer believe it is economically feasible for me to make these improvements.

11.     A ravine runs across the entire portion of my 50-acre property. The ravine is about 75-85 feet deep and 200-250 feet wide.

12.     At the bottom of the ravine is a creek bed. The water at the bottom of the creek bed varies depending on the time of the year and the amount of rainfall.

13.     For about seven to eight months of the year, there is a very small stream of water running through the creek bed. This stream is about 2-3 feet wide and 5-6 inches deep.

14.     During the summer, the creek bed will often go dry and no water will run through it. Only a few small puddles of water will remain at the bottom of the ravine.

15.     At other times (usually when there has been heavy rainfall), the water in the ravine will rise and the stream will grow. At its peak, the stream is about 6-8 feet deep and 20-30 feet wide.

16.     When flowing, the water in the ravine feeds into the Spavinaw Creek, which flows into Lake Eucha and Lake Spavinaw. These waters eventually feed into the Arkansas River and the Mississippi River.

17.     My property also contains small natural springs, many of which are in the ravine. They are often about 25-30 feet above the creek bed on the shelves of the

**76a**

ravine. These springs are formed when water comes up from the ground and collects in pools. When active, they trickle across the property and into the creek bed below.

18.     My property also contains indentations in the ground where there are visible signs that water occasionally flows during storms.

19.     Before the WOTUS Rule, my property was not subject to federal regulation under the Clean Water Act. I thus was free to use my land for the agricultural and enjoyment purposes for which I had planned.

20.     If the WOTUS Rule takes effect, however, I believe these portions of my land will become subject to federal regulation under the Clean Water Act. I fear the federal government will classify these waters as "tributaries" because the land contains physical signs of occasional water flow and the water (when running through my property) eventually feeds into navigable waters downstream.

21.     Since I currently do not use this property for agricultural purposes, I do not believe it qualifies for any agricultural exemption.

22.     If my property is subject to the WOTUS Rule, I will be forced to halt all plans for improving my property because the rule would require me to obtain a costly permit from the federal government. For example, to raise cattle I will need to impound water on my property from the small natural springs on my property. This impoundment would now require a federal permit.

**77a**

23.     Complying with these regulations is an enormous burden and expense. Given the huge undertaking I was already facing (clearing the land, financing the improvement, etc.), it would no longer be worthwhile to bear the additional costs and burdens imposed by the WOTUS Rule.

24.     The WOTUS Rule thus harms me in several ways. I will not be able to obtain the highest economic value from my property, as the property will remain unimproved and unused. And without such improvements, the land is less attractive to others. One goal of mine was to improve the land so that one of my children could build a home on the property. The WOTUS Rule makes that impossible.

25.     This land has already been greatly devalued—both because I cannot improve it and because potential buyers know that they must obtain a costly permit if they wanted to do so.

26.     In addition, the profits that I hoped to realize in the future from cattle sales will be forever lost. Due to the WOTUS Rule, I will have to forego this investment opportunity and will be unable to use the land for these and other business purposes. The WOTUS Rule will stifle the valuable and productive use of my property. This Court should strike down the rule.

**78a**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ~~September~~ November 1, 2016

_____

Michael Jacobs

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

## DECLARATION OF KENT MANN

I, Kent Mann, declare based upon personal knowledge that:

1. I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2. I am the owner of M/M Feedlot ("M/M") located in Parma, Idaho, and a National Cattlemen's Beef Association member. In this role, I oversee all aspects of operation of M/M, including compliance with the Clean Water Act and other regulatory requirements.

3. M/M has numerous land and water features on its lands that it previously understood not to be subject to regulation under the Clean Water Act. But some of these features may constitute a "water of the United States" under EPA's recently promulgated WOTUS Rule, 80 Fed. Reg. 37,054 (June 29, 2015)—though given the Rule's vagueness, it is not clear which ones. These features include a constructed pond and ditches.

4. Because M/M qualifies as a "concentrated animal feeding operation" under 40 C.F.R. § 122.23, it is considered a "point source" under the Clean Water Act. Thus, it must

**82a**

obtain a NPDES permit under the Act in order to discharge any pollutant into "waters of the United States."

5.      The possibility that the WOTUS Rule will lead to the designation of additional features on M/M's land as "waters of the United States" creates uncertainty about whether and how M/M can use its lands. Any increase in the portion of M/M's land subject to Clean Water Act jurisdiction will mean an increase in the number of activities that require NPDES permitting.

6.      If the Rule goes into effect, it is almost certain that M/M will either have to change the use of its land or otherwise seek further regulatory approval of its family farming operation. Either outcome would cost M/M substantial time and resources.

7.      M/M has reviewed the Rule in an effort to understand the requirements and determine the impact to the operation. M/M has dedicated time to identifying features on its lands that may be covered under the Rule, and has made plans to take further action in response to the Rule. Those plans would have to be implemented if the Rule were allowed to go into effect.

8.      M/M has expended time, money, and other resources in attempting to ascertain the implications of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _9-7-16_

2

83a

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

## DECLARATION OF WILLIAM R. MURRAY

I, William R. Murray, declare, based on my personal knowledge, that:

1.  I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.  I am the Vice President for Policy and General Counsel for the National Alliance of Forest Owners ("NAFO"), a trade association that represents the interests of owners and managers of over 80 million acres of private forests in 47 states.

3.  NAFO works aggressively to sustain the ecological, economic, and social values of forests and to assure an abundance of healthy and productive forest resources for present and future generations.

4.  NAFO is committed to helping policy makers understand that working forests are essential to the natural resources infrastructure of the nation and key to addressing some of the highest priority issues facing our nation today.

**84a**

5.     NAFO advocates for its members' interests before Congress and federal agencies and in judicial proceedings.

6.     NAFO met several times with EPA during the rulemaking process, commented on the proposed Rule and engaged in education of its members on complexities and ambiguities of the Rule. *See* Comments of the National Alliance of Forest Owners on Definition of "Waters of the United States" Under the Clean Water Act; Proposed Rule, 79 Fed. Reg. 22,188 (Apr. 21, 2014), Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014). If the agencies had sought additional comments on what is now the final rule, NAFO would have submitted additional comments.

7.     NAFO members often have features on their lands that may qualify as waters of the United States under the Rule which generally require analysis to determine the applicability of the Rule. This creates uncertainty about the regulatory implications of the Rule and members may have to alter their behavior in response to the Rule and/or to expend resources to determine applicability of, and compliance with, the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Sept 7, 2016

2

No. 15-4211

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ASSOCIATION OF AMERICAN RAILROADS, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

## DECLARATION OF JEFF NORWOOD

I, Jeff Norwood, declare based upon personal knowledge that:

1.     I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.     I am General Manager for the Port Terminal Railroad Association (PTRA).

3.     PTRA is an unincorporated terminal railroad association with its principal place of business in Houston, Texas. PTRA provides rail service to more than 200 shippers in the Houston area and functions as agent for a number of railroads in connection with line-haul shipments.

4.     PTRA maintains 7 rail yards, 154 miles of rail track, and 20 bridges in the Houston area. Proper operation of these facilities and structures requires frequent construction and maintenance of the rail track, yards, and bridges. The expansive definition of "waters of the United States" in the proposed Waters of the United States Rule (the "Rule"), which was issued on June 29, 2015 (80 Fed. Reg. 37,054), will have significant adverse effects on PTRA's

construction, operations, and maintenance activities, and will hinder PTRA's ability to perform necessary emergency repairs.

5.    For example, because the Rule provides only vague descriptions of the land and water features that purportedly constitute "waters of the United States" and often requires unpredictable, case-specific determinations by the U.S. Environmental Protection Agency or the U.S. Army Corps of Engineers, PTRA faces substantial uncertainty in evaluating which features on the lands over which its rail yards, rail track, and bridges are situated are "waters of the United States," and which are not.

6.    Consequently, under the Rule, PTRA will face significant uncertainty and unnecessary burden in assessing its regulatory obligations, and could be subject to permitting and mitigation requirements that have never before applied to activities of this sort.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  *10-21-2016*

Jeff Norwood, General Manager
Port Terminal Railroad Association
8934 Manchester
Houston, Texas 77012-2149

2

**106a**

No.15-4188

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

WASHINGTON CATTLEMEN'S ASSOCIATION, et al.,

*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.

*Respondents*

---

## DECLARATION OF WALLACE RONEY

BASED ON PERSONAL KNOWLEDGE I, WALLACE RONEY, DECLARE:

1.      I ranch on approximately 100 thousand acres of land in the California counties of Butte, Tehama, Lassen and Plumas.

2.      The ranch has been for the past 50+ years a member in good standing of the California Cattlemen's Association ("CCA") and I currently serve on CCA's Executive Committee. I also serve on the Board of Directors of CCA's local affiliate Tehama County Cattlemen's Association and have for many years.

3.      I am aware of the pending "waters of the United States" Rule (the "Rule"). I have thought about which waters on my ranch might be regulated by the rule and how I might need to change my ranching practices to avoid violating the law under the Rule.

4.    My ranch is owned by a corporation of which I am the sole shareholder and president. My family has been cattle ranchers since the 1850's.

5.    I raise beef cattle. My Tehama and Butte county land is used as year-round pasture. The land is in California's Sacramento Valley has no appreciable rainfall from April through October so the grazing is limited.

6.    While I am not aware of the presence of any wetlands on my ranch which would be jurisdictional under Supreme Court decisions such as *Rapanos*, there are constructed "stock ponds" on the land to provide perennial water for the cattle and wildlife. There are also areas which are shallow depressions on top of mostly impervious soil/rock which accumulate water during the rainy season.

7.    Part of my ranch is in an arid area which receives about 25 inches of rain in a normal year, primarily in the winter; there are some defined ephemeral drainage channels but a large portion of the ranch consists of undulating land with shallow depressions which catch and hold water during rain events.

8.    The naturally-occurring ephemeral drains on my ranch only carry water after it rains. Some of these natural ephemeral drains have been improved as ditches to provide better flow of water for domestic, stock water and irrigation to extend the limited growing season. These ditches carry water only after a moderate or heavy rain.

7.    It is my understanding that under the Rule, my drainage ditches meet the definition of "tributaries" and are therefore categorically considered to be "waters of the United States." I also understand that they would not qualify for the rule's exclusion of certain ditches because they were excavated in natural erosional features that are likely also to have been "tributaries" as defined under the Rule.

8.    My ditches have never previously been identified as "waters of the United States" under the Clean Water Act, and no regulator has ever found that they had a "significant nexus" to downstream navigable waters. I have never believed that I had a legal obligation to seek a federal permit for any of my ranching activities in and around these drainage ditches.

9.    To the best of my knowledge, virtually none of the water which accumulates in the shallow depressions on my ranch ever makes its way to either

groundwater or to a defined water course which eventually connects to a navigable waterway during a normal weather pattern.

10. These shallow depressions that hold water are determined under the rule to be "similarly situated," however, even isolated shallow depressions on my ranch may be deemed to have a "significant nexus" with waters classified as "waters of the U.S." under the Rule, and may themselves thus be determined to be jurisdictional where a case-by-case analysis under the former Rule would not have determined a significant nexus.

12.     On the ranch there are numerous dirt roads and feeding areas and working pens which are in proximity to the ephemeral streams and shallow depressions.  I am currently replacing an area of working pens, routinely drive on the roads and have cattle causing dust which could constitute discharge of dirt (a pollutant) if those ephemeral waterways or shallow depressions were classified as waters of the United States. It is not clear to me that my activities are "normal farming activities" or whether they would qualify for any other potential exemption from permit requirements under Clean Water Act section 404 as a neighbor is being currently prosecuted for plowing a dry swale. For this reason, I will either have to seek a permit or face great uncertainty about whether my activities are violating the law.

13.     If the Court does not invalidate the Rule, I will incur many thousands of dollars in costs and lost revenue to comply with the Rule. This will make my multi-generational cattle ranch economically unviable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____17____ day of October, 2016.

_____
Wallace Roney

129a

No. 15-4211

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————————

ASSOCIATION OF AMERICAN RAILROADS, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

———————————————

### DECLARATION OF MICHAEL J. RUSH

I, Michael J. Rush, declare based upon personal knowledge that:

1.      I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.      I am the Senior Vice President, Safety and Operations, for the Association of American Railroads (AAR).

3.      AAR is a national trade association whose members include freight railroads that operate 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States. AAR's members also include passenger railroads that operate intercity passenger trains and provide commuter rail service. AAR's members each own, operate, construct, maintain, and/or facilitate transportation via railroads in the United States. Railroads are a critical component of the nation's transportation system, providing for the movement of freight and passengers throughout the continental United States and Alaska. Railroads operate over approximately 139,000 miles of right-of-way in the United States.

4.   AAR is the nation's leading railroad policy, research, standard setting, and technology organization. AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight transportation system in the world.

5.   A primary purpose of AAR is to represent and protect the interests of its members in federal rulemaking and in litigation that relates to or has the potential to impact its members' activities. To that end, AAR submitted comments on November 14, 2014, on the proposed Waters of the United States Rule (the "Rule"), which was later issued on June 29, 2015 (80 Fed. Reg. 37,054).

6.   Proper operation and maintenance of railroads requires construction and maintenance of track, yards, bridges, culverts, ditches, and other facilities, structures, and features within railroad right-of-ways across the United States. AAR's members operate and maintain tens of thousands of bridges and hundreds of thousands of culverts across the United States. The Rule's expansive definition of "waters of the United States" will have significant adverse effects on railroad construction, operations, and maintenance vital to the nation's rail network, and will hinder AAR's members' ability to perform necessary emergency repairs.

7.   As one example, ditches play a critical role in railroad safety by ensuring proper drainage, thus preventing the undermining of railroad bed material and potential sloughing, shifting, and uneven trackage. Railroad ditches also avoid washouts and ensure safe travel. AAR and its members estimate that there are over 100,000 miles of railroad ditches in the United States along railroad right-of-ways. Although the Rule provides an exclusion for ditches, the exclusion is subject to exceptions that raise substantial questions as to which of the railroad ditches would be considered "waters of the United States" and which would not. In addition, identifying certain railroad ditches as "waters of the United States" would restrict the railroads' ability to maintain ditches for safe operations.

2

**136a**

8.     In addition, because the Rule provides only vague descriptions of the land and water features that purportedly constitute "waters of the United States," AAR's members would face substantial and harmful uncertainty in evaluating those features on the lands over which their railroads run, or on which their rail terminals, rail yards and other facilities are situated, are "waters of the United States," and which are not.

9.     Some of AAR's members have initiated or will soon initiate the process of seeking jurisdictional determinations or permits under the Clean Water Act in connection with construction, operation, and/or maintenance of their railroads, rail terminals, or rail yards in order to comply, or mitigate the risk of noncompliance, with the Rule. This process is costly, burdensome, and can result in project delays and potentially costly mitigation.

10.     The interests that AAR seeks to protect in this action are manifestly germane to its organizational purposes. AAR has worked with its members on issues related to the scope and effect of the Clean Water Act and its regulations for decades, and it can represent its members' interests in this litigation without the direct participation of any of its member companies.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _October 26, 2016_

_Michael Rush_

3

**137a**

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

AMERICAN FARM BUREAU FEDERATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

_____

### DECLARATION OF FRANK SCHROEDER

I, Frank Schroeder, declare based on personal knowledge as follows.

1.     Frank Schroeder is Vice President of the Delaware Basin Business Unit for Devon

Energy Corporation ("Devon"). He is responsible for strategy development and the planning,

direction and coordination of all activities involving company exploration and production for the

company's assets in the Delaware Basin.

2.     Devon is a Fortune 500 company headquartered in Oklahoma City, Oklahoma.

Devon's operations are focused onshore in the United States and Canada. In the United States,

Devon produces, stores and transports crude oil, natural gas liquids and natural gas in Texas,

Oklahoma, New Mexico, Montana and Wyoming. Devon is a member of the National

Association of Manufacturers ("NAM") and American Petroleum Institute ("API"). API

submitted comments to the Proposed Rule in November 2014, and Devon endorsed those

comments and incorporated those comments in its own comments submitted to EPA.

3.     In light of the significant potential impacts of the proposed rule on the company,

Devon submitted comprehensive comments on the proposed WOTUS Rule on November 14,

Page 1 Declaration of Frank Schroeder

ЦУ

storm water discharges from such construction activities under Section 402 of the Clean Water
Act. Further, the Final Rule will have significant impacts on which sites will be required to
have Spill Prevention, Control and Countermeasure Plan.

6.    Our company develops oil and natural gas in areas of the United States that
contain land features that may be deemed dry "tributaries" to navigable waters under the Rule.
Such dry tributaries are per se jurisdictional under the final Rule. Determining which land
features qualify as jurisdictional "tributaries" under the Rule will require the expenditure of
substantial resources, including the hiring of engineers. The treatment of those dry channels as
jurisdictional will require our company to obtain permits under Sections 404 and 402 of the
Clean Water Act for disturbances to those features or for discharges into those features. Under
some conditions, we may be able to obtain general permits, which impose financial costs and
time delays. If general permits are unavailable, however, we are required to obtain individual
permits, which typically cost our company thousands of dollars and many months of time.

7.    The Rule's test to determine the "significant nexus" of a dry land feature or
waterbody to a jurisdictional water is vague. The Rule's vagueness and ambiguity will require
our company to expend considerable time and money to determine whether the waters or dry
landscape features involved in oil or natural gas development, transportation, or other activities
bear a "substantial nexus" to jurisdictional waters and are subject to the Rule's requirements.
These are costs that we would not bear were it not for the Rule.

8.    For example, Spill Prevention, Control, and Countermeasures (SPCC) Plans are
required by EPA as directed within 40 CFR Parts 110 and 112 for all non-transportation-related
facilities that have the potential or may "reasonably be expected" to have a discharge of oil into
navigable waters or adjoining shorelines. Based on Devon's internal decision-making process

Page 3 Declaration of Frank Schroeder

**140a**

regarding SPCC applicability, it has been determined that many sites in the states in which

Devon operates that were previously determined to be exempt would now be required to have

SPCC plans.

        9.      Determining that a particular water or dry landscape feature is *not* jurisdictional

under the new Rule will require our company to assume substantial risk.  Given the vagueness

and malleability of the Rule's "significant nexus" definition, the U.S. Army Corps of Engineers

or EPA may later challenge the company's finding of no significant nexus and bring an

enforcement action against the company for failure to comply with the Clean Water Act.  This

may lead to civil fines, criminal penalties, and the termination of the extractive activity.  To

mitigate the risk imposed by the Rule's vagueness, the company is likely obtain permits and

prepare SPCC Plans even where none are required under a reasonable reading of the Clean

Water Act and the Rule. Alternatively, the Rule's vagueness and ambiguities may also cause our

company to forego oil and natural gas development out of concern that the federal government

may later deem that area a jurisdictional water.

        10.     More generally, the possibility that various previously-non-jurisdictional features

will be treated as waters of the United States creates uncertainty about whether and how our

company can use its lands.  For example, , in the Delaware Basin of New Mexico, based on

Devon's internal decision-making process regarding SPCC applicability, it has been determined

that many sites that were previously determined to be exempt would now be required to have

SPCC plans

        11.     Over all, if the stay of the Rule were lifted and the Rule were allowed to go into

effect, the Rule's expansion of regulatory jurisdiction and its malleability and vagueness would

Page 4 Declaration of Frank Schroeder

**141a**

and have enormous practical impacts on the company's willingness to undertake new development projects and on the cost of those projects that it elects to undertake.

     12.    Vacatur of the Rule would save the company these substantial costs.

     I, Frank Schroeder, declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of Sept, 2016.

Frank Schroeder

State of Oklahoma
County of Oklahoma

Signed and affirmed to before on (date) by Frank Schroeder



Notarial Officer

My Commission Expires: May 8, 2018 )
My Commission Number: 14004230 )

Page 5 Declaration of Frank Schroeder

142a

No. 15-3751

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MURRAY ENERGY CORPORATION,
*Petitioner,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et. al.,
*Respondents.*

## DECLARATION OF C. CRELLIN SCOTT
## DIRECTOR OF ENVIRONMENTAL COMPLIANCE
## MURRAY ENERGY CORPORATION

1. I am C. Crellin Scott, and I make this Declaration in support of the opening brief filed by the Business and Municipal Petitioners in *Murray Energy Corporation v. U.S. Environmental Protection Agency*, No. 15-3751 (and consolidated cases).

2. I am currently Director of Environmental Compliance for Murray Energy Corporation (Murray Energy), and I have been employed by Murray Energy since 2011. Murray Energy and its subsidiary companies own and operate eleven active coal mines in six states (Ohio, Illinois, Kentucky, Pennsylvania, Utah, and West Virginia).

3. Murray Energy filed suit in the United States Court of Appeals for the Sixth Circuit to challenge and halt implementation of the Final Rule due to its unlawful scope and the numerous unlawful substantive and procedural defects that led to the Final Rule's adoption. That case, styled *Murray Energy Corporation v. U.S. Environmental Protection Agency*, No. 15-3751, is the lead case in this consolidated litigation.

4. Murray Energy is also a member of the National Mining Association (NMA). NMA joined a cross-industry coalition of other Business and Municipal Petitioners in challenging the Final Rule in Case No. 15-3850, which has since been consolidated.

5. Murray Energy filed comments on the proposed rule in which we detailed at length the numerous legal and procedural flaws in the proposed rule, both facially and as applied to Murray Energy's mining operations.

6. As detailed below and in the accompanying opening brief, the Final Rule did not adequately address Murray Energy's comments or the numerous additional comments submitted by the Business and Municipal petitioners.

7. Murray Energy and its affiliates currently employ approximately 5,400 persons throughout its mining operations. Murray Energy is the largest underground coal mining company in America and is a global leader in underground longwall mining, a process that entails the full extraction of coal along a linear path that is up to several miles long.

8. In my role as Director of Environmental Compliance, I am responsible for overseeing and managing, among other things, the Clean Water Act (CWA) permitting requirements related to the expansion and operation of the company's mines. I have over 35 years of experience with respect to CWA jurisdictional and permitting matters.

9. I have read and am familiar with the Final Rule issued by the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps) redefining the term "waters of the United States."

10. Based on my experience and information and belief, the Final Rule, if allowed to go into effect, will have a direct and substantial impact on Murray Energy's active mining operations, and will require additional permits and aquatic resource mitigation for features never previously subject to CWA jurisdiction.

2

**144a**

11. Murray Energy has extensive experience with permitting under sections 402 and 404 of the CWA, both of which hinge on the definition of "waters of the U.S." at issue in the Final Rule.

12. Murray Energy's mine sites generally contain numerous and varied water features, and the activities at these sites, including those associated with initial mine development, daily operations and routine expansions, often require some level of impact or interaction with these features, which, depending upon jurisdictional status, may or may not trigger Section 402 and 404 permitting. Murray Energy is thus keenly interested in and directly impacted by the Final Rule, which drastically expands the scope of Section 402 and 404 permitting requirements under the CWA.

13. For Murray Energy, the Final Rule, if allowed to go into effect, would significantly impede initial mine development, daily operations and routine expansions at many of our mine sites. EPA's extension of federal jurisdiction to previously unregulated features such as ephemeral streams, sediment ponds, drainage ditches, vernal pools, and other "fill and spill" features is particularly impactful to our mine sites. These features are abundant and pervade the eastern and western coalfields and, as a result, are frequently encountered during routine activities such as construction and maintenance of access and haul roads, as well as roadside ditches. Having to account for these features within the Section 402 or 404 permitting context would increase by several orders of magnitude both permitting costs and associated economic losses due to project delays.

14. By way of example, the Nolan Run Saddle Dike Extension is a refuse impoundment located at one of our mine sites in West Virginia. The CWA permitting for the impoundment has been completed, but additional permits have been requested for the Saddle Dike Extension. The proposed diversion ditches used to divert water away from the active mining areas will contribute flow to a perennial unnamed tributary of Jones Creek, which drains to Jones Creek and from there to Tenmile Creek. The ditches would be jurisdictional under the Final Rule, but are not jurisdictional under the old rule. These

3

**145a**

ditches total approximately 3,300 linear feet. The costs associated with permitting and mitigation are estimated to be approximately $1.9 million.

15. The Final Rule will also extend CWA jurisdiction to numerous other features on our mine sites that not jurisdictional under the old rule. For example, wastewater treatment systems on mine sites utilize a series of ponds (*i.e.*, bench ponds and sediment ponds), natural drainages, and man-made drainage ditches, including both permanent and temporary ditches. These systems are required at mining operations under separate federal regulations promulgated pursuant to the Surface Mining Control and Reclamation Act (SMCRA). *See, e.g.,* 30 C.F.R. §816.41. Construction of surface mine bench ponds and sediment ponds is already generally subject to Section 402 permitting requirements. However, the Final Rule would add a burdensome and unworkable layer of complexity to this permitting scheme by making drainage ditches *themselves* subject to CWA jurisdiction. These man-made ditches must be frequently altered or moved at mine sites for maintenance or operational reasons, as well as to ensure compliance with SMCRA. In fact, the federal SMCRA regulations specifically authorize and direct mine operators to divert flow from mined areas. These regulations require, for instance, that temporary diversion ditches be removed promptly when no longer needed. *See* 30 C.F.R § 816.43. If these routine interactions with natural drainages and constructed ditches were subject to Section 404 permitting, as the Final Rule would have it, the cost and impact to mining companies like Murray Energy would be staggering.

16. The types of features identified above as falling within the CWA's jurisdiction under the Final Rule are all prevalent in and across Murray Energy's mine sites. As a result, I expect that the Final Rule will have an impact on nearly all of Murray Energy's mine sites and the costs noted above for Nolan Run would be typical for other sites, as well. For a company like Murray Energy, the costs associated with the Final Rule would be significant. For example, the $1.9 million attributable to the impacts of the Final Rule on Nolan Run alone could pay the yearly salaries for 22 mine workers making an approximate average salary of $88,000 per year. Again, this $1.9 million figure is for

4

**146a**

just one of Murray Energy's eleven mining operations, and the impacts are expected to be exponentially higher across the enterprise.

17. Over the past few years, Murray Energy has had to substantially reduce its workforce nationwide. These workforce reductions are directly attributable to the regulations and policies of the current Administration, many of which appear designed to dismantle the coal mining sector. The Final Rule, if allowed to go into effect, will only exacerbate and expedite this end.

18. Moreover, the Final Rule makes Murray Energy less competitive with other sources of energy that may have fewer impacts from the Final Rule. The Final Rule also makes Murray Energy less competitive with coal producers in other countries, such as China, with whom we compete for global coal exports.

19. The rights to develop mine sites are extremely valuable, costing Murray Energy millions of dollars to obtain the legal and regulatory rights to operate. The Final Rule, if allowed to go into effect, would make our mine sites less valuable because it will cost significantly more to develop and operate them.

20. The Final Rule will force Murray Energy to redesign how mine sites will be developed and operated. This is a complicated process and involves legal, regulatory, and business decisions unique to each mine. In some instances, the Final Rule may make some mine sites uneconomical or logistically infeasible to operate.

21. Additionally, the Final Rule, if allowed to go into effect, would cause Murray significant business uncertainty with respect to how it approaches labor agreements, capital allocation, supplier contracts, and investment in land, labor, and equipment. This business uncertainty results from the lack of clarity in the Final Rule, and the costs associated with applying for, obtaining, and complying with CWA permits for geographic features that were previously not subject to CWA jurisdiction. These costs

are difficult to ascertain, but there is no doubt that the Final Rule will force Murray
Energy to expend significant sums on CWA jurisdictional issues.

22. As noted above, the Final Rule is just part of the Administration's regulatory assault on
the coal industry. The Final Rule serves as the foundation for a separate rulemaking by
the Office of Surface Mining Reclamation and Enforcement (OSMRE) called the
"Stream Protection Rule" or "SPR." *See* 80 Fed. Reg. 44436 (July 27, 2015).

23. The SPR borrows wholesale from the Final Rule's unlawful change to the definition of
"waters of the U.S." Specifically, OSMRE claims that the SPR "promote[s] consistency
with the Clean Water Act [by proposing] to define [Waters of the U.S.] as having the
same meaning as the corresponding definition [as the Final Rule] in 40 C.F.R. 230.3(s)."
80 Fed. Reg. at 44478. The SPR effectively bans underground mining that will result in
the subsidence of any "stream," the definition of which is dependent on the Final Rule
and the arbitrary science that EPA used to support the Final Rule.

24. The inclusion of ephemeral streams within the definition of "streams" in the SPR is based
on scientific studies conducted by EPA in the rulemaking leading to the Final Rule. Most
of the ephemeral streams that EPA is seeking to assert jurisdiction over in the Final Rule
(and OSMRE through the SPR), particularly those in headwaters such as Appalachia coal
country, are little more than insignificant, dry ditches with minimal biological value. Yet
OSMRE blindly relies upon the dubious scientific data for the Final Rule as the rationale
for extending the SPR to these water features. Accordingly, the Final Rule's misguided
and unlawful jurisdictional expansion of the CWA has emboldened other federal agencies
to produce regulations that are based on the same flawed science and methodology. This
constitutes a separate and unique threat to the mining industry, including Murray Energy,
that is a direct and immediate consequence of the Final Rule.

25. If the Final Rule is vacated, as it should be, the harm to Murray Energy resulting from the
Final Rule (and other federal rules that rely on it) would be redressed, and the costs,

6
**148a**

uncertainties, and potential for unfettered and subjective enforcement of the Final Rule would be averted.

I, C. Crellin Scott, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 24 day of Oct, 2016.

C. Crellin Scott
Director of Environmental Compliance
Murray Energy Corporation

No.15-4188

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

WASHINGTON CATTLEMEN'S ASSOCIATION, et al.,

*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.

*Respondents*

## DECLARATION OF VICTOR E. STOKES

BASED ON PERSONAL KNOWLEDGE I, VICTOR E. STOKES, DECLARE:

1.      My family and I operate a hay and cattle ranch located at 20647 State Route 20, Twisp, Washington  98856.

2.      I am the immediate Past President of the Washington Cattlemen's Association and am familiar with the new rule defining "waters of the United States" (WOTUS) and its implications for my ranch.

3.      We own about 1,600 acres of land consisting of fields and grazing land. The grazing land accounts for about 1,400 acres of the total and is punctuated with draws, swales or small canyons that have ephemeral streams with identifiable bed and banks and ultimately flow offsite into a navigable waterway.  These water features only flow during periods of snow melt or rain from intense summer storms.

4.      We also graze similar lands, with ephemeral streams, that we lease from the

State of Washington and the United States Forest Service. These lands encompass approximately 20,000 acres.

5.    The new WOTUS rule will undoubtedly cover these water features (either categorically as "tributaries" or "adjacent" waters, or on a case-by-case determination) for the first time. As I understand it, covered waters cannot be disturbed without federal approval. Even minor, unintended discharges are a technical violation of the Act that can lead to civil and criminal enforcement.

6.    Therefore, the new WOTUS rule will increase my risk of liability and add additional burdens to my operation through permitting requirements and more management costs such as an increased need for fencing or stock water development. Currently, fencing in our area costs between $12,000 to $15,000 per mile for a completed fence. Not only is fence costly to construct, it has future costs in maintenance that are hard to calculate, but nonetheless real. Depending on the type of stock water development, whether it be a groundwater well or distributing surface water, the cost can range from a few thousand to several thousand dollars. A recent stock water well we drilled cost around $20,000 for just the well alone.

7.    It is also likely that, with the implementation of the WOTUS rule, the State of Washington or the U.S. Forest Service will require greater protections for the ephemeral streams on the leased lands, adding to the regulatory and economic burden on our grazing operation.

8.    Consequently, the WOTUS rule will have great impacts on my family's

174a

operation.  Whereas these ephemeral streams were not previously regulated, they will be

regulated under the new WOTUS rule.  This will affect where and how we graze our

cattle and plant and harvest hay.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____19TH____ day of September, 2016.


_Victor E. Stokes_

**Victor E. Stokes**

No. 15-3850

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

## DECLARATION OF STEPHEN WRIGHT

I, Stephen Wright, declare based on personal knowledge as follows.

1.     My name is Stephen Wright and I am the Chief Executive Officer of Wright Brothers Construction Company, Inc. In my position I am responsible for overall management of a regional construction company working in 7 states employing in excess of 400 people.

2.     Wright Brothers Construction Company, Inc. is recognized as one of the largest civil contractors in the Southeastern United States and is based out of Charleston, Tennessee, with projects located across the Southeast. Our design and construction services include grading, site development, highway and bridge construction, landfill construction, asphalt production and paving, aggregate processing, commercial concrete services, and industrial maintenance services. Services associated with this work are asphalt paving, earth and rock excavation, drilling and blasting of rock, crushing and screening of rock, graded stone placement, storm drainage installation, leachate collection installation, utility installation, foundation work, steel erection, bridge construction, miscellaneous concrete construction, and erosion control installation. Wright Brothers currently performs these services in Alabama, Georgia,

Page 1 Declaration of STEPHEN WRIGHT

Kentucky, Mississippi, North Carolina, Tennessee, and Virginia.

     3.     Wright Brothers Construction Company, Inc. is a member of the Contractors Division of the American Road and Transportation Builders Association (ARTBA). I have served as ARTBA's Chairman and am currently a member of ARTBA's Board of Directors.

     4.     The economic effects of federal jurisdiction over waters and landscape features are of great concern to our company because such jurisdiction impacts our ability and costs to design and construct transportation improvements. Our company has expended significant time and money to ascertain the implications of the final Rule on our company. We submitted regulatory comments on the rule which can be found at: http://www.regulations.gov/document?D=EPA-HQ-OW-2011-0880-17060. Additionally, Wright Brothers Construction company supports ARTBA's comments on the rule.

     5.     A significant number of jobs Wright Brothers Construction Company works on are transportation improvement projects. As part of constructing any federal transportation project, Wright Brothers Construction Company undertakes a variety of activities that are subject to the environmental review and approval process in the normal course of their business operations. Specifically, activities involved in transportation construction often impact wetland areas. When any activity associated with construction impacts a wetland area or a "water of the United States" as defined by the Clean Water Act, a permit is required under Section 404 of the Act.

     6.     Wright Brothers Construction Company has concluded that the final rule will expand federal jurisdiction under the Clean Water Act and require permits for areas which had not previously been defined as "waters of the United States," including waters on our lands and the lands that we develop for our clients and customers. At a minimum, Wright Brothers

Construction Company believes the final rule is confusing and vague. If the Rule is allowed to come into force, this lack of clarity will require us to obtain permits defensively, even when none is necessary, given the economic ruin that criminal and civil penalties can inflict.

7.      Increased permitting requirements and confusion over federal jurisdiction will lead to delays in the project review and approval process. Delays will result in increased material costs and uncertainty of work schedules for our employees. Additionally, increased permitting requirements will also drive up the total cost associated with transportation improvement projects. Wright Brothers Construction Company is particularly concerned with the treatment of roadside ditches under the rule. Requiring wetland permits for ditch construction and maintenance would force our company to incur new administrative and legal costs in virtually every project we undertake. The potential delays and increased costs that would result from EPA's proposal would divert resources from timely ditch maintenance activities and potentially threaten the role ditches play in promoting roadway safety.

8.      Our company works on transportation construction projects in areas of the United States that contain land features that may be deemed dry "tributaries" to navigable waters under the Rule. Such dry tributaries are per se jurisdictional under the final Rule. Determining which land features qualify as jurisdictional "tributaries" under the Rule will require the expenditure of substantial resources, including the hiring of engineers. The treatment of those dry channels as jurisdictional will require project owners to obtain permits under Sections 404 of the Clean Water Act for disturbances to those features or for discharges into those features. Under some conditions, project owners may be able to obtain general permits, which impose financial costs and time delays. If general permit are unavailable, however, project owners are required to obtain individual permits, which typically cost our company hundreds of thousands of dollars

and years of time. This added uncertainty in the permitting process hampers the ability of

Wright Brothers Construction to set work schedules for our employees and can also result in

projects being scaled back.

9.  The Rule's test to determine the "significant nexus" of a dry land feature or body

of water to a jurisdictional water is vague. The Rule's vagueness and ambiguity will require our

company to expend considerable time and money to determine whether the waters or dry

landscape features involved on any job site bear a "substantial nexus" to jurisdictional waters and

are subject to the Rule's requirements. These are costs that we would not bear were it not for the

Rule.

10.  For example, on public transportation projects in the areas we work, it is

customary for contractors to be required to acquire and permit property for the import of or the

disposal of excess/unsuitable excavation generated by projects. The normal time allowed

between public advertisement and receipt of bids is less than 30 days. The inertia of this system

often does not allow for the necessary time for a complete and reliable assessment of various

potential sites prior to bid. The inability to quickly and reliably determine if an area is

jurisdictional or not dramatically increases the risk to the contractor in the bid process. This

increased risk ultimately has to be passed along to the public as increased construction costs.  In

cases where the time does exist the costs for every site can run into the thousands of dollars,

which again must ultimately be passed along to the tax paying customers.

11.  Determining that a particular water or dry landscape feature is *not* jurisdictional

under the new Rule will require our company to assume substantial risk. Given the vagueness

and malleability of the Rule's "significant nexus" definition, the U.S. Army Corps of Engineers

or EPA may later challenge the either the project owner's or the company's finding of no

significant nexus and bring an enforcement action against the company for failure to comply with the Clean Water Act. This may lead to civil fines, criminal penalties, and the termination of the extractive activity. To mitigate the risk imposed by the Rule's vagueness, the company is likely obtain permits even where none are required under a reasonable reading of the Clean Water Act and the Rule. Alternatively, the Rule's vagueness and ambiguities may also cause our company to forego transportation construction projects out of concern that the federal government may later deem that area a jurisdictional water.

12.     More generally, the possibility that various previously-non-jurisdictional features will be treated as waters of the United States creates uncertainty about whether and how our company can construct transportation improvements. For example, we currently have a transportation project in the Appalachian Mountains which has a significant amount of excess material. The excess material must be placed outside the DOT right of way, on private property. To date we are two years into the projects and are still not finished evaluating and permitting waste sites. This has added significant cost to the project and delayed progress. The proposed rule might very well make expensive and time consuming become impossible.

13.     Over all, if the stay of the Rule were lifted and the Rule were allowed to go into effect, the Rule's expansion of regulatory jurisdiction and its malleability and vagueness would have enormous practical impacts on the company's willingness to undertake new transportation construction projects and on the cost of those projects that it elects to undertake.

14.     Vacatur of the Rule would save the company these substantial costs.

I, Stephen Wright, declare under penalty of perjury that the foregoing is true and correct.

Executed this __22__ day of __September__, 2016.

_Stephen Wright_

Stephen Wright

Page 5 Declaration of STEPHEN WRIGHT

**208a**

# EXHIBIT E

# TABLE OF CONTENTS

Emily W. Coyner,
National Stone, Sand and Gravel Ass'n ……………………………………………… A-1

Ross Evan Eisenberg,
National Association of Manufacturers ……………………………………………… A-5

Don Parrish,
American Farm Bureau Federation ……………………………………………………A-9

Janet Price,
Rayonier Inc. ……………………………………………………………………………..A-12

Robert E. Reed,
member of Texas Farm Bureau and
American Farm Bureau Federation …………………………………………………… A-15

Jeff Slaven,
member of National Cattlemen's Beef Association ………………………………… A-18

Thomas J. Ward
member of National Association of Home Builders………………………………… A-21

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF GEORGIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 2:15-cv-79 |
| ANDREW WHEELER, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF EMILY W. COYNER

I, Emily W. Coyner, declare based upon personal knowledge that:

1. The National Stone, Sand and Gravel Association ("NSSGA") member companies are responsible for the essential raw materials found in every home, building, road, bridge and public works project in the U.S. and produce more than 90% of the crushed stone and 70% of the sand and gravel consumed annually in the United States. The industry employs about 100,000 men and women nationally. NSSGA and its predecessor organizations have represented the industry for over 100 years.

2. NSSGA works to advance public policies that protect and expand the safe, environmentally responsible use of aggregates. NSSGA favors a public policy environment that fosters business growth for the aggregates construction materials industries, including reasonable regulations.

3. NSSGA submitted comments on the 2015 WOTUS Rule on November 13, 2014, as well as signed onto the WAC comments letter. *See Comments on EPA and Corps Proposed Rule Defining Waters of the United States Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 13, 2014); *Comments of the Waters Advocacy Coalition on the Envt'l Protection Agency's and*

**A-1**

*U.S. Army Corps of Engineers' Proposed Rule to Define "Waters of the United States" Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 13, 2014) (corrected Nov. 14, 2014). NSSGA's comments included numerous examples of how the rule would make the 404 permitting process more difficult and expensive due to the inclusion of dry stream beds and isolated wetlands. NSSGA met with EPA to discuss the technical problems the Rule would impose on a typical aggregates operation. A member of NSSGA, Memphis Stone & Gravel Co., testified before the US House of Representatives Small Business Committee on the negative impacts the rule would have on their business, including increased costs and uncertainty. NSSGA also submitted comments on 12 congressional hearings on the Rule. NSSGA has worked to inform members about Rule via presentations and articles.

4.     NSSGA has worked with its members on CWA jurisdictional issues for decades, and can readily defend its members' interests in opposing the rule.

5.     Because aggregates are often created by water, they are located near water, such that jurisdictional definitions are of primary importance.

6.     The scope and reach of CWA jurisdiction has a direct impact on the costs of planning, financing, constructing, and operating an aggregates facility. Aggregates operators invest in properties with quality aggregates for decades in the future. Because the Rule increases the jurisdictional reach of the CWA, those reserves will become increasingly difficult to permit due to their proximity to natural wetlands, flood plains, and intermittent streams. The Rule would impose additional permitting and mitigation costs and add significant time delays in permitting for aggregates mining activities.

7.     The Rule will make it even more difficult and expensive for companies to meet the needs of their customers who depend on a steady supply of aggregate for essential public works projects such as new road construction, flood control, water and wastewater treatment, and the repair

of existing bridges and highways. Ultimately these increased infrastructure costs will be borne by taxpayers.

8.    The uncertainty surrounding the Rule and its implementation will make opening a new operation or expanding an existing operation that much more difficult. In some cases, property owners will have to walk away from reserves because of increased compliance costs. Because the 2015 Rule is unclear and vague, member companies will have to expend even more time and money hiring consultants and in some areas evaluate the effect the Rule will have on their operations. It is virtually certain that some of our member companies will have to alter their operations to comply with the Rule.

9.    Allowing the Rule to go into effect for even a short time is having a damaging effect on the aggregates industry. Where the WOTUS Rule has been implemented, member companies have had to expend time and expense hiring consultants for jurisdictional determinations. Member companies in jurisdictions where the 2015 Rule is stayed have also expended resources to evaluate the effects of the Rule on their operations should the stay be lifted for a short time before a new Rule is in place.

10.    Many of our members operate in multiple states. Because the Rule is stayed in some states but has entered effect in others, these members therefore are currently subject to two regulatory systems, leading to confusion. Because of the confusion and uncertainty, producers will likely hold off on permitting new facilities or expansions, possibly causing shortages of crucial building materials for vital infrastructure projects. Holding off on these projects, along with the resources that members will have to expend to ensure compliance under the current regulatory regime, could result in a loss of jobs.

11.    A national injunction is necessary to prevent irreparable harm to the industry, including many project delays and increased costs.

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _9/16/18_

Emily W. Coyner

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| STATE OF GEORGIA, *et al.*, | |
| *Plaintiffs*, | |
| AMERICAN FARM BUREAU FEDERATION, *et al.*, | Case No. 2:15-cv-79 |
| *Intervenor-Plaintiffs*, | |
| v. | |
| ANDREW WHEELER, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF ROSS EVAN EISENBERG

I, Ross Evan Eisenberg, declare based on personal knowledge as follows.

1.     I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.     I am Vice President of Energy and Resources Policy at the National Association of Manufacturers ("NAM"), the largest manufacturing association in the United States, representing over 14,000 small and large manufacturers in every industrial sector and in all 50 states. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

3.     NAM members own or have development rights over property that contain waters or landscape features that may qualify as waters of the United States in the 26 states currently subject to the 2015 rule ("WOTUS Rule"). The scope of waters and landscape features subject to the WOTUS rule is vague and unclear, thereby causing imminent harm to the NAM's members. For example:

    a.     Relatively minor activities such as clearing sediment from stormwater basins or moving stormwater drains can require additional permitting and reviews under the WOTUS Rule. This increases time and money required to complete work;

1

A-5

    b.  Ditches, including roadside ditches that have perennial flow, are regulated under the WOTUS Rule. The WOTUS Rule includes exemptions for certain ditches, but there are many other types of ditches that are now regulated as tributaries. Even dry ditches that are either a relocated tributary or were excavated in a tributary are now regulated by the EPA. It is up to landowner to prove that their ditches do not excavate or relocate a historic tributary. This allows the federal government to assert jurisdiction based on past conditions, not present;

    c.  Increased stream numbers and tributary lengths could undermine the utility of nationwide permits in some cases. This stalls transmission line maintenance, infrastructure expansion, and other projects that currently rely on nationwide permits;

    d.  At a minimum, energy exploration and production companies expect the number of permits required to double. Managing the nine-to-eighteen- month individual permitting process is difficult and could lead to loss of leases and production. For the increases in permitting, site delineations, and modified construction practices, one NAM member informed the NAM that costs could increase in the range of 100 to 750 percent under the WOTUS Rule;

    e.  When homebuilders face increased site costs under the WOTUS Rule, homeowners are forced to sacrifice other items, like upgrades to high efficiency appliances, windows, and doors, to stay within budget;

    f.  If a manufacturer needs to install a larger loading dock and build additional space to manufacture products, the WOTUS Rule could force the manufacturer to seek additional permits and potentially put major systems in place to treat stormwater that would not have applied before the WOTUS Rule's expanded jurisdiction; and

    g.  A heavy equipment manufacturer's site for testing equipment and moving dirt has rain flow, and as a result may now be covered under the WOTUS Rule. Even if the agencies say it is not a problem, citizen suits could hamper operations and maintenance work or prevent clearing out ponds and holes used for testing.

    4.    The application of the WOTUS rule in 26 states will delay important new projects or activities that would require new permits under the apparent requirements of the WOTUS Rule—permits that would not have been required under the rules and guidance in effect before promulgation of the WOTUS rule in 2015. I anticipate that these delays could impede the construction and operation of new facilities or expansions and could cost American jobs.

I declare under perjury that the foregoing is true and correct.

Dated: September 7, 2018

Ross Evan Eisenberg

Case 2:15-cv-00078-GW-BWC Document 208-4 Filed 09/26/18 Page 10 of 26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

STATE OF GEORGIA, *et al.*,

    *Plaintiffs*,

    v.

ANDREW WHEELER, *et al.*,

    *Defendants*.

Case No. 2:15-cv-79

## ~~DECLARATION OF DON PARRISH~~

I, Don Parrish, declare based upon personal knowledge that:

    1.    I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

    2.    I am the Senior Director of Regulatory Affairs at the American Farm Bureau Federation ("AFBF"). I offer this Declaration based on my 30 years working on behalf of farmers and ranchers across the nation, focusing primarily on Clean Water Act issues.

    3.    I submitted a declaration on September 20, 2016, in support of AFBF's challenge to the so-called 2015 "Clean Water Rule" (WOTUS Rule) in the U.S. Court of Appeals for the Sixth Circuit. I also signed a declaration on February 6, 2018 in support of AFBF's challenge to WOTUS Rule in the Southern District of Texas. Any statement made in those declarations remains true except insofar as it has been superseded by anything I have declared here.

    4.    In the jurisdictions where the 2015 WOTUS Rule has entered into effect, it has significantly expanded the scope of Clean Water Act jurisdiction as it applies to farm and ranch lands. The WOTUS Rule expands jurisdiction to regulate countless sometimes-wet landscape features that are ubiquitous in and around farmland. These common features include drains carrying

A-9

rainfall away farm fields, ordinary farm ditches, and low areas in farm fields where water channels or temporarily pools after heavy rains.

5.     AFBF members in the 26 states where the WOTUS Rule is currently in effect now must alter their activities to prevent inadvertent unlawful "discharges" of "pollutants" into waters categorized as "waters of the United States," which may require them to take lands out of production. Alternatively, they can obtain costly Clean Water Act permits, but the exorbitant cost of consultants, engineers, permit applications, mitigation costs and compliance costs makes that an untenable option for most farmers. This is despite the fact that the Agencies are currently working to repeal and replace the WOTUS Rule, such that it may soon be out of effect.

6.     The enormous costs of taking land out of production or seeking and obtaining permits will be not be recoverable by these farmers and ranchers. Nor will the injuries be remedial to the employees they may have to let go as a consequence.

7.     In many areas, farmers are now limited in their ability to conduct basic soil manip-ulation necessary for any farming – using a plow. If a field contains low areas deemed to be "adjacent waters" under the WOTUS Rule, farmers will be unable to plow through those low areas when the WOTUS Rule is in effect. Other common soil manipulation activities such as grading, laser leveling, and terracing are often necessary for agricultural production. But if a landscape feature is considered perfectly farmable land one month and "navigable water" the next, few farmers will be willing to conduct soil manipulation activities that risk CWA liability now that the WOTUS Rule is in effect. Farmers may choose to expend the resources necessary to seek Clean Water Act "dredge and fill" permits for these soil manipulation activities, even if the permit is not necessary. The costs associated with the permit process will not be recoverable.

8.     The WOTUS Rule also makes it difficult for farmers to avoid the risk of Clean Water Act liability in constructing and maintaining important farm infrastructure, such as farm roads, fences, ditches, ponds and culverts, when those improvements are constructed in a landscape feature

that may or may not be a regulated "water of the United States" depending on the status of litigation in a local district court. In states now subject to the WOTUS Rule, farmers within that district court will be at risk of violating the Clean Water Act because installing a fence post in an ephemeral drain is an unlawful discharge to a jurisdictional water under the WOTUS Rule.

9.       The harm to AFBF members caused by a constantly changing regulatory climate is further compounded by the vague language and lack of clarity in the WOTUS Rule. That lack of clarity complicates efforts by AFBF members to determine how they can farm their land because in many instances, they are unable to identify jurisdictional "waters" on their land without expending resources on a technical consultant. The WOTUS Rule allows the Agencies to rely on desktop tools and remote sensing technology unavailable to farmers. As a result, many farmers are unable to identify jurisdictional waters on their land with a naked eye, increasing the risk of an unintentional Clean Water Act violation. To avoid the risk of an unlawful discharge to these landscape features, farmers will either expend resources to determine whether land and water features in and around their property are "waters of the United States" or alter their agricultural operations to avoid discharges into ambiguous features. Again, these costs will not be recoverable.

10.       Without a nationwide injunction, farmers must either scale back important and otherwise lawful agricultural activities, roll the dice and assume the risk of potentially crippling liability, or incur tens of thousands of dollars plus months or years of delay in farming to seek precautionary permits.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _9-10-18_                                    _Don Parrish_

3

A-11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

STATE OF GEORGIA, *et al.*,

      *Plaintiffs*,

      v.

ANDREW WHEELER, *et al.*,

      *Defendants*.

Case No. 2:15-cv-79

---

## DECLARATION OF JANET PRICE

---

I, Janet Price, declare based upon personal knowledge that:

    1.    I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

    2.    I am the Environmental Manager for Rayonier Inc, a National Association of Forest Owners member company. In this role, I am responsible for supporting Rayonier's forestry operations in understanding and complying with environmental regulatory requirements.

    3.    Rayonier Inc., through its subsidiaries (collectively, "Rayonier"), owns over two million acres of land in the United States in states including Florida, Georgia, Alabama, Mississippi, Louisiana, Texas, Oklahoma, South Carolina, Washington, and Oregon. Some of these states are subject to the 2015 WOTUS Rule, 80 Fed. Reg. 37,054 (June 29, 2015), while others are not.

    4.    Rayonier has features on its lands that Rayonier has historically understood not to be subject to regulation under the Clean Water Act. Some of these features may constitute a "water of the United States" under the 2015 Rule. Because the 2015 Rule is vague, it is not certain which features qualify.

    5.    Rayonier has undertaken a detailed internal review of the 2015 Rule in an effort to interpret the requirements and determine the impact to timberland operations encompassing a multi-

A-12

state land base. This review has entailed substantial time and resources, which are not recoverable, and will continue to be incurred as I and other Rayonier staff and contractors work to identify features potentially covered under the 2015 Rule.

6.    The 2015 Rule may have expanded the scope of "waters of the United States" to cover additional features on Rayonier lands that are difficult to characterize, such as dry ephemeral drains or ditches crossing Rayonier land that may eventually feed into some other water feature offsite of Rayonier property.

7.    The possibility that these features will be treated as "waters of the United States" creates uncertainty about whether and how Rayonier can use its lands and about what regulatory requirements of particular uses may apply.

8.    The 2015 Rule further affects Rayonier's use of some pesticide application general permits in states in which Rayonier operates.  Rayonier must identify and quantity features on its lands that are "waters of the United States" and demonstrate that it does not discharge into such areas above a particular threshold. Because the 2015 Rule is unclear and covers land features that are difficult to identify, this process is rendered extraordinarily difficult and uncertain.

9.    To ensure that Rayonier continues to engage in best management practices under the 2015 Rule, I anticipate that Rayonier will have to establish additional buffering around potential "waters of the United States," which would irreparably take land out of production.

10.    The regulatory uncertainty surrounding the 2015 Rule makes the situation untenable. It is my understanding that the 2015 Rule has been the subject of legal challenges and that the EPA is currently seeking to repeal and replace the 2015 Rule. Because the 2015 Rule may soon be replaced, our efforts to identify features that qualify as "waters of the United States" may soon become moot. Adding to the complexity and uncertainty, the 2015 Rule is now in effect in some, but not all, of the states in which we operate. This shifting legal landscape impacts Rayonier's ability to plan its operations to ensure compliance.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 09/10/2018                    *Janet Pince*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

STATE OF GEORGIA, *et al.*,

       *Plaintiffs*,

AMERICAN FARM BUREAU
FEDERATION, *et al.*,

       *Intervenor-Plaintiffs*,

v.

ANDREW WHEELER, *et al.*,

       *Defendants*.

Case No. 2:15-cv-79

### DECLARATION OF ROBERT E. REED

I, Robert E. Reed, declare based upon personal knowledge that:

1. I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2. I farm about 3,000 acres of land near Bay City, Matagordo County, Texas.

3. I am today and have been for the past 40 years a member in good standing of the Matagorda County Farm Bureau, Texas Farm Bureau, and American Farm Bureau Federation. I served on the board of directors of the Texas Farm Bureau from 1999-2005 and 2011-2017.

4. I am aware of the 2015 "waters of the United States" Rule (the "Rule"). I have thought about which waters on my farm may be regulated by the Rule and how I will need to change my farming practices in order to avoid the possibility of liability under the Rule.

5. I am what is commonly called a "cash tenant," meaning I lease, rather than own the land I farm. I pay rent on land that I lease, even if am not able to farm any portion of it. I have been farming this land for the last 40 years.

6. I farm rice and sorghum and graze cattle, although the cattle belong to another local tenant farmer. The land was first converted to rice fields in the early 1900s. I started farming rice in 1979, which is planted in a three year rotation. Cattle graze on fallowed fields as part of this rotation.

7. While I am not aware of the presence of any wetlands on my farm, I have constructed ponds on my land in the last ten years. These ponds serve two purposes: to provide water for cattle and to serve as habitat for ducks for hunting.

8. The ponds are generally filled with runoff from rains. Rice fields are drained prior to harvest and where drainage allows, the water from rice fields is also captured in these ponds. Also, at the end of irrigation season, if the Lower Colorado River Authority has water available, it can be purchased and diverted to the duck ponds.

9. The terrain on my farm appears flat but it has gradual natural slope. I have not precision-leveled my fields. As a result, when water moves through my farm, it typically forms a channel and moves with the natural contours of the land.

10. The land I farm has naturally occurring ephemeral drains that carry water only after it rains. Some of these natural ephemeral drains have been improved as ditches to provide better flow of water from my fields. These ditches carry water only after a moderate or heavy rain or

when there is overflow from my rice fields. From what I can see (now and prior to their improvement), these ditches have a lower area of elevation (possibly a bed), an area of higher elevation (possibly a bank) and the flow of stormwater tends to move vegetation and leave visible marks in the soil (possibly an ordinary high water mark). These ditches lead to a creek and eventually to Matagorda Bay and the Gulf of Mexico.

11. It is my understanding that under the Rule (but not under prior guidance), my drainage ditches meet the definition of "tributaries" and are therefore categorically considered to be "waters of the United States." I also understand that they would not qualify for the Rule's exclusion of certain ditches because they were excavated in natural erosional features that are likely also to have been "tributaries" as defined under the Rule.

12. My ditches have never previously been identified as "waters of the United States" under the Clean Water Act, and no regulator has ever found that they had a "significant nexus" to downstream navigable waters. I had never before believed that I had a legal obligation to seek a permit for any of my farming activities in and around these drainage ditches.

13. I have always recognized that the water in my ditches eventually reaches Matagorda Bay. I therefore have always taken care to place a small buffer and farm around those ditches to avoid spraying pesticides and fertilizers into them. Now, however, I understand that I will have a legal obligation to ensure that absolutely no fertilizers or pesticides fall into those ditches, even when the ditches are dry, without first obtaining a Clean Water Act permit.

14. Because my ditches are now probably "waters of the U.S." under the Rule, if the Rule remains in effect, I will need to either establish a large buffer around those ditches, at least 15 feet, to avoid an unlawful "discharge" of any "pollutant" (including, for example, fertilizers and pesticides) to those ditches. I will need to take about 5 percent of the field out of production, which is about 5 acres of lands from a 100-acre field, to ensure compliance the rule. In a typical crop year, taking that amount of land out of production would cost me about $1,400 an acre in revenue. Even if I must take this land out of production, my rent charges remain the same.

15. It is my understanding that the 2015 Rule has currently entered effect in Texas, but that it is the subject of legal challenges and may be invalidated even a short time from now. However, I must prepare my land for the next year's planting season months in advance. Timing is critical. I face two options. First, I can till the field as I normally would absent the 2015 Rule, and risk that the costs I expend preparing the land for planting will be lost if the 2015 Rule is still in effect during the planting season and requires me to leave those lands out of production. Or, I can leave those portions of the field untilled as described in Paragraph 14, but will lose the opportunity to plant in those areas, even if the 2015 Rule is later invalidated. In either case, I face an unrecoverable loss of revenue.

16. I have traditionally used aerial applications of pesticides and fertilizers for my rice fields. Based on my understanding of my new legal obligations, I will no longer be able to use aerial applications of pesticides or fertilizers on my rice fields unless I can be sure that there is absolutely no unlawful "discharge" of "pollutants" to these ditches, even at times when they are not carrying water. I am also concerned because many of these ditches are very close to the rice field levees. While aerial application of pesticides and fertilizers is aimed at a particular target rice field, there is a certain amount of imprecision in application, resulting in product falling outside the rice field. To prevent any potentially unlawful "discharge" to ditches in close proximity to my rice fields, I will need to stop aerially applying fertilizers and pesticides within a 35 foot buffer on the inside perimeter of my rice fields. If field conditions are dry enough at the right times, I may be able to use ground applicators to apply fertilizer or pesticide on the perimeter of the fields (but outside of the buffer zone around the ditches). This would involve additional time and cost. If ground conditions do not allow for ground applications, my rice production acreage will be reduced by about 10% since plants within the perimeter would not receive sufficient fertilizer or pesticides to cultivate a viable crop. This will cost me about $14,000 per 100 acre field in unrecoverable revenue losses.

17. All of these ditches have culverts and pipe crossings, enabling me to move my farm equipment over the ditches. Many of the culverts will need to be replaced in the near future. Replacement of a culvert will likely result in the discharge of dirt and gravel (a pollutant) into these ditches. Unless my culvert improvements are deemed "normal farming activities" by the Corps, I will need to seek a permit. It is unclear to me whether replacing a culvert qualifies as a

A-16

"normal farming activity" or qualifies for any other exemption under the 2015 Rule. I therefore have no way to know with confidence whether replacing the culverts would be lawful without a permit.

18. If the Court does not invalidate the Rule, I will incur many thousands of dollars in costs and lost revenue to comply with the Rule. These costs will not be recoverable.

19. I signed a declaration on August 24, 2016 in support of the American Farm Bureau and Texas Farm Bureau's challenge to the 2015 Rule in the U.S. Court of Appeals for the Sixth Circuit. Everything I stated in that declaration remains accurate except insofar as it has been superseded by anything I have declared here.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of September, 2018.

*Robert E. Reed*

Robert E. Reed

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF GEORGIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 2:15-cv-79 |
| ANDREW WHEELER, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF JEFF SLAVEN**

I, Jeff Slaven, declare based upon personal knowledge that:

1.     I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.     I am the owner of Maple Springs Farm ("Maple Springs"), and a National Cattlemen's Beef Association member. In this role, I oversee all aspects of operation of Maple Springs, including compliance with the Clean Water Act and other regulatory requirements.

3.     Maple Springs has numerous ditches and other land and water features on its lands that it previously understood not to be subject to regulation under the Clean Water Act. Some of these features do or may constitute a "water of the United States" under EPA's recently promulgated WOTUS Rule, 80 Fed. Reg. 37,054 (June 29, 2015), although it is unclear which ones because the Rule is vague. The United States Geological Survey's National Hydrography Dataset shows an intermittent stream flowing through my property. Standing on the land, there is no visual indication of an intermittent stream. In fact, Maple Springs recently constructed a covered cattle barn that is located on, or about, a portion of this mapped feature. I am particularly

concerned that the government will interpret this mapped feature to be a water of the United States under the WOTUS Rule and require me to get a permit under the Clean Water Act.

4.      Maple Springs qualifies as an "animal feeding operation" (AFO) under 40 C.F.R. § 122.23. Pursuant to 40 C.F.R. § 122.23(c), an AFO can be designated as a "concentrated animal feeding operation" (CAFO) based upon, among other things, "the location of the AFO relative to waters of the United States."

5.      A CAFO is considered a "point source" under the Clean Water Act. *See* 33 U.S.C. § 1362(14). Thus, CAFOs must obtain a NPDES permit under the Act in order to discharge any pollutant into "waters of the United States." Accordingly, the possibility that the WOTUS Rule will designate additional features on Maple Springs' land as "waters of the United States" creates uncertainty about whether and how Maple Springs can use its lands. The presence of additional waters of the United States near Maple Springs' lands could cause it to be designated a CAFO— which, in turn, would require Maple Springs to obtain NPDES permits for activities that previously would not have required one or otherwise to cease those activities.

6.      Separate and apart from possible CAFO designation, the Rule would also have direct effects on the use of Maple Springs' lands, as discharges from point sources like farming equipment into features like ditches may require permits or changes in farming practices.

7.      Maple Springs has reviewed the Rule in an effort to understand the requirements and determine the impact to its operations. Maple Springs has dedicated time to identifying features on its lands that may be covered under the Rule, and has made plans to take further action in response to the Rule.

8.      Due to the decision of a federal judge in the U.S. District of South Carolina, the WOTUS Rule is now in effect in the State of Virginia, where Maple Springs is located. I am spending additional time, money, and resources to access and implement further plans to come

2

compliance with the law. These further plans include relocating three-hundred steer calves to a sod confinement lot to complete the backgrounding phase. Consequently, I expect a loss of weight gain, increased labor associated with daily feeding, and reduced overall cattle performance at an estimated cost of $0.35/pound and $15,750. Additionally, I have increased concern for placing three-hundred head of cattle in the semi-confinement sod boundary for 90-100 days due to the associated nitrogen, phosphorus, and sediment runoff that will occur due to sod degradation from cattle movement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _9/20/2018_

3

A-20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

STATE OF GEORGIA, *et al.*,

     *Plaintiffs*,

     v.

ANDREW WHEELER, *et al.*,

     *Defendants*.

Case No. 2:15-cv-79

---

### DECLARATION OF THOMAS WARD

---

I, Thomas J. Ward, declare and state under penalty of perjury as follows:

1.    I am a resident of Virginia, over 18 years of age, and have personal knowledge of the matters contained herein.

2.    I am the Vice President for Legal Advocacy for the National Association of Home Builders ("NAHB").  In this capacity, I am familiar with the mission and goals of NAHB in the administrative, legislative and judicial areas.  Furthermore, as the head of NAHB's Litigation Department, I am knowledgeable of the ongoing litigation surrounding the 2015 *Definition of "Waters of the United States*," and the subsequent related rulemakings.

3.    NAHB is a national trade association, headquartered in Washington, D.C., whose mission is to enhance the climate for housing and the building industry.  Chief among NAHB's goals is providing and expanding opportunities for all consumers to have safe, decent and affordable housing.

4.    Founded in 1942, NAHB is a federation of more than 800 state and local associations.  About one-third of NAHB's 140,000 members are home builders and/or remodelers.  The remaining members are associates working in closely related fields within the housing industry, such as land development, mortgage finance and building products and services.

5.      NAHB works closely with federal agencies during adjudicative and rulemaking processes to ensure that the agencies' decisions do not adversely impact the home building industry.

6.      NAHB commented extensively on the 2015 *Definition of "Waters of the United States,"* and has commented on all of the subsequent related rulemakings.

7.      Due to the August 16, 2018 Order filed in the District Court of South Carolina vacating the Environmental Protection Agency's rule titled *Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule*, NAHB has had to expend resources to inform its members of the impact of the South Carolina decision.

8.      Because of the nationwide confusion caused by August 16 Order, and the preliminary injunctions of the 2015 *Definition of "Waters of the United States,"* NAHB has explained to its membership that some states will continue to conduct Clean Water Act jurisdictional determinations ("JDs") under the so-called 1986 definition of the term "waters of the United States" while in other states, JD's will be conducted under the 2015 definition of that term.

9.      In addition, I personally have answered questions from members in some of the 23 states where the 2015 definition is currently applicable. All of the questions concern whether they should wait some amount of time before seeking a JD on their property. I have explained that if they were to obtain a JD under the 2015 definition, there is a likelihood that more of their property will be determined to be a "water of the United States" than under the 1986 definition. Furthermore, I have explained that if they obtain a JD under the 2015 definition, they may be precluded from having the property reassessed under the 1986 definition, or that any reassessment will cause a delay in their project. The NAHB members that I have spoken to have explained that postponing a JD will delay their project thereby costing more money to bring the project to completion.

10.     NAHB would not have taken these actions but for the confusion caused by the South Carolina District Court's August 2018 Order and the preliminary injunctions of the 2015

*Definition of ''Waters of the United States.''*

11. Under Clean Water Act section 404, the Corps of Engineers issues both individual and nationwide (or general) permits. Individual permits are site specific and the permittee does not know the conditions of the permit before it is issued. In my experience, it take over 2 years to obtain an individual permit and costs over $250,000.

12. In contrast, nationwide permits are general, and the permittee knows the conditions of the permit before applying. Furthermore, to qualify for a nationwide permit, a landowner may only impact a limited area (or linear footage) of jurisdictional waters. In my experience, a landowner can usually obtain a nationwide permit in less than a year with an average cost of around $30,000.

13. Many homebuilders obtain their Clean Water Act approvals pursuant to nation-wide permits. Homebuilders choose to operate under nationwide permits because they can obtain their approval in less time and less expensively than under an individual permit.

14. Under the 2015 definition, the jurisdictional area (or linear footage) of waterbodies will be greater than under the 1986 definition. Thus, many projects that obtain JDs under the 2015 definition will have more or larger jurisdictional waters on site. Therefore, many projects will not qualify for a nationwide permit under the 2015 definition.

15. Therefore, many homebuilders that operate in states where the 2015 definition is now applicable will delay their projects to avoid having to obtain an individual permit and some projects may even be abandoned.

16. This means NAHB members' operations are being irreparably delayed and disrupted by the 2015 Rule.

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _09/13/18_____

_____
Thomas J Ward