**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No.: 20-cv-10820-DPW |

**BRIEF OF AMICI CURIAE CRAFT BREWERS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICI CURIAE ...................................................................................................1

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................3

A.     Businesses, like Craft Breweries, that Depend on Clean Water Rely on the CWA's Regulatory *Status Quo*. ....................................................................................................3

B.     Under *County of Maui*, the Rule Should Be Vacated as Inconsistent with the Clean Water Act's Purpose and Text. ..........................................................................................5

1.     *County of Maui* Instructs That the Mere Desire for a Bright Line Rule Cannot Overcome the Purpose of the Clean Water Act. ..............................................................6

2.     *County of Maui* Instructs That the Mere Desire for a Bright Line Rule Cannot Overcome the Plain Language of the Clean Water Act. ...................................................8

CONCLUSION .............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Petroleum Inst. v. EPA*,
 540 F.2d 1023 (10th Cir. 1976) ..................................................................................................7

*Cty. of Maui, Hawaii v. Hawaii Wildlife Fund, et al.*,
 140 S. Ct. 1462 (2020)............................................................................................... *passim*

*Nat'l Cotton Council of Am. v. EPA*,
 553 F.3d 927 (6th Cir. 2009) ......................................................................................................7

*Rapanos v. United States*,
 547 U.S. 715 (2008) .........................................................................................................7, 8, 9

**Statutes**

33 U.S.C. § 1251(a) ........................................................................................................1, 6, 7

33 U.S.C. § 1342................................................................................................................1

**Regulations**

33 C.F.R. § 328.3.............................................................................................................1, 2

85 Fed. Reg. 22,250 (Apr. 21, 2020) ......................................................................................1

85 Fed. Reg. 22,273 (Apr. 21, 2020) ......................................................................................2

85 Fed. Reg. 22,279 (Apr. 21, 2020) ......................................................................................1

**Other Authorities**

Brewers Association, *Economic Impact*,
 https://www.brewersassociation.org/statistics-and-data/economic-impact-data/
 (last visited Dec. 15, 2020) ...................................................................................................3

## INTEREST OF AMICI CURIAE

*Amici curiae* Craft Brewers are a coalition of craft breweries from across the United States.[1] The Craft Brewers operate businesses dependent on consistent sources of clean water and rely upon the Clean Water Act (33 U.S.C. §§ 1251, *et seq.*) ("CWA" or the "Act") to protect their water supply and their business operations.

The Craft Brewers are directly affected by decisions that could undermine the Act's existing protections and make it trivially easy to evade. The Brewers have a vital interest in preserving the longstanding interpretation of the Act, as described below.

## INTRODUCTION

The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the Act's specific goals is to ***eliminate*** the discharge of pollutants into navigable waters. *Id.* at § 1251(a)(1). To that end, Congress made it unlawful to discharge pollutants into "waters of the United States" without authorization. *Id.* at §§ 1342, 1362(7).

The Navigable Waters Protection Rule (the "Rule"), issued by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corp of Engineers (together with the EPA, the "Agencies") in April 2020, substantially narrows the definition of "waters of the United States" by removing CWA protections from all "ephemeral" streams, which flow only after rain or snowfall, and all "non-adjacent wetlands," wetlands lacking specific types of surface-water connections to other waters. 33 C.F.R. § 328.3(b)(3), (c)(3); The Navigable Waters Protection Rule: Definitions of "Waters of the United States," 85 Fed. Reg. 22,250, 22,279 (Apr. 21, 2020);

---

[1] The Appendix lists the individual breweries that form the coalition of Craft Brewers.

1

*see* 33 C.F.R. § 328.3(a)(4), (c)(1). Plaintiffs clearly and accurately explain the fatal problems with the Agencies' new interpretation of the Act. The purpose of this brief is (1) to explain why the Rule would harm *Amici* and (2) to amplify a related point—that the Supreme Court's recent decision in *County of Maui, Hawaii v. Hawaii Wildlife Fund, et al.*, 140 S. Ct. 1462 (2020), supports Plaintiffs' position that the Rule should be vacated as inconsistent with the Clean Water Act's purpose and text.

To the first point, *Amici* are a coalition of craft brewers which, like many other businesses in a range of important industries, rely upon clean water for their livelihood. Quality beer cannot be brewed without clean water, and so brewers (like many other businesses) rely upon the Clean Water Act to protect their water supply and their operations. They have a vital interest in maintaining the current regulatory regime, which will be severely threatened if the Rule is not vacated.

To the second point, the Agencies claim that the primary benefit of the Rule is its bright line, allowing for easy determination of whether a permit is required to discharge pollutants into a particular water or wetland. *See* Defs.' Opp'n at 1; 85 Fed. Reg. at 22,273.

But no law or doctrine permits an agency to adopt a "bright-line" rule merely because it provides a bright line. Instead, agencies must be guided by Congressional intent and the statute's text. Indeed, in *County of Maui*, the Supreme Court specifically instructed that a mere desire (by an agency or anyone else) for a "bright-line rule" neither can nor should influence the core question before this Court: whether the Agencies' interpretation is in fact permitted by the Clean Water Act. 140 S. Ct. at 1477. There, the Court observed that the EPA had applied the Act's permitting provisions for over 30 years with no evidence of inadministrability or an "unmanageable expansion" in the Act's scope, and ultimately held that the statute's meaning

2

must be derived from its purpose and plain language, not a mere desire for a bright-line rule. *Id.* The same established principles of statutory interpretation should guide this Court's decision here.

Accordingly, *Amici* respectfully request that this Court vacate the Navigable Waters Protection Rule.

## ARGUMENT

### A.  Businesses, like Craft Breweries, that Depend on Clean Water Rely on the CWA's Regulatory *Status Quo*.

The craft brewing industry contributes about $82.9 billion to the U.S. economy each year, along with more than 580,000 jobs.[2]  It cannot exist without a reliable clean water supply.

Water is the most fundamental ingredient in all craft beer and accounts for about 90% of the finished product.  Thus, the quality of source water significantly affects the finished product, and compounds present in brewing water can affect pH, color, aroma, and taste.  For example, sulfates make hops taste astringent, while chlorine can create a medicinal off-flavor.  The presence of bacteria can spoil a batch of beer.  Even small chemical disruptions in a brewer's water supply can influence factors like shelf life and foam pattern.  It is critical to the industry not only that water be clean but also that it reliably be so under consistent standards.  Unexpected changes in water quality—for instance, due to pollution in waters upstream from a craft brewer's source water—will threaten the brewing process, consistency, and the craft brewers' bottom line. Thus, the craft brewing industry has a direct stake in preserving the current clean water *status quo*.

---

[2] Brewers Association, *Economic Impact*, https://www.brewersassociation.org/statistics-and-data/economic-impact-data/ (last visited Dec. 15, 2020).

Indeed, the craft brewing industry largely grew up with the Clean Water Act. In 1972, when the Act (and Sections 1342 and 1362 of the Act) was enacted, the craft brewing business was in its infancy. It has since grown at an extraordinary rate—in part because American craft brewers can rely upon a clean water supply.

A threat of transforming clean water regulation, therefore, is no trivial matter to the craft brewing industry, which depends on the preservation of the current clean-water *status quo*. Even with the current regulatory scheme, *Amici* face ongoing water-quality issues, such as extreme fluctuations in chlorine levels, excessive mineral content, and low service pressure. A shift in rules that would threaten the contaminate-content of water used by craft brewers, or the contaminate-content of waters upstream from brewers' source water, would be a severe problem for the industry (as it would be for many other industries, and for every individual who relies on clean water for drinking or recreation), particularly because, once contaminants make their way into the water supply, there is ***no quick fix***.

Indeed, pollution caused now will remain a constant threat to breweries for many years to come. For instance, one *Amici* brewer is located near a former army base where contaminants from 60 years of army use still impact the community's water today—over 20 years later. That water has been under continual monitoring, which must continue for at least another 10 years to ensure the source water remains contaminant-free. Were pollution to enter the source water, it would be devastating—likely resulting in the brewery shutting down. The best way to prevent pollution from entering brewers' source water supply is to trap it far upstream. The Rule, by removing protections for upstream waters, introduces long-term risk for all *Amici* and their communities.

Moreover, the Court should not lose the economic forest for the trees. *Amici's* economic interest is inextricably tied to a reliably clean water supply. For many businesses, including *Amici*, it is far more important to have an unquestionably safe, clean water source than it is to have a "bright-line" rule from the Agencies, particularly when that "bright-line" rule disregards the Clean Water Act's text and Congress' intent in enacting the Act.

### B. Under *County of Maui*, the Rule Should Be Vacated as Inconsistent with the Clean Water Act's Purpose and Text.

In *County of Maui*, the Supreme Court addressed the Clean Water Act's prohibition on "the 'addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit from the [EPA.]" 140 S. Ct. at 1468. The question at issue was "whether the [Clean Water] Act requires a permit when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source, [t]here, groundwater." *Id.* (internal quotation marks omitted). The County of Maui ("Maui")—appealing the Ninth Circuit's holding that "the permitting requirement applies so long as the pollutant is 'fairly traceable' to a point source," *id.* at 1470—advocated for a bright-line rule requiring a permit *only if* a pollutant traveled from a "point source" directly to "navigable waters." *Id.* at 1473. The EPA, as *amici*, contended that the permitting requirement would *not* apply if a pollutant travels through any amount of groundwater before reaching navigable waters. Brief of the United States as Amicus Curiae in support of Petitioner at 8, *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), 2019 WL 2153160,. The purported "clarity" of that interpretation was one of the core rationales for the EPA's position. *See, e.g.*, *id.* at 29–31 (arguing for categorical exclusion of groundwater from the NPDES program to provide a clear federal role); *see also* Brief of Petitioner at 38, *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), 2019 WL 2068597 (arguing for "a bright-line analysis for homeowners, businesses, municipalities, and

5

regulated entities" that may need NPDES permitting).

The Supreme Court's approach to interpreting the Clean Water Act in *County of Maui* is highly instructive here. Specifically, the Court looked to the purpose and text of the Act to decide the question presented. The Court was not willing to abandon long-standing principles of statutory interpretation merely to sanction a bright-line rule.

After considering the Act's "language, structure, and purposes," the majority held that the bright-line rule was "too extreme" a departure from statute. *Id.* at 1476. And though the Supreme Court acknowledged that its own interpretation did not present as clear a line as the other interpretations proffered, it held that such considerations neither could nor should outweigh the Act's known purpose or plain language—even considering deference to an agency's views in light of its expertise. *Id.* at 1477. Here too, the Court should look to congressional intent and statutory text to interpret the Act, and refuse to sanction the Rule for bright-line rule's sake, particularly when it strays so unreasonably far from the Act's known purpose and plain language.

### 1. *County of Maui* Instructs That the Mere Desire for a Bright Line Rule Cannot Overcome the Purpose of the Clean Water Act.

The unequivocal purpose of the Clean Water Act is to "restore and maintain the . . . integrity of the Nation's waters." 33 U.S.C. § 1251(a); *Cty. of Maui*, 140 S. Ct. at 1468. In *County of Maui*, the Supreme Court reasoned that the proposed bright-line rule—under which no permitting would be required if there was "*any* amount of groundwater between the [point source] and the edge of the navigable water"—"would open a loophole allowing easy evasion of the statutory provision's basic purposes" and "risk serious interference with EPA's ability to regulate ordinary point source discharges." *Id.* at 1473–74. For instance, to avoid permitting under the bright-line rule, "a pipe that spews pollution directly into coastal waters" (requiring a

6

permit) could simply be moved back a few yards "so that the pollution must travel through at least some groundwater before reaching the sea" (not requiring a permit). *Id.* at 1473. The Supreme Court could "not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act," and therefore held that the bright-line rule was inconsistent with the Act's purpose. *Id.*

Here, the Rule seeks to narrow the definition of "waters of the United States" by categorically excluding all ephemeral streams and non-adjacent wetlands. But this is patently inconsistent with the Act's purpose of restoring, maintaining, and indeed *eliminating* pollution from the Nation's waters. 33 U.S.C. § 1251(a)(1).

Not only do ephemeral streams and non-adjacent wetlands make up a significant portion of the country's waters—respectively, at least 18 percent of the country's stream miles and about half of the country's wetlands—but they also significantly affect the integrity of other navigable waters, making their protection "critical to the statutory scheme." *Rapanos v. United States*, 547 U.S. 715, 775, 786 (2008) (Kennedy, J., concurring); *see also Cty. of Maui*, 140 S. Ct. at 1468 (holding that the Act applies to discharges to non-jurisdictional groundwater that reach navigable waters by a "functional equivalent" of a direct discharge). The decision to categorically exclude such waters from the Act's purview contravenes Congress's clear directive "to protect water quality" and "eliminate pollution." *Nat'l Cotton Council of Am. v. EPA*, 553 F.3d 927, 939 (6th Cir. 2009); *see Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1028 (10th Cir. 1976) ("[T]he intent of Congress to improve and preserve the quality of the Nation's waters" must be the "guiding star" when interpreting the Clean Water Act). The Agencies seek intensive line drawing with respect to the Act, but the resulting Rule strays so far from statutory intent as to be wholly unreasonable, not meriting deference.

### 2. *County of Maui* Instructs That the Mere Desire for a Bright Line Rule Cannot Overcome the Plain Language of the Clean Water Act.

As Plaintiffs here note, in *Rapanos*, five justices rejected a textual interpretation of the CWA (which the Agencies adopt) that categorically excludes ephemeral streams and non-adjacent wetlands from the definition of "waters of the United States." *See* 547 U.S. at 733–34 (plurality op.); *compare id*. at 768–70 (Kennedy, J., concurring in judgment) (finding the plurality's approach to "intermittent and ephemeral streams" to be "without support in the language and purposes of the [CWA]"); *id*. at 800–04 (Stevens, J., dissenting [joined by Justices Souter, Ginsburg, and Breyer]) (rejecting the plurality's categorical exclusion of intermittent or ephemeral stream beds).

The linguistic analysis in *County of Maui* further indicates that the current Supreme Court would reject the plurality opinion's view in *Rapanos* and reach the opposite conclusion. In *County of Maui*, the Court looked to the text of the Act, focusing the "linguistic question" on the statutory word "from"—*i.e.*, whether pollution that reaches navigable waters only through groundwater is "from" a point source. 140 S. Ct. at 1470. Maui argued that "from" connotes the "*means of delivering* pollutants to navigable waters" and not "*where* the pollution originated." *Id*.; *see also id*. at 1473 ("Maui argue[d] that the statutory meaning of 'from any point source' is not about *where* the pollution originated, but about *how* it got there."). The majority rejected Maui's "esoteric definition of 'from' as connoting a means" in favor of the "every day meaning" connoting an origin. *Id.* at 1473. In doing so, the Court emphasized the importance of context in determining the appropriate definition for a given word. *Id.* There, considering the Act's purpose of protecting the Nation's waters, the majority found Maui's proffered interpretation "unreasonable," concluding that it "[did] not remotely fit in this context." *Id.*

The Court further reasoned that, had it been Congress's intent to exclude discharges

8

through groundwater from the permitting requirement, it could have simply stated as much. Congress, of course, did not, and as written, "[t]he statutory text itself alludes to no exception for discharges through groundwater." *Id.* at 1474. Accordingly, the majority held that Maui's bright-line rule was inconsistent with the plain language of the Act.

Similarly, here, there is no textual basis for concluding that the word "waters" somehow excludes ephemeral streams and non-adjacent wetlands. Such an interpretation adopts an imprecise and arbitrary definition of "waters," over the word's plain, every day meaning—contrary to guidance in *County of Maui*. *See also Rapanos*, 547 U.S. at 770 (Kennedy, J., concurring) (quoting Webster's New Int'l Dictionary at 2882 (2d ed. 1954) (reasoning that "a full reading of the dictionary definition [of "waters] *precludes* [an] emphasis on permanence," because "[t]he term 'waters' may mean 'flood or inundation,' . . . events that are impermanent by definition."); *id.* at 778 (Kennedy, J., concurring) (concluding that the plurality opinion is "not a correct reading of the text").

Additionally, the Agencies' interpretation fails to consider statutory context—for it is wholly at odds with the purpose of protecting the Nation's waters. As Justice Kennedy noted, it makes "little practical sense in a statute concerned with downstream water quality" to regulate streams with the "merest trickle, if continuous," but to not regulate "torrents thundering at irregular intervals through otherwise dry channels." *Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring). Without more explicit indication from Congress that it intended this less-common meaning, the Agencies' definition is clearly unreasonable. And, under *County of Maui*, would not likely survive Supreme Court review.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate the Navigable Waters Protection Rule.

Dated: December 17, 2020

*[signature]*

Katelyn A. Kuwata
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Phone: (310) 556-2700
Email: kkuwata@kbkfirm.com

*Counsel for Amici Curiae*

# **APPENDIX**

Allagash Brewing Co. – Portland, ME

Asheville Brewing Co. – Asheville, NC

Aslan Brewing Co. – Bellingham, WA

Bang Brewing Co. – St. Paul, MN

Brewery Vivant – Grand Rapids, MI

Cahaba Brewing Co. – Birmingham, AL

Diner Brew Co. – New Rochelle, NY

Engrained Brewery – Springfield, IL

Flying Fish Brewing Co. – Somerdale, NJ

Fibonacci Brewing Co. – Cincinnati, OH

Greenstar Brewing – Chicago, IL

Half Acre Beer Co. – Chicago, IL

Horse and Dragon Brewing Co. – Fort Collins, CO

Lakefront Brewery – Milwaukee, WI

New Belgium Brewing Co. – Fort Collins, CO

Old Bust Head Brewing Co. – Vint Hill Farms, VA

Orono Brewing Co. – Orono, ME

Pilot Project Brewing – Chicago, IL

Rising Tide Brewing Co. – Portland, ME

Sedona Beer Co. – Sedona, AZ

Sierra Nevada Brewing Co. – Chico, CA

Short's Brewing Co. – Bellaire, MI

Temperance Beer Co. – Evanston, IL

Upslope Brewing Co. – Boulder, CO

Wren House Brewing Co. – Phoenix, AZ

Zed's Beer – Marlton, NJ