## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 1:20-cv-10820-DPW |
| v. | ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) | ***Leave to File Granted on December 17, 2020*** |
| *Defendants*. | ) ) ) | |
| _____ | ) | |

***AMICUS CURIAE* BRIEF OF 15 CONSTRUCTION, MINING, MANUFACTURING, AGRICULTURE, LIVESTOCK, AND ENERGY TRADE ASSOCIATIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF <u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF THE *AMICI CURIAE* ............................................................... 1

BACKGROUND ................................................................................................ 5

SUMMARY OF THE ARGUMENT ................................................................... 6

ARGUMENT ..................................................................................................... 7

I.      THE AGENCIES PROVIDED A REASONED EXPLANATION FOR THE 2020 RULE ......................................................................... 7

      A.     The 2020 Rule is supported by a reasoned explanation ........................... 8

      B.     Plaintiffs' Arguments That The 2020 Rule Is Arbitrary And Capricious Have No Merit ..................................................................... 10

            1.     The agencies explained their treatment of ephemeral features ..................................................................................... 10

            2.     The agencies explained their treatment of wetlands .................... 11

      C.     The agencies did not ignore water quality ............................................. 12

II.     THE 2020 RULE IS CONSISTENT WITH THE CLEAN WATER ACT ......... 12

      A.     The 2020 Rule is consistent with controlling Supreme Court precedent .......................................................................................... 12

      B.     Plaintiffs misunderstand the Rule's foundations and ignore governing precedent ............................................................................ 15

      C.     The 2020 Rule is a proper interpretation of the States' role in water resource regulation ............................................................................. 19

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brzonkala v. Virginia Polytechnic Inst. & State Univ.*,
    169 F.3d 820 (4th Cir. 1999) ................................................17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)................................................12

*Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric*,
    984 F.2d 514 (1st Cir. 1993)................................................11

*County of Maui v. Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020)................................................18

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)................................................7, 8, 12

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................7, 8

*Georgia v. Pruitt*,
    326 F. Supp. 3d 1356 (S.D. Ga. 2018)................................................5

*Georgia v. Wheeler*
    418 F. Supp. 3d 1336 (S.D. Ga. 2019)................................................11

*Gonzales-Veliz v. Barr*,
    938 F.3d 219 (5th Cir. 2019) ................................................10

*In re Jones*,
    534 B.R. 149 (Bankr. E.D. Ky. 2015) ................................................17

*King v. Palmer*,
    950 F.2d 771 (D.C. Cir. 1991) (en banc) ................................................13, 15, 16

*Large v. Fremont Cty., Wyo.*,
    670 F.3d 1133 (10th Cir 2012) ................................................13

*Marks v. United States*,
    430 U.S. 188 (1977)................................................ *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)................................................7

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Nat'l Ass'n of Mfrs.* v. *Dep't of Defense*,
  138 S. Ct. 617 (2018) ........................................................................................................4

*Nat'l Ass'n of Regulatory Util. Comm'rs v. SEC*,
  63 F.3d 1123 (D.C. Cir. 1995) .........................................................................................9

*Nat'l Shooting Sports Found., Inc. v. Jones*
  716 F.3d 200 (D.C. Cir. 2013) .......................................................................................11

*National Cable & Telecommunications Association v. Brand X Internet Services*,
  545 U.S. 967 (2005) .....................................................................................................7, 15

*New York v. U.S. Dep't of Health & Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..............................................................................8

*North Dakota v. EPA*,
  127 F. Supp. 3d 1047 (D.N.D. 2015) ................................................................................5

*O'Dell v. Netherland*,
  521 U.S. 151 (1997) ........................................................................................................16

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) ..........................................................................................17

*Purcell v. BankAtlantic Fin. Corp.*,
  85 F.3d 1508 (11th Cir. 1996) ........................................................................................17

*Rapanos v. United States*,
  547 U.S. 715 (2006) .................................................................................................. *passim*

*Tyler v. Bethlehem Steel Corp.*,
  958 F.2d 1176 (2d Cir. 1992) ..........................................................................................15

*United States v. Alcan Aluminum Corp.*,
  315 F.3d 179 (2d Cir. 2003) ............................................................................................13

*United States v. Brooks*,
  2009 WL 3644122 (E.D.N.Y. 2009) ...............................................................................17

*United States v. Cundiff*,
  555 F.3d 200 (6th Cir. 2009) ..........................................................................................13

*United States v. Davis*,
  825 F.3d 1014 (9th Cir. 2016) ........................................................................................13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*United States v. Epps*,
   707 F.3d 337 (D.C. Cir. 2013) ..................................................................14

*United States v. Freedman Farms, Inc.*,
   786 F. Supp. 2d 1016 (E.D.N.C. 2011) ......................................................18

*United States v. Johnson*,
   467 F.3d 56 (1st Cir. 2000) ..................................................................15, 18

*United States v. Riverside Bayview Homes*,
   474 U.S. 121 (1985) ...................................................................................13

*United States v. Robison*,
   505 F.3d 1208 (11th Cir. 2007) .................................................................17

*Whole Woman's Health v. Paxton*,
   972 F.3d 649 (5th Cir. 2020) .....................................................................17

**Statutes, Rules, and Regulations**

5 U.S.C. § 706(2) ...............................................................................................7

33 U.S.C. § 1251(a) ...........................................................................................8

33 U.S.C. § 1251(b) ...........................................................................................8

33 U.S.C. § 1344(g)-(l) .....................................................................................19

91 Stat. 1567, 1575, Public Law 95-217 (1977) ..............................................19

Clean Water Rule: Definition of "Waters of the United States",
   80 Fed. Reg. 37,054 (June 29, 2015) .....................................................4, 12

Restoring the Rule of Law, Federalism, and Economic Growth by reviewing the
   "Waters of the United States" Rule, 82 Fed. Reg. 12,497 (Feb. 28, 2017) ..............................9

Definition of "Waters of the United States"—Recodification of Pre-Existing
   Rules, 82 Fed. Reg. 34,899 (July 27, 2017) ................................................5

Definition of "Waters of the United States"—Recodification of Pre-Existing
   Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ...............................................5

The Navigable Waters Protection Rule: Definition of "Waters of the United
   States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) .................................... *passim*

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

**Other Authorities**

*American Farm Bureau Fed'n v. EPA*,
  3:15-cv-165 (S.D. Tex. Sept. 12, 2018), Dkt. 87 ........................................................5

A.M. Honore, *Ratio Decidendi*: *Judge and Court*, 71 Law Q. Rev. 196 (1955) ..........................17

Am. Forest & Paper Ass'n, *State Industry Economic Impact–United States* (Aug.
  2018), https://www.afandpa.org/docs/default-source/factsheet/2018-
  update/united-states-august-2018.pdf?sfvrsn=2 ........................................................2

American Petroleum Inst., *Oil & Natural Gas: Supporting the Economy, Creating
  Jobs, Driving America Forward* (2018),
  https://www.api.org/~/media/Files/Policy/Taxes/DM2018-086_API_
  Fair_Share_OnePager_FIN3.pdf ............................................................................3

Forest2Market, *New Report Details the Economic Impact of US Forest Products
  Industry* (May 9, 2019),  https://blog.forest2market.com/new-report-details-
  the-economic-impact-of-us-forest-products-industry .................................................2

Jonathan H. Adler, *Reckoning With Rapanos: Revisiting "Waters of the United
  States" and the Limits of Federal Wetland Regulation*, 14 Mo. Envt'l L. &
  Pol'y Rev. 1, 14 (2006) ........................................................................................16

Nat'l Alliance of Forest Owners, *The Economic Impact of Privately-Owned
  Forests in the 32 Major Forested States* (Apr. 4, 2019),
  https://nafoalliance.org/wp-
  content/uploads/2018/11/Forest2Market_Economic_Impact_of_Privately-
  Owned_Forests_April 2019 ...................................................................................2

Nat'l Mining Association, *The Economic Contributions of U.S. Mining* (Sept.
  2018), https://nma.org/wp-
  content/uploads/2016/09/Economic_Contributions_of_Mining_2017_
  Update.pdf..........................................................................................................3

U.S. Census Bureau, *Annual Value of Construction Put in Place 2008-2019*,
  https://www.census.gov/construction/c30/ historical_data.html ...............................1

U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Sectors and the
  Economy* (May 4, 2020), https://www.ers.usda.gov/data-products/ag-and-
  food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy .......................2

U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Statistics: Charting
  the Essentials, February 2020* (Feb. 2020),
  https://www.ers.usda.gov/webdocs/publications/96957/ap-083.pdf .........................2

v

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

U.S. Energy Information Ass'n, *Annual Energy Outlook 2019*,
   https://www.eia.gov/outlooks/aeo/ data/browser/#/?id=1-
   AEO2019&cases=ref2019&sourcekey=0.pdf ........................................................................3

**INTEREST OF THE *AMICI CURIAE***

*Amici curiae*, which are further described in the Appendix, are the American Farm Bureau Federation, American Petroleum Institute, American Road & Transportation Builders Association, Chamber of Commerce of the United States, Edison Electric Institute, Leading Builders of America, National Alliance of Forest Owners, National Association of Home Builders, National Cattlemen's Beef Association, National Corn Growers Association, National Mining Association, National Pork Producers Council, National Stone, Sand & Gravel Association, Public Lands Council, and U.S. Poultry & Egg Association. These national trade associations represent a broad cross-section of the Nation's infrastructure, commercial and residential construction industries, and mining, manufacturing, forestry, agriculture, livestock, and energy industries, all of which are vital to a thriving national economy, including providing much needed jobs.

Many of *amici*'s members construct residential developments, multi-family housing units, commercial buildings, shopping centers, factories, warehouses, waterworks, roads and other infrastructure. During 2019, total public and private investment in the construction of residential structures alone totaled over $550 billion. U.S. Census Bureau, *Annual Value of Construction Put in Place 2008-2019*, https://www.census.gov/construction/c30/ historical_data.html. Every $1 billion of residential construction generates around 16,000 jobs. Spending on commercial and institutional facilities such as shopping centers, schools, office buildings, factories, libraries, and fire stations has an even larger job creation effect, at around 18,000 jobs per $1 billion of spending.

In addition, many of *amici*'s members construct and maintain critical infrastructure: highways, bridges, railroads, tunnels, airports, electric generation, transmission, and distribution

facilities, and pipeline facilities. Infrastructure investments increase economic growth, productivity, and land values. Not only are investments in infrastructure critical to quality of life throughout the nation, but they create many jobs. Every $1 billion in transportation and water infrastructure construction creates approximately 18,000 jobs.

*Amici*'s agricultural members grow virtually every agricultural commodity produced commercially in the United States, including significant portions of the U.S. wheat, soybean, cotton, milk, corn, poultry, egg, pork, and beef supply. Agriculture and livestock-related industries contributed over $1 trillion to the U.S. gross domestic product in 2017 and employed 22 million people in 2018. U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Sectors and the Economy* (May 4, 2020), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy; *see also* U.S. Dep't of Agric., Economic Research Serv., *Ag and Food Statistics: Charting the Essentials, February 2020* (Feb. 2020), https://www.ers.usda.gov/webdocs/publications/96957/ap-083.pdf. Forestry-related businesses support 2.9 million total jobs and are associated with $128.1 billion in total payroll. And forest products—paper, wood, and furniture manufacturing—contribute nearly 6% of GDP. Forest2Market, *New Report Details the Economic Impact of US Forest Products Industry* (May 9, 2019), https://blog.forest2market.com/new-report-details-the-economic-impact-of-us-forest-products-industry; Nat'l Alliance of Forest Owners, *The Economic Impact of Privately-Owned Forests in the 32 Major Forested States* (Apr. 4, 2019), https://nafoalliance.org/wp-content/uploads/2018/11/Forest2Market_Economic_Impact_of_Privately-Owned_Forests_April 2019. pdf; *see also* Am. Forest & Paper Ass'n, *State Industry Economic Impact–United States* (Aug. 2018), https://www.afandpa.org/docs/default-source/factsheet/2018-update/united-states-august-2018.pdf?sfvrsn=2.

Additionally, *amici* represent producers of most of America's coal, metals, and industrial minerals. In 2017, U.S. mining activities directly and indirectly generated over 1.5 million U.S. jobs and $95 billion in U.S. labor income, and contributed $217.5 billion to the U.S. GDP. *See* Nat'l Mining Association, *The Economic Contributions of U.S. Mining*, at E-1 (Sept. 2018), https://nma.org/wp-content/uploads/2016/09/Economic_Contributions_of_Mining_2017_ Update.pdf. They also represent the energy industry that generates, transmits, transports, and distributes the nation's energy to residential, commercial, industrial, and institutional customers. Together, oil and natural gas supply more than 60 percent of our nation's energy. U.S. Energy Information Ass'n, *Annual Energy Outlook 2019*, https://www.eia.gov/outlooks/aeo/ data/browser/#/?id=1-AEO2019&cases=ref2019&sourcekey=0.pdf. Overall, as of 2017, the oil and natural gas industry supported 10.3 million U.S. jobs and contributed 8% of U.S. GDP. American Petroleum Inst., *Oil & Natural Gas: Supporting the Economy, Creating Jobs, Driving America Forward* (2018), https://www.api.org/~/media/Files/Policy/Taxes/DM2018-086_API_ Fair_Share_OnePager_FIN3.pdf.

Individually and collectively, *amici*'s members are thus of critical importance to the Nation's economy. Their experience, planning, and operations make them experts in the Clean Water Act (CWA) and the practical consequences of the regulatory definition of "waters of the United States" (WOTUS) challenged here, the *Navigable Waters Protection Rule*, 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("2020 Rule"). *Amici* have a strong interest in ensuring that federal CWA jurisdiction is exercised lawfully and in promoting national uniformity in the definition of what features are "waters of the United States." Their members must comply with the CWA's prohibition against unauthorized "discharges" into areas that are ultimately deemed jurisdictional. The 2020 Rule provides their members much-needed certainty in describing features that

are or are not "waters of the United States." The prior regulatory regime required unpredictable case-by-case determinations by the agencies, and under that system businesses did not know which features on their lands were jurisdictional and which were not. That uncertainty was compounded by court rulings that meant different regulatory regimes applied in different states. Uncertainty as to which features were jurisdictional deprived *amici*'s members of notice of what the law requires and made it impossible for them to make informed decisions concerning the operation, logistics, and finances of their businesses. And it put them at risk of severe criminal and civil penalties and citizen suits for failing to predict how the Act would be applied.

The 2020 Rule culminates more than five years of multiple administrative rulemakings and litigation, in which many members of the *amicus* coalition participated at every step. They have submitted comments on every proposed rule and litigated for a lawful, reasonable standard since the U.S. EPA and Army Corps of Engineers (the "agencies") proposed what became the 2015 rule defining WOTUS. *See* 80 Fed. Reg. 37,054 (June 29 2015) ("2015 Rule"). They were among the most active litigants challenging the 2015 Rule's unlawful expansion of federal jurisdiction. Many of the *amici* challenged the 2015 Rule in district courts in Texas and Georgia—where the courts held the 2015 invalid—and as *amici* in the District of North Dakota and elsewhere. Among other things, they persuaded the U.S. Supreme Court that these challenges belong in district court, resolving a long-time split among the circuits as to where jurisdiction lay. *Nat'l Ass'n of Mfrs.* v. *Dep't of Defense*, 138 S. Ct. 617 (2018).

For all these reasons, *amici* believe that their experience with the development of and litigation over the regulatory definition of WOTUS—including their members' experience operating under prior regulatory regimes—should inform this Court's decision.

4

# BACKGROUND

The agencies' brief describes the landscape; *amici* need not repeat it here, except to emphasize the regulatory confusion predating the agencies' adoption of the 2020 Rule, which harmed *amici*'s members. What features qualify as WOTUS for purposes of the CWA has been a source of confusion to regulated parties and regulators alike for some time. Seeking to bring clarity to the definition, but in reality engendering much more confusion, the Obama administration published an expansive definition of WOTUS in 2015, sweeping in features that had never been subject to federal jurisdiction. For the regulated community, including *amici*'s members, the 2015 Rule was a disaster, imposing huge risks for ordinary land use activities, while bearing no discernible relation to statutory text or Supreme Court precedent. *See* Declaration of Don Parrish ("Parrish Decl.") ¶¶ 27-29, 40-45 (detailed costs and confusion under the 2015 Rule) (attached as Exhibit 1). The 2015 Rule was subject to multiple legal challenges and was preliminarily enjoined in twenty-seven States. *See American Farm Bureau Fed'n v. EPA*, 3:15-cv-165 (S.D. Tex. Sept. 12, 2018), Dkt. 87; *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1364-65 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1051 n.1, 1055 (D.N.D. 2015). But it went into effect in other states, leading to a patchwork regulatory regime with inconsistent legal obligations for regulated entities with nationwide operations. Parrish Decl. ¶ 25.

In part due to the legal uncertainty generated by the 2015 Rule, the agencies resolved to repeal and replace it in a "comprehensive, two-step process." 82 Fed. Reg. 34,899, 34,899 (July 27, 2017). As the first step, the agencies repealed the defunct 2015 Rule. 84 Fed. Reg. 56,626 (Oct. 22, 2019). The agencies then promulgated the 2020 Rule, the second step, to implement the "objective of the Clean Water Act to restore and maintain the integrity of the nation's waters." 85 Fed. Reg. 22,250. That involved relying on science to "inform[] the agencies' interpretation

of [WOTUS]," while recognizing that "science cannot dictate where to draw the line between Federal and State or Tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id.* at 22,271. To correct the illegalities inherent in the 2015 Rule, the agencies thus struck "a reasonable and appropriate balance between Federal and State waters" that is "intended to ensure that the agencies operate with the scope of the Federal government's authority over navigable waters." *Id.* And, to address the significant confusion generated under prior regimes, the agencies crafted the 2020 Rule with "categorical bright lines" to improve clarity and predictability. *Id.* at 22,273.

## SUMMARY OF THE ARGUMENT

The 2020 Rule was a valid exercise of the agencies' authority and should be upheld. The 2015 Rule manifested an unreasonably expansive scope of federal jurisdiction and required costly case-by-case jurisdictional determinations that failed to provide certainty to the regulated community. The agencies promulgated the 2020 Rule to better accommodate the twin congressional purposes underlying the Clean Water Act ("CWA")—protection of the integrity of navigable waters and preservation of state authority over land and water use—in a manner that observed constitutional boundaries and provided greater regulatory predictability.

Plaintiffs charge that the 2020 Rule violates the APA because it is arbitrary and capricious. But the agencies complied with their obligation to provide a reasoned explanation for their policy change. The agencies were not required to affirmatively disprove the scientific basis for the 2015 Rule because the 2020 Rule is predicated on a legal policy determination regarding the permissible scope of federal jurisdiction, not a rejection of past science or alteration of federal jurisdiction as a scientific matter. Plaintiffs' repeated attempts to fault the 2020 Rule as scientifically unsound thus fall flat.

Another central focus of Plaintiffs' challenge is on the agencies' decision to incorporate into the 2020 Rule aspects of Justice Scalia's plurality decision in *Rapanos v. United States*, 547 U.S. 715 (2006). But Justice Scalia's opinion is only one of the sources relied on by the agencies in promulgating the Rule. And the agencies retain authority to reasonably interpret ambiguous statutory provisions within the bounds of the CWA and binding precedent. See *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). The 2020 Rule is a reasonable and measured interpretation of the scope of federal jurisdiction under the CWA in the light of statutory language, structure, and purpose and Supreme Court precedent.

Contrary to Plaintiffs' argument, there is no binding holding from *Rapanos* rejecting the plurality's view. To prevail on that point, Plaintiffs must combine the four-Justice dissent in *Rapanos* with Justice Kennedy's concurrence. But a dissenting opinion cannot be used to form the basis of a legal holding: because the dissenters did not join in the judgment, their views can have no precedential weight.

## ARGUMENT

## I.   THE AGENCIES PROVIDED A REASONED EXPLANATION FOR THE 2020 RULE

Agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under that standard of review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Agencies need not rigidly adhere to their past policies. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). But they must provide a "reasoned explanation" for any change in position (*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016)) and "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. The agencies here satisfied those standards.

### A.      The 2020 Rule is supported by a reasoned explanation

Although Plaintiffs claim the agencies failed to provide reasoned explanations for changes in the 2020 Rule impacting jurisdiction over certain ephemeral waters and wetlands, Dkt. 31 at 12-19, the agencies in fact provide explanations that span 75 pages of the Federal Register and meticulously set forth the agencies' interpretation of the CWA's text, structure, and purpose (85 Fed. Reg. 22,252-54), the regulatory history (*id*. at 22,254-55), legal precedent bearing on the phrase "waters of the United States" (*id*. at 22,256-59), and the rulemaking process. *Id*. at 22,259-337. This is not a rule backed by "terse explanation" or beset by "unexplained inconsistency." *Encino Motorcars*, 136 S. Ct. at 2126; *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 549 (S.D.N.Y. 2019).

The agencies acknowledge the change in policy in the 2020 rule, explaining the 2020 Rule was intended to "eliminat[e] the case-specific application of the agencies' previous interpretation of Justice Kennedy's significant nexus test" in favor of "clear categories of jurisdictional waters that adhere to the basic principles articulated" in Supreme Court precedent and comport with the structure of the CWA. 85 Fed. Reg. 22,273. And they showed "good reasons" for the new rule. *Fox*, 556 U.S. at 515. The 2020 Rule balances the CWA's goals of preventing pollution and preserving states' control over their water and land resources—a key defect of the prior rule. 85 Fed Reg. 22,252; *see* 33 U.S.C. §§ 1251(a), (b). The agencies found that the 2015 Rule had rested on too narrow a "view of Congress' policy in section 101(b)" regarding states' roles under the CWA as inconsistent with statutory text and history. 85 Fed Reg. at 22,269-70. Under the reasoned-explanation test, "an agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies." *Encino Motorcars*, 136 S. Ct. at 2127. That is what the agencies did.

In carrying out their mandate to balance national interests in keeping navigable waters free from pollution while "promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles on the Congress and the States under the Constitution," 82 Fed. Reg. 12,497, 12,497 (Feb. 28, 2017), the agencies concluded that the 2015 Rule "failed to adequately consider and accord due weight to the policy of Congress" preserving states' rights. 85 Fed. Reg. 22,260. The policy change thus rebalances jurisdiction to match Congress' purposes in the CWA. That is a "good reason" for the change. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. SEC*, 63 F.3d 1123, 1127 (D.C. Cir. 1995).

The agencies also implemented the Rule to be consistent with constitutional limits on their jurisdiction. In *SWANCC*, 531 U.S. at 172-73, the Court explained that Congress did not manifest a clear intent in the CWA for federal regulation to extend to the limits of the agencies' constitutional authority under the Commerce Clause. An interpretation of WOTUS to be as broad as the federal government's Commerce Clause authority would "alter[] the federal-state framework by permitting federal encroachment upon a traditional state power"—the power over local land use. *Id*. at 173. The agencies properly crafted the 2020 Rule to bring the definition of WOTUS within that constitutional limit and to comply with SWANCC. See 85 Fed. Reg. 22,264-65.

Another "good reason" for the change in policy from the 2015 Rule to the 2020 Rule is that the new Rule provides greater regulatory certainty that was lacking in the prior regulations, which were impermissibly vague. 85 Fed. Reg. 22,325 (2020 Rule's "categorical bright lines" provide "clarity and predictability for regulators and the regulated community"); *see* Parrish Decl. ¶¶ 49-55 (outlining benefits under the 2002 Rule). Without doubt, "[r]emoving the source

of confusion" is "'good reason[] for the new policy.'" *Gonzales-Veliz v. Barr*, 938 F.3d 219, 235 (5th Cir. 2019).

### B.    Plaintiffs' Arguments That The 2020 Rule Is Arbitrary And Capricious Have No Merit

Plaintiffs' claims that the 2020 Rule is nevertheless arbitrary and capricious boil down to their dissatisfaction that the agencies did not adopt findings that informed the 2015 rulemaking and their allegations that the agencies did not address scientific matters. Dkt. 31 at 13-15. But the 2020 Rule establishes the opposite: the agencies were cognizant of the hydrological science, addressed that science, and considered it along with other factors. There is no requirement that the agencies consider *only* science; indeed, it would be unlawful for the agencies to do so at the expense of statutory language, structure, and precedent.

### 1.    The agencies explained their treatment of ephemeral features

Plaintiffs' claim that the agencies ignored the scientific record regarding the importance of ephemeral streams to downstream water quality (Dkt. 31 at 13, 16), but the agencies did not need to rebut the scientific record of a connection between ephemeral streams to downstream water quality because science alone cannot answer the jurisdictional question and the agencies made a determination that the policies underlying the CWA supported their line-drawing. Further, the agencies *did* address this question, acknowledging that the Connectivity Report supports the conclusion that ephemeral streams influence downstream waters. 85 Fed. Reg. 22,288. They observed that the SAB recommended using a "connectivity gradient" to recognize the probability that impacts occurring along the gradient will be transmitted downstream, but the SAB also recognized that the Connectivity Report is not a "policy document." *Id*. The agencies explained that they used the Connectivity Report "to inform" the new WOTUS definition, including by "recognizing the 'connectivity gradient' and potential consequences between

perennial, intermittent, and ephemeral streams and downstream waters within a tributary system." *Id*.

Plaintiffs assail the agencies' use of the connectivity gradient to exclude ephemeral streams, Dkt. 31 at 15-16, but that is simply a complaint about the agencies' drawing lines that accommodate the governing legal principles. *See Nat'l Shooting Sports Found., Inc. v. Jones* 716 F.3d 200, 214-15 (D.C. Cir. 2013); *Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric*, 984 F.2d 514, 522 (1st Cir. 1993). The agencies explained that they considered the connectivity gradient in light of their decision to draw lines to preserve state sovereignty and provide regulatory certainty (85 Fed. Reg. 22,288, 22,325), and that they "looked to science to inform" their definition of the term "'ephemeral'" while following the legal principles established in the statute and precedent. *Id*. at 22,271.  That was sufficient.

## 2.    The agencies explained their treatment of wetlands

Because the definition of WOTUS is a legal, not scientific, exercise, Plaintiffs' criticisms that the agencies ignored record evidence and findings in the Connectivity Report regarding coverage of wetlands fail. Dkt. 31 at 31-32. The agencies explained that a scientific analysis of the interconnectedness of remote waters and wetlands cannot alone answer the legal question of the scope of federal jurisdiction under the statute: "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." 85 Fed. Reg. 22,271 (emphasis added). Instead, the definition of WOTUS "must be grounded in a legal analysis of the limits on CWA jurisdiction reflected in the statute and Supreme Court case law." *Id*. (emphasis added). They further stated that the 2015 Rule, which rested in large part on the Connectivity Report, failed to "implement the legal limits on the scope of the agencies' authority under the CWA" which were recognized by the district court in *Georgia v. Wheeler* when it held the 2015 Rule to be unlawful. 418 F. Supp. 3d 1336 (S.D. Ga. 2019); 85 Fed. Reg. 22,272.

And simply because the Connectivity Report found that wetlands are connected to downstream water integrity does not mean that those wetlands must come within the definition of WOTUS, as even the 2015 Rule recognized. *See* 80 Fed. Reg. 37,057. Therefore, the exclusion of some wetlands in the 2020 Rule is not an "unexplained inconsistency in agency policy" and does satisfy the reasoned-explanation test. *Encino Motorcars*, 136 S. Ct. at 2126.

### C. The agencies did not ignore water quality

Plaintiffs say the agencies failed to consider the effects of the Rule on the CWA's objective "to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Dkt. 31 at 23. But, as Plaintiffs concede, the agencies repeatedly considered water quality in the Rule. *Id.* (quoting 85 Fed. Reg. at 22,252, 22,272, 22,287). And they specifically discussed that States may begin to regulate more waters and that "a State can more efficiently allocate resources towards environmental protection due to local knowledge of amenities and constituent preferences." 85 Fed. Reg. 22,334. Thus, the agencies did not ignore an aspect of the problem—they considered the likelihood that states would exercise their powers to efficiently fill any regulatory gaps, which would be a net benefit from the Rule.

## II.   THE 2020 RULE IS CONSISTENT WITH THE CLEAN WATER ACT

Plaintiffs claim that the 2020 Rule violates the CWA because it incorporates aspects of the *Rapanos* plurality (Dkt. 31 at 26) and it improperly addresses the role of the states under the Act (*id*. at 29-30). Neither of those arguments has any merit.

### A. The 2020 Rule is consistent with controlling Supreme Court precedent

The Rule complies with the Supreme Court's binding holdings on the interpretation of WOTUS. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 865-66 (1984), "[a] court's prior judicial construction of a statute trumps an agency construction" when "the prior court decision holds that its construction follows from the

unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The agencies properly determined that precedent constrained the reach of CWA jurisdiction in ways previous rulemaking had failed to implement.

Although "WOTUS" is, to some extent, an ambiguous term, courts have found that the term unambiguously has (or does not have) certain core attributes. *See SWANCC*, 531 U.S. 159 (2001); *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985). That is where a second legal doctrine comes into play. *Rapanos* was a fractured decision without a majority opinion. The Supreme Court's guidance in that situation is that "'the holding of the Court may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (emphasis added). "[T]he *Marks* rule produces a determinative holding 'only when one opinion is a logical subset of other, broader opinions.'" *Large v. Fremont Cty., Wyo.*, 670 F.3d 1133, 1141 (10th Cir 2012); *see United States v. Davis*, 825 F.3d 1014, 1021-22 (9th Cir. 2016) ("A fractured Supreme Court decision should only bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably described as a logical subset of the other"); *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) ("Where no standard put forth in a concurring opinion is a logical subset of another concurring opinion (or opinions) that, together, would equal five votes, *Marks* breaks down"); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (applying logical subset rule under *Marks*); *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc) ("one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justice who support the judgment").

In a situation where "the plurality and concurring opinions do not share common reasoning whereby one analysis is a 'logical subset' of the other," there is no controlling opinion. *United States v. Epps*, 707 F.3d 337, 350 (D.C. Cir. 2013). That is the case here because neither the *Rapanos* plurality opinion nor Justice Kennedy's concurrence is the logical subset of the other—they are distinct approaches to defining the scope of WOTUS. The plurality applied a two-part test to determine whether a wetland was within the jurisdictional reach of the CWA. First, there must be "waters" that contain a "relatively permanent flow," and second, there must be a "continuous surface connection" between the water and the wetland. *Rapanos*, 547 U.S. at 757 (plurality). By contrast, Justice Kennedy's significant nexus test provided that wetlands "possess the requisite nexus . . . if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780 (Kennedy, J., concurring).

The plurality did not accept Justice Kennedy's significant nexus test, explaining that the test "leaves the [CWA]'s 'text' and 'structure' virtually unaddressed." *Id*. at 753. The plurality continued that the "case-by-case determination of ecological effect" of a wetland on a navigable water under the significant nexus test "*was not the test*" and had been "*specifically rejected*" by the Court's prior cases. *Id*. at 754. Likewise, Justice Kennedy did not accept the plurality's test, finding it to be "inconsistent with the Act's text, structure, and purpose." *Id*. at 776 (Kennedy, J.) The plurality's test, but not the significant nexus test, would exclude wetlands that abut navigable-in-fact waters but lack a continuous surface connection, and it would include remote wetlands with a surface-water connection with a small but continuously flowing stream that may be excluded by the significant nexus test. *Id*. at 776-77. Because the *Rapanos* plurality and concurrence took entirely different approaches, under *Marks* neither opinion is the binding

14

holding of *Rapanos*. *See United States v. Johnson,* 467 F.3d 56, 63-64 (1st Cir. 2000) (neither the *Rapanos* plurality or concurrence is a logical subset of the other under *Marks*).

In the absence of a controlling opinion under *Marks*, the Court should still determine whether there is common ground between the *Rapanos* plurality and concurrence. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1182 (2d Cir. 1992) (court may look for common ground in plurality and concurring opinions); *King*, 950 F.2d at 781 (the focus of the *Marks* analysis and the logical subset test is on finding "a common denominator of the Court's reasoning"). Both the plurality and Justice Kennedy agreed that (1) the word "navigable" in the CWA must be given some effect, *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring); *see id*. at 731 (plurality); (2) WOTUS includes some waters and wetlands not navigable-in-fact but which bear a substantial connection to navigable waters, *id*. at 739, 742 (plurality); *id*. at 784-85 (Kennedy, J.); (3) environmental concerns cannot override the statutory text, *id.* at 745-46 (plurality); *id*. at 778 (Kennedy, J.); and (4) WOTUS cannot include drains, ditches, streams remote from navigable-in-fact water and carrying only a small volume water toward navigable-in-fact water, or waters or wetlands that are alongside a drain or ditch, *id*. at 733-34, 742 (plurality); *id*. at 778, 778-91 (Kennedy, J.). Under *Brand X*, those are conclusions about the core meaning of WOTUS that the agencies cannot ignore in their subsequent rulemaking, and the 2020 Rule is consistent with those requirements. *E.g.*, 85 Fed. Reg. 22,251-52.

### B.     Plaintiffs misunderstand the Rule's foundations and ignore governing precedent

Plaintiffs argue that the 2020 Rule "is modeled after the plurality opinion in *Rapanos*" but that five Supreme Court Justices "rejected the plurality's statutory interpretation[.]" Dkt. 31 at 26. Those points are both incorrect and irrelevant.

As an initial point, Plaintiffs' premise is false because the 2020 Rule does not wholly adopt the *Rapanos* plurality opinion nor wholly reject Justice Kennedy's concurrence. Instead,

the agencies explained that "there are sufficient commonalities between these opinions to help instruct the agencies on where to draw the line between Federal and State waters." 85 Fed. Reg. 22,268. For instance, the 2020 Rule "incorporates important aspects of Justice Kennedy's opinion, together with those of the plurality, to craft a clear and implementable definition [of "tributary"] that stays within their statutory and constitutional authorities." *Id*. at 22,291. The agencies further acknowledged that each opinion "excludes some waters and wetlands that the other standard does not," but were guided by the fact that both opinions "agreed in principle that the determination must be made using a basic two-step approach that considers (1) the connection of the wetland to the tributary; and (2) the status of the tributary with respect to downstream traditional navigable waters." *Id*. at 22,267. Additionally, both opinions "also agreed that the connection between the wetland and the tributary must be close." *Id*. The agencies sought to implement guidance from "the [opinions'] common analytical framework." *Id*. The 2020 Rule thus uses both the *Rapanos* plurality and concurrence as guideposts.

Further, Plaintiffs' suggestion that a "majority" of the *Rapanos* Court rejected the plurality decision is misguided. Dkt. 37 at 26. As explained, to determine the legal holding of a fragmented decision, *Marks* instructs courts to consider the opinions of the Justices "who concurred in the judgments." 430 U.S. at 193; *see O'Dell v. Netherland*, 521 U.S. 151, 160 (1997) (in determining precedential effect of its fragmented decisions, the Court looks to the opinions of "the Justices whose votes were necessary to the judgment"). That analysis excludes consideration of dissenting opinions. *King*, 950 F.2d at 783 ("*Marks* has never been so applied by the Supreme Court, and we do not think we are free to combine a dissent with a concurrence to form a *Marks* majority"); Jonathan H. Adler, *Reckoning With Rapanos: Revisiting "Waters of the United States" and the Limits of Federal Wetland Regulation*, 14 Mo. Envt'l L. & Pol'y Rev. 1, 14 (2006) ("it would be wrong to view any part of Justice Stevens' dissent as a 'holding' of

the Court. Nothing in the dissent constitutes a portion of the judgment of the Court, so nothing in the dissent is part of the actual holding of the case").

This approach stands to reason. "Although dissents may be scholarly and persuasive to some, they are not binding law to any." *Okpalobi v. Foster*, 244 F.3d 405, 415 n.15 (5th Cir. 2001); *see Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996) ("a dissenting Supreme Court opinion is not binding precedent"). Because the Justices' "views in dissent, of course, are not binding authority," *Brzonkala v. Virginia Polytechnic Inst. & State Univ.*, 169 F.3d 820, 878 (4th Cir. 1999), it does not make sense to combine dissenting views with a concurrence to create binding authority. *See United States v. Brooks*, 2009 WL 3644122, at \*12 (E.D.N.Y. 2009) ("a dissent, even from the Supreme Court … 'has absolutely no precedential value'").

Dissenting opinions "cannot form part of the *ratio decidendi* of a case [because] they are not reasons for the order made by the court." A.M. Honore, *Ratio Decidendi*: *Judge and Court*, 71 Law Q. Rev. 196, 198 (1955). "The Supreme Court, like all appellate courts, makes binding precedent solely by giving reasons for its judgments. Dissents do not contain reasons for the Court's judgments; they provide reasons their authors oppose the Court's judgment." *In re Jones*, 534 B.R. 149, 158 (Bankr. E.D. Ky. 2015). Therefore, "any intimation that the views of dissenting Justices can be cobbled together with those of a concurring Justice to create a binding holding must be rejected. That is not the law in this or virtually any court following common-law principles of judgments." *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020).

As specifically applied to *Rapanos*, the Eleventh Circuit held that "[w]e simply cannot avoid the command of *Marks*," which "does *not* direct lower courts interpreting fractured Supreme Court decisions to consider the positions of those who dissented," so "it would be inconsistent with *Marks* to allow the dissenting *Rapanos* Justices to carry the day." *United States*

*v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) (emphasis in original); *see also id.* ("pursuant to *Marks*, we are left to determine which of the positions taken by the *Rapanos* Justices *concurring in the judgment* is the 'narrowest,' i.e, the least 'far-reaching'") (emphasis in original); *United States v. Freedman Farms, Inc.*, 786 F. Supp. 2d 1016, 1021 (E.D.N.C. 2011) (agreeing with Eleventh Circuit that "it would be 'inconsistent with *Marks* to allow the dissenting *Rapanos* Justices to carry the day'").

Strong policy considerations support this rule that courts should not assign weight to dissenting opinions to contrive a precedential holding from a Supreme Court decision otherwise lacking one under the *Marks* analysis. When a decision of the Court does not yield a binding legal holding, "the process of continued percolation through independent lower court reasoning yields important value." *Duvall*, 740 F.3d at 622 (Williams, J., concurring in denial of *en banc* consideration).

Therefore, there is no binding holding from *Rapanos* that agencies cannot consider the plurality decision.[1] In fact, the Supreme Court's own understanding of *Rapanos* confirms this because the Court looks to the plurality when it seeks guidance from that case. For instance, in *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), the Court issued a fragmented decision addressing the meaning of language in the CWA regarding discharge of pollutants "from any point source." Four Justices wrote opinions and all of them cited the *Rapanos* plurality's discussion of point sources under the CWA. *Id.* at 1468-78; *id.* at 1478-79 (Kavanaugh, J., concurring); *id.* at 1479-82 (Thomas, J., dissenting); *id.* at 1482-92 (Alito, J., dissenting). While each opinion applied the plurality's reasoning differently, there can be no

---

[1]    Plaintiffs cite *Johnson*, 467 F.3d 56, for the proposition that Justice Stevens's dissent is the binding opinion in *Rapanos*. Dkt. 31 at 26. *Johnson* stands for no such thing. In that case, the First Circuit found the *Marks* framework unworkable as applied to *Rapanos* and sought guidance from Justice Stevens's dissent as a "simple and pragmatic" alternative to finding a binding opinion where there is none. 467 U.S. at 64. And *Johnson* was not considering the issue here, which is the propriety of the 2020 Rule under the APA, and did not have the benefit of the agencies' lengthy explanation of their approach.

question that the Court believes the plurality—even though not a holding under *Marks*—is the source from which to draw guidance about the meaning of the statute.

### C.    The 2020 Rule is a proper interpretation of the States' role in water resource regulation

Plaintiffs argue that the 2020 Rule places too much emphasis on the States' role in regulating water and land resources set forth in Section 101(b). Dkt. 31 at 29-30. They suggest that Section 101(b) assigns to states a role in administering federal programs but does not have any broader relevance. Dkt. 31 at 29-30. That reading is based on a misunderstanding of the statute's history. As the *Rapanos* plurality explained, the "statement of policy" that Congress intended in the CWA "to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution," and "to plan the development and use . . . of land and water resources" was included in the CWA as amended in 1972. 547 U.S. at 737. The 1977 amendments to the CWA then added language defining certain roles for states in permitting programs under the Act. 91 Stat. 1567, 1575, Public Law 95-217 (1977). Given this history, the *Rapanos* plurality explained that the statement of policy from the 1972 Act "plainly referred to something beyond the subsequently added state administration program of 33 U.S.C. § 1344(g)-(l)." 547 U.S. at 737; *see* 85 Fed. Reg. 22,270. The evolution of the statutory text confirms that the agencies were entitled to rely on the preservation of state authority over land and water resources as one key policy of the CWA.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion should be granted.

Dated: December 17, 2020

Respectfully submitted,

*/s/ Timothy S. Bishop*
Timothy S. Bishop, *pro hac vice*
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
(202) 263-3300
tbishop@mayerbrown.com

*Counsel for* Amici Curiae

*/s/ James M. Campbell*
James M. Campbell (BBO #541882)
Jacob J. Lantry (BBO #690452)
CAMPBELL CONROY & O'NEIL, P.C.
1 Constitution Wharf, Suite 310
Boston, MA 02129
(617) 241-3060
(617) 241-5115
jmcampbell@campbell-trial-lawyers.com
jlantry@campbell-trial-lawyers.com

*Counsel for* Amici Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 17, 2020, the foregoing document was electronically submitted to the Clerk of Court for the U.S. District Court for the District of Massachusetts using the Court's electronic case filing system. Accordingly, notice of this filing will be sent to all counsel of record.

<u>/s/ *James M. Campbell*</u>
James M. Campbell

## APPENDIX

*Amici* are as follows:

The American Farm Bureau Federation (AFBF) is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. Through its state and county Farm Bureau organizations, AFBF represents about six million member families in all 50 States and Puerto Rico.

The American Petroleum Institute (API) is the only national trade association representing all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy**.** API's more than 600 members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, marine businesses, and service and supply firms. These companies provide most of the nation's energy. API was formed in 1919 as a standards-setting organization. In its first 100 years, API has developed more than 700 standards to enhance operational and environmental safety, efficiency and sustainability.

The American Road and Transportation Builders Association (ARTBA) is a non-partisan federation established in 1902 whose primary goal is to aggressively grow and protect transportation infrastructure investment to meet the public and business demand for safe and efficient travel. ARTBA's members designed, built and continue to manage the Nation's Interstates and intermodal surface transportation network. Its core mission is market development and protection on behalf of the U.S. transportation design and construction industry.

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation, representing the interests of approximately 300,000 direct members and indirectly representing the interests of more than three million businesses and organizations of every size, in every industry sector, and from every geographical region of the country. A central function of the Chamber is to represent the interests of its members in important matters before Congress, the Executive Branch, and the courts.

The Edison Electric Institute (EEI) is the trade association representing all U.S. investor-owned electric companies. Its members provide electricity for about 220 million Americans and operate in all 50 states and the District of Columbia. EEI's mission is to promote the long-term success of the electric power industry.

The Leading Builders of America (LBA) is a national trade association representing 20 of the largest homebuilding companies in North America. Collectively, LBA members build approximately 35% of all new homes in America. Its purpose is to preserve home affordability for American families. LBA member companies build across the residential spectrum from first-time and move-up to luxury and active-adult housing. In each of these segments, its members are leaders in construction quality, energy efficiency, design, and the efficient use of land. Many of its members are also active in urban multi-family markets and also develop traditional and neo-traditional suburban communities.

The National Alliance of Forest Owners (NAFO) is a national advocacy organization committed to advancing federal policies that support the long-term economic, social, and environmental benefits of sustainably managed, privately owned forests. NAFO member companies own and manage more than 46 million acres of private working forests—forests that are managed to provide a steady supply of timber. NAFO's membership also includes state and

national associations representing tens of millions of additional acres. NAFO works aggressively to sustain the ecological, economic, and social values of forests and to assure an abundance of healthy and productive forest resources for present and future generations.

The National Association of Home Builders (NAHB) is a national trade association incorporated in Nevada. NAHB's membership includes more than 140,000 builder and associate members organized into approximately 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. Its members include individuals and firms that construct single-family homes, apartment buildings, condominiums, and commercial and industrial projects, as well as land developers and remodelers.

The National Cattlemen's Beef Association (NCBA) is the largest and oldest national trade association representing American"show that there are good reasons for the new policy." cattle producers. Through state affiliates, NCBA represents more than 175,000 of America's farmers and ranchers, who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests.

The National Corn Growers Association (NCGA) was founded in 1957. NCGA represents nearly 40,000 dues-paying corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their States. NCGA and its 50 affiliated state organizations work together to create and increase opportunities for corn growers to help them sustainably feed a growing world.

The National Mining Association (NMA) is the national trade association of the mining industry. NMA's members include the producers of most of the Nation's coal, metals, and

industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry.

The National Pork Producers Council (NPPC) is an association of 43 state pork producer organizations and the global voice in Washington, DC for the Nation's approximately 60,000 pork producers. NPPC conducts public policy outreach at both the state and federal level with a goal of meeting growing worldwide consumer demand for pork while simultaneously protecting the water, air, and other environmental resources that are in the care of or potentially affected by pork producers and their farms. NPPC and its members have engaged directly with EPA over the last two decades regarding the development of water quality standards and have made significant capital investments in the design and operation of farms to comply with these environmental regulations.

The National Stone, Sand, and Gravel Association (NSSGA) member companies are responsible for the essential raw materials found in every home, building, road, bridge and public works project in the U.S. and produce more than 90% of the crushed stone and 70% of the sand and gravel consumed annually in the United States. The industry employs about 100,000 men and women nationally. NSSGA and its predecessor organizations have represented the industry for over 100 years.

The Public Lands Council (PLC) has actively represented cattle and sheep producers who hold public lands grazing permits since 1968. Public land grazing is the economic backbone of countless rural communities within 11 western states. The PLC advocates for these western ranchers, who preserve the Nation's natural resources while providing vital food and fiber to the Nation and the world. Approximately 22,000 ranchers own nearly 120 million acres of private land and hold grazing permits on more than 250 million acres managed by the U.S. Forest

Service and Bureau of Land Management. Nearly 40% of western cattle herd and 50% of the nation's sheep herd spend time on public lands.

The U.S. Poultry & Egg Association (U.S. Poultry) is the world's largest and most active poultry organization. The Association represents the entire industry as an "All Feather" association. Membership includes producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Formed in 1947, the association has affiliations in 27 states and member companies worldwide.