**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                               )

CONSERVATION LAW FOUNDATION,  )
et al.,                                 )
                                  )
            Plaintiffs,              )
                                   )
       v.                            )    Case No. 20-cv-10820-DPW
                                   )
U.S. ENVIRONMENTAL PROTECTION  )
AGENCY, et al.,                     )
                                   )
                                   )
          Defendants.          )
_____)

**BRIEF OF *AMICUS CURIAE*
NATIONAL PARKS CONSERVATION ASSOCIATION IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTERESTS OF *AMICUS CURIAE* .............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 2

ARGUMENT ..................................................................................................................... 3

I.  THE 2020 RULE DRASTICALLY REDUCES THE NUMBER AND AREA OF WATERS PROTECTED ............................................................................. 3

II.  PRECEDENT REQUIRES THAT THE AGENCIES ASSESS THE WATER QUALITY IMPACTS OF EXCLUDING WATERS FROM CWA JURISDICTION ........................ 3

III.  THE AGENCIES IRRATIONALLY FAIL TO QUANTIFY THE IMPACT OF THE 2020 RULE ON THE SCOPE OF CWA JURISDICTION ................................................. 4

　A.  When Promulgating the 2020 Rule, the Agencies Refused to Use the Same Datasets that They Relied on Before and After the 2020 Rulemaking ................... 5

　B.  The Agencies Ignore Relevant Evidence in the Administrative Record ............... 6

IV.  THE AGENCIES ARBITRARILY IGNORE THE 2020 RULE'S IMPACT ON DOWNSTREAM WATERS ............................................................................ 7

　A.  The Agencies Do Not Address the Scientific Record from the 2015 Rule, which Demonstrated the Interrelation between Ephemeral Streams, Non-adjacent Wetlands, and Downstream Waters ...................................................................... 8

　B.  The Agencies' Predictions about Potential State Reactions to Reduced CWA Jurisdiction Are Baseless and Unreasonable ......................................................... 9

V.  REMOVING PROTECTION FROM EPHEMERAL STREAMS AND NON-ADJACENT WETLANDS WILL HARM NATIONAL PARKS ................................... 11

　A.  Many National Parks Incorporate and are Dependent on Waters ........................ 11

　B.  Many National Park Waters Are Already Impaired ............................................. 12

　C.  Pollution That Affects Park Waters Often Originates Beyond Park Boundaries . 13

　D.  Some National Parks are in Watersheds Where a Significant Number of Upstream Ephemeral Streams and/or Wetlands Have Lost Protection Under the 2020 Rule 14

E.     The Impairment of National Park Waters Will Devastate Wildlife Habitats ....... 18

F.     The Impairment of National Park Waters Will Have Negative Economic Impacts ................................................................................................................ 19

G.     Climate Change Will Only Further Harm National Park Waters ......................... 19

VI.    BY FAILING TO ACCOUNT FOR THE 2020 RULE'S IMPACTS ON THE CWA'S SCOPE, AS WELL AS ITS ANCILLARY EFFECTS, THE AGENCIES HAVE IGNORED THE PRIMARY PURPOSES OF THE ACT ................................................ 20

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................................... 20

*F.C.C. v. Fox Television, Inc.*, 556 U.S. 502 (2009) .................................................... 8

*Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)................................................................................................ 7, 11

*Rapanos v. United States*, 547 U.S. 715 (2006)......................................................... 3, 4

*United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006) .................................................. 4

**Statutes**

33 U.S.C. § 1251(a) .......................................................................................... 2, 20

33 U.S.C. § 1251(a)(2)...................................................................................... 19, 20

33 U.S.C. § 1311 ................................................................................................... 7

33 U.S.C. § 1311(a) .............................................................................................. 2

33 U.S.C. § 1321 ................................................................................................... 8

33 U.S.C. § 1345 ................................................................................................... 8

33 U.S.C. § 1362(7) ........................................................................................ 1, 2, 8

33 U.S.C. § 1362(12) ............................................................................................. 2

54 U.S.C. § 100751(b) ........................................................................................... 1

**Federal Register Notices**

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ....................................................................................................... 3, 8

Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ............................................................................... 3

The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020)............................................................... 2, 3, 4, 9, 11

**Other Authorities**

*Acadia National Park Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=ACAD ............................................. 12

*Advocacy in Action: Fragile Treasures Threatened in Chaco Culture National Historical Park*,
NATIONAL PARKS CONSERVATION ASSOCIATION, https://www.npca.org/advocacy/25-fragile-
treasures-threatened-in-chaco-culture-national-historical-park ................................. 16

*Big Cypress National Preserve Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=BICY ............................................... 17

Blackstone River Coalition, *Watershed-wide Volunteer Water Quality Monitoring Program:
Report Card for 2018 Monitoring Season* (Mar. 2018) ........................................... 13

*Boston Harbor Islands National Recreation Area Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=BOHA ............................................. 12

Compl., *California v. Wheeler*, No.3:20-cv-03005-RS (N.D. Cal. May 1, 2020) ...................... 10

*Cleaning Up Stormwater Pollution*, CONSERVATION LAW FOUNDATION,
https://www.clf.org/strategies/stormwater-pollution/ ............................................. 20

Emmett Environmental Law and Policy Clinic, *Comments on Behalf of National Parks
Conservation Association* (Apr. 12, 2019) (EPA-HQ-OW-2018-0149-7628) ........................ 19

ENVIRONMENTAL LAW INSTITUTE, STATE CONSTRAINTS: STATE-IMPOSED LIMITATIONS ON THE
AUTHORITY OF AGENCIES TO REGULATE WATERS BEYOND THE SCOPE OF THE FEDERAL CLEAN
WATER ACT (May 2013) ............................................................................. 10

EPA & DEP'T OF THE ARMY, ECONOMIC ANALYSIS FOR THE NAVIGABLE WATERS PROTECTION
RULE: DEFINITION OF "WATERS OF THE UNITED STATES" (2020) .................................... 5, 9, 10

EPA & DEP'T OF THE ARMY, ECONOMIC ANALYSIS OF THE EPA-ARMY CLEAN WATER RULE
(2015) ............................................................................................... 6, 10

EPA & DEP'T OF THE ARMY, LIMITATIONS OF THE NATIONAL HYDROGRAPHY DATASET AT HIGH
RESOLUTION AND THE NATIONAL WETLANDS INVENTORY AND THEIR USE FOR DETERMINING
THE SCOPE OF WATERS SUBJECT TO CLEAN WATER ACT JURISDICTION (EPA-HQ-OW-2018-
0149-11585) ......................................................................................... 7

EPA & DEP'T OF THE ARMY, RESOURCE AND PROGRAMMATIC ASSESSMENT FOR THE NAVIGABLE
WATERS PROTECTION RULE: DEFINITION OF "WATERS OF THE UNITED STATES" (2020) ... 4, 5, 6

EPA & DEP'T OF THE ARMY, TECHNICAL SUPPORT DOCUMENT FOR THE CLEAN WATER RULE:
DEFINITION OF WATERS OF THE UNITED STATES (2015) ............................................................ 8

*Everglades National Park Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=EVER ................................................................ 17

Jan Goldman-Carter, Senior Counsel, Wetlands and Water Resources, Nat'l Wildlife Fed'n,
*Comment Letter* (Apr. 15, 2019) (EPA-HQ-OW-2018-0149-6880) ........................................ 7

Dr. Michael Honeycutt, Chair, Science Advisory Board, Letter to Andrew R. Wheeler,
Administrator, U.S. EPA, C*ommentary on the Proposed Rule Defining the Scope of Waters
Federally Regulated Under the Clean Water Act* (Feb. 27, 2020) ............................................ 9

James Hughes et al., *Long-Term Discrete Water Quality Monitoring at Big South Fork National
River and Recreation Area, Blue Ridge Parkway, and Obed Wild and Scenic River*, NAT'L
PARK SERV. (Dec. 2018) .................................................................................................... 13, 18

*Indiana Dunes National Park Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=INDU ............................................................... 15

Stacey M. Jenson, HQUSACE Regulatory Program Manager, Email and attachments to John
Goodin, EPA (Sept. 5, 2017, 1:00 PM) ................................................................................... 5

*Lowell National Historical Park Statistics*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/his-
parkreport.htm?unitType=Park&parkNames=LOWE ............................................................. 12

*Lowell National Historical Park: The Merrimack River*, NAT'L PARK SERV.,
https://www.nps.gov/lowe/learn/historyculture/the-merrimack-river.htm .............................. 14

Bobby Magill, *New Mexico Says It Can't Halt Pollution Under Feds' Water Rule*, BLOOMBERG
LAW (Sept. 16, 2020) ............................................................................................................. 10

Cathy Martin, *Student Conservation Association Helps Restore Great Marsh*, SAVE THE DUNES
(Nov. 7, 2018), https://savedunes.org/2018/11/07/student-conservation-association-helps-
restore-great-marsh/ ................................................................................................................ 16

Roger Meyer & Andrew Robertson, *Clean Water Rule Spatial Analysis: A GIS-based Scenario
Model for Comparative Analysis of the Potential Spatial Extent of Jurisdictional and Non-
jurisdictional Wetlands* (Jan. 16, 2019) ................................................................................... 6

RONALD L. MILLER ET AL., U.S. GEOLOGICAL SURVEY, WATER QUALITY IN BIG CYPRESS
NATIONAL PRESERVE AND EVERGLADES NATIONAL PARK—TRENDS AND SPATIAL
CHARACTERISTICS OF SELECTED CONSTITUENTS (2004) .................................................. 17, 19

Moffat & Nichol, *Proposed Changes to the Waters of the United States (WOTUS) Definition–Summary of M&N Conclusions* (Apr. 7, 2019) ............................................................. 7

Kelly F. Moser et al., S. Envtl. Law Ctr., *Comment Letter* (Apr. 15, 2019) (EPA-HQ-OW-2018-0149-9717) ............................................................................................................... 7

NAT'L PARK SERV., BLACKSTONE RIVER VALLEY: SPECIAL RESOURCE STUDY: STUDY REPORT 2011 .......................................................................................................................... 14, 18

*National Park System*, NAT'L PARK SERV., https://www.nps.gov/aboutus/national-park-system.htm ................................................................................................................. 1

*NPS Servicewide Statistics*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=ZZSE ................................................. 12

*Parks with Clean Water Act 303(d)-Listed Impairments*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/his-related.htm?category=303 ................. 12, 15

*Parks with No Hydrography*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/his-related.htm?category=noHydro ............... 12

ANITRA PAWLEY, PH.D. & MUI LAY, NAT'L PARK SERV., COASTAL WATERSHED ASSESSMENT FOR GOLDEN GATE NATIONAL RECREATION AREA AND POINT REYES NATIONAL SEASHORE (2013) ........................................................................................................................ 13

KEITH W. ROBINSON ET AL., U.S. GEOLOGICAL SURVEY, WATER QUALITY TRENDS IN NEW ENGLAND RIVERS DURING THE 20TH CENTURY (2003) ............................................... 15

S. Mažeika P. Sullivan et al., *Opinion: The Proposed Change to the Definition of "waters of the United States" Flouts Sound Science*, 116 PROC. NAT'L ACAD. SCI. U.S. 11,558 (2019) ........ 19

ABIGAIL A. TOMASEK ET AL., U.S. GEOLOGICAL SURVEY, WASTEWATER INDICATOR COMPOUNDS IN WASTEWATER EFFLUENT, SURFACE WATER, AND BED SEDIMENT IN THE ST. CROIX NATIONAL SCENIC RIVERWAY AND IMPLICATIONS FOR WATER RESOURCES AND AQUATIC BIOTA, MINNESOTA AND WISCONSIN, 2007–08 (2012) ............................................. 15

Br. Amici Curiae Trout Unlimited et al., *South Carolina Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687-DCN (D.S.C. July 17, 2020) ....................................... 18

Linda K. Vance, *Geographically Isolated Wetlands and Intermittent/ Ephemeral Streams in Montana: Extent, Distribution, and Function* (Jan. 2009) ........................................... 7

*Visitor Spending Effects—Economic Contributions of National Park Visitor Spending*, NAT'L PARK SERV., https://www.nps.gov/subjects/socialscience/vse.htm ................................ 19

*Water Quantity*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/water-quantity.htm ......................................................................................................... 11

*Water Use in National Parks*, NAT'L PARK SERV.,
https://www.nps.gov/subjects/protectingwater/water-
use.htm#:~:text=Ecosystem%20Use&text=Many%20ecosystems%20in%20national%20parks,
of%20maintaining%20healthy%20river%20systems ............................................................. 11

Ariel Wittenberg & Hannah Northey, C*lean Water Act: Army Corps Banks on Wetland Data
EPA Deemed 'Unreliable,'* E&E NEWS (Oct. 28, 2020) .......................................................... 5

## INTERESTS OF *AMICUS CURIAE*[1]

National Parks Conservation Association ("NPCA") is a non-profit and non-partisan organization with nearly 1.4 million members and supporters dedicated to improving and protecting the National Park System.[2] Since its inception, the National Park System has grown to include spectacular rivers, stunning lakes, expansive oceans, and other majestic water resources across the United States. The first director of the National Park Service ("NPS") founded NPCA in 1919 to serve as an independent voice that would ensure the preservation of national parks for future generations. Throughout its century of advocacy, NPCA has served as a champion of areas of unrivaled natural wonder, cultural value, and historical significance.

Protecting national park waters is crucial to NPCA's mission, as many parks rely on the waters that flow through them. These waters are central to many parks' unique character, provide vital habitats for fish and wildlife, and offer special recreational opportunities. Visitors and some cities also rely on parks to supply clean drinking water. The NPS lacks the ability to regulate waterways located outside of park boundaries, *see* 54 U.S.C. § 100751(b), even though pollution entering many such waterways can impair park waters when carried downstream. The Clean Water Act's (the "CWA" or "Act") definition of "waters of the United States," 33 U.S.C. § 1362(7), is therefore crucial for national parks because it determines the extent of protections for upstream waters whose degradation could impact downstream park waterways. The Navigable

---

[1] *Amicus* certifies that no person or entity, other than *amicus* or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

[2] The National Park System is made up of 423 units, including national parks, national lakeshores, national seashores, national historic sites, national monuments, national military parks, national battlefields, and many other designations. *National Park System*, NAT'L PARK SERV., https://www.nps.gov/aboutus/national-park-system.htm. In this brief, the terms "national park," "national parks," "park," or "parks" refer to all units in the National Park System.

Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) (the "2020 Rule"), strips protections from many such waters, increasing the potential for pollution to enter park waters, which undermines NPCA's mission to protect them. NPCA submits this brief in support of Plaintiffs' motion for summary judgment and in support of clean water regulation that adequately protects the indispensable natural treasures that parks provide to the nation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The CWA prohibits the "discharge of any pollutant," into "navigable waters" except as authorized by permit. 33 U.S.C. §§ 1311(a), 1362(12). "Navigable waters," in turn, are defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). This makes the definition of "waters of the United States" of vital importance because any water body that is not considered to be such a water will not receive crucial federal protections under the CWA.

The 2020 Rule fundamentally departs from well-established CWA case-law, policy, and science. Specifically, the 2020 Rule rejects the "significant nexus" test and revokes protections for ephemeral streams and non-adjacent wetlands, even if they substantially impact protected waters. The Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") have failed to sufficiently analyze both: (a) the 2020 Rule's effects on the scope of waters protected under the CWA, and (b) the serious and adverse environmental, ecological, and recreational consequences that will result, including in national parks. The 2020 Rule will adversely impact many national park waters and will undermine the CWA's primary goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). It also threatens the Act's goals of protecting wildlife and recreation. As such, the regulation is arbitrary and capricious and must be vacated by this Court.

## ARGUMENT

### I.   THE 2020 RULE DRASTICALLY REDUCES THE NUMBER AND AREA OF WATERS PROTECTED

The 2020 Rule reduces the jurisdictional reach of the CWA as compared to two previous rules: the Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) (the "2015 Rule"), and the Definition of "Waters of the United States"— Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) (the "2019 Rule"). Unlike the previous rules, the 2020 Rule categorically excludes ephemeral streams, which it defines as "flowing or pooling only in direct response to precipitation." 85 Fed. Reg. at 22,338. Under the 2015 Rule, "ephemeral streams that meet the definition of tributary" were jurisdictional.[3] 80 Fed. Reg. at 37,079. The 2019 Rule returned to the pre-2015 regime where ephemeral streams that have a significant nexus with a traditionally navigable water are jurisdictional. *See* 84 Fed. Reg. at 56,660. Moreover, the 2020 Rule excludes wetlands that are not adjacent to another jurisdictional water, 85 Fed. Reg. at 22,338, and is narrower than the 2015 Rule, which includes wetlands that are either adjacent to or have a significant nexus with a protected water. 80 Fed. Reg. at 37,104–05; *see* Pls.' Mem. Law Supp. Mot. Summ. J (ECF No. 31) at 8. The 2019 Rule is also more expansive than the 2020 Rule, as it protects wetlands that meet the significant nexus analysis. *See* 84 Fed. Reg. at 56,660.

### II.   PRECEDENT REQUIRES THAT THE AGENCIES ASSESS THE WATER QUALITY IMPACTS OF EXCLUDING WATERS FROM CWA JURISDICTION

The determination of whether water bodies are "waters of the United States" is an inherently scientific and technical determination. In *Rapanos v. United States*, 547 U.S. 715,

---

[3] The 2015 Rule defined "tributaries" as waters that contribute flow to another traditional navigable water and have a bed, a bank, and an ordinary high-water mark. 80 Fed. Reg. at 37,126.

(2006), Justice Kennedy, in his concurring opinion, stated that the CWA covers waters that have a "significant nexus" to traditionally navigable waters, *id.* at 779 (Kennedy, J., concurring in the judgment). The First Circuit has held that any water that satisfies the test in Justice Kennedy's opinion is jurisdictional under the CWA. *See United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006) (explaining that "a majority of the [Supreme] Court would support" jurisdiction found under either the plurality or concurrence test). Under Justice Kennedy's test, a water has a "significant nexus" if it "significantly affect[s] the chemical, physical, and biological integrity" of a traditionally navigable water. *Rapanos*, 547 U.S. at 780.

The Agencies must therefore assess how the exclusion of waters from the definition of "waters of the United States" will impact the chemical, physical, and biological integrity of traditionally navigable waters—which necessarily involves a review of the scientific facts. As discussed below, the Agencies have disregarded this duty by failing to conduct any meaningful evaluation of the 2020 Rule's impacts on downstream water quality and have excluded waters that Justice Kennedy's test requires them to protect.

## III.   THE AGENCIES IRRATIONALLY FAIL TO QUANTIFY THE IMPACT OF THE 2020 RULE ON THE SCOPE OF CWA JURISDICTION

The Agencies acknowledge that the 2020 Rule will reduce the number of waters that are considered "waters of the United States."[4] They claim, however, that they are unaware of any means to quantify the 2020 Rule's effects on CWA jurisdiction "with any precision." 85 Fed. Reg. at 22,332. However, this assertion is inconsistent with the Agencies' previous and subsequent actions, as well as the administrative record.

---

[4] EPA & DEP'T OF THE ARMY, RESOURCE AND PROGRAMMATIC ASSESSMENT FOR THE NAVIGABLE WATERS PROTECTION RULE: DEFINITION OF "WATERS OF THE UNITED STATES" 22–30 (2020) [hereinafter "RESOURCE AND PROGRAMMATIC ASSESSMENT"].

A.   When Promulgating the 2020 Rule, the Agencies Refused to Use the Same Datasets that They Relied on Before and After the 2020 Rulemaking

The Agencies argue that their lack of analysis is due to the "unavoidable uncertainties and associated limitations" inherent in existing datasets.[5] Yet the Agencies used some of the same datasets before and after the 2020 rulemaking that they identified as inadequate here. The failure to explain this discrepancy suggests that the Agencies could have carried out meaningful quantitative analyses but inexplicably chose not to do so.

The Agencies' decision to ignore National Wetlands Inventory ("NWI") data is arbitrary and capricious because it departs from previous and current Agency actions. The Agencies claim that they did not use the NWI to assess changes in jurisdiction under the 2020 Rule because of its "analytic and data challenges."[6] However, a 2017 internal EPA analysis relied on NWI data to assess the percentages of wetlands losing protection under the 2020 Rule.[7] Moreover, even after the promulgation of the 2020 Rule, the Corps has continued to rely on NWI data to decide the jurisdictional status of hundreds of individual waters.[8] The Agencies have not explained why NWI data was dependable enough to use before and after the promulgation of the 2020 Rule, yet was too unreliable to have been used during the rulemaking process here.

---

[5] *Id.* at 34.

[6] EPA & DEP'T OF THE ARMY, ECONOMIC ANALYSIS FOR THE NAVIGABLE WATERS PROTECTION RULE: DEFINITION OF "WATERS OF THE UNITED STATES" 24 (2020) [hereinafter "ECONOMIC ANALYSIS"].

[7] E-mail and attachments from Stacey M. Jenson, HQUSACE Regulatory Program Manager, to John Goodin, EPA (Sept. 5, 2017, 1:00 PM), https://www.eenews.net/assets/2018/12/11/document_gw_05.pdf.

[8] *See* Ariel Wittenberg & Hannah Northey, *Clean Water Act: Army Corps Banks on Wetland Data EPA Deemed 'Unreliable,'* E&E NEWS (Oct. 28, 2020), https://www.eenews.net/stories/1063716735.

The Agencies did use another dataset—the Operation and Maintenance Business Information, Link, Regulatory Module ("ORM2"), which categorizes the jurisdictional status of individual waters—to analyze the 2020 Rule. But for many jurisdictional categories, the Agencies claim that the data does not allow them to assess how the revised definition will change individual determinations.[9] In the 2015 rulemaking, however, the Agencies relied on the same ORM2 dataset to analyze how much the 2015 Rule would change the CWA's jurisdictional scope.[10] The Agencies have not explained why a similar analysis could not provide an approximate understanding of how the scope of the CWA would change under the 2020 Rule. Without an adequate explanation, it is arbitrary and capricious for the Agencies to decline to use data that they previously relied upon.

B.        The Agencies Ignore Relevant Evidence in the Administrative Record

The administrative record also provided the Agencies with the information necessary to attempt an analysis of the impact of the 2020 Rule on the scope of CWA jurisdiction. For example, a study by researchers at Saint Mary's University of Minnesota found that the proposed rule would significantly reduce the percentage of protected wetlands in each watershed analyzed.[11] Another analysis estimated that 40% to 90% of streams in multiple Southeastern

---

[9] *See, e.g.*, RESOURCE AND PROGRAMMATIC ASSESSMENT, *supra* note 4, at 25, 27.

[10] EPA & DEP'T OF THE ARMY, ECONOMIC ANALYSIS OF THE EPA-ARMY CLEAN WATER RULE 9–12 (2015) [hereinafter "2015 ECONOMIC ANALYSIS"].

[11] Roger Meyer & Andrew Robertson, *Clean Water Rule Spatial Analysis: A GIS-based Scenario Model for Comparative Analysis of the Potential Spatial Extent of Jurisdictional and Non-jurisdictional Wetlands* 23–26 (Jan. 16, 2019), https://static1.squarespace.com/static/578f93e4cd0f68cb49ba90e1/t/5c50c0e988251bc68fe33388/1548796144041/Hewlett_report_Final.pdf [hereinafter "Saint Mary's Report"].

watersheds could lose protection under the proposal.[12] An earlier study had found that at least

30% of streams in each Montana ecoregion are ephemeral;[13] these waters are not jurisdictional

under the 2020 Rule. The Agencies did not take these studies into account when finalizing the

2020 Rule, even though all three analyses were part of the administrative record.[14] Moreover, the

Saint Mary's and Moffat & Nichol studies demonstrated methods that the Agencies themselves

could have adopted to conduct a more comprehensive analysis of the 2020 Rule's impacts.

Rather than availing themselves of this opportunity, the Agencies chose to move forward blindly.

## IV.     THE AGENCIES ARBITRARILY IGNORE THE 2020 RULE'S IMPACT ON DOWNSTREAM WATERS

The 2020 Rule is also arbitrary and capricious because the Agencies fail to address its

impact on downstream water quality. Because the purpose of the CWA is to create a

comprehensive national program to address water pollution—and the central purpose of a statute

is an "important aspect of the problem," *Motor Vehicles Manufacturers Ass'n v. State Farm

Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)—the Agencies cannot legally ignore

the hydrological implications of the 2020 Rule. Three of the CWA's most important protections,

the prohibitions of unpermitted discharges from point sources, 33 U.S.C. § 1311, of unpermitted

---

[12] Moffat & Nichol, *Proposed Changes to the Waters of the United States (WOTUS) Definition–Summary of M&N Conclusions* (Apr. 7, 2019), attached as Exhibit B to Kelly F. Moser et al., S. Envtl. Law Ctr., Comment Letter (Apr. 15, 2019) (EPA-HQ-OW-2018-0149-9717).

[13] Linda K. Vance, *Geographically Isolated Wetlands and Intermittent/ Ephemeral Streams in Montana: Extent, Distribution, and Function* 26–28 (Jan. 2009), https://ia800501.us.archive.org/28/items/geographicallyis2009vanc/geographicallyis2009vanc_bw.pdf [hereinafter "Vance Report"].

[14] *See* Jan Goldman-Carter, Senior Counsel, Wetlands and Water Resources, Nat'l Wildlife Fed'n, Comment Letter (Apr. 15, 2019) (EPA-HQ-OW-2018-0149-6880) (attachment 2) (Saint Mary's Report); Moffat & Nichol, *supra* note 12; EPA & DEP'T OF THE ARMY, LIMITATIONS OF THE NATIONAL HYDROGRAPHY DATASET AT HIGH RESOLUTION AND THE NATIONAL WETLANDS INVENTORY AND THEIR USE FOR DETERMINING THE SCOPE OF WATERS SUBJECT TO CLEAN WATER ACT JURISDICTION, (EPA-HQ-OW-2018-0149-11585) (citing Vance Report).

disposal of dredge and fill material, *id.* § 1345, and of discharges of oil and other hazardous substances, *id.* § 1321, apply only to "navigable waters," which are defined as "waters of the United States," *id.* § 1362(7). Therefore, whether a feature is within the "waters of the United States" determines whether it receives these key federal pollution control protections. Yet the Agencies fail to quantify the effects that removing protections from a significant number of waters would have on protected downstream waters.

A.      <u>The Agencies Do Not Address the Scientific Record from the 2015 Rule, which Demonstrated the Interrelation between Ephemeral Streams, Non-adjacent Wetlands, and Downstream Waters</u>

The Agencies fail to explain their disregard of the scientific facts that supported the 2015 Rule. As such, the 2020 Rule does not meet the test in *F.C.C. v. Fox Television, Inc.*, 556 U.S. 502 (2009), which requires agencies to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy," *id.* at 516. The 2015 Rule was based upon extensive scientific studies. These analyses found that ephemeral streams and wetlands within 100 feet of the ordinary high water mark or within the floodplain (up to a maximum of 1500 feet) of a jurisdictional water helped regulate the chemical, physical, and biological integrity of downstream navigable waters. 80 Fed. Reg. at 37,079 & 37,085. The Agencies thus previously concluded that the "evidence *unequivocally demonstrates* that the stream channels and riparian/floodplain wetlands or open waters that together form river networks are *clearly connected to downstream waters in ways that profoundly influence downstream water integrity*."[15]

---

[15] EPA & DEP'T OF THE ARMY, TECHNICAL SUPPORT DOCUMENT FOR THE CLEAN WATER RULE: DEFINITION OF WATERS OF THE UNITED STATES 101 (2015) (emphasis added).

In promulgating the 2020 Rule, however, the Agencies ignore the extensive evidence demonstrating the effects of ephemeral streams and non-adjacent wetlands on downstream water quality. Although they claim the 2020 Rule is "informed by science," 85 Fed. Reg. at 22,288, they do not include a new review of the scientific literature. Nor do they rebut the scientific conclusions underlying the 2015 Rule. As EPA's Science Advisory Board informed the Agencies, the 2020 Rule offers "no scientific justification for disregarding the connectivity of waters accepted by current hydrological science," "introduc[es] new risks to human and environmental health," and lacks "consistency with the objective of [the CWA]."[16]  In short, scientific record makes it clear that, by removing protections for ephemeral streams and non-adjacent wetlands, the 2020 Rule will harm downstream water quality.

B.    The Agencies' Predictions about Potential State Reactions to Reduced CWA Jurisdiction Are Baseless and Unreasonable

The Agencies attempt to downplay the impact of the reduction in federal jurisdiction by asserting without justification that states will have the ability and interest to regulate waters that lose their jurisdictional status under the 2020 Rule. They assert that "complete State 'gap-filling' could result in a zero-net impact in the long-run," 85 Fed. Reg. at 22,333—in effect claiming "no harm, no foul," but this assertion is supported by nothing more than uninformed assumptions. For instance, in evaluating the 2020 Rule's effects on the CWA section 404 permitting program regulating the dredging and filling of waterways, the Agencies assume that "33 states with existing inland programs, regardless of scope, are likely to have the capacity and interest to regulate waters that are no longer jurisdictional" under the 2020 Rule.[17] No evidence supports

---

[16] Dr. Michael Honeycutt, Chair, Science Advisory Board, Letter to Andrew R. Wheeler, Administrator, U.S. EPA, *Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act* 2, 4 (Feb. 27, 2020).

[17] ECONOMIC ANALYSIS, *supra* note 6, at 31.

this assumption and, in fact, the Agencies acknowledge elsewhere in the same document that state programs may not have the same geographic scope or cover the same activities as the CWA.[18]

The states themselves do not agree with the Agencies' characterization of their authority to step up when federal CWA protection is removed. A state's authority over its waters does not go beyond the state line; hence a "nationwide floor of water pollution controls" under the CWA is essential to protect states from upstream pollution.[19] Additionally, because many states rely heavily on the federal programs to protect their waters, the 2020 Rule will create immediate disruptions that the states are not equipped to address, such as the lack of available funds.[20]

Moreover, the Agencies took an entirely different view in the 2015 rulemaking, where they did not even "account for the possibility that some states . . . may be considering a broader set of waters to be subject to a state's implementation of certain CWA programs."[21] The Agencies were reluctant to make assumptions about state responses because of the variety of "individual state laws" that restrict agencies from adopting protections that are more stringent or expansive than federal protections under the CWA.[22] Because the 2020 Rule neither

---

[18] *See id.*

[19] Compl. ¶ 77, *California v. Wheeler*, No.3:20-cv-03005-RS (N.D. Cal. May 1, 2020).

[20] *See, e.g.*, Bobby Magill, *New Mexico Says It Can't Halt Pollution Under Feds' Water Rule*, BLOOMBERG LAW (Sept. 16, 2020), https://news.bloomberglaw.com/environment-and-energy/new-mexico-says-it-cant-halt-pollution-under-feds-water-rule (New Mexico officials have criticized the 2020 Rule because there is "no ready substitute under the state laws and budgets to maintain critical surface water protections provided by the [CWA].").

[21] 2015 ECONOMIC ANALYSIS, *supra* note 10, at 4.

[22] *Id.; see also* ENVIRONMENTAL LAW INSTITUTE, STATE CONSTRAINTS: STATE-IMPOSED LIMITATIONS ON THE AUTHORITY OF AGENCIES TO REGULATE WATERS BEYOND THE SCOPE OF THE FEDERAL CLEAN WATER ACT 11 (May 2013), https://www.eli.org/sites/default/files/eli-pubs/d23-04.pdf ("28 states have adopted laws or policies that limit the authority of state agencies to protect waters more stringently than would otherwise be required" under the CWA.).

acknowledges nor explains the inconsistency in the Agencies' approach to evaluating state reactions, it is arbitrary and capricious for the Agencies to predict that "complete State 'gap-filling' could result in a zero-net impact in the long-run." 85 Fed. Reg. at 22,333.

## V.  REMOVING PROTECTION FROM EPHEMERAL STREAMS AND NON-ADJACENT WETLANDS WILL HARM NATIONAL PARKS

A review of potential impacts of the 2020 Rule on national parks provides additional evidence that it will significantly reduce the scope of CWA jurisdiction and harm downstream water quality—and not just in uncertain, hypothetical locations, but in some of our most treasured landscapes. National parks need clean water to promote the CWA's goals of protecting fish, wildlife, and recreational uses of water. By failing to consider the 2020 Rule's environmental and economic impacts on national parks, the Agencies blatantly and unlawfully ignore the fundamental purposes of the CWA. *Motor Vehicles Manufacturers Ass'n*, 463 U.S. at 43.

### A.   Many National Parks Incorporate and are Dependent on Waters

The National Park System has over 150,000 miles of rivers and streams and contains over 4 million acres of lakes and other water bodies.[23] These waters are integral aspects of many parks; visitors rely on clean water for drinking, fishing, and swimming and clean water supports wildlife habitats and ecosystems.[24] Moreover, many iconic parks, such as Grand Canyon National Park, Yosemite National Park, and Acadia National Park, rely on the presence of water for stunning visuals that attract millions of visitors each year. Many water bodies that flow

---

[23] *Water Quantity*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/water-quantity.htm.

[24] *See Water Use in National Parks*, NAT'L PARK SERV., https://www.nps.gov/subjects/protectingwater/water-use.htm#:~:text=Ecosystem%20Use&text=Many%20ecosystems%20in%20national%20parks,of%20maintaining%20healthy%20river%20systems.

through national parks originate outside of park boundaries. Parks therefore depend on the CWA

for protection because pollution that originates outside of parks impairs downstream park waters.

      B.    <u>Many National Park Waters Are Already Impaired</u>

     Of the 360 national parks that contain a body of water, about two-thirds of them have

impaired waters.[25] Approximately 42% of park lakes, reservoirs, and ocean waters within parks

do not meet water quality standards, as well as nearly 25% of the shoreline miles of parks.[26] In

some cases, the majority or even all of a park's waters suffer from severe pollution.[27]

     Massachusetts is home to many national parks with impaired waters. Nearly 79% of

Lowell National Historical Park's waterways are impaired,[28] as are about 76% of the shoreline

miles found in Boston Harbor Islands National Recreation Area.[29] Blackstone River, which

flows through John H. Chafee Blackstone River Valley National Heritage Corridor, also suffers

---

[25] *See Parks with Clean Water Act 303(d)-Listed Impairments*, NAT'L PARK SERV. (last updated Nov. 3, 2020), https://www.nps.gov/subjects/protectingwater/his-related.htm?category=303 (239 out of 429 parks have water impairments); *Parks with No Hydrography*, NAT'L PARK SERV. (last updated Nov. 3, 2020), https://www.nps.gov/subjects/protectingwater/his-related.htm?category=noHydro (69 parks have no waters within their boundaries).

[26] *See NPS Servicewide Statistics*, NAT'L PARK SERV. (last updated Nov. 3, 2020), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=ZZSE (all national parks have: 4,414,228 total acres of waterbodies ((lakes, reservoirs, and sea/ocean)) and 1,856,204 total impaired waterbody acres; 46,788 total miles of shoreline ((lakes, reservoirs, and sea/ocean)) and 11,569 total impaired shoreline miles).

[27] *See, e.g.*, *Acadia National Park Statistics*, NAT'L PARK SERV. (last updated Oct. 30, 2017), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=ACAD (100% of park waters are impaired).

[28] *See Lowell National Historical Park Statistics*, NAT'L PARK SERV. (last updated Feb. 8, 2019), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=LOWE.

[29] *See Boston Harbor Islands National Recreation Area Statistics*, NAT'L PARK SERV. (last updated Feb. 7, 2019), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=BOHA.

from poor water quality.[30] These parks need additional protections to cure their water pollution, yet the 2020 Rule will significantly eliminate protections for many park waters.

      C.      <u>Pollution That Affects Park Waters Often Originates Beyond Park Boundaries</u>

Because NPS can regulate water within park boundaries, much of the pollution that affects park waters originates outside national parks. The list of parks affected by pollution outside of their borders is seemingly endless. Point Reyes National Seashore in California has degraded water quality in part from upstream sources of agricultural, urban, and industrial pollutants.[31] Obed Wild & Scenic River in Tennessee contains "severely polluted waters" threatened by wastewater discharges associated with upstream suburban and urban growth, and by pollutants associated with timbering, mining, oil, and gas operations.[32] The impairment of many waters within Blue Ridge Parkway in Virginia and North Carolina is also caused by conditions that originate outside of the park's boundaries, such as urban development.[33] Because upstream ephemeral streams and non-adjacent wetlands will lose protection under the 2020 Rule, the Rule will likely exacerbate the harms these and other park units are already experiencing from out-of-park pollution.

---

[30] *See* Blackstone River Coalition, *Watershed-wide Volunteer Water Quality Monitoring Program: Report Card for 2018 Monitoring Season* 2 (Mar. 2018), http://zaptheblackstone.org/Data/2018/2018_Report_Card.pdf.

[31] ANITRA PAWLEY, PH.D. & MUI LAY, NAT'L PARK SERV., COASTAL WATERSHED ASSESSMENT FOR GOLDEN GATE NATIONAL RECREATION AREA AND POINT REYES NATIONAL SEASHORE xl (2013).

[32] JAMES HUGHES ET AL., LONG-TERM DISCRETE WATER QUALITY MONITORING AT BIG SOUTH FORK NATIONAL RIVER AND RECREATION AREA, BLUE RIDGE PARKWAY, AND OBED WILD AND SCENIC RIVER, NAT'L PARK SERV. 15 (Dec. 2018).

[33] *Id.* at 18–19 ("These streams are 303d-listed for causes originating outside park boundaries.").

D.     Some National Parks are in Watersheds Where a Significant Number of Upstream Ephemeral Streams and/or Wetlands Have Lost Protection Under the 2020 Rule

Under the 2020 Rule, pollution entering ephemeral streams and non-adjacent wetlands poses a significant risk for downstream national parks. Because those upstream waters are not jurisdictional under the 2020 Rule, potential sources of pollution discharging into them are no longer subject to the permitting requirements of sections 402 and 404 of the Act. *See* Pls.' Mem. Law Supp. Mot. Summ. J (ECF No. 31) at 3. Therefore, it is likely that the amount of pollution entering these waters—and from there flowing to downstream national parks—will increase.

For example, several national parks in Massachusetts are at significant risk of becoming more polluted under the 2020 Rule. The Merrimack River, which flows through Lowell National Historical Park, is already threatened by upstream wastewater discharges, as well as urban and suburban land use.[34] The 2020 Rule will likely increase the amount of pollution entering the river and the park, as experts estimate that 30–51% of the streams in the river's watershed that were previously jurisdictional are now unprotected under the 2020 Rule, and 25% of the watershed's wetlands are also unprotected.[35] The loss of CWA protections exposes Lowell National Historical Park to an increased risk of upstream water quality impairments, which can negatively impact the park's already degraded waters.

John H. Chafee Blackstone River Valley National Heritage Corridor ("Blackstone National Corridor"), located in Massachusetts and Rhode Island, is also at risk. The Blackstone River is threatened by upstream wastewater discharges and urban land use.[36] Approximately 26–

---

[34] *See Lowell National Historical Park: The Merrimack River*, NAT'L PARK SERV. (last updated Nov. 9, 2018), https://www.nps.gov/lowe/learn/historyculture/the-merrimack-river.htm.

[35] Decl. Kurt Fesenmyer ¶ 11 (ECF No. 33) [hereinafter "Fesenmyer Decl."]; Decl. Stacy Woods, Ph.D., M.P.H. ¶ 47 (ECF No. 32) [hereinafter "Woods Decl."].

[36] NAT'L PARK SERV., BLACKSTONE RIVER VALLEY: SPECIAL RESOURCE STUDY: STUDY REPORT 2011, at 67 [hereinafter "Blackstone Report"]; KEITH W. ROBINSON ET AL., U.S. GEOLOGICAL

46% of the watershed's streams that were jurisdictional prior to the 2020 Rule are ephemeral, and therefore no longer protected, and 16% of the watershed's wetlands are not jurisdictional.[37] The loss of protection for these wetlands and streams puts the Blackstone National Corridor at an increased risk of degradation.

Similar examples can be found all over the country. The thirteenth most impaired national park[38]—St. Croix National Scenic Riverway in Wisconsin and Minnesota—is at significant risk of additional water pollution as a result of the 2020 Rule. It has recently experienced greater pollution as a result of expanded agriculture and urban development.[39] It is estimated that 64–77% of the streams in the watershed of the Namekagon River (a St. Croix tributary in the Wisconsin part of the Scenic Riverway) that were protected before the 2020 Rule are ephemeral and 26% of the watershed's wetlands are unprotected under the 2020 Rule.[40] The loss of protection for these waters will have negative downstream consequences for park waters.

The 2020 Rule will also detrimentally impact waters at Indiana Dunes National Park in Indiana. Approximately 69% of the park's waterbodies are impaired,[41] and the park is home to

SURVEY, WATER QUALITY TRENDS IN NEW ENGLAND RIVERS DURING THE 20TH CENTURY 18 (2003).

[37] Fesenmyer Decl. ¶ 7; Woods Decl. ¶ 48.

[38] *Parks with Clean Water Act 303(d)-Listed Impairments*, Nat'l Park Serv. (last updated Nov. 3, 2020), https://www.nps.gov/subjects/protectingwater/his-related.htm?category=303.

[39] ABIGAIL A. TOMASEK ET AL., U.S. GEOLOGICAL SURVEY, WASTEWATER INDICATOR COMPOUNDS IN WASTEWATER EFFLUENT, SURFACE WATER, AND BED SEDIMENT IN THE ST. CROIX NATIONAL SCENIC RIVERWAY AND IMPLICATIONS FOR WATER RESOURCES AND AQUATIC BIOTA, MINNESOTA AND WISCONSIN, 2007–08, at 3 (2012).

[40] Fesenmyer Decl. ¶ 13; Woods Decl. ¶ 58.

[41] *See Indiana Dunes National Park Statistics*, NAT'L PARK SERV. (last updated Feb. 7, 2019), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=INDU.

the Great Marsh—the biggest internal wetland on the Lake Michigan shoreline.[42] NPCA has

helped secure funding for a restoration project aimed at rehabilitating the Great Marsh because

recent agricultural and construction activities have disturbed its hydrology.[43] However, NPCA's

efforts may be hindered by the 2020 Rule because part of Indiana Dunes National Park is located

in the Chicago River watershed. Experts estimate that 39–56% of the watershed's streams that

were protected prior to the 2020 Rule are ephemeral and 86% of that watershed's wetlands will

not be protected under the 2020 Rule.[44] Another part of the park is located in the Little Calumet-

Galien watershed and 70% of that watershed's wetlands are not protected under the 2020 Rule.[45]

It is therefore likely that the pollution and hydrological disturbances found in the park's

waterbodies and in the Great Marsh will be exacerbated under the 2020 Rule.

NPCA has also sought to protect Chaco Culture National Historical Park in New Mexico

from the negative impacts of oil and gas development,[46] but the 2020 Rule may hamper those

efforts. The Bureau of Land Management has noted that there may be negative impacts to

surface water quality from oil and gas development in the area and the map accompanying this

analysis reveals that potential projects may be developed in the park's watershed.[47] The Corps

has issued jurisdictional determinations since the promulgation of the 2020 Rule that have

---

[42] Cathy Martin, *Student Conservation Association Helps Restore Great Marsh*, SAVE THE DUNES (Nov. 7, 2018), https://savedunes.org/2018/11/07/student-conservation-association-helps-restore-great-marsh/.

[43] *Id.*

[44] Fesenmeyer Decl. ¶ 8; Woods Decl. ¶ 55.

[45] Woods Decl. ¶ 56.

[46] *See Advocacy in Action: Fragile Treasures Threatened in Chaco Culture National Historical Park*, NATIONAL PARKS CONSERVATION ASSOCIATION, https://www.npca.org/advocacy/25-fragile-treasures-threatened-in-chaco-culture-national-historical-park.

[47] *See* Decl. Michelle Wu Ex. 25 (ECF No. 34) (map of potential projects near Chaco Culture National Historical Park, which are inherently located in the park's watershed).

classified ephemeral streams near the park as not jurisdictional. *See* Pls.' Mem. Law Supp. Mot. Summ. J (ECF No. 31) at 39. Park waters are at risk because developers no longer need to get a permit under section 402 or 404 of the CWA when their projects impact ephemeral streams.

The 2020 Rule will also detrimentally affect two of Florida's most famous national parks: Everglades National Park and Big Cypress National Preserve. Waters in these parks are either 100% impaired, or almost 100% impaired,[48] in part because "land-use activities that impair water quality have intensified in the upstream watersheds."[49] The parks are highly susceptible to the effects of upstream water management practices and are increasingly threatened by nearby land development and agricultural practices.[50] Park waters are further threatened by the 2020 Rule, which will not protect 81% of the wetlands in the watershed where the parks are located.[51]

The Florissant Fossil Beds National Monument in Colorado are also threatened by the 2020 Rule. 99% of the stream miles in the Grape Creek watershed, where the park is located, are jurisdictional under the 2015 and 2019 rules, but only 64% are under the 2020 Rule.[52] Pollution entering the streams that have lost protection are at could threaten the park's water quality.

---

[48] *See Everglades National Park Statistics*, NAT'L PARK SERV. (last updated July 27, 2020), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=EVER; *Big Cypress National Preserve Statistics*, NAT'L PARK SERV. (last updated Aug. 16, 2020), https://www.nps.gov/subjects/protectingwater/his-parkreport.htm?unitType=Park&parkNames=BICY.

[49] RONALD L. MILLER ET AL., U.S. GEOLOGICAL SURVEY, WATER QUALITY IN BIG CYPRESS NATIONAL PRESERVE AND EVERGLADES NATIONAL PARK—TRENDS AND SPATIAL CHARACTERISTICS OF SELECTED CONSTITUENTS 3 (2004).

[50] *Id.* at 3–4.

[51] Woods Decl. ¶ 53.

[52] Decl. Andrew Robertson ¶¶ 5–7.

Many other parks are downstream from newly unprotected waters. For example, the Tongue River basin is upstream of Yellowstone River, and in 2015, about 35% of its waters that were impacted by section 404 projects were ephemeral streams and non-floodplain wetlands.[53] Such waters are no longer jurisdictional under the 2020 Rule. The loss of protection for these waters can degrade the Yellowstone River, and thereby harm Yellowstone National Park.

E.      The Impairment of National Park Waters Will Devastate Wildlife Habitats

It is arbitrary and capricious for the Agencies to have ignored the harmful effects the 2020 Rule will have on national parks. As demonstrated above, many parks have traditionally navigable waters whose water quality will likely be harmed by pollution in upstream waters. However, the Agencies never analyzed how the 2020 Rule will harm national parks, or how the CWA's objectives, such as the protection for wildlife, will be hindered as a result of that harm.

Degraded park waters will threaten wildlife habitats, especially because many parks are home to threatened or endangered species. For instance, the Obed Wild and Scenic River hosts "one of only two existing populations of the federally-endangered Alabama lampshell mussel" as well as the spotfin chub, a federally-threatened fish species.[54] Further impairment of the park's already degraded waters could jeopardize the survival of these vulnerable species. Blackstone River Valley National Heritage Corridor mainly hosts pollution-tolerant species of fish because of its impaired water quality.[55] If the 2020 Rule exacerbates the park's poor water quality, the park may not be able to host less pollution-tolerant species. The failure of the 2020 Rule to

---

[53] Br. Amici Curiae Trout Unlimited et al., *South Carolina Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687-DCN (D.S.C. July 17, 2020), at 27.

[54] JAMES HUGHES ET AL., NAT'L PARK SERV., LONG-TERM DISCRETE WATER QUALITY MONITORING AT BIG SOUTH FORK NATIONAL RIVER AND RECREATION AREA, BLUE RIDGE PARKWAY, AND OBED WILD AND SCENIC RIVER 17 (2018).

[55] Blackstone Report, *supra* note 36, at 42.

adequately protect various species of animals undermines the CWA's purpose to "provide[] for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(2).

F.     The Impairment of National Park Waters Will Have Negative Economic Impacts

The Agencies have also failed to assess the economic implications the 2020 Rule will have on national parks, even though information in the administrative record would have allowed them to do so.[56] Approximately 328 million people visited national parks in 2019, which generated about $21 billion in spending in nearby regions.[57] Because of popular activities such as boating and swimming, clean water is an integral part of the experience at national parks. Without clean water, the significant economic activity parks generate could be threatened.

G.     Climate Change Will Only Further Harm National Park Waters

The harms identified above are likely to worsen over time due to climate change, as the 2020 Rule increases the likelihood that more waters will be removed from CWA jurisdiction in the future. For instance, many perennial streams are transforming to ephemeral streams and these newly-changed streams will no longer be jurisdictional.[58] Moreover, a warming climate could lead to a decline in water levels and flows, which can increase the concentrations of organic waste and nutrients and therefore intensify water impairments.[59] It is also likely that rain and

---

[56] *See, e.g.*, Emmett Environmental Law and Policy Clinic, Comments on Behalf of National Parks Conservation Association 38–39 (Apr. 12, 2019) (EPA-HQ-OW-2018-0149-7628) (summarizing potential economic harm national parks will face under the 2020 Rule).

[57] *Visitor Spending Effects—Economic Contributions of National Park Visitor Spending*, NAT'L PARK SERV., https://www.nps.gov/subjects/socialscience/vse.htm.

[58] S. Mažeika P. Sullivan et al., *Opinion: The Proposed Change to the Definition of "waters of the United States" Flouts Sound Science*, 116 PROC. NAT'L ACAD. SCI. U.S. 11,558 (2019), https://www.pnas.org/content/116/24/11558#ref-16.

[59] RONALD L. MILLER ET AL., U.S. GEOLOGICAL SURVEY, WATER QUALITY IN BIG CYPRESS NATIONAL PRESERVE AND EVERGLADES NATIONAL PARK—TRENDS AND SPATIAL CHARACTERISTICS OF SELECTED CONSTITUENTS 31 (2004).

snowstorms will increase in frequency and intensity, which will worsen stormwater pollution.[60] Climate change will exacerbate the harm the 2020 Rule inflicts on national parks because the recent loss of protection for many waters will endanger downstream park waters.

## VI.   BY FAILING TO ACCOUNT FOR THE 2020 RULE'S IMPACTS ON THE CWA'S SCOPE, AS WELL AS ITS ANCILLARY EFFECTS, THE AGENCIES HAVE IGNORED THE PRIMARY PURPOSES OF THE ACT

The Agencies have ignored the environmental, ecological, recreational, and economic implications of the 2020 Rule. The 2020 Rule is therefore arbitrary and capricious because it was not based on "a consideration of the relevant factors," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Agencies, in defining "waters of the United States," cannot ignore the CWA's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act also promotes the "protection and propagation of fish, shellfish, and wildlife" and "recreation in and on the water." *Id.* § 1251(a)(2). Cumulatively, the evidence described above provided the Agencies with the information necessary to at least approximately analyze the effect of the 2020 Rule on the scope of CWA jurisdiction, as well as its implications for water quality, recreation, and wildlife. The Agencies' failure to do so renders the 2020 Rule arbitrary and capricious.

## <u>CONCLUSION</u>

For the foregoing reasons, *amicus* respectfully requests that the Court grant Plaintiffs' motion for summary judgment.

---

[60] *Cleaning Up Stormwater Pollution*, CONSERVATION LAW FOUNDATION, https://www.clf.org/strategies/stormwater-pollution/.

DATED: December 17, 2020

SHAUN A. GOHO (BBO No. 652287)
NANDING CHEN*
NATALIE SOWINSKI*
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett Street, Suite 5116
Cambridge, MA 02138
(617) 496-3368 (office)
(617) 384-7633 (fax)
sgoho@law.harvard.edu

*Counsel for Amicus Curiae*
*National Parks Conservation Association*

*\* Clinical student; not admitted in the U.S. District*
*Court for the District of Massachusetts*