### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, et al., | ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) Civil Action No. 20-cv-10820-DPW |
| v. | ) |
|  | ) *Leave to File Granted on* |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | ) *December 17, 2020* ) |
|  | ) |
| Defendants. | ) |
|  | ) |

### AMICUS BRIEF OF MASSACHUSETTS, CALIFORNIA, CONNECTICUT, ILLINOIS, MAINE, MARYLAND, MICHIGAN, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MAURA HEALEY
ATTORNEY GENERAL

David S. Frankel, BBO No. 706647
  *Special Assistant Attorney General*
Seth Schofield, BBO No. 661210
  *Senior Appellate Counsel*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
david.frankel@mass.gov
seth.schofield@mass.gov

*Attorneys for the Commonwealth of Massachusetts*; Additional Counsel Listed on Signature Page

Dated: December 17, 2020

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................ i

INTRODUCTION & INTERESTS OF AMICI CURIAE .......................................... 1

ARGUMENT ........................................................................................... 4

I.   The Agencies' Justification of the Rule as Necessary to Maintain the
     Traditional Power of States Contravenes the Act's Purpose and Is Refuted by
     the Structure and Language of the Provision on Which the Agencies Rely ...................... 4

     A.   The Act Was Designed to Protect States from Excessive Pollution
          Originating Outside Their Borders. ........................................................ 4

     B.   The Agencies Misconstrue § 101(b)'s Recognition of States' Substantial
          Role in Administering the Duties Explicitly Assigned by the Act. ........................... 7

II.  The Agencies Arbitrarily Disregard the Significant Harms that the Rule Will
     Inflict on the States. ....................................................................... 9

     A.   The 2020 Rule Will Degrade Water Quality in Massachusetts and the
          Other Amici States. ................................................................... 10

     B.   States Cannot Fill All the Regulatory Gaps Created by the Rule to Protect
          In-State Water Quality. ............................................................... 16

CONCLUSION ....................................................................................... 20

CERTIFICATE OF SERVICE .......................................................................... 21

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) ..................................... 19

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ................................................... 6, 17

*California v. Wheeler*, 467 F. Supp. 3d 864 (N.D. Cal. 2020) ..................................... 2

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ............................................ 5

*County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020) ............................... 7, 8

**Table of Authorities - Continued**                                           *Page*

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) ........................................... 6

*Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ...................................................... 17

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987).................................... 6, 7, 8

*King v. Burwell*, 576 U.S. 473 (2015) .......................................................................... 9

*Rapanos v. United States*, 547 U.S. 715 (2006)......................................................... 6, 7

*United States v. Marathon Dev. Corp.*, 867 F.2d 96 (1st Cir. 1989)............................. 8

*Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983) ...................................................... 5

**Statutes**

Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 82 Stat.
    816 (1972) (codified as amended at 33 U.S.C. §§ 1251-1388 (2018)....................... 1

    § 101, 33 U.S.C. § 1251 ....................................................................................... 3, 9

    § 101(a), 33 U.S.C. § 1251(a) .................................................................................. 2

    § 101(b), 33 U.S.C. § 1251(b) .......................................................................... *passim*

    § 101(f), 33 U.S.C. § 1251(f) ................................................................................... 9

    §§ 104-106, 33 U.S.C. §§ 1254-56 .......................................................................... 8

    §§ 201-214, 33 U.S.C. §§ 1281-1301 ...................................................................... 8

    § 401, 33 U.S.C. § 1341 ................................................................................... 14, 15

    § 401(a), 33 U.S.C. § 1341(a) .................................................................................. 8

    § 401(a)(2), 33 U.S.C. §§ 1341(a)(2)....................................................................... 6

    § 402, 33 U.S.C. § 1342 .................................................................... 1, 8, 11, 18

    § 402(b), 33 U.S.C. § 1342(b) ................................................................................. 6

    § 402(d)(2), 33 U.S.C § 1342(d)(2) ......................................................................... 6

    § 404, 33 U.S.C. § 1344.................................................................... 1, 8, 11, 19

    § 510, 33 U.S.C. § 1370............................................................................................ 8

**Table of Authorities - Continued** *Page*

**Legislative History**

Congressional Res. Serv., A Legislative History of the Water Pollution Control Act
  Amendments of 1972, Ser. No. 93–1 (1973).............................................................. 7

S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 1971 WL 11307 .............. 5

**Regulations**

310 C.M.R. § 10.57........................................................................................... 15

314 C.M.R. § 4.06............................................................................................ 11

40 C.F.R. § 122.26(b)(15).................................................................................... 13

40 C.F.R. § 230.10(a)........................................................................................ 15

**Federal Register**

65 Fed. Reg. 50,108 (Aug. 16, 2000).......................................................................... 19

Navigable Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) ........................... *passim*

**Miscellaneous**

EPA, *Vernal Pools*, https://www.epa.gov/wetlands/vernal-pools ................................... 14

Richard L. Revesz, *Federalism and Interstate Environmental Externalities*, 144 U. Pa. L.
  Rev. 2341 (1996) ......................................................................................... 12

## INTRODUCTION & INTERESTS OF AMICI CURIAE

Amici States—the Commonwealths of Massachusetts and Virginia; the States of California, Connecticut, Illinois, Maine, Maryland, Michigan, New Mexico, New York, North Carolina, Oregon, Rhode Island, and Washington; and the District of Columbia (collectively, Amici States)—believe clean water is vitally important to the health of their communities, species and lands held in public trust, and local economies. Yet because water flows downstream, no matter how stringent Amici States' laws may be, the health of waters within Amici States' borders depends on effective regulation in upstream States. Congress enacted the Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 82 Stat. 816 (1972) (codified as amended at 33 U.S.C. §§ 1251-1388 (2018)) (Clean Water Act or Act) precisely because a patchwork of state laws had failed to prevent the extensive pollution of waters nationwide. Because each State could reap the full economic benefits of local development while exporting downstream many of the costs—in the form of pollution and other ecological harms—individual States lacked sufficient incentive to structure their own laws to protect the Nation's interconnected, shared watershed system. To remedy this problem, Congress passed the Act to establish a comprehensive federal regulatory floor designed to prevent States from discharging excessive pollution across state borders and to disincentivize States from competing for economic development in a regulatory "race to the bottom." For decades, Amici States have relied on that floor—implemented mainly through the Act's permit programs in § 402 (point-source pollution discharges) and § 404 (discharges of dredged and fill material)—to protect their waters from upstream pollution.

The Navigable Waters Protection Rule (Rule), 85 Fed. Reg. 22,250 (Apr. 21, 2020), tramples Congress's intent to ensure a federal regulatory floor and invites the very "race to the bottom" the Act sought to deter. It does so by redefining the "waters of the United States" protected

under the Act to categorically exclude, *inter alia*, ephemeral streams (streams that flow in response to precipitation) and wetlands without specific types of surface-water connections to other waters. The newly excluded waters comprise nearly 20 percent of stream miles and over 50 percent of wetlands in the country. Those waters are vital to the health of waters nationwide, but choices about whether and how to protect them now devolve to the disparate prerogatives of over fifty state, district, and territorial governments, frustrating Amici States' efforts to protect their waters.

In explaining the decision to exclude waters protected for *decades* under the Act, the Environmental Protection Agency (EPA) and Army Corps of Engineers (collectively, Agencies) purport to "balance" two interests. *See, e.g.*, 85 Fed. Reg. at 22,252, 22,261, 22,287. On one side of the scale, they acknowledge the Act's singular "objective"—"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—and do not dispute that broad federal protections will best secure that objective. On the other side, the Agencies read § 101(b) of the Act, 33 U.S.C. § 1251(b)—which identifies a "policy" of preserving "the primary responsibilities and rights of States" to combat water pollution—as a counterweight favoring less federal protection. In the Agencies' words, the Rule "strikes a reasonable and appropriate balance between Federal and State Waters" by balancing water quality impacts against a need to preserve traditional state authority. 85 Fed. Reg. at 22,252.

Amici States write to explain why the Agencies' balancing approach is fundamentally flawed.[1] First, the Agencies rely on a highly distorted vision of "States' rights," based on an incorrect reading of § 101(b), to justify their major reduction in waters protected by the Act. The

---

[1] In addition to participating as amici here, Amici States are also plaintiffs in a challenge to the Rule in the Northern District of California—a district in the arid West where the Rule's exclusion of ephemeral streams has especially dramatic impact. *See California v. Wheeler*, No. 3:20-cv-03005-RS (N.D. Cal.). While the court in that action denied preliminary relief, *see California v. Wheeler*, 467 F. Supp. 3d 864 (2020), full merits briefing on summary judgment is now underway.

Agencies claim that their interpretation empowers the States, but their reading merely elevates the rights of States to allow the degradation of water quality above the rights of States to be free from excessive pollution, contravening the Act's animating purpose. As plaintiffs explain, Opening Br. at 29-30, section 101(b) is not a directive to withdraw federal protections from large numbers of streams and wetlands. Rather, it embodies a recognition that States may opt to regulate more stringently than the federal floor and that States are authorized to fulfill key roles under the Act—like administering permit programs and setting state water quality standards. The Agencies' contrary interpretation enjoys no support in the Act's text: it supposes a federal-state partnership at odds with the one enumerated in the Act's substantive provisions and it implausibly treats one of the many "policy" statements in § 101 as an equal counterweight to the Act's sole "objective."

Second, the Agencies fail to seriously account for the Rule's harms. As plaintiffs explain, *see* Opening Br. at 23-25, the Agencies have not rationally "balanced" water-quality impacts against any purportedly countervailing factor because they have not considered the number of streams and wetlands that will lose federal protections or the extent of pollution the Rule will cause. In illustrating impacts that the Agencies ignore, Amici States focus on Massachusetts, a State that will be harmed despite a robust state water protection program. Massachusetts lacks direct power to prevent harmful activities that are nearly certain to occur in upstream States, and the Rule also exposes gaps in existing state law where the Commonwealth has relied on federal protections. For example, Massachusetts has relied on federal stormwater controls—which lack an equivalent state cognate—to reduce harmful sediments and other pollutants; it also has relied on broad federal jurisdiction to limit the filling of certain wetlands that fall outside existing state protections. The Agencies' claim that States can fill the voids left by the Rule is misleading at best,

- 3 -

given the interstate nature of water pollution and the difficulty of swiftly restructuring state programs configured in reliance on longstanding federal programs and protections.

## ARGUMENT

I.  **The Agencies' Justification of the Rule as Necessary to Maintain the Traditional Power of States Contravenes the Act's Purpose and Is Refuted by the Structure and Language of the Provision on Which the Agencies Rely.**

The Agencies unlawfully rely on a theory of States' rights premised on § 101(b) of the Clean Water Act to curtail achievement of the Act's central objective—restoring and maintaining the Nation's water quality. *See* 85 Fed. Reg. at 22,261-62, 22,269-70. The Agencies pin their rationale to § 101(b)'s first sentence, which sets forth "the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). But interpreting this language as the Agencies do—as a free-standing license to exclude from federal jurisdiction an array of streams and wetlands critical to the health of the Nation's waters—flouts the Act's essential purpose and is incompatible with § 101(b)'s language and structure. Indeed, the Rule does not advance States' rights, as the Agencies claim; it merely prioritizes States' rights to pollute, an aim contrary to the Act's objective, over States' rights to protect their water resources from pollution, in line with the Act's only stated objective.

A.  **The Act Was Designed to Protect States from Excessive Pollution Originating Outside Their Borders.**

The Agencies' reliance on § 101(b) to justify their decision to narrow federal jurisdiction—by leaving large swaths of waters subject only to the vicissitudes of state regulation—is irreconcilable with the reason driving Congress's passage of the Act: Congress's determination that the preexisting patchwork of state regulation had proven "inadequate in every vital respect," leaving many waters "severely polluted." S. Rep. No. 92-414, at 7 (1971), *as reprinted in* 1972

U.S.C.C.A.N. 3668, 3673, 1971 WL 11307. To replace that inadequate State-led scheme, Congress in 1972 "establish[ed] an all-encompassing program of water regulation" that would set minimum national standards to control discharges directly at the sources. *City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981); *see* S. Rep. No. 92-414, at 77 ("[I]t is essential that discharge of pollutants be controlled at the source.").[2] While the Act vests States with authority to regulate more stringently than the federal floor (through, among other things, stricter water quality standards or discharge limitations, *see infra* at 7-8), it was designed to prevent individual States from degrading the Nation's shared waterways either by purposefully structuring their own state laws to allow unregulated discharges or by failing to act at all for whatever reason. Indeed, the Act represented Congress's explicit abandonment of the policy to which the prior "legislation . . . had been keyed": "States . . . lead[ing] the national effort to prevent, control and abate water pollution." S. Rep. No. 92-414, at 1. Yet the Rule reinstates that discarded regime, once again allowing each State to choose whether to control activities that will degrade or destroy a vast number of streams and wetlands that are inseparably bound up with the health of the waters in downstream States. *See infra* at 10-12. Because the Agencies' interpretation is "at odds with" Congress's clearly expressed intent, *see Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 56 (1983), it cannot stand.

The Agencies' interpretation—which, again, categorically excludes a vast number of critical waters from the Act's jurisdiction—deprives downstream States of a statutory remedy Congress intended to afford them to protect against upstream harms. Specifically, in the 1972 Act, Congress gave downstream States affected by out-of-state pollution the right to object to a proposed permit in another State and to ask EPA to disapprove the permit because of an undue

---

[2] *See also Milwaukee*, 451 U.S. at 318-19 (discussing historical evidence about "comprehensive" nature of Act).

impact on water quality within their borders. *See* 33 U.S.C. §§ 1341(a)(2), 1342(b), (d)(2); *Arkansas v. Oklahoma*, 503 U.S. 91, 99 (1992); *International Paper Co. v. Ouellette*, 479 U.S. 481, 490-91 (1987). But under the Rule, discharges into many waters that are integral to maintaining downstream water quality are excluded from the Act's permitting scheme, including all ephemeral streams and most wetlands. As a result, downstream States now lack the federal statutory right to object to out-of-state polluting activities in those essential waters, no matter how substantial the harms. The Rule thus deprives downstream States of the "ample opportunity . . . to seek redress" that Congress, when enacting the 1972 Act, intended for such circumstances. *Milwaukee*, 451 U.S. at 326. In other words, while the Agencies purport to scale back the Act's protections in the name of empowering States, they in fact strip States of a critical safeguard necessary to protect against neighboring States' ecologically destructive decisions. *Cf. Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (a State is entitled to "the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air").

As Justice Kennedy admonished in *Rapanos v. United States*, any rational reading of § 101(b) should not undercut the key function of "the Act [in] protect[ing] downstream States from out-of-state pollution that they cannot themselves regulate" directly. 547 U.S. 715, 777 (2006) (Kennedy, J., concurring). But that is exactly what the Agencies' interpretation of the Act in the Rule does here. And they have advanced that construction even though interpreting the Act to achieve Congress's central objective—by covering all streams (including ephemeral streams) and all wetlands (including those without surface connections) with a "significant nexus" to navigable waters—"does not raise federalism . . . concerns" of the type the Agencies read into § 101(b). *Id.* at 782 (Kennedy, J., concurring); *see also id.* at 802-03 (Stevens, J., dissenting) (four other Justices, like Justice Kennedy, rejecting view that § 101(b) supports a narrow interpretation of Agencies'

jurisdiction). This Court should reject the Rule for those reasons alone. But, as Amici States further explain, numerous other reasons also require that result.

**B.  The Agencies Misconstrue § 101(b)'s Recognition of States' Substantial Role in Administering the Duties Explicitly Assigned by the Act.**

Section 101(b)'s "policy" of preserving state "responsibilities and rights" is not, as the Agencies would have it, a directive to arbitrarily carve out entire categories of waters from federal protections in a manner that would, as discussed above, defy the design of the Act. Properly read, the language on which the Agencies rely embodies Congress's recognition that States have power to regulate in-state waters *above and beyond* the federal floor and authority to fulfill many critical responsibilities under the Act, such as planning, administering permitting programs, and setting state water quality standards. *See, e.g.*, *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020) (describing subjects on which "Congress intended to leave substantial responsibility and autonomy to the States," including "groundwater pollution and nonpoint source pollution"). As the Supreme Court explained, the delegation to States of responsibility to administer the Act— most notably authority to manage the Act's permit programs—represents the "significant role in protecting their own natural resources" contemplated by § 101(b). *Ouellette*, 479 U.S. at 489; *see also* Congressional Res. Serv., A Legislative History of the Water Pollution Control Act Amendments of 1972, Ser. No. 93–1, at 403 (1973) (noting that Act "aims to preserve the primary right and responsibility of states to prevent and abate pollution by assigning them a large role in the national discharge permit system"). More broadly, the States' "strong voice in regulating their own pollution" consists of state power to "require discharge limitations *more stringent* than those

required by the Federal Government," to develop water quality standards, and to prevent the issuance of permits that do not meet such standards. *Ouellette*, 479 U.S. at 490 (emphasis added).[3]

Congress codified those powers in the Act's substantive provisions, many of which are cross-referenced—explicitly or implicitly—in § 101(b)'s text.[4] Section 101(b) states "the policy of Congress that the States manage the construction grant program under [§§ 201-214, 33 U.S.C. §§ 1281-1301] and implement the permit programs under sections 402 and 404 [33 U.S.C. §§ 1342, 1344] of this Act" and, further, that it is "the policy of the Congress to support aid and research . . . and to provide Federal technical services and financial aid to State . . . agencies" under §§ 104-106, 33 U.S.C. §§ 1254-56, and other provisions.[5] Additionally, section 510 (33 U.S.C. § 1370) expressly preserves state authority to impose standards more stringent than the federal baseline, and section 401(a) (33 U.S.C. § 1341(a)) details state power to issue water quality certifications and to reject federal permits for projects that do not meet state standards. It is those provisions that define the contours of the Act's federal-state partnership and delineate the state rights Congress intended to preserve within the Act's regulatory scheme. The Agencies thus err in reading § 101(b) as promoting an amorphous set of state powers unmoored from the Act's specific substantive provisions.

---

[3] *See also United States v. Marathon Dev. Corp.*, 867 F.2d 96, 99 (1st Cir. 1989) (describing States' "veto power" over federal permits and authority to "set more stringent water quality standards" as effectuating Act's purpose to reserve significant powers to the States).

[4] Per § 101(b)'s title, the entire provision concerns the "Congressional recognition, preservation, and protection of primary responsibilities and rights of States." 33 U.S.C. 1251. The policies articulated in the provision's latter sentences thus further flesh out the specific content of the state "responsibilities and rights" that are stated in more general terms earlier in the provision.

[5] *See County of Maui*, 140 S. Ct. at 1471 ("The Act envisions EPA's role in managing nonpoint source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants.")

The Agencies further err in invoking these unenumerated state powers as tools to undermine the Act's singular objective—"to restore and maintain the chemical, physical and biological integrity of the Nation's waters"—by excluding important waters from the Act's jurisdiction. Even if § 101(b)'s "policy" statement were ambiguous, and it is not, it cannot serve the counterbalancing function that the Agencies assert because that would irrationally place one of the Act's many "policies" in direct opposition to (and on equal footing as) the Act's sole "objective." *See King v. Burwell*, 576 U.S. 473, 493 (2015) (explaining that that statutes should not be interpreted to "negate their stated purposes"). To illustrate the absurdity of giving equal and opposite weight to this "policy" as to the Act's singular "objective," consider the following: although § 101(f) notes the "drastic minimization of paperwork" as a congressional "policy" embodied by the Act, Congress plainly did not intend for the Agencies to reduce the scope of federal protections, and undercut the Act's objective, on the basis that fewer permit applications entails less paperwork. And of the twelve "policies" identified in § 101, interpreting a policy in subsection (b) as countering the Act's sole objective is especially perverse given that § 101(b) repeats—three separate times—that the "policy" of preserving States' rights is for the express aim of "prevent[ing], reduc[ing], and eliminat[ing] pollution," not narrowing the Act's jurisdiction in a way that will, as discussed below, degrade the Nation's shared water resources.

## II.     The Agencies Arbitrarily Disregard the Significant Harms that the Rule Will Inflict on the States.

Given the Act's sole objective of restoring and protecting the Nation's waters, the Agencies do not dispute that they had to account for the Rule's effects on water quality in determining the breadth of federal protections. Yet the Agencies fail to meaningfully consider the Rule's harms: they disclaim estimates of the scope of waters that lose protection (including their own prior analysis) and then expressly decline to enumerate or quantify the nature and extent of harm to

waters nationwide. *See* 85 Fed. Reg. at 22,332, Economic Analysis (EA) at 48-52.[6] Without such

basic information, the Agencies cannot seriously claim to have "balanced" the Rule's harms

against a purportedly countervailing policy.

     A.     **The 2020 Rule Will Degrade Water Quality in Massachusetts and the Other
Amici States.**

     The harms that the Agencies ignore are immense: according to conservative estimates,[7] the

Rule deprives a staggering 51 percent of the Nation's wetlands and 18 percent of the Nation's

streams of federal protections.[8] That massive reduction in federal protections will degrade the

waters in Amici States (and every State) through two main avenues. First, the Rule will allow the

destruction of ecological resources in upstream States with state laws that regulate less stringently

than the longstanding, prior federal protections. Second, because many States have structured their

own laws in reliance on a strong federal floor of protection, the Rule creates numerous in-state

regulatory gaps. Massachusetts provides a case study of a State with broadly protective state laws

that will still suffer significant harm.

     Because water flows downstream without regard to state boundaries, activities in upstream

States, where Massachusetts lacks direct regulatory authority, will necessarily affect water quality

---

    [6] EPA & Dep't of the Army, *Economic Analysis for the Navigable Waters Protection Rule:
Definition of "Waters of the United States"* at 48-52 (Jan. 22, 2020), Doc. No. EPA-HQ-OW-
2018-0149-11572, https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11572)
(explaining that Agencies declined to conduct a comprehensive analysis of the scope of waters that
would be left unprotected by the new rule because of purported uncertainties and data limitations);
*see also* 85 Fed. Reg. at 22,332 (explaining that in promulgating the Rule, the Agencies did "not
use[]" even the more limited, qualitative descriptions of the Rule's effects provided in the
Economic Analysis and Resource and Programmatic Assessment).

    [7] These estimates likely substantially undercount the number of affected streams because
ephemeral streams are largely unmapped across the country. *See* EA at 200.

    [8] *See* Preliminary Analyses of National Hydrography Dataset & National Wetlands Inventory
at 2-4, 9 (Sept. 15, 2017), EPA-HQ-OW-2018-0149-11767, https://www.regulations.gov/
document?D=EPA-HQ-OW-2018-0149-11767.

within the Commonwealth. When, for example, out-of-state activities degrade the headwaters or wetlands that feed and protect the Merrimack River—which runs through New Hampshire before entering Massachusetts—toxins, sediments, and floodwaters flow downstream into Massachusetts. *See* Comments of Attorney General of New York, et al. (State Comments), App'x at 8.[9] In eliminating ephemeral streams and most wetlands from federal jurisdiction, the Rule drastically curtails the scope of the § 402 and § 404 permit programs that had protected States like Massachusetts from harmful upstream discharge and fill activities.

The likelihood that decreased federal protections will allow ecologically destructive activities upstream of Massachusetts is quite high. Indeed, in 2017, the Governor of New Hampshire (also upstream of Amici Rhode Island and Connecticut) urged the Agencies to adopt "a narrower definition of 'the waters of the United States'" precisely to facilitate development projects that would otherwise require federal permits. Ltr. from Governor Sununu to Administrator Pruitt at 3.[10] As the Governor explained, narrowing the Act's scope will make it easier for New Hampshire entities "to make alterations to land and water" and to implement "wetland alterations" needed for such projects. *Id.* Although those activities may well "benefit New Hampshire" residents economically, *see id.* at 2, they will harm Massachusetts and the other downstream States, which will share the burden of increased pollution from upstream discharges and from the

---

[9] Comments of Attorney General of New York, et al. (Apr. 15, 2019), Doc. No. EPA-HQ-OW-2018-0149-5467, https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5467; *see also* 314 C.M.R. § 4.06 (mapping waterways, including many that originate out-of-state, and river basins in Massachusetts).

[10] Ltr from Christopher T. Sununu, Governor, N.H., to Scott Pruitt, Administrator, EPA, & Douglas W. Lamont, P.E., Sr. Official Performing Duties of the Ass't Sec'y of the Army (Civil Works), Re: Proposal for the Clean Water Rule, at 3 (June 19, 2017), https://www.epa.gov/sites/production/files/2017-09/documents/nh-governor_sununu_2017-06-19_1.pdf.

destruction of wetlands that filter pollutants. The loss of water-retaining wetlands in New Hampshire also will increase downstream flood risks in Massachusetts and beyond.

The Rule threatens similar harms to all Amici States, as each possesses water bodies shared with or downstream of other States, and each is thus impacted by those upstream States' regulatory choices. The integrity of Virginia's and Maryland's Chesapeake Bay, for example, depends on water protection decisions made in five other upstream jurisdictions, including West Virginia, which has limited state-law protections. State Comments, App'x at 7; Decl. of Lee Currey ¶¶ 5, 7.[11] The Potomac River runs the length of the District of Columbia's southwestern border, but over 99 percent of that river's watershed lies outside of the District's boundaries. State Comments, App'x at 67. And the Amargosa River in California—which is ephemeral for most of its length— originates in Nevada, where significant pollution sources, such as Nevada's largest working dairy farm and hazardous waste disposal site, lurk alongside. State Comments, App'x at 5; Decl. of Steve Parmenter ¶¶ 5-6, 12-13.[12] No matter how protective California, Maryland, or District of Columbia laws may be in preserving their own sensitive ecosystems, those jurisdictions cannot readily control the choices of upstream States like West Virginia or Nevada, which can now allow projects to advance in their States without adequate controls to protect downstream water quality.[13]

---

[11] Decl. of Lee Currey, Dir. of Water & Sci. Admin., Md. Dep't of the Envt. (May 11, 2020), *California v. Wheeler*, No. 3:20-cv-03005-RS (N.D. Cal.), ECF No. 30-14. The declarations cited in this brief were all filed by the States in the *California* litigation.

[12] Decl. of Steve Parmenter, Senior Envtl. Scientist Specialist, Cal. Dep't of Fish & Wildlife (May 13, 2020), ECF No. 30-20 (N.D. Cal.).

[13] "The problem of interstate externalities arises because a state that sends pollution to another state obtains the labor and fiscal benefits of the economic activity that generates the pollution but does not suffer the full costs of the activity. Under these conditions, economic theory maintains that an undesirably large amount of pollution will cross state lines." Richard L. Revesz, *Federalism and Interstate Environmental Externalities*, 144 U. Pa. L. Rev. 2341, 2343 (1996).

The harms from upstream pollution are likely to be widespread and significant, as many States located upstream of Amici States—including West Virginia and Nevada—have fashioned their state laws to "require their state regulations to parallel federal CWA regulations," including through "limits on geographic jurisdiction of state regulations to match CWA jurisdiction." Resource & Programmatic Assessment (RPA) at 46[14]; EA at 33. Additionally, twenty-four States "have adopted laws that require extra steps or finding of benefits in order to impose state regulations beyond federal requirements." RPA at 46. The Agencies admit that those laws provide "a useful indicator" that a large number of States are in fact "unlikely" to expand their regulation of state waters to fill the gaps created by the Rule. EA at 39.

Beyond the increase in out-of-state pollution that is sure to flow into Massachusetts and other downstream States, the Rule also creates numerous gaps that will allow harmful activities within Amici States' borders. Even Massachusetts—with state laws that are, again, broadly protective of streams and wetlands—will suffer significant environmental consequences because of instances where those laws are not presently coextensive with federal protections and regulatory tools. For example, the Act's regulations require upland stormwater controls for existing projects larger than one acre, so long as stormwater will discharge to a water of the United States. *See* 40 C.F.R. § 122.26(b)(15); State Comments, App'x at 8-9; Decl. of Kathleen M. Baskin (Baskin Decl.) ¶ 11.[15] By reducing the scope of waters that would trigger such federal controls, many activities affecting water quality in Massachusetts that had been federally regulated will no longer

---

[14] EPA & Dep't of the Army, *Resource & Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* (RPA) (Jan. 23, 2020), Doc. No. EPA-HQ-OW-2018-0149-11573, https://www.regulations.gov/document?D=EPA-HQ-OW-2018 -0149-11573.

[15] Decl. of Kathleen M. Baskin, Asst. Comm'r for Bur. of Water Resources, Mass. Dep't of Envtl. Prot. (Nov. 17, 2020), ECF No. 214-1 (N.D. Cal.).

be regulated *at all* because Massachusetts law does not currently require a corresponding set of controls. That is a serious gap because construction-site erosion from stormwater discharges is the largest source of sediments (i.e., sands, clays, and silts) in Massachusetts' waters, and stormwater discharges carry other damaging pollutants (e.g., pathogens and nutrients) into state waterways and wetlands. State Comments, App'x at 8-9; Baskin Decl. ¶ 11.

The Rule also will create a gap in coverage for many important wetlands in Massachusetts, including a significant number of seasonal wetlands known as vernal pools. Those pools, which typically form in the autumn or winter and dry up in the summer, provide essential habitat for various amphibians and other wildlife, including rare and endangered species.[16] The Commonwealth's § 401 water quality certification program historically has protected many vernal pools that—because they are outside defined state resource areas—are not protected by the state Wetlands Protection Act. State Comments, App'x at 10; Baskin Decl. ¶¶ 12-13. But Massachusetts' § 401 program is triggered only if a vernal pool is subject to the Act, as determined by the Army Corps of Engineers under the Act's § 404 permit program. By narrowing the definition of waters subject to the Act, the Massachusetts Department of Environmental Protection (MassDEP) can no longer use its § 401 water quality certification authority to protect many vernal pools from destructive dredging and filling activities, including pools that serve critical ecological functions and are hydrologically connected to downstream navigable waters. State Comments, App'x at 10; Baskin Decl. ¶¶ 12-13.

Other wetlands that previously would have been covered by federal law fall into a similar gap. In the short time since the Rule took effect, MassDEP has become aware of at least two projects that entail filling ecologically important wetlands (which provide, *inter alia*, flood storage

---

[16] *See* EPA, *Vernal Pools*, https://www.epa.gov/wetlands/vernal-pools; Baskin Decl. ¶ 12.

and animal habitat) that would have required MassDEP § 401 water quality certifications under previous federal rules, but that now fall outside of federal and state protections. *See* Baskin Decl. ¶ 14. The threatened wetlands—in Bolton and in Marlborough—are not protected by state law because they do not meet certain size and location thresholds, *see* 310 C.M.R. § 10.57, and they are now outside federal jurisdiction because they lack the surface-water connections necessary to trigger federal controls under the Rule, despite a likely "significant nexus" with navigable waterways, *see* Baskin Decl. ¶ 14. The developers thus need not obtain permits before filling the wetlands and need not show, for example, the lack of a practicable alternative to that work. *See* 40 C.F.R. § 230.10(a).

These kinds of regulatory gaps abound, as many other States have relied on federal law to protect at least some in-state waters. In some States, particularly in the arid west, the gaps and associated loss of protections are immense. For example, in New Mexico—which does not operate its own § 402 permit program and instead relies on EPA-issued federal permits to regulate pollutant discharges—about 89 percent of rivers are ephemeral and thus newly outside of federal protections. *See* State Comments, App'x at 20-21; Decl. of Rebecca Roose (Roose Decl.) ¶¶ 9-10, 19.[17] Under the Rule, hundreds of § 402 permits in New Mexico, including 25 to 45 percent of stormwater general permits and 50 percent of individual permits, are no longer required. Roose Decl. ¶¶ 9-10, 19-20. Because New Mexico does not have in place a state regulatory program to replace the federal permitting framework, pollutants such as pesticides, paints, solvents, and acidic wastewater can now be freely discharged into New Mexico waters—including the Tijeras Arroyo, Gila River, and Rio Hondo watersheds—without regulatory limits. *Id.* ¶¶ 9, 15-17.

---

[17] Decl. of Rebecca Roose, Dir. of Water Prot. Div., N.M. Envtl. Dep. (Nov. 19, 2020), ECF No. 214-7 (N.D. Cal.).

**B.   States Cannot Fill All the Regulatory Gaps Created by the Rule to Protect In-State Water Quality.**

The Rule's unprecedented withdrawal of federal regulation will have major consequences for water quality in Amici States and across the country. Yet instead of considering those impacts (which were detailed extensively in comments submitted by Amici States and have since come to fruition), the Agencies brush them aside with cursory assertions that individual States may use state law to fill regulatory gaps. The Agencies note, for example, that some States already "regulate surface waters and wetlands as broadly as or more broadly than the 2019 Rule," 85 Fed. Reg. at 22,334, and suggest that other States may "choose to modify their existing regulatory programs" to fill gaps, *id.* at 22,333. The Agencies further speculate that "complete State 'gap-filling' could result in a zero-net impact in the long-run." *Id.* The Agencies' skin-deep analysis is both flawed and incomplete.

First, as discussed, States lack direct regulatory authority to protect streams and wetlands outside of their borders, and thus can do little to prevent pollution and destruction of those resources in upstream States—including the many upstream States that have laws barring those States from "regulat[ing] a more expansive set of waters than those subject to the federal CWA definition." *Id.* at 22,334. The Agencies are thus wrong that "States that regulate surface waters and wetlands as broadly as or more broadly than the 2019 Rule may not be affected." *Id.*

In fact, the Rule removes "interstate waters" as a standalone jurisdictional category, rendering the Agencies' decision to ignore cross-boundary water pollution even more inexplicable. *See id.* at 22,282-83. Under all prior iterations of the Agencies' regulations, downstream States could at least be assured that sources in adjacent States could not evade federal protections to pollute or fill water bodies that straddle (or form the boundary of) their shared state lines. *Id.* at

22,283.[18] But now, at those locations where one State's regulatory choices have the most immediate ecological impact on waters in another State,[19] the Rule irrationally (and unlawfully) removes federal protections. *See Arkansas*, 503 U.S. at 110 (explaining that "interstate water pollution is controlled by *federal* law"). The Agencies do not explain how, after withdrawing the Act's protections for interstate waters, one State can prevent another from polluting a shared waterbody.

Second, the Agencies concede that their assumptions about how States may fill regulatory gaps are based only on speculation. And, even if they were not, the Agencies cannot rely on the actions of third parties over which they have no control to justify eliminating prior and longstanding protections. Indeed, the Agencies admit that States' responses to the Agencies' withdrawal of federal jurisdiction are "difficult to predict." *See, e.g.*, RPA at 44; EA at 34, 38. And because the Agencies decline to estimate the extent of waters that the Rule leaves unprotected, *see* EA at 48-52, they are necessarily unaware, in even the broadest terms, of the magnitude of gaps States would have to fill.

Third, even in situations where States would like to revise their state laws to fill in-state regulatory gaps created by the Rule, substantial practical and fiscal obstacles may prevent many States from filling those gaps in a timely manner, if at all. Indeed, many of the Amici States have done substantial work over the past decades to configure their state programs in relation to the previously existing and longstanding federal law protections,[20] and it can be difficult, costly, and

----

[18] Even before the major expansion of federal protections in the 1972 Act, the Act's predecessor statutes governed the pollution of interstate waters. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 102 (1972) (holding that, under predecessor statute, "it is federal, not state, law that in the end controls the pollution of *interstate* or navigable waters" (emphasis added)).

[19] *See* Baskin Decl. ¶ 9 (identifying interstate waters that cross Massachusetts' borders).

[20] As an independent body of administrators from every state environmental agency and many interstate commissions advised the Agencies, "the reality is that jurisdiction and its impacts cannot

time-consuming to restructure those programs to account for the massive elimination in federal protections effected by the Rule.

Massachusetts, for example, is one of three States (plus the District of Columbia) that rely on EPA to administer the Act's § 402 NPDES point-source discharge permit program. EA at 54; *see* Baskin Decl. ¶ 19 (noting general EPA responsibility for permit issuance, compliance, and enforcement for Massachusetts' nearly 3,000 NPDES permit holders). In circumstances involving a surface-water discharge into a waterbody covered by state law but now excluded from federal coverage under the Rule, MassDEP now will have to work on its own to issue permits. That will entail additional personnel costs at an agency that has been staffed more leanly as a non-delegated program, as well as other significant burdens, like the need to contract with outside consultants to design an expensive new data management system. *See* Baskin Decl. ¶¶ 20, 23.[21] Similarly, New York, which aims to expand its state laws to cover smaller wetlands formerly protected by the federal Act, already has had to devote substantial resources to identify and map those wetlands. *See* State Comments, App'x at 30-31; Jacobson Decl. ¶¶ 13-14.[22] And to protect its numerous

---

be boiled down to shifting a line and shifting resources, as many states have regulatory overlap between Waters of the State and Waters of the U.S. and have built their state programs and their cooperative relationship with the agencies around that complicated overlap." *See* Comments of Association of Clean Water Administrators at 6 (Apr. 15, 2019), Doc. No. EPA-HQ-OW-2018-0149-4588, https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-4588; *see also* Association of Clean Water Administrators, Our Members (listing membership), https://www.acwa-us.org/members/; Baskin Decl. ¶ 21 (noting substantial work MassDEP has done to streamline the processes and eliminate duplicative requirements for projects triggering both federal and state permits).

[21] *See also* Baskin Decl. ¶ 17 (noting substantial costs of developing new total maximum daily loads (TMDLs) in areas where water quality deteriorates due to pollution from upstream States or other regulatory gaps); *id.* ¶ 20 (noting that to cover discharges previously covered by general permits, MassDEP must develop a new, separate general permit, or else issue multiple individual permits in circumstances where general permits are more appropriate and efficient).

[22] Decl. of Roy A. Jacobson, Jr., Head of Habitat Prot. Section, Div. of Fish & Wildlife, N.Y. State Dep't of Envtl. Conservation (Nov. 17, 2020), ECF No. 214-5 (N.D. Cal.).

ephemeral streams, New Mexico—which, like Massachusetts, has relied on federal operation of the Act's § 402 permit program—will need to overhaul its groundwater and surface-water regulations to create a new permitting program at a cost of over $7.5 million annually, representing a 115 percent increase in its budget for surface-water programs. Roose Decl. ¶¶ 20, 22.

Even assuming that many States can ultimately overcome the practical and financial obstacles, crafting gap-filling measures can take years. *See* EA at 63-65 (acknowledging costs and burdens of ramping up new programs). Washington State, for example, has determined that it will take at least four to five years and $5 million to fill the new regulatory gaps. Decl. of Lauren Driscoll ¶ 7[23]; *see* State Comments, App'x at 59. Four years is more than enough time to allow massive and irreversible ecological destruction. Indeed, history shows that developers will swiftly take advantage of temporary suspensions of permit requirements to fill streams and wetlands, an environmental injury that, "by its nature, can seldom be adequately remedied . . . and is often permanent or at least of long duration, *i.e.*, irreparable." *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). For example, when an opinion by the U.S. Court of Appeals for the District of Columbia Circuit created a less-than-one-year gap in statutory coverage over certain dredging activities, developers ditched "upwards of 20,000 of acres of wetlands" and channelized "more than 150 miles of streams" without any § 404 review or the need for compensatory mitigation. 65 Fed. Reg. 50,108, 50,109 (Aug. 16, 2000). If allowed to stand, the Rule threatens much farther-reaching devastation in Amici States and nationwide, undermining the fundamental, overriding purposes of the Act.

---

[23] Decl. of Lauren Driscoll, Wetlands Section Manager, Shorelands & Envtl. Assistance Prog., Wash. Dep't of Ecology (May 4, 2020), ECF No. 30-13 (N.D. Cal.).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for plaintiffs and vacate the Rule.

Dated: December 17, 2020

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

 /s/ David S. Frankel
David S. Frankel, BBO No. 706647
  *Special Assistant Attorney General*
Seth Schofield, BBO No. 661210
  *Senior Appellate Counsel*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 963-2294
david.frankel@mass.gov
seth.schofield@mass.gov

XAVIER BECERRA
Attorney General of California
1300 I Street
Sacramento, CA 94244

WILLIAM TONG
Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

KWAME RAOUL
Attorney General of Illinois
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
Attorney General of Maine
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
Attorney General of Michigan
P.O. Box 30212
Lansing, MI 48909

HECTOR BALDERAS
Attorney General of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

JOSHUA H. STEIN
Attorney General of North Carolina
114 W. Edenton Street
Raleigh, NC 27603

PETER F. NERONHA
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
Attorney General of Washington
P.O. Box 40100
Olympia, WA 98504

LETITIA JAMES
Attorney General of New York
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

MARK R. HERRING
Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219

KARL A. RACINE
Attorney General for the District of Columbia
441 4th Street, NW
Washington, D.C. 20001

## CERTIFICATE OF SERVICE

I, David S. Frankel, certify that the foregoing brief, which was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ David S. Frankel