**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, et al., | |
| Plaintiffs, | |
| v. | Case No. 20-cv-10820-DPW |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants, | |
| CHANTELLE SACKETT; MICHAEL SACKETT, | |
| Defendant-Intervenors. | |

**PLAINTIFFS' COMBINED OPPOSITION TO CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

ARGUMENT ...................................................................................................................2

I.    The Rule is arbitrary and capricious ...................................................................2

      A.    The Agencies ignored water quality impacts when crafting the Rule ...................2

      B.    The Agencies failed to provide a reasoned explanation for
            categorically excluding ephemeral streams and most non-abutting
            wetlands ...............................................................................................6

            1.    The Agencies' reasons for excluding ephemeral streams
                  lack record support, ignore relevant evidence, and contain
                  unexplained inconsistencies.............................................................7

            2.    The Agencies' reasons for excluding wetlands that lack certain
                  surface-water connections suffer from similar deficiencies ....................14

II.   The Rule is inconsistent with the Clean Water Act's text, structure, and
      purpose....................................................................................................18

      A.    The Agencies' interpretation is unreasonable because it is
            modeled on the *Rapanos* plurality opinion, which five Justices
            correctly rejected........................................................................................19

      B.    The Sacketts' radical arguments mischaracterize the statute and
            Supreme Court precedent........................................................................23

III.  The Agencies violated section 7 of the ESA .....................................................27

      A.    The Agencies had discretion to benefit endangered species.................................27

      B.    The Agencies' "no effect" determination was insufficient and
            arbitrary.....................................................................................................32

IV.   Plaintiffs' challenge is jurisdictionally and prudentially ripe ...........................36

V.    Vacatur of the entire Rule is both appropriate and necessary............................40

CONCLUSION..............................................................................................................42

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Abramski v. United States*,
  573 U.S. 169 (2014)..............................................................................................25

*Aguasvivas v. Pompeo*,
  984 F.3d 1047 (1st Cir. 2021)..............................................................................36

*Alaska Wilderness League v. Jewell*,
  788 F.3d 1212 (9th Cir. 2015) .............................................................................31

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) .............................................................................41

*Am. Equity Inv. Life Ins. Co. v. SEC*,
  613 F.3d 166 (D.C. Cir. 2010) .............................................................................17

*Am. Forest & Paper Ass'n v. EPA*,
  137 F.3d 291 (5th Cir. 1998) ...............................................................................31

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ........................................................................31, 36

*Animal Welfare Inst. v. Martin*,
  623 F.3d 19 (1st Cir. 2010)..................................................................................38

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995)..............................................................................................34

*California v. Azar*,
  --- F. Supp. 3d ----, 2020 WL 6733641 (N.D. Cal. Nov. 17, 2020)...................40

*California ex rel. Lockyer v. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ..........................................................................35, 36

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (D.C. Cir. 2007) .........................................................................37-38

*Chem. Mfrs. Ass'n v. EPA*,
  28 F.3d 1259 (D.C. Cir. 1994) .............................................................................11

*Citizens for Better Forestry v. Dep't of Agric.*,
  481 F. Supp. 2d 1059 (N.D. Cal. 2007) ....................................................32-33, 34, 36

*City & Cnty. of San Francisco v. Azar*,
  411 F. Supp. 3d 1001 (N.D. Cal. 2019) ...............................................................41

*City & Cnty. of San Francisco v. USCIS*,
  981 F.3d 742 (9th Cir. 2020) ...............................................................................11

ii

*Comite de Apoyo v. Solis*,
    933 F. Supp. 2d 700 (E.D. Pa. 2013) ..............................................................................42

*Cook County v. Wolf*,
    --- F. Supp. 3d ----, 2020 WL 6393005 (N.D. Ill. Nov. 2, 2020).....................................40

*Cook County v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) .................................................................................... 21-22

*County of Maui v. Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020)...............................................................................................19, 24

*CTIA v. FCC*,
    530 F.3d 984 (D.C. Cir. 2008) ......................................................................................38

*Ctr. for Biological Diversity v. FWS*,
    623 F. Supp. 2d 1044 (N.D. Cal. 2009) ........................................................................34

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ........................................................................................39

*Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*,
    541 F. Supp. 2d 1091 (D. Ariz. 2009) ..........................................................................35

*Ctr. for Food Safety v. Vilsack*,
    718 F.3d 829 (9th Cir. 2013) ........................................................................................30

*Cuomo v. Clearing House Ass'n*,
    557 U.S. 519 (2009)................................................................................................. 20-21

*Curran v. Aetna Life Ins. Co.*,
    No. 13-cv-00289, 2016 WL 3843085 (S.D.N.Y. July 11, 2016)......................................23

*Del. Riverkeeper Network v. EPA*,
    No. 20-cv-3412, 2020 WL 7488962 (E.D. Pa. Dec. 18, 2020)..................................37, 38

*Env't Def. Ctr., Inc. v. EPA*,
    344 F.3d 832 (9th Cir. 2003) .................................................................................. 26-27

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995)...........................................................................................37

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)......................................................................................................25

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................................................................14, 16

*Florida Key Deer v. Paulison*,
    522 F.3d 1133 (11th Cir. 2008) ......................................................................... 31-32, 36

*Good Samaritan Med. Ctr. v. NLRB*,
   858 F.3d 617 (1st Cir. 2017) ................................................................ 12

*Humane Soc'y of U.S. v. Kempthorne*,
   579 F. Supp. 2d 7 (D.D.C. 2008) .......................................................... 42

*Humane Soc'y of U.S. v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ................................................................ 6

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979) .............................................................................. 25

*Kholi v. Wall*,
   582 F.3d 147 (1st Cir. 2009) ................................................................. 25

*Kucana v. Holder*,
   558 U.S. 233 (2010) .............................................................................. 25

*Lane Cnty. Audubon Soc'y v. Jamison*,
   958 F.2d 290 (9th Cir. 1992) ................................................................ 34

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ........................................................................ 40-41

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*,
   170 F.3d 23 (1st Cir. 1999) ................................................................... 40

*Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*,
   --- F. Supp. 3d ----, 2020 WL 6390143 (D. Mass. Oct. 25, 2020) .................. 37

*Mercado-Zazueta v. Holder*,
   580 F.3d 1102 (9th Cir. 2009) .............................................................. 21

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................................... 2-3

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) .............................................................................. 41

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) .............................................................................. 22

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................ 6, 9, 15

*Murphy v. Smith*,
   138 S. Ct. 784 (2018) ............................................................................ 40

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) .............................................................................. 31

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   138 S. Ct. 617 (2018) ...................................................................................25

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .....................................................................................20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .....................................................................................38

*Nat'l Parks Conserv. Ass'n v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) ................................................................ 13-14

*Nat'l Parks Conserv. Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) ...................................................................42

*Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005) .................................................................34

*N. Cal. River Watch v. City of Healdsburg*,
   496 F.3d 993 (9th Cir. 2007) .......................................................................29

*N. Cal. River Watch v. Wilcox*,
   633 F.3d 766 (9th Cir. 2011) .......................................................................31

*New York v. Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) .........................................................41

*New York v. United States*,
   505 U.S. 144 (1992) .....................................................................................26

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008) .....................................................................41

*NRDC v. Callaway*,
   392 F. Supp. 685 (D.D.C. 1975) ............................................................ 23-24

*NRDC v. EPA*,
   No. 19-cv-5174, 2020 WL 2769491 (S.D.N.Y. Apr. 15, 2020) ............... 41-42

*NRDC v. EPA*,
   824 F.2d 1258 (1st Cir. 1987) .......................................................................9

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................40

*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*,
   313 U.S. 508 (1941) ................................................................................ 25-26

*Petrone v. Long Term Disability Income Plan*,
   935 F. Supp. 2d 278 (D. Mass. 2013) .........................................................12

*Philbrick v. Azar*,
397 F. Supp. 3d 11 (D.D.C. 2019) ...................................................................6

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
962 F.2d 27 (D.C. Cir. 1992) ........................................................................31

*PPL Mont., LLC v. Montana*,
565 U.S. 576 (2012).......................................................................................25

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*,
511 U.S. 700 (1994)..................................................................................21, 28

*Rapanos v. United States*,
547 U.S. 715 (2006)............................................ 8, 20, 23, 24, 26, 29-30

*Reddy v. Foster*,
845 F.3d 493 (1st Cir. 2017) ....................................................................36, 37

*Reno v. Flores*,
507 U.S. 292 (1993).......................................................................................22

*Roman Catholic Bishop of Springfield v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013)..............................................................36, 37, 38

*Sackett v. EPA*,
No. 08-cv-00185 (D. Idaho Mar. 31, 2019) ...................................................26

*Sackett v. EPA*,
566 U.S. 120 (2012).......................................................................................25

*Scalia v. New York*,
--- F. Supp. 3d ----, 2020 WL 5370871 (S.D.N.Y. Sept. 8, 2020).....................5

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)...........................................................................................3

*Serco Inc. v. United States*,
81 Fed. Cl. 463 (Fed. Cl. 2008) ........................................................................7

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*,
531 U.S. 159 (2001)............................................................................. 23, 28-29

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .........................................................................5

*Stewart v. Azar*,
313 F. Supp. 3d 237 (D.D.C. 2018) ..................................................................6

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).......................................................................................37

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)...........................................................................................28

*United States v. Ashland Oil & Transp. Co.*,
    504 F.2d 1317 (6th Cir. 1974) .......................................................................26

*United States v. Cundiff*,
    555 F.3d 200 (6th Cir. 2009) .........................................................................29

*United States v. Deaton*,
    332 F.3d 698 (4th Cir. 2003) .........................................................................25

*United States v. Johnson*,
    467 F.3d 56 (1st Cir. 2006).............................................................................24

*United States v. Martinez-Flores*,
    428 F.3d 22 (1st Cir. 2005).............................................................................26

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985)..............................................................................25, 26, 29

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016)....................................................................................25

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001).........................................................................................26

## STATUTES

5 U.S.C. § 706(2) .........................................................................................................40

16 U.S.C. § 799 ...........................................................................................................31

16 U.S.C. § 1536(a) ..........................................................................................27-28, 33

16 U.S.C. § 1536(b) ....................................................................................................33

33 U.S.C. § 1251(a) ...................................................................1, 21, 22, 26-27, 28, 32

33 U.S.C. § 1251(b) ....................................................................................................21

33 U.S.C. § 1252(a) ....................................................................................................28

33 U.S.C. § 1311(g) ....................................................................................................28

33 U.S.C. § 1311(h) ....................................................................................................28

33 U.S.C. § 1311(m) ...................................................................................................28

33 U.S.C. § 1312(a) ....................................................................................................28

33 U.S.C. § 1313(c) ....................................................................................................28

33 U.S.C. § 1313(d) ..............................................................................................28

33 U.S.C. § 1314(a) ..............................................................................................28

33 U.S.C. § 1314(l) ...............................................................................................28

33 U.S.C. § 1315(b) ..............................................................................................28

33 U.S.C. § 1321(b) ................................................................................................7

33 U.S.C. § 1342 ....................................................................................................7

33 U.S.C. § 1343(c) ..............................................................................................28

33 U.S.C. § 1344 ....................................................................................................7

33 U.S.C. § 1344(c) ..............................................................................................28

33 U.S.C. § 1345 ....................................................................................................8

42 U.S.C. 4022(b) ................................................................................................32

## REGULATIONS

33 C.F.R. § 325.2(b) .............................................................................................33

50 C.F.R. § 402.02 ...............................................................................................28

50 C.F.R. § 402.14(a) ...........................................................................................32

80 Fed. Reg. 37,054 (June 29, 2015) .........................................................16, 17, 29

85 Fed. Reg. 22,250 (Apr. 21, 2020) .......................... 3, 6, 9, 11-20, 23, 29, 30, 32, 42

## OTHER AUTHORITIES

EPA Office of Gen. Couns., Legal Issues Concerning Section 404(B)(1) Guidelines,
1983 WL 44288 (Mar. 17, 1983) ............................................................................28

S. Rep. No. 95-370 (1977) .....................................................................................28

The Navigable Waters Rule reverses decades of federal policy by removing Clean Water Act protections from streams and wetlands that are critical to protecting the nation's water quality. The Agencies were required to provide a reasoned explanation for that policy change. Instead, they failed to consider important issues, disregarded relevant evidence and prior findings, and gave internally inconsistent reasons for the regulatory lines they drew. The vast majority of the Agencies' arguments are attempts to gloss over and distract the Court from these record-based deficiencies, which render the Rule arbitrary and capricious and therefore unlawful.

Although the record-based flaws are fatal to the Rule, the Agencies' defense of the Rule under *Chevron* also fails. The Agencies apparently believe that because "waters of the United States" is ambiguous, they have discretion to interpret the phrase however they wish, so long as they claim to be "balancing" the objective and policies of the statute. But even under a highly deferential standard of review, the Agencies were required to ground their interpretation in the statute's text and purpose, which the Agencies failed to do.

Despite claiming that they had nearly unlimited discretion to "balance" Congress's policy directives, the Agencies dubiously insist that, for purposes of the Endangered Species Act (ESA), they lacked discretion to consider Congress's policy directives to protect "wildlife" and the "biological integrity" of navigable waters. 33 U.S.C. § 1251(a). The Agencies also claim that removing federal protections from potentially hundreds of thousands of acres of wildlife habitat will not affect endangered species. That is illogical and at odds with the purpose of the ESA's consultation requirement, which is to ensure that any possible effects are analyzed.

Because the Rule is arbitrary and capricious under the Administrative Procedure Act (APA) and violates the Clean Water Act and the ESA, the Court should vacate the Rule.

<u>**ARGUMENT**</u>

**I.     The Rule is arbitrary and capricious**

      **A.     The Agencies ignored water quality impacts when crafting the Rule**

      The Agencies do not dispute that water quality is an important factor they were required to consider in defining "waters of the United States." Instead, they argue that they did consider this factor, but that "data limitations" prevented them from making "precise" predictions about the Rule's water quality impacts. Defs.' Br. 33, ECF No. 46. This argument fails. First, the record shows that the Agencies did *not* consider water quality impacts when crafting the Rule. At most, they addressed potential impacts in a cursory manner in documents that, according to the Agencies, did *not* inform the rulemaking. Second, the Agencies' inability to make "precise" predictions did not entitle them to ignore water quality effects entirely, as they did.

      The Agencies insist that there are "numerous discussions" in the record supposedly demonstrating that they considered water quality impacts. *Id.* However, all their citations refer to documents that the Agencies claimed *not* to have relied on when formulating the Rule. Specifically, the Agencies cite a single section of their response-to-comments document (section 11). *See id.* But that section only responds to public comments about the Agencies' Economic Analysis (EA) and Resource and Programmatic Assessment (RPA). *See* Suppl. Wu Decl. Ex. 1, Resp. to Comments (RTC) § 11, p. 1 (titled "Economic Analysis and Resource and Programmatic Assessment"); *id.* § 11.3.3.2, pp. 32-37 (referring to discussion of potential water quality effects in EA and RPA); *id.* § 11.6, p. 71 (same); *id.* § 11.3.2.3, pp. 16-17 (referring to analysis in EA of potential state responses to the change in federal jurisdiction); *id.* § 11.3.2.5, p. 26 (similar); *id.* § 11.4, pp. 42-43 (not discussing water quality impacts). As Plaintiffs explained, the Agencies cannot rely on the EA and RPA to show the Rule was purportedly based on water quality considerations, because the Agencies expressly disclaimed reliance on these documents

during the rulemaking. *See* Pls.' Br. 24, ECF No. 31 (citing *Michigan v. EPA*, 576 U.S. 743, 758, 760 (2015)); 85 Fed. Reg. 22,250, 22,332 (Apr. 21, 2020) ("the final rule is not based on the information in the [EA or RPA]"); Suppl. Wu Decl. Ex. 1, RTC § 11.3.2.3, p. 16 ("The EA and RPA were intended to assist the public to better understand the potential effects of the rule but did not form a basis for the agencies' interpretation of the scope of their regulatory authority . . . ."). This does not mean the Agencies must "pretend these documents do not exist." Defs.' Br. 34. It simply means they cannot claim to have considered the information in these documents when formulating the Rule, because they expressly did not. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which . . . [the] action was based.").

Even if the Agencies had relied on the EA and RPA, these documents do not show that the Agencies meaningfully considered water quality impacts, or that such impacts would be "minimal[ ]." Defs.' Br. 1, 28; *see* Pls.' Br. 24. For example, in the EA, the Agencies conducted a nationwide analysis of only "some" potential effects flowing from just *one* of the Clean Water Act's programs—the section 404 dredge-and-fill program. Defs.' Br. Ex. 4, EA at 171. That partial analysis was itself incomplete because the Agencies quantified only the lost recreational and habitat benefits of wetlands, not the water quality impacts associated with wetland loss. *See* Suppl. Wu Decl. Ex. 1, RTC § 11.8.4.1, pp. 88-89. Meanwhile, the Agencies recognized that changes to the Act's section 402 and 311 programs could have a range of water quality impacts due to increased "pollutant loads" and "oil spill risk[s]." Defs.' Br. Ex. 4, EA at 105-06. But they did not make any predictions about the extent of those impacts across the country.[1]

---

[1] The Agencies also conducted a limited "case study" analysis of three watersheds. However, contrary to Defendants' claims, Defs.' Br. 28, the EA explains that the case studies may "not be representative" of the Rule's nationwide impacts because they "do not include watersheds

The Agencies also rely on the RPA to argue that pollution discharged into waters excluded from the Rule "may" still be regulated if it causes an "exceedance" of a water quality standard developed for a downstream "water of the United States." Defs.' Br. 35 (citing RPA at 63). To the extent the Agencies cite this part of the RPA as evidence that they considered water quality impacts, that fails for the reasons discussed above: the Agencies said that the RPA did not inform the Rule. It also makes no sense. The fact that there may be *some* tools left to address pollution discharged into unregulated waters does not justify the Agencies' failure to consider the water quality impacts of removing the *primary* regulatory tools, such as permitting protections, which are indisputably "key" to implementing the Act. *See id.* at 4.

The Agencies' suggestion that they considered water quality impacts by recognizing that states will continue to play a role in protecting water quality, *see id.* at 34-35, is another red herring. Like the EA and RPA, the Agencies disclaimed reliance on potential state responses when developing the Rule. *See, e.g.*, Suppl. Wu Decl. Ex. 1, RTC § 11.3.2.5, p. 26 ("Whether or how states choose to regulate . . . does not affect the agencies' determination of the scope of CWA jurisdiction."). In fact, the only purported analysis of potential state responses is in the EA, which the Agencies maintain did not inform the Rule. *See* Suppl. Wu Decl. Ex. 1, RTC § 11.3.2.3, p. 16. Even if the Agencies had relied on state "gap-filling," Defs.' Br. 35 (citation omitted), as a basis for removing federal protections from streams and wetlands, that would have arbitrarily ignored evidence that many states cannot or may not fill the regulatory gaps created by the Rule. Twenty-nine states have laws that either require state regulations to parallel Clean Water Act regulations or require extra steps or findings before state regulations may protect

predicted to see the largest changes in wetland areas or ephemeral streams," *id.* Ex. 4, EA at 164. The case studies are fundamentally flawed in other ways, too. *See* Inst. for Pol'y Integrity Amicus Br. 14-15, ECF No. 87.

waters beyond federal requirements.[2] States without such legal restrictions will still face

significant financial and administrative hurdles in expanding their state programs to protect

waters no longer regulated by the Act. *See* Suppl. Wu Decl. Ex. 2 at 22-23 (comment submitted

by 14 states and D.C.); Defs.' Br. Ex. 4, EA at 27 (acknowledging that reduced federal regulation

could result in "significant" costs for states to build, expand, and maintain infrastructure to

protect water resources); *see also* States Amicus Br. 16-19, ECF No. 80. The Agencies' assertion

that "complete State 'gap-filling' could result in a zero-net impact," Defs.' Br. 35, is thus "sheer

speculation," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (agency's

"predictive judgments" "must be based on some logic and evidence") (citations omitted).

Finally, the Agencies' attempt to blame "data limitations" for their failure to consider

water quality impacts, Defs.' Br. 33, fails. The record contained plenty of data they could have

used to estimate—even if not precisely quantify—the water quality effects of their decision. *See*

*Scalia v. New York*, --- F. Supp. 3d ----, 2020 WL 5370871, at *33 (S.D.N.Y. Sept. 8, 2020)

(even if exact magnitude of harm from rule is uncertain, that does not justify disregarding it). For

example, the Agencies could have used the National Hydrography Dataset (NHD) and National

Wetlands Inventory (NWI)—federal datasets that map streams and wetlands—as they did earlier

in the rulemaking. That earlier analysis indicated that the rule would exclude around 18% of

streams and 50% of wetlands. *See* Pls.' Br. 10; *see also* Defs.' Br. Ex. 3, RPA at 35 (recognizing

that the NHD and NWI are "the most comprehensive national datasets of the potential location

and extent of streams, rivers, lakes, ponds, and wetlands"). Limitations in the NHD and NWI

maps may not allow for "precise conclusions," Defs.' Br. 33, but that does not explain why the

---

[2] Thirteen states require their regulations to parallel federal standards and 16 additional states require extra steps or findings for state regulations to exceed federal requirements. Defs.' Br. Ex. 3, RPA at 46.

Agencies decided that it would be better to have no estimate at all. Because the Clean Water Act's objective is to restore and protect water quality, a rulemaking under the Act needed at least to estimate the proportion of waters that could lose coverage, and the extent to which that loss could affect water quality across the country. *See Philbrick v. Azar*, 397 F. Supp. 3d 11, 23-24 (D.D.C. 2019) (APA required agency "to address the magnitude of [Medicaid coverage] loss" where coverage was a "core objective" of the statute); *see also Stewart v. Azar*, 313 F. Supp. 3d 237, 262-64 (D.D.C. 2018) (agency failed to consider important factor of coverage loss by acting "with no idea of how many people might lose" coverage and failing to make a "bottom-line" estimate). The Agencies' "'failure to address' this 'salient factor' renders [their] decision arbitrary and capricious." *Philbrick*, 397 F. Supp. 3d at 24 (quoting *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606-07 (D.C. Cir. 2017)).

## B.    The Agencies failed to provide a reasoned explanation for categorically excluding ephemeral streams and most non-abutting wetlands

The Agencies and some amici misunderstand Plaintiffs' APA claim as saying that science required the Agencies to define "waters of the United States" as including all ephemeral streams and non-abutting wetlands. *See* Defs.' Br. 24, 26, 29; Industry Amicus Br. 12, ECF No. 73. That is not Plaintiffs' argument. Plaintiffs argue only that the Agencies were required to explain how their decision to *categorically exclude* these waters had a reasonable foundation in the scientific record, because the Agencies claim that it did. *See* 85 Fed. Reg. at 22,290 (asserting that the Rule has a "scientific foundation"); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (agency action "must be upheld, if at all, on the basis articulated by the agency"). It is the lack of record support and reasoned explanation that render the Rule arbitrary and capricious. As Plaintiffs explained, the Agencies' rationales are unsupported by the scientific evidence on which they purport to rely; ignore contradictory evidence and prior

findings without explanation; and suffer from a bevy of internal inconsistencies and circular, conclusory statements. *See* Pls.' Br. 13-23. Instead of responding with record-based arguments, the Agencies' defense consists largely of pointing to the number of pages in the record and insisting that the Court owes them deference. *See* Defs.' Br. 2, 20, 29, 31. But courts do not "assess the reasonableness of [an] . . . analysis by the weight of the paper involved." *Serco Inc. v. United States*, 81 Fed. Cl. 463, 499 (Fed. Cl. 2008). Nor do courts defer to agency decisions that, like the Navigable Waters Rule, offer conclusory and unsupported suppositions, ignore unfavorable evidence, and rest on an internally inconsistent approach.

### 1. The Agencies' reasons for excluding ephemeral streams lack record support, ignore relevant evidence, and contain unexplained inconsistencies

The Agencies excluded ephemeral streams based on their conclusion that ephemeral streams are not sufficiently connected to downstream navigable waters. Indeed, the Agencies' self-styled "unifying legal theory" is that the Rule limits "waters of the United States" to waters with "*sufficient* surface water connection[s]" to navigable waters. Defs.' Br. 14 (quoting 85 Fed. Reg. at 22,252) (emphasis added). Yet the Agencies' brief misleadingly insists that they "did *not* conclude 'that ephemeral streams are not sufficiently connected to downstream waters to qualify for protection,'" *id.* at 27 (quoting Pls.' Br. 17), because streams excluded from the Rule will still receive "protection" under the Act, *id.* at 28. That is disingenuous. By excluding ephemeral streams from the definition of "waters of the United States," the Agencies have removed federal regulatory protections from these waters. As a result, federal permits are no longer required before filling or destroying ephemeral streams, *see* 33 U.S.C. § 1344 (permitting program applicable to "navigable waters," i.e., "waters of the United States"); federal permits may no longer be required for discharging pollutants into ephemeral streams (or the permits could be substantially weakened), *see id.* § 1342, Defs.' Br. 28 & Ex. 4, EA at 59, 106; and the Act's

myriad other regulatory protections no longer apply, *see, e.g.*, 33 U.S.C. § 1321(b)(3) (regulating discharge of oil and hazardous substances capable of harming "navigable waters"); *id.* § 1345 (regulating disposal of sewage sludge if pollutants would enter "navigable waters").

In any event, the Agencies' argument that ephemeral streams may still enjoy some residual protections despite being excluded from the definition of "waters of the United States" is beside the point. As noted above, the Agencies' rationale for limiting "waters of the United States" to intermittent and perennial streams was that these streams have "sufficient," 85 Fed. Reg. at 22,252, and "significant enough" connections to navigable waters, *id.* at 22,310 (citation omitted), while ephemeral streams do not. That rationale lacks record support and a reasoned explanation, rendering the Rule arbitrary and capricious.

The Agencies argue that they provided a reasoned explanation because they stated that streams must be "relatively permanent" to qualify as "waters of the United States," and ephemeral streams are not "relatively permanent." Defs.' Br. 21-22. But that argument is circular—it does not explain *why* streams must be "relatively permanent" to qualify as "waters of the United States." Nowhere in the rulemaking did the Agencies claim that a "relatively permanent" requirement was compelled by the statutory text, such that a record- or science-based rationale was irrelevant.[3] To the contrary, the Agencies stated that their decision that only "relatively permanent" waters have "significant enough" connections to qualify as "waters of the United States" "rests upon a reasonable inference of ecological interconnection" with navigable waters. 85 Fed. Reg. at 22,310 (citation and quotations omitted). Elsewhere, too, the Agencies

---

[3] The Agencies asserted that the "relatively permanent" limitation was consistent with the plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), *see* 85 Fed. Reg. at 22,288-89, but claimed that this opinion (as well as Justice Kennedy's concurring opinion) served only as "guidance," not controlling authority, *id.* at 22,267.

repeatedly claimed that their interpretation of "waters of the United States" was informed by science. *See, e.g.*, *id.* at 22,271 (the Agencies used science to "inform[ ]" their interpretation and "in deciding how to apply key [legal] principles"); *id.* at 22,288 (the Agencies "relied on the available science to help inform where to draw the line of federal jurisdiction over tributaries").

The Agencies' argument that their decision to exclude ephemeral streams was based on legal and policy considerations *in addition to* science, *see* Defs.' Br. 23-24, misses the point. Plaintiffs do not argue that "only science matters." *Contra id.* at 23. Rather, Plaintiffs argue that because the Agencies concluded that ephemeral streams lack sufficient connections to navigable waters, and said that conclusion was based *in part* on science, the Agencies needed to explain how their conclusion had scientific support. Instead, they ignored the overwhelming evidence directly contradicting their conclusion, and failed to provide evidence supporting it. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "runs counter to the evidence"); *NRDC v. EPA*, 824 F.2d 1258, 1267 (1st Cir. 1987) ("facts relied upon [must] have some supporting basis in the administrative record").

Like the Rule's preamble, the Agencies' brief cherry-picks one tiny excerpt from the scientific record that they claim supports their decision. But they misrepresent even that excerpt. Specifically, the Agencies point to a figure created by EPA's Science Advisory Board illustrating the "connectivity gradient" concept. Defs.' Br. 22 (citing 85 Fed. Reg. at 22,288). The figure depicts a lower probability that an ephemeral stream will transmit changes to downstream waters as compared to a perennial or intermittent stream. *See* Wu Decl. Ex. 12, SAB Review at 54. But Plaintiffs explained that the Agencies' reliance on this figure improperly ignores the context in which it must be understood, namely, streams' cumulative and aggregate effects on downstream water quality. In other words, even if a *single* ephemeral stream has fewer downstream effects

than a *single* perennial stream, the relative abundance of ephemeral streams makes their *aggregate* effect highly significant, as the scientific evidence makes clear. *See* Pls.' Br. 15-16.

The Agencies do not respond to Plaintiffs' argument on this point, other than asserting, without support, that it is "inaccurate." Defs.' Br. 25. But the Court need not take Plaintiffs' word for it: EPA's own scientific experts agree. During the public comment process, several members of the expert panel that had recommended the "connectivity gradient" approach as part of their review of the draft Connectivity Report criticized the Agencies for now misrepresenting that concept. *See* Pls.' Br. 14. Their criticism underscored the "importance of the cumulative, aggregate effects of streams" on downstream waters, "which has not been recognized in the proposed Rule," and noted that ephemeral streams are often "extremely abundant and widespread," such that "destroying or degrading . . . ephemeral streams can have drastic effects for watersheds, water quality, water supply, and key organisms." Wu Decl. Ex. 14, SAB Panel Comment Letter at 3. EPA's Science Advisory Board also explained that using a "systems approach"—as opposed to looking at each stream in isolation as the Agencies have done—"is imperative when defining the connectivity of waters." Wu Decl. Ex. 8, draft SAB commentary at 2; *see also* Suppl. Wu Decl. Ex. 3, SAB Review at 24 (explaining that streams' aggregate and cumulative effects on water quality are an important part of connectivity). Yet the Agencies arbitrarily, and without explanation, ignored this crucial issue.

The Agencies' other record citations do not come close to providing support for their conclusion that ephemeral streams are less connected to navigable waters than intermittent and perennial streams. The Agencies cite a handful of pages in their public comment responses that purportedly "discuss[ ]" the Connectivity Report. *See* Defs.' Br. 25. But those responses either claim that the Agencies relied on the Connectivity Report without mentioning the Report's

10

findings, *see* Suppl. Wu Decl. Ex. 4, RTC § 1.5.5.3, p. 115, or they cite parts of the Report that

they admit are inconsistent with their conclusions, but dismiss those inconsistencies on the

grounds that "science alone cannot dictate where to draw the line between Federal and State

waters," Suppl. Wu Decl. Ex. 5, RTC § 13.1.7.1, pp. 13-14.[4] However, "making some mention

of evidence but then coming to a contrary, 'unsupported and conclusory' decision 'add[s]

nothing to [an] agency's defense of its thesis except perhaps the implication that it was

committed to its position regardless of any facts to the contrary.'" *City & Cnty. of San Francisco

v. USCIS*, 981 F.3d 742, 760 (9th Cir. 2020) (quoting *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259,

1266 (D.C. Cir. 1994)). The Agencies' remaining citations are simply statements that science

supports *other* aspects of the Rule, *see* Defs.' Br. 24-25, and are thus irrelevant to this issue.

The Agencies also have no excuse for ignoring other scientific evidence that undermines

their rationale for excluding ephemeral streams. The Agencies assert that the scientific reports

discussed in Plaintiffs' brief do not "distinguish[ ] between intermittent and ephemeral streams."

Defs.' Br. 25. But that is the point. These studies conclude that ephemeral and intermittent

streams can *both* perform critical hydrological and ecological functions for downstream waters.

*See* Wu Decl. Ex. 6, Ephemeral Streams Report at iii, 76 & Ex. 13, Goodrich et al. paper at 18-

19. Yet the Agencies concluded, to the contrary and without support, that intermittent streams

---

[4] Contrary to the arguments made in the amicus brief filed by mining company Freeport-McMoRan Inc., the Agencies never said the Connectivity Report was "flawed and overinclusive." ECF No. 89 at 10. And there is no support for Freeport-McMoRan's own claims that the Report is "unreliable and unpersuasive," *id.* at 13, apart from the company's own public comments. As EPA's Science Advisory Board explained, the Connectivity Report, which synthesizes over 1,200 peer-reviewed publications, *see* Pls.' Br. 7, "is a thorough and technically accurate review of the literature on the connectivity of streams and wetlands to downstream waters," Suppl. Wu Decl. Ex. 3, SAB Review (cover letter at 1). Freeport-McMoRan also claims that two reports commissioned by the company supposedly show that the Agencies' decision was supported by science. *See* ECF No. 89 at 6-9. These reports are not peer-reviewed publications, nor did the Agencies purport to rely on them during the rulemaking.

have "significant enough" connections to downstream waters, 85 Fed. Reg. at 22,310 (citation

omitted), while ephemeral streams do not. The Agencies' only other excuse for failing to

consider these relevant studies is that they supposedly do not offer "guidance to determining

*legal* jurisdiction." Defs.' Br. 26. However, as explained above, the fact that these are scientific

documents did not give the Agencies license to ignore them, because the Agencies repeatedly

claimed that they relied on science to inform the scope of their legal jurisdiction. But in fact, the

Agencies arbitrarily relied on only a selective part of the scientific record that supposedly

supported their decision (misrepresenting even that part), while ignoring the overwhelming

evidence weighing against it. *See Good Samaritan Med. Ctr. v. NLRB*, 858 F.3d 617, 638 (1st

Cir. 2017) (explaining that, in the context of substantial evidence standard, an agency cannot

"pick[ ] and choos[e] what will support [its] preconception and willfully ignor[e] whatever

weighs against it" (citation omitted)); *Petrone v. Long Term Disability Income Plan*, 935

F. Supp. 2d 278, 293 (D. Mass. 2013) (it was arbitrary for administrator to "ignore contrary

evidence, or engage with only that evidence which supports his conclusion").

Defendants' post-hoc attempt to conjure up meaningful scientific differences between

ephemeral and intermittent streams is equally unavailing. They cite the Connectivity Report as

purported evidence that intermittent and ephemeral streams are "functionally distinct." Defs.' Br.

27. However, they misread that Report. Although the Report recognizes that these streams fall

into different "flow duration classes," Suppl. Wu Decl. Ex. 6, Connectivity Report at 2-14, the

Report never says that they perform different *functions*, *see id.* at 2-22 to 2-26 (discussing

"functions" of streams without distinguishing between flow classification); *id.* at 3-47

(describing five "functions" of streams generally); *id.* at B-55 ("ephemeral and intermittent

streams perform many of the same functions in a watershed as perennial streams").

12

The similarity between ephemeral and intermittent streams is exemplified by the fact that certain intermittent streams, like ephemeral streams, flow only in response to precipitation. *See* 85 Fed. Reg. at 22,275. Yet the Rule arbitrarily excludes precipitation-fed ephemeral streams that flow in response to "snowfall," but includes precipitation-fed intermittent streams that flow in response to melting "snowpack." *See* Pls.' Br. 18. In their brief, the Agencies argue that flow from snowpack is purportedly different because it is "cumulative and seasonal, and thus relatively permanent." Defs.' Br. 26. As Plaintiffs explained, ephemeral flow can also be "seasonal," so that does not provide a distinction. *See* Pls.' Br. 18. Meanwhile, the Agencies never claimed that intermittent streams flowing in response to snowpack have "cumulative" *flow*, Defs.' Br. 26; they merely stated that *the source* of flow (i.e., snowpack) is snowfall that "accumulate[s]." 85 Fed. Reg. at 22,275. To the extent the Agencies are claiming that snowpack's "accumulation" is what distinguishes these streams, they failed to explain why that distinction is important or otherwise provides a legitimate basis for treating them differently.

The Agencies also fail to make sense of the inconsistency in their conclusion that ephemeral streams do not have sufficient surface-water connections to navigable waters, yet perennial and intermittent streams do, even when they are connected to navigable waters via ephemeral streams. According to the Agencies, they decided that ephemeral streams "may not have sufficient flow to be jurisdictional," but "may still convey flow . . . at a frequency sufficient to maintain jurisdiction over . . . upstream waters." Defs.' Br. 27. But how can ephemeral streams have enough flow to sufficiently connect an upstream and downstream water, but not enough flow for the ephemeral stream itself to be sufficiently connected downstream? The Agencies pass over this logical fallacy by asserting that their decision was "well within the Agencies' discretion." *Id.* But courts do not defer to "an internally inconsistent analysis." *Nat'l*

*Parks Conserv. Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

Lastly, the Agencies' brief does not address—much less explain why the Agencies ignored—the conflicting factual findings they made when issuing the Clean Water Rule. *See* Pls.' Br. 16-17. Instead, the Agencies insist that they were not required to provide reasons "more substantial than those required to adopt a policy in the first instance." Defs.' Br. 21 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)). The Agencies are wrong. Because their conclusion that ephemeral streams lack significant connections to navigable waters "rests upon factual findings that contradict those which underlay [their] prior policy," the Clean Water Rule, the Agencies were required to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television*, 556 U.S. at 515. Specifically, they needed to give a "reasoned explanation . . . for disregarding" those prior findings. *Id.* at 516. The Agencies gave none. *See* Pls.' Br. 16-17. Although the Agencies claim that they "analyzed district court opinions as to the infirmities of the [Clean Water Rule]," Defs.' Br. 20, none of those "infirmities" relate to the Agencies' prior findings that many ephemeral streams significantly affect the chemical, physical, and biological integrity of navigable waters. *See* 85 Fed. Reg. at 22,272 (only discussing court orders that "distance limitations" in Clean Water Rule's definition of adjacent wetlands lacked record support). The Agencies did not acknowledge that they were departing from their prior factual findings with respect to ephemeral streams. Nor did they explain why they believed that those prior factual findings were wrong. The Rule is therefore arbitrary and capricious. *See Fox Television*, 556 U.S. at 515-16.

### 2. The Agencies' reasons for excluding wetlands that lack certain surface-water connections suffer from similar deficiencies

The Agencies eliminated federal protections for most non-abutting wetlands based on their findings that these wetlands are "not inseparably bound up with" navigable waters and lack

"sufficient" surface-water connections to them. 85 Fed. Reg. at 22,308, 22,271. While the Agencies stated during the rulemaking that these findings were informed by science, *see id.* at 22,314, they now argue that their decision "need not be rooted in science" because it was based on their interpretation of the statute and "'principles and concepts' set forth in *Riverside Bayview*, *SWANCC*, and *Rapanos*," Defs.' Br. 29-30 (quoting 85 Fed. Reg. at 22,308). But the Agencies are improperly trying to draw a binary distinction between decisions based on science, on the one hand, and legal principles, on the other—when they said during the rulemaking that the Rule has both a "legal *and* scientific foundation." 85 Fed. Reg. at 22,290 (emphasis added). Indeed, the Agencies claimed they relied on science to "*inform* their interpretation" of the Act, and to "decid[e] *how* to apply key principles from the *Riverside Bayview*, *SWANCC*, and *Rapanos* decisions." *Id.* at 22,271 (emphases added). Because the Agencies said their decision to exclude certain types of wetlands was at least partly based on science, they were required to examine the relevant scientific evidence and explain how their decision had record support. *See State Farm*, 463 U.S. at 43. They did not.

The Agencies do not even address the scientific evidence cited by Plaintiffs, which the Agencies ignored during the rulemaking. Instead, they dismiss Plaintiffs' argument as a "disagreement" with their "use" of the science. Defs.' Br. 30. But there is no disagreement about what the science says. EPA's own scientific experts explained that the Agencies' decision with respect to wetlands "departs from [the] established science" on which the Agencies purport to rely. Pls.' Br. 20 (quoting Wu Decl. Ex. 8, draft SAB commentary at 3). The Agencies' brief not only fails to show otherwise, but it fails to cite *any* part of the rulemaking where the Agencies provided scientific support for their conclusion that only the wetlands protected under the Rule have sufficient connections to and are inseparably bound up with navigable waters.

Glossing over the lack of scientific support for their conclusions, the Agencies claim that "no one clear answer exists" and so the Court owes deference to the Agencies' decision. Defs.' Br. 31. But just because the Agencies had broad discretion to determine which types of wetlands qualify as "waters of the United States" does not mean the Agencies could ignore relevant evidence or fail to explain how their findings were supported by the record. Yet that is what the Agencies did. For example, they concluded that wetlands inundated by flooding from a jurisdictional water in a "typical year" have a connection that is "sufficient to warrant federal jurisdiction," 85 Fed. Reg. at 22,274, 22,310, whereas wetlands inundated by flooding less frequently have only "speculative" connections, *id.* at 22,310. Yet the Agencies did not provide any record support for this conclusion, nor did they address the scientific evidence directly contradicting it. *See* Pls.' Br. 20 (citing scientific evidence that many infrequently flooded wetlands are highly connected to streams and rivers).

The Agencies' discretion also did not give them license to disregard their prior factual findings. *See* Pls.' Br. 21-22 (citing *Fox Television*, 556 U.S. at 515). Like the Rule, the Agencies' brief fails to address the inconsistency between their prior finding that many wetlands have significant connections to navigable waters even if they do not flood every year, and their current finding that those same wetlands have only "speculative" connections. *See id*. With respect to wetlands connected via shallow subsurface flow, the Agencies merely claim that protecting them would be "overinclusive." Defs.' Br. 32 (quoting 85 Fed. Reg. at 22,313). But the Agencies failed to explain why that is so, considering their previous findings, based on the same scientific record, that wetlands connected to waters via shallow subsurface flow "clearly affect the condition of downstream waters." 80 Fed. Reg. 37,054, 37,063 (June 29, 2015). The Agencies also assert that protecting wetlands based on subsurface connections would be

16

"confusing" and "difficult to implement." Defs.' Br. 31 (quoting 85 Fed. Reg. at 22,313). But

that reasoning contradicts, without explanation, the Agencies' prior findings that identifying such

connections would *not* be difficult. *See* Suppl. Wu Decl. Ex. 7, CWR RTC § 3.5., p. 319

(shallow subsurface connections between waters are "reasonably identifiable"); *id.* at 43 (it is not

"overly burdensome" to identify shallow subsurface connections); 80 Fed. Reg. at 37,085

(shallow subsurface connections "often" exist when wetlands are within a certain distance).

      The Agencies' failure to supply record support is also not excused by their claim that the

Rule provides "improved clarity and ease of administration." Defs.' Br. 30. As a threshold

matter, the Agencies repeatedly claimed during the rulemaking that "clarity" was not a "primary

or fundamental basis for the final Rule." 85 Fed. Reg. at 22,270; *see also* Suppl. Wu Decl. Ex. 4,

RTC §§ 1.2.7, p. 38; 1.3.3.4, p. 68; 1.5.5.5, p. 118. The Agencies did not mention administrative

efficiency as a goal at all. Regardless, improved "clarity" by itself is not an adequate explanation

for the regulatory lines the Agencies chose because any categorical rule could be said to improve

clarity as compared to the case-specific analyses endemic to the preexisting regime. *See Am.*

*Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 177-78 (D.C. Cir. 2010) (agency cannot justify a

particular rule based solely on the assertion that it provides greater clarity than no rule at all).

      The Agencies' other responses are conclusory and fail to show that their findings with

respect to wetlands had a "scientific foundation," as the Agencies claim. *See* 85 Fed. Reg. at

22,290. For example, the Agencies argue that wetlands that do not flood in a "typical year" were

excluded because they "are inundated less frequently" and "do not otherwise have a sufficient

hydrologic connection to other jurisdictional waters." Defs.' Br. 31. But that simply restates the

conclusion the Agencies were required to explain. As Plaintiffs argued, the Agencies never

explain *why* wetlands have a "sufficient" hydrologic connection only when they are flooded in a

"typical year." *See* Pls.' Br. 21-22. The absence of a record-based explanation was particularly arbitrary considering the evidence and the Agencies' prior findings—both of which the Agencies ignore—that many wetlands that do *not* flood every year are highly connected to rivers and streams and critical to protecting them. *See id.* at 20-22.

The Agencies' argument that they explained the difference between surface-water connections created by flooding *from* a jurisdictional water versus flooding *to* a jurisdictional water is also conclusory. *See* Defs.' Br. 32. It is not enough for the Agencies to assert that these are "two distinct hydrological connections." *Id.* The Agencies must explain why these distinctions matter. Instead, the Agencies simply repeat the statement from the Rule's preamble that flooding must occur *from* a jurisdictional water to ensure "that the hydrologic connection occurs regularly and is not 'unduly speculative.'" *Id.* (quoting 85 Fed. Reg. at 22,310). But Plaintiffs already explained how this statement both lacks record support and is inconsistent with the Agencies' findings. *See* Pls.' Br. 22. The Agencies claimed that a surface-water connection in a "typical year" is "sufficient" to "warrant federal jurisdiction." 85 Fed. Reg. at 22,274. Thus, under the Agencies' own reasoning, flooding that occurs *to* a jurisdictional water in a typical year should be sufficient to warrant federal jurisdiction. Yet the Agencies irrationally excluded these wetlands based on their purportedly *insufficient* connections.

## II.   The Rule is inconsistent with the Clean Water Act's text, structure, and purpose

The Agencies do not dispute that it is unnecessary for the Court to reach the statutory interpretation question if Plaintiffs prevail on their APA or ESA claims. *See* Pls.' Br. 25-26.[5] Regardless, because the Rule has no support in the Clean Water Act's text, structure, or purpose,

---

[5] The Sacketts erroneously claim that Plaintiffs' APA and ESA claims are irrelevant because the Rule, at least as to wetlands, was supposedly "compelled" by the statutory text. *See* Def.-Int'rs' Br. 16-18, ECF No. 47. As discussed *infra* pp. 23-25, the Sacketts misread the statute and judicial precedent.

Plaintiffs should prevail on their statutory claim too.

### A.   The Agencies' interpretation is unreasonable because it is modeled on the *Rapanos* plurality opinion, which five Justices correctly rejected

While the Agencies insist on *Chevron* deference, they fail to explain how their interpretation of "waters of the United States" is consistent with the text, structure, and purpose of the Clean Water Act. They claim that limiting federal jurisdiction to waters with a "sufficient surface water connection" to navigable waters is "consistent with the statutory text," Defs.' Br. 14, but they do not explain the textual basis for such a requirement. They also claim they gave "appropriate consideration" to the Act's objective, *id.* at 17, but they never explain how defining "waters of the United States" based solely on surface-water connectivity is consistent with protecting the integrity of navigable waters. Nor could they, because the Agencies' surface-water requirement excludes many waters that have significant impacts on and are critical to maintaining downstream water quality. *See* Pls.' Br. 27-29; *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020) (rejecting reading of Clean Water Act that would have "consequences that are inconsistent with major congressional objectives").

Although the Agencies try to distinguish *Rapanos*, that case establishes that the Rule is inconsistent with the text, structure, and purpose of the Act, and is therefore unreasonable. *See* Pls.' Br. 26-29. Even if *Rapanos* does not say what the Agencies *must* regulate, Defs.' Br. 15, five Justices made plain what the Agencies must *not* do: limit the Act's reach to only "relatively permanent" waters and those with "continuous" surface connections to navigable waters. *See* Pls.' Br. 27-29. Yet, as the Agencies claimed during the rulemaking, that is what the Navigable Waters Rule does. *See* 85 Fed. Reg. at 22,271, 22,309-11.

The Agencies' argument that the Rule is not entirely modeled on the *Rapanos* plurality opinion is misleading. The Agencies claim that the Rule "synthesized" the opinions of the

*Rapanos* plurality and Justice Kennedy. Defs.' Br. 16. But the Rule repudiates the crux of Justice Kennedy's opinion (the "significant nexus" standard) and adopts the plurality's "two limitations" that Justice Kennedy rejected, *Rapanos*, 547 U.S. at 768-76—the requirements of relatively permanent flow and "continuous" surface connections. *See* Pls.' Br. 26-29. The Agencies' brief claims, without elaboration, that the Rule protects wetlands beyond those with a "continuous surface connection." Defs.' Br. 16 (citation omitted). But during the rulemaking, the Agencies asserted that each type of wetland protected under the Rule satisfied the plurality's requirement of a "continuous surface connection"—"or, in the terminology of the agencies' proposal, a direct hydrologic surface connection." 85 Fed. Reg. at 22,310; *see id.* at 22,309 (abutting wetlands have a "continuous surface or physical connection"); *id.* at 22,310 (wetlands flooded in a typical year are jurisdictional because they have a "continuous surface connection" during the flood event); *id.* at 22,311 (wetlands separated by a berm or bank are jurisdictional because such features are "indicators of a direct hydrologic surface connection").

Invoking *Brand X*, the Agencies insist that because "waters of the United States" is ambiguous, *Rapanos* did not "displace[ ]" their discretion to "reasonably reinterpret" the phrase. Defs.' Br. 15. That argument misses the point. *Brand X* explained that courts must defer to an agency's *reasonable* interpretation of a statute even if a court previously interpreted the statute differently, as long as the court did not conclude that its interpretation was the only permissible option. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-84 (2005). Nothing in *Brand X* erases the basic principle, applicable here, that a court should reject an agency's *unreasonable* interpretation. *See Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525-31 & n.2 (2009) (applying case law and "normal principles of construction" to conclude that agency's interpretation of statute was unreasonable and explaining that *Brand X* argument

"misses the point"); *Mercado-Zazueta v. Holder*, 580 F.3d 1102, 1112-13 (9th Cir. 2009) (an agency may not "put forward an interpretation that we already have examined under *Chevron* and found unreasonable"), *abrogated on other grounds by Holder v. Martinez Gutierrez*, 566 U.S. 583 (2012). Even if *Rapanos* did not set forth the only permissible interpretation of "waters of the United States," the concurring and dissenting opinions—applying ordinary principles of statutory construction—establish that the Agencies' interpretation is *unreasonable* and thus should be rejected by this Court.

The Agencies also claim their interpretation "appropriately balances" the water quality objective in section 101(a) of the Act, 33 U.S.C. § 1251(a), against the policies in section 101(b), *id.* § 1251(b). Defs.' Br. 17. This makes no sense, because sections 101(a) and 101(b) do not contain competing goals; they are complementary. Section 101(b) recognizes the states' key role in *advancing* the Act's objective in section 101(a) to protect "waters of the United States." *See* States Amicus Br. 4-9, ECF No. 80; Congress Amicus Br. 9-12, ECF No. 56. States fulfill this role in part by administering the Act's pollution control programs, Defs.' Br. 19, and also by imposing, at their discretion, protections for "waters of the United States" that are more stringent than federal requirements, Pls.' Br. 29-30. The Agencies argue that another purpose of section 101(b) is to "preserve traditional state authority," supposedly by narrowing the definition of "waters of the United States" and thus limiting the reach of the Act. Defs.' Br. 19. But preserving "state authority" does not require limiting the reach of the Act. Even when waters are protected under the Act, the statute does not "place any constraint on a State's power to regulate the quality of [those] waters more stringently than federal law might require." *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 723 (1994) (Stevens, J., concurring). The Agencies' claim that Congress gave them wide discretion to reduce water quality protections in favor of

states' rights is also unreasonable because it has "no natural limitation." *See Cook County. v. Wolf*, 962 F.3d 208, 228-29 (7th Cir. 2020). It would afford them unfettered discretion to strike "the balance" in any way they wish, regardless of the harms to water quality—protection of which is the sole objective of the Act. That cannot be what Congress intended.

The Agencies' remaining defenses are straw man arguments. Plaintiffs did not argue that the Agencies must exceed their statutory or constitutional authority in pursuit of improved water quality. *See* Defs.' Br. 18. Nor did Plaintiffs argue that the Agencies must regulate to the "broadest constitutionally permissible reach." *See id.*[6] Plaintiffs also did not argue that the Agencies must disregard considerations like administrative efficiency. *See id.* at 19 (citing *Reno v. Flores*, 507 U.S. 292, 311-13 (1993)). Rather, Plaintiffs argued that the Rule is unreasonable because it interprets the Act in a way that ignores—and undermines, rather than advances—the statute's sole objective to protect water quality. *Morrison v. National Australia Bank Ltd.*, cited by the Agencies, rejected a statutory interpretation that purported to advance a purpose that had "no textual support." 561 U.S. 247, 270 (2010). Here, by contrast, the statutory text makes clear that the Act's purpose is to restore and maintain the integrity of the Nation's waters. *See* 33 U.S.C. § 1251(a). By ignoring that purpose, the Agencies have failed to "give the statute the effect its language suggests." *Morrison*, 561 U.S. at 270.

The Agencies' reliance on *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers* is also misguided. In *SWANCC*, the Supreme Court held that the Agencies could not regulate certain "isolated" ponds on the sole basis that they provided habitat to migratory birds and thus had a link to interstate commerce. 531 U.S. 159, 164-67 (2001).

---

[6] Plaintiffs cited legislative history indicating that Congress intended "waters of the United States" to be given the broadest constitutional interpretation, Pls.' Br. 1, because it shows that the Agencies' extremely *narrow* interpretation is inconsistent with Congressional intent.

Nothing in *SWANCC* precludes the Agencies' authority to regulate wetlands and streams that have significant chemical, physical, and biological connections to navigable waters and thus are not "isolated." *See Rapanos*, 547 U.S. at 766-67 (Kennedy, J., concurring) (noting that a significant nexus was lacking between ponds at issue in *SWANCC* and navigable waters). The Agencies implicitly concede this. *See* 85 Fed. Reg. at 22,269 (claiming that *SWANCC* "calls into question the agencies' authority to regulate nonnavigable, isolated, intrastate waters *that lack a sufficient connection* to traditional navigable waters" (emphasis added)). *SWANCC* therefore does not "reject[ ] Plaintiffs' argument," Defs.' Br. 18, that it was unreasonable to interpret the statute as categorically excluding these critically important wetlands and streams. And *SWANCC* certainly does not support the Sacketts' claim that the Agencies were "compelled" to exclude these waters. *See* Def.-Int'rs' Br. 16.

### B. The Sacketts' radical arguments mischaracterize the statute and Supreme Court precedent

Whereas the Agencies claim they had nearly unlimited discretion in crafting the Rule, the Sacketts take the opposite extreme position that the Rule was "not a discretionary decision" because it was "compelled" by the statutory text. Def.-Int'rs' Br. 1. This unfounded argument is based on a misreading of the statute's text, legislative history, and Supreme Court precedent.

The Sacketts' legal theory is that the Clean Water Act applies only to "navigable-in-fact" waters and their abutting wetlands.[7] *Id.* at 4, 5-6. However, that cramped reading of the statute was rejected more than 45 years ago, *see NRDC v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975), because it is inconsistent with the Act's text and legislative history, which show that Congress

---

[7] The Sacketts repeatedly refer the Court to "the more extensive analysis" attached as an exhibit to their attorney's declaration. Def.-Int'rs' Br. 4; *see also id.* at 6. The Court should decline their "attempt to supplement" their twenty-page brief "with more pages of legal argument" than permitted by the Court's scheduling order. *Curran v. Aetna Life Ins. Co.*, No. 13-cv-00289, 2016 WL 3843085, at *8 (S.D.N.Y. July 11, 2016).

intended for "waters of the United States" to be interpreted broadly. *See* Pls.' Br. 1, 3. The Sacketts' theory has also been rejected by the Supreme Court, which has recognized that "waters of the United States" extend beyond navigable-in-fact waters and their abutting wetlands. *See Rapanos*, 547 U.S. at 742 (plurality opinion) (finding that the Act covers "relatively permanent" tributaries of navigable waters, and wetlands with "continuous" surface connections to those tributaries); *id*. at 779 (Kennedy, J., concurring) (interpreting the term to mean waters with a "significant nexus" to navigable waters); *id.* at 804 (Stevens, J., dissenting) (finding that the Army Corps reasonably interpreted the term broadly to cover certain ditches and streams).

Indeed, the Sacketts' claim that the Clean Water Act applies only to navigable-in-fact waters and their abutting wetlands is not even supported by the *Rapanos* plurality opinion, which the Sacketts mischaracterize as the "controlling" authority. *See* Def.-Int'rs' Br. 4; *see also id.* at 7 (describing their interpretation as "closer" to that of the *Rapanos* plurality). Regardless, the Sacketts' claim that the plurality opinion is controlling has been rejected by every circuit court to have considered the issue. *See* Pls.' Br. 5 & n.1 (citing cases). Most importantly, the First Circuit in *United States v. Johnson* rejected the idea that the *Rapanos* plurality opinion controlled. 467 F.3d 56, 66 (1st Cir. 2006). Faced with this precedent, the Sacketts misrepresent case law by insisting that the Supreme Court recently determined in *County of Maui v. Hawaii Wildlife Fund* that the *Rapanos* plurality is controlling, purportedly abrogating *Johnson*. *See* Def.-Int'rs' Br. 11-15. But *Maui* did not even address the meaning of "waters of the United States," much less decide that the *Rapanos* plurality controls. Rather, the *Maui* majority opinion cited the *Rapanos* plurality only once, to support its interpretation of an entirely different phrase in the Clean Water Act. *See Maui*, 140 S. Ct. at 1475. The Sacketts' reliance on other Supreme Court cases is similarly misplaced. Those cases, too, cited the *Rapanos* plurality opinion for reasons that have

nothing to do with the meaning of "waters of the United States."[8] The "mere fact" that the

Supreme Court has cited the *Rapanos* plurality opinion "approvingly for one point does not

imply [its] wholesale acceptance of each and every proposition" for which that opinion stands.

*Kholi v. Wall*, 582 F.3d 147, 152 n.5 (1st Cir. 2009). Because the *Rapanos* plurality is neither

controlling nor a reasonable interpretation of the statute, the Sacketts' argument that it "compels

the changes made to the Rule's definition of 'adjacent wetlands,'" Def.-Int'rs' Br. 4, fails.

The Sacketts' constitutional arguments are also meritless. First, as the Supreme Court

recognized in *United States v. Riverside Bayview Homes, Inc.*, Congress's powers under the

Commerce Clause are not limited to waters that meet the traditional tests of navigability. 474

U.S. 121, 133 (1985). Rather, "[i]t has long been settled that Congress has extensive authority

over this Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S.

164, 173 (1979). This extensive authority includes "the authority to regulate nonnavigable waters

when . . . necessary to achieve Congressional goals in protecting navigable waters." *United*

*States v. Deaton*, 332 F.3d 698, 707 (4th Cir. 2003); *see also Oklahoma ex rel. Phillips v. Guy F.*

*Atkinson Co.*, 313 U.S. 508, 525 (1941) ("There is no constitutional reason why Congress cannot

under the commerce power treat the watersheds as a key to flood control on navigable streams

---

[8] *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 508 n.21 (2008) (citing *Rapanos* plurality
for "the Court's 'oft-expressed skepticism toward reading the tea leaves of congressional
inaction'"); *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (citing *Rapanos* plurality for tenet that
"no law pursues its purpose at all costs" and that "textual limitations upon a law's scope are no
less a part of its 'purpose' than its substantive authorizations"); *Abramski v. United States*, 573
U.S. 169, 198 (2014) (Scalia, J., dissenting) (similar); *PPL Mont., LLC v. Montana*, 565 U.S.
576, 592 (2012) (noting that *Rapanos* plurality's and Justice Kennedy's opinions both cited an
earlier case); *Sackett v. EPA*, 566 U.S. 120, 124 (2012) (describing *Rapanos* and noting that "no
one rationale commanded a majority of the Court"); *U.S. Army Corps of Eng'rs v. Hawkes Co.*,
136 S. Ct. 1807, 1811-12, 1815 (2016) (citing *Rapanos* plurality's discussion of permitting
process); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625, 633 (2018) (similar and
quoting plurality's description of waters at issue in *Rapanos*).

and their tributaries."). As the Sixth Circuit observed shortly after the Clean Water Act was enacted, it would "make a mockery" of Congress's commerce power if it were limited to navigable waters, since those waters could then become "mere conduit[s] for upstream waste." *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974). In other words, Congress has the power to protect wetlands and streams if their degradation or destruction would significantly affect the integrity of navigable waters. Thus, a rule allowing federal regulation of these waters would "not raise . . . Commerce Clause concerns." *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring); *see also id.* at 803 (Stevens, J., dissenting) (Commerce Clause concern was "plainly not warranted" where wetlands were adjacent to tributaries of navigable waters and "play important roles in the watershed"). For that reason, there can also be no Tenth Amendment violation. *See New York v. United States*, 505 U.S. 144, 156 (1992).[9]

Second, while the Sacketts argue that interpreting the Act broadly violates the nondelegation doctrine, Def.-Int'rs' Br. 9, the Supreme Court itself has found that "waters of the United States" should be construed broadly, *Riverside Bayview*, 474 U.S. at 133. Moreover, the nondelegation rule is "extraordinarily difficult to violate." *United States v. Martinez-Flores*, 428 F.3d 22, 27 (1st Cir. 2005); *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001) (noting that the Supreme Court has found a violation of the doctrine "in only two statutes"). It is satisfied so long as the statute includes an "intelligible principle" to guide the agency when exercising its discretion. *Martinez-Flores*, 428 F.3d at 27 (citation omitted). While

---

[9] Although the Sacketts claim that the wetland on their property shows the constitutional problems with regulating non-abutting wetlands, *see* Def.-Int'rs' Br. 8, in reality, it shows why regulation of such wetlands is well within Congress's constitutional authority to protect navigable waters. EPA determined that the Sacketts' wetland, which is just 300 feet from a navigable lake, has "significant physical and biological impacts on [the lake]," such as "improving water quality" and "supporting fish and wildlife species." Order at 22, 24-27, *Sackett v. EPA*, No. 08-cv-00185 (D. Idaho Mar. 31, 2019), ECF No. 120.

"waters of the United States" may be a capacious phrase, the Act's purpose "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), establishes the requisite "determinate criterion" to guide the Agencies' interpretation, *Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 877 (9th Cir. 2003) (rejecting nondelegation challenge to another section of the Clean Water Act). Indeed, for many decades the Agencies have interpreted "waters of the United States" as broader than just navigable waters and their abutting wetlands. Although the Sacketts claim that such interpretations create nondelegation problems, none of the numerous court decisions involving those regulations, including multiple Supreme Court decisions, have found "waters of the United States" impossible to interpret or that the Agencies' discretion is unconstitutionally unrestrained.

## III.  The Agencies violated section 7 of the ESA

The Agencies argue that they did not violate section 7 of the ESA by failing to consult on the Rule's impacts to threatened and endangered species because they were "simply defining the extent of [their] regulatory jurisdiction" and because the Rule "does not affect listed species." Defs.' Br. 36. They are wrong on both fronts. First, section 7 applies to *all* discretionary actions; in defining "waters of the United States," the Agencies had the requisite discretion to trigger section 7. Second, the Agencies' "no effect" finding was both insufficient and arbitrary; the Rule may affect listed species by allowing more of their habitat to be degraded and destroyed without federal safeguards to mitigate or avoid that harm.

### A.  The Agencies had discretion to benefit endangered species

The Court should decline the Agencies' invitation to read section 7 as exempting regulations like the Navigable Waters Rule that define the scope of an agency's jurisdiction. *See id.* at 36. Congress could have enumerated specific types of discretionary federal actions subject to section 7's consultation requirement. Instead, it chose for section 7 to apply to "*any* action

authorized, funded, or carried out" by a federal agency. 16 U.S.C. § 1536(a)(2) (emphasis added); *see also* 50 C.F.R. § 402.02 (defining "action" as "*all* activities . . . *of any kind*," including "the promulgation of regulations" (emphases added)). "This language admits of no exception." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978); *see also* Pls.' Br. 6-7, 30-33.

The text of the Clean Water Act forecloses the Agencies' claim that they lacked discretion to consider protection of listed species as an "end in itself." Defs.' Br. 38-40. Two principal goals of the Clean Water Act are to "restore and maintain the . . . biological integrity of the Nation's waters" and "provide[ ] for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a).[10] The "use of [a] river" as "habitat" for fish or other species "directly reflects" these goals. *See PUD No. 1 of Jefferson Cnty.*, 511 U.S. at 714. In addition, the Act's legislative history reflects concern for the "myriad" species that rely on "wetlands and bays, estuaries and deltas," which Congress described as "the Nation's most biologically active areas." S. Rep. No. 95-370, at 10 (1977) (legislative history of 1977 amendments); *see also* EPA Office of Gen. Couns., Legal Issues Concerning Section 404(B)(1) Guidelines, 1983 WL 44288, at *2 (Mar. 17, 1983) (noting congressional concern that destruction of wetlands would harm aquatic habitat). By declaring protection of wildlife as a primary goal and by recognizing that preserving the integrity of navigable waters includes preserving the species that inhabit them, the Clean Water Act gives the Agencies discretion to consider protection of listed species when deciding which waters are protected under the Act.

The Agencies are unable to align these statutory objectives with their position. Instead, they erroneously argue that the Supreme Court's decision in *SWANCC* precluded them from

---

[10] Congress stressed the importance of the goal of protecting wildlife by repeating it in many sections of the statute. *See, e.g.*, 33 U.S.C. §§ 1252(a), 1311(g)(2)(C), 1311(h), 1311(m)(2), 1312(a), 1313(c)(2)(a), 1313(d), 1314(a), 1314(l)(1)(A), 1315(b)(1)(C), 1343(c)(1), 1344(c).

considering "ecological considerations" as an "independent basis" for asserting jurisdiction over waters. Defs.' Br. 40 (quoting *Rapanos* plurality's description of *SWANCC*). As explained *supra* p. 23, *SWANCC* addressed whether the Agencies could regulate certain "isolated" waters based on a species' presence, irrespective of its impact on navigable waters. *SWANCC* did not address whether the Agencies can consider aquatic species or other wildlife when assessing whether streams and wetlands should be protected under the Act because of their impact on navigable waters' biological integrity. *See* 80 Fed. Reg. at 37,068 (finding for purposes of the Clean Water Rule that certain streams and wetlands were protected under the Act in part because they provide habitat for aquatic species located in downstream waters). These ecological considerations are not "independent" from water quality, *contra* Defs.' Br. 40—they are "integral" to it. *Rapanos*, 547 U.S. at 796 (Stevens, J., dissenting). The Agencies thus had discretion to consider them. *See Riverside Bayview*, 474 U.S. at 134-35 (deferring to Corps's "ecological judgment" that wetlands affect water quality in part because they provide "'food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic . . . species'" (citation omitted)).[11]

The Agencies' own statements also demonstrate that they had discretion to consider listed species in defining "waters of the United States." For example, the Agencies state that their "tributary" definition "rests" on the "ecological interconnection" between streams and downstream waters. 85 Fed. Reg. at 22,288 (quoting *Rapanos*, 547 U.S. at 780 (Kennedy, J.,

---

[11] Indeed, post-*SWANCC*, the Agencies considered ecological factors, such as whether a water provided wildlife habitat, as a basis for asserting jurisdiction over that water. *See, e.g.*, Wu Decl. Ex. 1, Rapanos Guidance at 11. And circuit courts endorsed that practice. *See, e.g.*, *United States v. Cundiff*, 555 F.3d 200, 211 (6th Cir. 2009) (wetland jurisdictional in part because it performed "significant ecological functions," including "providing an important habitat for plants and wildlife"); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000-01 (9th Cir. 2007) (upholding district court's findings that waters were jurisdictional in part because of their "significant ecological connection" to navigable water, including evidence that they "support[ed] substantial bird, mammal and fish populations").

concurring)). Section 7 consultation is directly relevant to that inquiry, as the process could inform how certain species move throughout the river network, and whether that movement creates an ecological interconnection between streams, wetlands, and downstream waters. Further, the Agencies argue that, when defining "waters of the United States," they had ample discretion to weigh policy and "practical considerations," like consequences to "water transfers." Defs.' Br. 27; *see also* Pls.' Br. 32. The Agencies thus claim they had discretion to address "the potential impact . . . on longstanding water management practices," 85 Fed. Reg. at 22,278, which is not a statutory goal, yet they purport to lack discretion to address the potential impact on wildlife, the preservation of which *is* an express statutory goal. That is illogical.

The Agencies' wide discretion to define "waters of the United States" distinguishes this case from *Center for Food Safety v. Vilsack*, 718 F.3d 829 (9th Cir. 2013). There, the Ninth Circuit held that because the Department of Agriculture lacked authority to regulate genetically modified alfalfa under the Plant Protection Act, its decision to deregulate the plant was a "nondiscretionary act." *Id.* at 842; *see also id.* at 839 (explaining that if the agency had discretion under the statute to regulate genetically modified alfalfa, the ESA would require consultation). Here, the Agencies do not argue that they lacked authority to regulate all waters excluded from the Rule's definition of "waters of the United States," such that their decision to remove federal protections from those waters was nondiscretionary. To the contrary, the Agencies claim that "no one clear answer exists," Defs.' Br. 31, and suggest that regulating the broader set of waters covered by the 1980s Regulations also would have been legally permissible, *see infra* p. 32; *see also* Defs.' Br. 31 (asserting that "many reasonable definitions" could have been adopted). Because even the Agencies effectively concede that they could have chosen to assert jurisdiction over some additional waters, the Rule was a discretionary act under section 7.

The other cases on which the Agencies rely are inapposite because they involved statutory provisions that cabined agency discretion to consideration of enumerated, exclusive factors. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007) ("mandatory" provision of Clean Water Act that included an "exclusive" list of "nine specified criteria" for agency transfer of power to states); *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998) (same provision); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1221 (9th Cir. 2015) (statute mandating approval of plan if it met "six enumerated requirements"). And in *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, the relevant statute allowed the agency to amend licenses only "upon mutual agreement between the licensee and the [agency]," thus limiting the agency's discretion to unilaterally amend licenses to protect species. 962 F.2d 27, 32 (D.C. Cir. 1992) (quoting 16 U.S.C. § 799). These cases stand for the same point: when an agency "is *required* by statute to undertake" an action based on criteria unrelated to protection of wildlife, the agency may not go beyond those limitations by basing its decision on factors to benefit endangered species. *Home Builders*, 551 U.S. at 669. As explained, the Clean Water Act does not include such constraints on the Agencies' discretion to define "waters of the United States." To the contrary, the objectives of the ESA and Clean Water Act are "intertwined." *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781-82 (9th Cir. 2011).

The broad discretion afforded to the Agencies here is more akin to *American Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559 (D.C. Cir. 2019). There, EPA claimed that it lacked discretion to benefit endangered species when setting fuel volumes under the Clean Air Act. *Id.* at 597. The D.C. Circuit rejected that contention because the Act allowed EPA to reduce fuel volumes based on severe environmental harms or a test that included "concerns about wetland conversion, wildlife habitat, and water quality." *Id*. Similarly, in *Florida Key Deer v.*

*Paulison*, the Eleventh Circuit held that the Federal Emergency Management Agency had discretion to consider listed species when issuing flood insurance because Congress "set out several purposes for [the agency] to consider," which were "broad" and included "protection of 'natural and beneficial floodplain functions.'" 522 F.3d 1133, 1142 (11th Cir. 2008) (quoting 42 U.S.C. § 4022(b)(1)(B)). Here, like the statutory provisions at issue in *American Fuel* and *Paulison*, the congressional directives to protect "wildlife" and "biological integrity," 33 U.S.C. § 1251(a), are broad and compatible with the goals of the ESA. Therefore, section 7 applies.

Finally, the Agencies exercised discretion, and thus triggered the ESA, in deciding to issue a new definition in the first place. *See* Pls.' Br. 31. While the Agencies claim that they "had" to replace the Clean Water Rule because it was "unlawful," Defs.' Br. 41, that is irrelevant. The Navigable Waters Rule did not replace the Clean Water Rule. It replaced the Agencies' rule that repealed the Clean Water Rule and recodified the 1980s Regulations. *See* Pls.' Br. 9. The Agencies never claimed that the 1980s Regulations were illegal—only that they were not "preferable." *See* 85 Fed. Reg. at 22,272. The Agencies therefore had discretion to keep the 1980s Regulations in place if doing so would avoid jeopardizing endangered species.

### B.    The Agencies' "no effect" determination was insufficient and arbitrary

The Agencies were required to determine whether the Rule "may affect" listed species. 50 C.F.R. § 402.14(a). The Agencies claim they satisfied that requirement in their response to public comments, where they argued that the Rule does not affect listed species because it is not the *legal* cause of any harm. *See* Defs.' Br. 41 (citing RTC § 1.5.2, pp. 89-90). But the Agencies' response to public comments, which lacked any analysis of the rulemaking's potential effects on listed species, did not qualify as a "no effect" finding under the ESA. *See* Pls.' Br. 35 (citing cases); *see also Citizens for Better Forestry v. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1095 (N.D. Cal. 2007) (court "unable to find *any* Ninth Circuit cases" affirming "no effect" finding "without

the agency having engaged in some type of analysis in the form of a [biological assessment] or . . . consultation"). As a result, the Court should order the Agencies to make a proper effects determination under the statute.

Even if the Court were to find that the Agencies' response to public comments constituted a "no effect" determination, that determination was arbitrary and capricious. The Agencies claim that the rulemaking has no effect on listed species because it is not a "but for" cause of environmental degradation and because effects to listed species are not "reasonably certain to occur." Defs.' Br. 42 (citations omitted). Both arguments fail.

First, the Rule is a "but for" cause of degradation and destruction of wildlife habitat. But for the Rule, attempts to fill or destroy now-excluded streams and wetlands would have been subject to Clean Water Act permitting and mitigation efforts, which provide environmental and species protections. Now those protections are gone, and in many cases that will mean pollution or destruction of habitat. Also, but for the Rule, projects seeking to fill or destroy now-excluded waters would have been required to comply with project-specific section 7 consultation. That is because the Army Corps's issuance of a Clean Water Act permit is a discretionary federal action independently subject to consultation requirements. *See* 33 C.F.R. § 325.2(b)(5). Thus, but for the Rule, if a future project would have jeopardized listed species, the Corps could not have issued a Clean Water Act permit and the project could not proceed. *See* 16 U.S.C. § 1536(a)(2), (b)(3)(A). Now, countless destructive projects in waterbodies excluded from the Rule can move forward without a Clean Water Act permit and without the protections afforded by consultation.

The Agencies' attempt to obscure this reality falters. They claim that section 7 consultation will still be required for projects that involve federal funding or approval under other statutes. *See* Defs.' Br. 42-43. Yet they give no estimate of how many projects may fall

into this category. In any event, the Agencies' claim that section 7 consultation may be required for some individual projects does not relieve them of their obligation to consult on the Rule as a whole now, because only consultation that assesses the Rule's impacts "as a whole" can prevent "piece-meal destruction of . . . habitat." *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005). Indeed, myriad cases have required consultation for high-level "programmatic" decisions, rejecting agency insistence that subsequent, site-specific consultation is sufficient. *See, e.g.*, *Citizens for Better Forestry*, 481 F. Supp. 2d at 1095, 1097; *Ctr. for Biological Diversity v. FWS*, 623 F. Supp. 2d 1044, 1051-52 (N.D. Cal. 2009); *Brownlee*, 402 F. Supp. 2d at 10; *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 292-94 (9th Cir. 1992). For the same reason, the Agencies are wrong that effects to listed species can be addressed in the future under section 9 of the ESA, which makes it unlawful to "take" listed species without a permit, the issuance of which triggers section 7 consultation. *See* Defs.' Br. 43. Future site-specific consultations when section 9 is implicated can supplement an analysis of how the Rule, as a whole, may affect listed species. But they cannot supplant it. The Agencies' reliance on section 9 is also misplaced because section 9 only requires permits before modifying habitat if it "actually kills or injures wildlife." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995). It does not prevent "broad . . . adverse habitat modifications" like section 7 does. *Id.*

Second, the Rule is reasonably certain to result in destruction and degradation of wildlife habitat, which may harm ESA-listed species. As Plaintiffs explained, *see* Pls.' Br. 37, even in their flawed and incomplete Economic Analysis, the Agencies estimated that the Rule would result in millions of dollars in foregone wetland benefits due to increased wetland loss. *See* Defs.' Br. Ex. 4, EA at xxiii, 72. In addition to the decline in "non-abutting wetland acreage," the Agencies also anticipated a potential decline in "ephemeral stream miles and the riparian areas

associated with ephemeral streams" as compared to the preexisting regulations. *Id*. at 120; *see also* Defs.' Br. Ex. 3, RPA at 22 (noting that "many" non-relatively permanent waters, such as ephemeral streams, were jurisdictional under the preexisting regulations, and anticipating a particularly big change in jurisdiction in the arid west where ephemeral streams are especially prevalent). These facts parallel those in *California ex rel. Lockyer v. U.S. Department of Agriculture*, where the agency replaced one rule with another that provided fewer across-the-board protections for roadless areas in national forests. 575 F.3d 999, 1004-05 (9th Cir. 2009). Faced with an ESA challenge, the agency claimed that the rule was simply procedural and "independently would have no effect on the environment." *Id*. at 1019. The Ninth Circuit rejected this argument, explaining that the repeal of protections afforded to roadless areas "*may affect* federally listed species and their critical habitats," because the previous regime "'would impose greater protections.'" *Id*. So, too, here: the 1980s Regulations provided greater protections to ephemeral streams and wetlands than the new Rule. Replacing those regulations with the less-protective Rule "may affect" species that live in or rely on those waters.

Nor are the effects of the Rule, which allows immediate pollution without federal oversight, too "remote in time" or part of a "lengthy causal chain." Defs.' Br. 43 (quoting RTC § 1.5.2). In *Center for Biological Diversity v. U.S. Department of Housing & Urban Development*, there was a long chain of events between the agency action and impacts to endangered species: the federal agencies guaranteed loans issued by private actors, who provided financial assistance to borrowers, who built residential and commercial developments, which pumped groundwater from an aquifer, which supplied water to a river, which provided habitat for listed species. *See* 541 F. Supp. 2d 1091, 1093-99 (D. Ariz. 2009) (district court decision affirmed in unpublished case Defendants cite). Here, by contrast, there are only two links in the

causal chain: the Agencies removed federal regulatory protections for broad swaths of waters that provide habitat for listed species, and now third parties can fill or discharge pollutants into that habitat without federal oversight. This causal chain is no more extensive than other agency actions that courts have found "may affect" listed species. *See, e.g.*, *Paulison*, 522 F.3d at 1143-44 (flood insurance program affected species "because development is encouraged and in effect authorized by . . . flood insurance"); *Citizens for Better Forestry*, 481 F. Supp. 2d at 1096-97 (forest management regulations removing protections for forest resources satisfied "may affect" threshold due to indirect impacts on listed species); *California ex rel. Lockyer*, 575 F.3d at 1019; *see also Am. Fuel & Petrochem. Mfrs.*, 937 F.3d at 593-94, 597-98 (requiring EPA to analyze effects of increased crop cultivation by private parties as a result of its decision setting targets for renewable fuels). Far from "hypothetical," Defs.' Br. 44, increased destruction of wildlife habitat is a predictable consequence of the Rule, based on the Agencies' own analysis. The Agencies' "no effect" determination was therefore arbitrary and capricious.

## IV.     Plaintiffs' challenge is jurisdictionally and prudentially ripe

Plaintiffs' claims are ripe. *Contra* Defs.' Br. 10-12. The ripeness inquiry involves two prongs: "fitness" and "hardship." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). The fitness prong has traditionally involved "both jurisdictional and prudential components," *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013), although "it is unclear whether prudential ripeness concerns . . . may still be entertained" given recent Supreme Court case law, *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021). The jurisdictional component of "fitness" concerns "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Roman Catholic Bishop of Springfield*, 724 F.3d at 89. The prudential component asks whether delaying review may result in "the dissipation of the legal dispute without need for decision," *id.* (citation

36

omitted); it involves questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," *id.* at 89-90 (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995)). The "hardship" prong of ripeness is "wholly prudential," and concerns the harm from withholding a decision until a later point in time. *Reddy*, 845 F.3d at 501 (citation omitted). Plaintiffs' lawsuit satisfies both prongs of the ripeness test.

First, Plaintiffs' challenge satisfies the fitness prong because there is a live controversy between the parties and because the legal issues require no further factual development. Plaintiffs have satisfied Article III's case-or-controversy requirement with evidence that the Rule allows destruction and degradation of numerous streams and wetlands, creating a substantial threat of harm to waters in which Plaintiffs' members have protected interests. *See* Pls.' Br. 36-43; *Reddy*, 845 F.3d at 500 ("injury is imminent . . . if there is a substantial risk that harm will occur"); *see also Del. Riverkeeper Network v. EPA*, No. 20-cv-3412, 2020 WL 7488962, at *4 (E.D. Pa. Dec. 18, 2020) (Clean Water Act regulations created "substantial threat of real harm" where it was "likely" they would be applied in a way that harmed plaintiffs). Plaintiffs' lawsuit also involves "a facial challenge to a final rule based on purely legal claims." *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*, --- F. Supp. 3d ----, 2020 WL 6390143, at *6 (D. Mass. Oct. 25, 2020) (such actions are "presumptively" ripe); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (claim was "fit" where it presented "an issue that is 'purely legal, and will not be clarified by further factual development'" (citation omitted)). Plaintiffs allege that the Rule is arbitrary and capricious, not in accordance with the Clean Water Act, and was issued in violation of the ESA. It is "well-established" that such claims "'present purely legal issues.'" *See Cement*

*Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) (citation omitted).[12] Moreover, because the Rule has been in effect since June 2020, and is still in effect, Plaintiffs' claims do not rest on "future events that may not occur," *contra* Defs.' Br. 12 (citation omitted), and this dispute will not "dissipat[e] . . . without need for decision," *Roman Catholic Bishop of Springfield*, 724 F.3d at 89 (citation omitted). This case is thus entirely unlike *CTIA v. FCC*, cited by the Agencies, where the regulation had yet to take effect and may never have taken effect in its then-current form, *see* 530 F.3d 984, 987-88 (D.C. Cir. 2008).

The legal flaws in the Rule, such as the Agencies' failure to provide a reasoned explanation or engage in ESA consultation, are unrelated to its application. The Court therefore will not be better positioned to address Plaintiffs' claims in the context of a "concrete activity" applying the Rule to specific waters. *Contra* Defs.' Br. 11. The Agencies' reliance on *National Park Hospitality Association v. Department of Interior* is misplaced. In that case, the government acknowledged that its legal position could change depending on the factual scenario involved, and the plaintiffs likewise relied on specific factual scenarios to support their legal arguments. 538 U.S. 803, 812 (2003). Here, by contrast, the Rule's legality turns solely on the applicable statutes, case law, and administrative record. Thus, its "application in a specific context would not be helpful to the Court's analysis." *Del. Riverkeeper Network*, 2020 WL 7488962, at *4.

In any event, Defendants ignore that Plaintiffs *did* supply evidence of "concrete action[s]" applying the Rule in a way that threatens Plaintiffs' members. Defs.' Br. 11. Plaintiffs

---

[12] The fact that Plaintiffs' claims of injury *for purposes of demonstrating standing* "are not purely legal," Defs.' Br. 12, does not show that Plaintiffs' claims are unripe. Defendants' argument to the contrary makes no sense; it would mean no case could ever involve purely legal issues, since allegations of injury to show standing are by their nature factual. *See Animal Welfare Inst. v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010) ("Plaintiffs must clearly allege *facts* demonstrating standing." (emphasis added)).

identified several decisions by the Army Corps that specific streams and wetlands can now be filled without a Clean Water Act permit, posing substantial risks to waters that Plaintiffs' members use. *See* Pls.' Br. 38 (citing jurisdictional determination in Rio Rancho); *id.* at 39 (citing jurisdictional determinations near Chaco National Park); *id.* at 40 n.11 (citing jurisdictional determinations near Estero Bay); *id.* at 43 n.12 (citing jurisdictional determination near Lake Okeechobee). There are yet more "concrete" actions under the Rule that threaten to harm Plaintiffs' members. For example, the Army Corps recently determined that over 300 acres of wetlands next to Georgia's Okefenokee National Wildlife Refuge no longer qualify as "waters of the United States" under the Rule, paving the way for a proposed mining project to destroy those wetlands without a Clean Water Act permit. S*ee* Suppl. Wu Decl. Ex. 8 (Corps jurisdictional determination) & Ex. 9 (EPA letter concerning earlier version of mining project before Corps determined that wetlands were no longer federally protected). The mining project could cause "substantial and unacceptable impacts" to the Okefenokee Refuge. Suppl. Wu Decl. Ex. 9, EPA letter at 3; *see also* Suppl. Wu Decl. Ex. 10, U.S. Fish & Wildlife Service letter at 2 (cautioning that earlier version of mining project posed "substantial risks" for significant environmental effects). This creates a substantial risk of harm to NRDC members who enjoy visiting the Refuge. *See* Eng Decl. ¶¶ 4-8; Tilley Decl. ¶¶ 6-10, 12; Willis Decl. ¶¶ 3-8.

Second, Plaintiffs would suffer hardship if the Court withholds judicial review. Plaintiffs' members have substantial interests in numerous waters that, as a result of the Rule, can be polluted or destroyed without federal safeguards. *See* Pls.' Br. 36-44. This threat of harm is immediate and, once it occurs, irreparable. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 709 (9th Cir. 2009) ("the irreparable nature of environmental impact" constituted hardship to petitioner of withholding review). Indeed, the Rule has been in effect for just eight

months and the Agencies have already determined that over 4,500 ephemeral waters and

wetlands do not qualify for federal protection under the Rule. Devine Decl. ¶¶ 11-12. Because

the Agencies are currently applying the Rule in a way that harms Plaintiffs, delayed review of

the Rule would cause Plaintiffs hardship. This case is ripe.

## V.      Vacatur of the entire Rule is both appropriate and necessary

No further briefing on remedy is warranted. Vacatur is the presumptive remedy when a

rule is held to violate the APA and ESA. *See* Pls.' Br. 45 (citing cases and 5 U.S.C. § 706(2));

*see also Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 32 (1st Cir. 1999)

("Where a regulation is not adequately supported, the normal practice is to set it aside pending

further proceedings.").

In an attempt to avoid complete vacatur, the Agencies ask the Court to take a more

complicated route and narrowly tailor a remedy either by limiting the Rule's vacatur to specific

parties or regions or by vacating only part of the Rule. Neither approach is warranted. A remedy

limited to particular parties or regions is both improper and potentially impossible.[13] An agency

rule found to be unlawful in whole is not "set aside" for certain plaintiffs or geographic areas;

rather, the rule "shall" be "set aside" in full. *Cook County v. Wolf*, --- F. Supp. 3d ----, 2020 WL

6393005, at *3-4 (N.D. Ill. Nov. 2, 2020) (citing *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018));

*see also California v. Azar*, --- F. Supp. 3d ----, 2020 WL 6733641, at *9 (N.D. Cal. Nov. 17,

2020); *O.A.*, 404 F. Supp. 3d at 153 (vacatur "invalidate[s]" the agency action; it does "not

simply . . . forbid[ ] its application to a particular individual" (quoting *Lujan v. Nat'l Wildlife*

---

[13] "As a practical matter, . . . how could [a] [c]ourt vacate [a challenged] Rule with respect to
the . . . plaintiffs in [a] case without vacating the Rule writ large? What would it mean to 'vacate'
a rule as to some but not other members of the public? What would appear in the Code of
Federal Regulations?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019).

*Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting))). Because a rule cannot be vacated just for a limited group of parties, "[a]ll of the courts that have been presented with the possibility of such a remedy have rejected it." *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1025 (N.D. Cal. 2019) (collecting cases).

In arguing against nationwide relief, the Agencies mistakenly rely on *Monsanto Co. v. Geertson Seed Farms*. In that case, the Supreme Court explained that an injunction should not be granted if a "less drastic remedy," such as "partial or complete vacatur" is sufficient to address plaintiffs' injury. 561 U.S. 139, 165-66 (2010). In other words, in *Monsanto*, a "less drastic remedy" *was* complete vacatur—the appropriate remedy here. Although the Court recognized that vacating part of the agency decision might also be possible, that is not an option here because the violations are "numerous, fundamental, and far-reaching." *New York v. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019). Each violation—the failure to consider water quality, lack of record support or reasoned explanation, and noncompliance with the Clean Water Act and ESA—infects the entire Rule and shows that the rulemaking process was "shot through with glaring legal defects." *Id.* As a result, no illegal portions of the rule can be "severed," and the entire Rule must be vacated. *Id.*

Remand without vacatur is also inappropriate, and the Agencies did not argue otherwise. Courts remand without vacatur where the error was not serious, or where vacatur would be particularly disruptive, *see Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), neither of which is the case here. The Agencies' APA, Clean Water Act, and ESA violations are fundamental flaws that require the Agencies to "redo [the rulemaking] from the ground up." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008); *see NRDC v. EPA*, No. 19-cv-5174, 2020 WL 2769491, at *1 (S.D.N.Y. Apr. 15, 2020) (failure to explain policy

change and lack of record support were "serious" deficiencies warranting vacatur); *Comite de Apoyo v. Solis*, 933 F. Supp. 2d 700, 715 (E.D. Pa. 2013) (failure to comply with statutory mandate was serious error warranting vacatur); *Nat'l Parks Conserv. Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20-22 (D.D.C. 2014) (failure to initiate section 7 consultation was serious flaw that warranted vacatur). And no significant disruptive consequences will flow from vacating the Rule. It will simply result in the 1980s Regulations going back into effect—regulations that were in effect nationwide immediately before the Navigable Waters Rule, and for several decades before 2015. *Cf. Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) ("Little confusion or inefficiency will result from reinstating a regulatory regime that was in place" for several decades). The Agencies themselves have described the 1980s Regulations as providing "regulatory certainty." 85 Fed. Reg. at 22,260. Were the Rule to remain in place on remand, on the other hand, there would likely be a rush by industry to get decisions from the Army Corps—before a new rule is promulgated—that certain waters are exempt from federal regulation. These "jurisdictional determinations" are generally valid for five years, *id.* at 22,331-32, and so would allow pollution of those waters without federal oversight even if the Agencies issue a more protective rule. The environmental damage would be widespread and potentially irreversible. These are not speculative threats; the Army Corps already decided that thousands of waters across the country are not protected under the Rule, paving the way for them to be destroyed. *See* Devine Decl. ¶¶ 8, 11, 12. Vacatur is thus not only appropriate, but necessary to protect the environmental values that the Clean Water Act and ESA were enacted to preserve.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion, and vacate the Rule.

Dated: February 16, 2021                  Respectfully submitted,

*/s/ Jolie McLaughlin*
Jolie McLaughlin, *pro hac vice*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 995-5902
Email: jdmclaughlin@nrdc.org

Nancy S. Marks, Bar No. 542204
Michelle Wu, *pro hac vice*
Catherine Marlantes Rahm, *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Phone: (212) 727-4414
Email: nmarks@nrdc.org

*Counsel for Plaintiffs Clean Wisconsin, Natural
Resources Defense Council, New Mexico
Wilderness Alliance, and Prairie Rivers Network*

*/s/ Heather A. Govern*
Heather A. Govern, Bar No. 688482
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Phone: (617) 850-1765
Email: hgovern@clf.org

Elena Mihaly, Bar No. 687387
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
Phone: (802) 622-3012
Email: emihaly@clf.org

*Counsel for Plaintiffs Conservation Law
Foundation, Connecticut River Conservancy,
Massachusetts Audubon Society, and Merrimack
River Watershed Council*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 16, 2021, I caused the foregoing **PLAINTIFFS'**

**COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND**

**RESPONSE IN OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**, and

attached declarations, to be filed and served upon counsel of record via the Court's CM/ECF

filing system.

Dated:  February 16, 2021                          */s/ Jolie McLaughlin*